# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE, 310 First Street S.E., Washington, D.C. 20003, | ) ) ) ) ) |
| *Plaintiff*, | ) ) ) |
| v. | ) ) |
| NANCY PELOSI, in her official capacity as Speaker of the United States House of Representatives, 1236 Longworth House Office Building Washington, D.C. 20515; | ) ) ) ) ) ) |
| BENNIE G. THOMPSON, in his official capacity as Chair of the Select Committee to Investigate the January 6th Attack on the United States Capitol, 2466 Rayburn House Office Building Washington, D.C. 20515; | ) ) ) ) ) ) ) |
| ELIZABETH L. CHENEY, in her official capacity as Vice Chair of the Select Committee to Investigate the January 6th Attack on the United States Capitol, 416 Cannon House Office Building Washington, D.C. 20515; | ) ) ) ) ) ) ) |
| ADAM B. SCHIFF, in his official capacity as a member of the United States House of Representatives, 2309 Rayburn House Office Building Washington, D.C. 20515; | ) ) ) ) ) ) |
| JAMIE B. RASKIN, in his official capacity as a member of the United States House of Representatives, 2242 Rayburn House Office Building Washington, D.C. 20515; | ) ) ) ) ) ) |
| SUSAN E. LOFGREN, in her official | ) |

**Case No. 1:22-cv-00659-TJK**

capacity as a member of the United States          )
House of Representatives,                          )
1401 Longworth House Office Building               )
Washington, D.C. 20515;                            )
                                                   )
ELAINE G. LURIA, in her official                   )
capacity as a member of the United States          )
House of Representatives,                          )
412 Cannon House Office Building                    )
Washington, D.C. 20515;                            )
                                                   )
PETER R. AGUILAR, in his official                  )
capacity as a member of the United States          )
House of Representatives,                          )
109 Cannon House Office Building                    )
Washington, D.C. 20515;                            )
                                                   )
STEPHANIE MURPHY, in her official                  )
capacity as a member of the United States          )
House of Representatives,                          )
1710 Longworth House Office Building               )
Washington, D.C. 20515;                            )
                                                   )
ADAM D. KINZINGER, in his official                 )
capacity as a member of the United States          )
House of Representatives,                          )
2245 Rayburn House Office Building                  )
Washington, D.C. 20515;                            )
                                                   )
SELECT COMMITTEE TO                                )
INVESTIGATE THE JANUARY 6TH                        )
ATTACK ON THE UNITED STATES                        )
CAPITOL,                                           )
Longworth House Office Building                     )
Washington, D.C. 20515,                            )
                                                   )
SALESFORCE.COM, INC.                               )
a Delaware corporation at Salesforce Tower,)
415 Mission Street, 3rd Floor, San Francisco,)
California, 94105                                   )
                                                   )
            *Defendants*.                          )
_____)

**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. Plaintiff, the Republican National Committee ("RNC"), brings this complaint seeking declaratory and injunctive relief to prohibit the enforcement of an overbroad, unauthorized subpoena issued by the U.S. House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Select Committee") seeking non-public information on Republican donors, volunteers, and supporters and the internal deliberative processes of the RNC in violation of the Constitution and laws of the United States.

2. The Select Committee's subpoena to Salesforce.com ("Salesforce"), a key data and digital communications vendor to the RNC, vastly exceeds Congress' limited subpoena power and infringes on rights of the RNC, its constituent members, donors, and other supporters. The RNC and its millions of supporters face an unprecedented threat that will undoubtedly chill their First Amendment rights and expose the RNC's supporters to reprisals and harassment.

3. Digital communication has revolutionized how political parties and other non-profit organizations exercise their core First Amendment rights of political speech and association. The ability of the RNC and other political groups to interact virtually with millions of Americans through media like email to recruit volunteers, persuade voters, convey political messages, and fundraise has become a central and core component of their political activities.

4. To this end, organizations like the RNC now routinely engage vendors like Salesforce to help develop and execute technical aspects of these digital communication strategies. In doing so, political organizations across the political spectrum collect and maintain significant amounts of data regarding these efforts, including confidential and sensitive information about private individuals with whom the organizations have engaged.

5. The Select Committee's subpoena ("Salesforce Subpoena") includes a staggeringly broad and unduly burdensome set of requests "referring or relating to" RNC documents that have no connection to the attack on January 6, 2021.  Without any limitation to the events of January 6, the Salesforce Subpoena demands production of sensitive and proprietary data over more than a two-month period, which would give the Select Committee unprecedented access to the RNC's internal political strategies and to private, personal information regarding its supporters.

6. If forced to comply, Salesforce would disclose records regarding whether and how individual RNC supporters have responded to emails (including at what time they opened such emails), reacted to specific political messaging, signed any RNC petitions, completed any surveys on specific issues and policy proposals, or responded to specific fundraising appeals. It would also include information regarding individual voting habits, involvement in various coalition groups, and even what political merchandise they liked best. "[T]he subject matter of these materials represents the very heart of the organism which the [F]irst [A]mendment was intended to nurture and protect: political expression and association concerning federal elections and officeholding." *FEC v. Machinists Non-Partisan Political League*, 655 F.2d 380, 388 (D.C. Cir. 1981).

7. The Select Committee's fishing expedition would only serve to chill the RNC's and its supporters' First Amendment rights, while providing their political opponents with an all-access pass to confidential RNC political strategies and the personal information of millions of its supporters. Worryingly, the information targeted is universally for persons opposed to the political party in control of the U.S. House of Representatives and the Select Committee.

8. If allowed to stand, this unprecedented sweep of a national political party's donors' and supporters' private information will surely chill constitutionally protected political activity and

subject the RNC's supporters to the risk of reprisals by those who disagree with their support of the Republican Party and its candidates.

9. To be sure, this lawsuit is not intended to circumscribe Congress' legislative power to address the attack on the Capitol on January 6, 2021.  Rather, the RNC has been forced to bring this lawsuit in order to ensure that the events of that day are not used as a pretense to indiscriminately rifle through the internal affairs and deliberations of one of the country's two major political parties by an irregularly composed Select Committee dominated by members of the other.

10. Plaintiff RNC seeks immediate declaratory and injunctive relief to protect its legal rights and prevent Salesforce from disclosing the subpoenaed records, and the Select Committee from obtaining information it has no legal right to subpoena.

## PARTIES

11.  The RNC is a national political party with its principal place of business at 310 First Street, S.E., Washington D.C., 20003.  In addition to managing the Republican Party's business affairs at the national level, the RNC represents tens of millions of  Republicans in all 50 states, the District of Columbia, and the U.S. territories.  It is comprised of 168 voting members representing state and territorial Republican Party organizations.[1]

12. Defendant Nancy Pelosi is a Democratic member of the U.S. House of Representatives and Speaker of the House.

13. Defendant Bennie G. Thompson is a Democratic member of the U.S. House of Representatives and Chairman of the Select Committee to Investigate the January 6th Attack on

---

[1] The RNC is also a participant in the Trump Make America Great Again Committee ("TMAGAC"), a joint fundraising committee, whose data are owned by the RNC and also demanded by the Select Committee.

the United States Capitol.  The Salesforce Subpoena was issued on his authority as the Select Committee Chairman.

14. Defendant Elizabeth L. Cheney is a Republican member of the U.S. House of Representatives and member of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

15. Defendant Adam B. Schiff is a Democratic member of the U.S. House of Representatives and member of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

16. Defendant Jamie B. Raskin is a Democratic member of the U.S. House of Representatives and member of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

17. Defendant Susan E. Lofgren is a Democratic member of the U.S. House of Representatives and member of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

18. Defendant Elaine G. Luria is a Democratic member of the U.S. House of Representatives and member of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

19. Defendant Peter R. Aguilar is a Democratic member of the U.S. House of Representatives and member of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

20. Defendant Stephanie Murphy is a Democratic member of the U.S. House of Representatives and member of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

21. Defendant Adam D. Kinzinger is a Republican member of the U.S. House of Representatives and member of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

22. Defendant Select Committee to Investigate the January 6th Attack on the United States Capitol is a select committee created by House Resolution 503 ("H. Res. 503") passed by the U.S. House of Representatives on June 30, 2021.

23. Defendant Salesforce is a key data and digital communications vendor to the RNC and the target of the Salesforce Subpoena.  Salesforce is added as a party to ensure effective relief.

## JURISDICTION AND VENUE

24. This Court has subject matter jurisdiction, pursuant to 28 U.S.C. § 1331, because this action arises under the Constitution and laws of the United States.

25. This Court has personal jurisdiction over Speaker Pelosi because she sponsored H. Res. 503 and oversaw its passage in the House. Her office is in Washington, D.C.

26. This Court has personal jurisdiction over Chairman Thompson because he presides over the Select Committee and issued the Salesforce Subpoena from his office address in Washington, D.C.

27. This Court has personal jurisdiction over Elizabeth L. Cheney, Adam B. Schiff, Jamie B. Raskin, Susan E. Lofgren, Elaine G. Luria, Peter R. Aguilar, Stephanie Murphy, and Adam D. Kinzinger because they serve as members of the Select Committee that issued the Salesforce Subpoena from Washington, D.C.

28. This Court has personal jurisdiction over the Select Committee because it is located and operates in Washington, D.C.

29. This court has personal jurisdiction over Salesforce because Salesforce does business with the RNC in Washington, D.C. and has been commanded to respond to the Salesforce Subpoena in Washington, D.C.

30. Venue is proper under 28 U.S.C. § 1391(b) as a substantial part of the events giving rise to the claim occurred in Washington, D.C.

## BACKGROUND

31. The RNC uses the Salesforce Marketing Cloud platform in support of various electoral and fundraising activities, including during the period leading up to and following the 2020 Presidential Election through the Inauguration of President Biden on January 20, 2021.

32. The RNC, like many political organizations, relies on Salesforce to host and organize campaign and donor information.  This organization of campaign and donor data necessarily involves the private information of donors, as well as organizational trade secrets related to campaign strategy, fundraising, and donor relations.

33. By way of comparison, in a relatively recent lawsuit, the Democratic National Committee alleged the Russian Federation hacked "thousands of emails and documents containing sensitive data from the DNC including donor information, financial and economic information, proprietary opposition research compiled from multiple sources, information regarding planned political activities, and thousands of private confidential emails."  Second Amended Complaint at 105, *Democratic Nat'l Comm. v. Russian Fed'n*, 2019 WL 2488795 (S.D.N.Y.).  Both major political parties clearly recognize the importance of privacy for critical donor and other sensitive information.

8

**A.     The Select Committee's Salesforce Subpoena.**

34. On February 23, 2022, the Select Committee served the Salesforce Subpoena on Salesforce.  A true and correct copy of the Salesforce Subpoena is attached as <u>Exhibit A</u>.

35. The Salesforce Subpoena includes a sweeping set of document demands for RNC records hosted on the Salesforce Marketing Cloud platform in support of various electoral and fundraising activities of the RNC, including documents "referring or relating to" the following five categories:

> a.  All performance metrics and analytics related to email campaigns by or on behalf of Donald Trump for President, Inc. ("Trump Campaign"), the Republican National Committee ("RNC"), or the Trump Make America Great Again Committee ("TMAGAC"), including but not limited to delivery metrics (send rates and bounce rates), engagement metrics (opens, open rates, click rates, and click-to-open rates), time attributes, and message attributes.

> b.  All records related to login sessions by individuals associated with the Trump Campaign or the RNC into Salesforce's Marketing Cloud platform, including all related metadata.

> c.  For the time period of January 1, 2021, to January 31, 2021, all documents and communications concerning investigative reports or analyses conducted by Salesforce regarding the protests, marches, public assemblies, rallies, or speeches in Washington, D.C. on January 5, 2021, or January 6, 2021 (collectively, the "Washington Rallies").

> d.  For the time period of November 3, 2020, to January 31, 2021, all documents and communications concerning investigative reports or analyses conducted by Salesforce regarding the use of Salesforce's platforms by the RNC or the Trump Campaign and related materials.

> e.  For the time period of November 3, 2021, all communications between Salesforce representatives and representatives of the RNC or the Trump Campaign concerning the 2020 Presidential election, the continued use of Salesforce's platforms by the RNC or the Trump Campaign, the Washington Rallies, or any of the facts and circumstances of the topics that are the subject of any of the above requests.

36.  The Salesforce Subpoena commands Salesforce to produce documents that include private and secure donor and campaign communications, as well as private financial information of donors and other individuals who bear no relationship to the Select Committee's investigation, but who

are in opposition to the political party whose members are in control of the House and the Select Committee.

37. The Salesforce Subpoena directed Salesforce to produce all responsive documents by March 9, 2022.

38. The Salesforce Subpoena also demands that Salesforce appear for a deposition to provide testimony regarding the materials subpoenaed on March 16, 2022.

39. The breadth and invasiveness of the Salesforce Subpoena is astounding.  It seeks information on vast numbers of Republican donors, volunteers, supporters, and coalition members. All of this information is unquestionably political information of the RNC, without limitation to the events of January 6, and with no apparent nexus to any potential legislative activity. By any measure, the Salesforce Subpoena exceeds the scope of Congress' limited subpoena power.

40. The Select Committee has demonstrated that it cannot be trusted to keep private information secure.   In at least one instance, for example, information regarding private communications only available to the Select Committee was leaked to *The Washington Post*.  *See* Jacqueline Alemany, et al., *Texting Through An Insurrection*, WASH. POST (Feb. 16, 2022), https://www.washingtonpost.com/politics/interactive/2022/texting-insurrection/.

**B.    Responding to Pressure from the Select Committee, Salesforce is No Longer Willing to Hold Production During the Pendency of this Lawsuit.**

41. The RNC did not learn of the Salesforce Subpoena from the Select Committee.  Rather, the RNC was notified by Salesforce—as required by Section 7.3 of the RNC's Master Services Agreement with Salesforce—of the Salesforce Subpoena on February 24, 2022.  Section 7.3 of the RNC's Master Services Agreement provides that Salesforce, as the "Receiving Party" of the RNC's confidential information, may not disclose such information unless Salesforce is "compelled by law to do so."

42. Salesforce, through counsel agreed to withhold production during the pendency of any RNC legal action challenging the authority of the Select Committee to subpoena the materials demanded, so long as Salesforce's counsel received notice of such suit before its deadline to comply with the Salesforce Subpoena.

43. At 8:30am (EST) on March 9, 2022, the RNC informed Salesforce's counsel it would be filing this lawsuit. Salesforce's counsel confirmed Salesforce would therefore not produce documents to the Select Committee while the lawsuit was pending.

44. At approximately 9:45am on March 9, 2022 and prior to the RNC filing its initial Complaint in the present litigation, Salesforce wrote to the Select Committee raising various objections to the Subpoena. Salesforce also reserved the right to supplement its objections after reviewing any lawsuit filed by the RNC. Salesforce indicated it would begin producing some documents to the Select Committee the week of March 14.

45. The RNC filed its initial Complaint in this lawsuit later in the day on March 9, 2022 and immediately provided Salesforce's counsel with a copy of this initial Complaint.

46. Late in the afternoon on March 10, 2022, Salesforce's counsel informed the RNC that after discussions with staff for the Select Committee during which Select Committee staff took the position that the RNC's initiation of this lawsuit was insufficient to relieve Salesforce of its production obligations, Salesforce indicated that it would not be able to withhold production during the pendency of this matter.

47. Salesforce's counsel further informed the RNC that the Select Committee had extended its deadline for production until Wednesday, March 16, 2022 and that its deposition date had been moved to Wednesday, March 23, 2022.

48. Salesforce's counsel represented to the RNC that absent a pending motion for emergency relief from this court, Salesforce would begin to produce documents to the Select Committee in compliance with the Salesforce Subpoena on Wednesday, March 16, 2022.

49. The RNC has added Salesforce as a party to this action in order to ensure it can obtain effective and complete emergency relief until this dispute is finally resolved on the merits.

50. Although the RNC has named Salesforce as a defendant in this action, the RNC does not believe that Salesforce has breached any contractual or other duty to the RNC.

**C.     The Select Committee Lacks Authority to Issue the Salesforce Subpoena Because the Subpoena was Issued in Pursuit of Non-Legislative Activities.**

51. The Select Committee is not a typical Congressional committee.  After failing to enlist the U.S. Senate in a bicameral commission, Speaker Pelosi introduced H. Res. 503, "[e]stablishing the Select Committee to Investigate the January 6th Attack on the United States Capitol."  Two days later, the House passed H. Res. 503 on a near party-line vote of 222 yeas and 190 nays.  Only two Republicans, Reps. Cheney and Kinzinger, voted in favor of H. Res. 503.

52. H. Res. 503 establishes three "functions" of the Select Committee: (1) to "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol"; (2) to "identify, review, and evaluate the causes of and the lessons learned from the domestic terrorist attack on the Capitol"; and (3) to "issue a final report to the House containing such findings, conclusions, and recommendations for corrective measures described in subsection (c) as it may deem necessary."

53. H. Res. 503 provides that "[t]he Select Committee may not hold a markup of legislation."

54. The Select Committee's investigation is led by Chief Investigative Counsel Timothy J. Heaphy, former United States Attorney for the Western District of Virginia, and Senior Investigative Counsel John Wood, former United States Attorney for the Western District of

Missouri.  The Select Committee reportedly has more than a dozen former federal prosecutors on staff.  *See* Michael S. Schmidt & Luke Broadwater, *In Scrutinizing Trump and His Allies, Jan. 6 Panel Adopts Prosecution Tactics*, N.Y. TIMES (Feb. 5, 2022), https://www.nytimes.com/2022/02/05/us/politics/january-6-committee.html.

55. Since the passage of H. Res. 503, Speaker Pelosi and members of the Select Committee have made countless public statements explaining the purpose of the Select Committee is not legislative.

56. For example, in an interview on December 29, 2021, Rep. Kinzinger stated, "[w]e'll be able to have out on the public record anything Justice Department needs maybe in [sic] in pursuit of [a crime]."  Zachary Cohen & Annie Grayer, *January 6 Committee Says It Would Make Criminal Referrals If 'Appropriate,' But That Could Be A Long Way Off*, CNN (Dec. 21, 2021), https://www.cnn.com/2021/12/21/politics/january-6-committee-criminal-referrals/index.

57. As Chairman Thompson noted on October 24, 2021, "obviously we are pursuing evidence" leading to "former President Trump or anyone else."  *Transcript: Rep. Bennie Thompson on "Face the Nation"*, CBS News (Oct. 24, 2021), https://www.cbsnews.com/news/transcript-rep-bennie-thompson-on-face-the-nation-october-24-2021/.  Chairman Thompson also tweeted on January 6, 2022, "We have been working diligently to bring justice to [the tragedy of Jan. 6]."  @BennieGThompson, TWITTER, (Jan. 6, 2022 8:31 AM), https://twitter.com/BennieGThompson/status/1479083311163232258.

58. Rep. Schiff tweeted, "We will expose those responsible for Jan 6.  No one is above the law."   @RepAdamSchiff, TWITTER (Nov. 12, 2021, 4:54 PM), https://twitter.com/RepAdamSchiff/status/1459278425118625794.

59. Rep. Raskin has also affirmed the law enforcement purpose of the investigation when he stated on multiple occasions that no privilege (neither attorney-client nor executive) "operate[s] to shield participants in a crime from an investigation into a crime."  Hugo Lowell, *Capitol Panel To Investigate Trump Call To Willard Hotel In Hours Before Attack*, GUARDIAN (Dec. 27, 2021), https://www.theguardian.com/us-news/2021/dec/27/capitol-attack-panel-investigate-trump-call-willard-hotel-before-assault; *see also* @RepRaskin, TWITTER (Dec. 2, 2021, 5:40 PM), https://twitter.com/RepRaskin/status/1466537815185891329 ("Exec. privilege doesn't cover criminal misconduct, like insurrections or coups . . . .").

60. Perhaps unsurprisingly given its non-legislative purpose, the Select Committee has issued hundreds of wide-ranging subpoenas for documents and the testimony of witnesses.  It has also demanded records and sent preservation notices to social media companies, telecommunications companies, and banking entities.  A recent press release suggests that the Select Committee has interviewed more than 550 individuals.  *See* Press Release, Bennie Thompson, Chairman, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol, Select Committee Demands Information on Efforts to Send False "Alternate Electors" to Congress and Otherwise Interfere with Election Certification (Feb. 15, 2021), https://january6th.house.gov/news/press-releases/select-committee-demands-information-efforts-send-false-alternate-electors.

61. At least twenty-five individuals and corporations have filed civil actions challenging subpoenas issued by the Select Committee.  Many of these subpoenas challenged in court were issued discreetly by the Select Committee to third parties who hold individuals' cellular or banking data.

62. Public reporting has widely confirmed the Select Committee's investigation aims to produce criminal referrals.  *See* Michael S. Schmidt & Luke Broadwater, *Jan. 6 Committee Weighs*

*Possibility   of   Criminal   Referrals*,   N.Y.   TIMES   (Dec.   20,   2021), https://www.nytimes.com/2021/12/20/us/politics/jan-6-committee-trump-criminal-referral.html; *see also* Josh Dawsey, Jacqueline Alemany & Tom Hamburger, *Inside The Jan. 6 Committee's Effort To Trace Every Dollar Raised And Spent Based On Trump's False Election Claims*, WASH. POST (March 8, 2022), https://www.washingtonpost.com/politics/2022/03/08/jan-6-fundraising-trump/.

63. Tellingly, since its inception in July 2021, the Select Committee has held only one public hearing.

64. With the Salesforce Subpoena, the Select Committee now seeks highly confidential, sensitive information of the national political party opposed to the dominant political party of the Select Committee for wrongful purposes.

**D.     The Select Committee Also Lacks Authority to Issue the Salesforce Subpoena Because the Select Committee Was Not Formed in Accordance with H. Res. 503 and Therefore Cannot Act in Accordance with H. Res. 503.**

65. H. Res. 503 requires the chair of the Select Committee to consult with the "ranking minority member" before issuing a subpoena. *See* Section 3(b)(1) of H. Res. 8. The Select Committee, however, has no ranking minority member.

66. H. Res. 503 instructs the Speaker of the House to appoint thirteen members to the Select Committee, only five of which "shall be appointed after consultation with the minority leader."

67. Speaker Pelosi appointed Rep. Thompson to serve as Chair of the Select Committee and appointed six additional Democrat members: Rep. Zoe Lofgren of California, Rep. Adam Schiff of California, Rep. Pete Aguilar of California, Rep. Stephanie Murphy of Florida, Rep. Jamie Raskin of Maryland, and Rep. Elaine Luria of Virginia. 167 Cong. Rec. H3597 (2021).

68. House Republican Leader Kevin McCarthy recommended five Republican members to serve on the Select Committee, consistent with H. Res. 503: Rep. James E. Banks of Indiana to serve as Ranking Member and Reps. Rodney L. Davis of Illinois, James D. Jordan of Ohio, Kelly M. Armstrong of North Dakota, and Troy E. Nehls of Texas.

69. In what she acknowledged was an "unprecedented decision," Speaker Pelosi refused to appoint Rep. Banks, Leader McCarthy's choice for Ranking Member, and Rep. Jordan to the Select Committee.  Press Release, Nancy Pelosi, Speaker, U.S. House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Committee to Investigate the January 6th Attack on the U.S. Capitol (July 21, 2021), https://www.speaker.gov/newsroom/72121-2.

70. Instead, Speaker Pelosi appointed Rep. Adam Kinzinger and Rep. Liz Cheney— the only two Republicans who voted in favor of H. Res. 503—and left the other seats vacant after Leader McCarthy rescinded his recommendations in protest. *See* 167 Cong. Rec. H3805, H3819-H3820 (2021).

71. Neither Rep. Cheney nor Rep. Kinzinger were appointed as Ranking Member.  Rather, on September 2, 2021, Chairman Thompson announced in a press release that "he has named Representative Liz Cheney (R-WY) to serve as the Vice Chair of the Select Committee."  *See* Press Release, Bennie Thompson, Chairman, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol, Chairman Thompson Announces Representative Cheney as Select Committee Vice Chair (Sept. 2, 2021), https://january6th.house.gov/news/press-releases/chairman-thompson-announces-representative-cheney-select-committee-vice-chair.  H. Res. 503 does not mention a "vice chair", much less authorize the chair to appoint a "vice chair."  *See generally* H. Res. 503, 117th Cong. (2021).

72. House Rule XI(2)(d) instructs that a committee chair shall designate "[a] member of the majority party . . . as vice chair of the committee."  Rep. Cheney is a member of the Republican Conference of the House of Representatives.  She is not a member of the current majority party.

73. Indeed, the Defendants have all but admitted there is no Ranking Member on the Select Committee.  In a court pleading filed on February 25, 2022, the Defendants described Rep. Liz Cheney as the "Vice Chair" of the Committee and, according to Defendants, the "most senior Republican Member of the Select Committee" "for purposes of" consultation prior to issuance of a subpoena under H.R. 503.  Def. Mtn. to Dismiss, p. 18, Feb. 25, 2022, *Flynn v. Pelosi, et al.*, Case No. 8:21cv2946 (M.D. Fla.), attached as Exhibit B.

## CLAIM I

### (The Salesforce Subpoena violates the First Amendment.)

74. Plaintiff restates the foregoing paragraphs as if set forth fully herein.

75. The First Amendment protects "a political party's discretion in how to organize itself, conduct its affairs, and select its leaders."  *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 230 (1989); *see also Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 224 (1986) ("The Party's determination of the boundaries of its own association, and of the structure which best allows it to pursue its political goals, is protected by the Constitution."); *Buckley v. Valeo*, 424 U.S. 1, 64 (1976) ("We long have recognized that significant encroachments on First Amendment rights of the sort that compelled disclosure imposes cannot be justified by a mere showing of some legitimate governmental interest.").

76. This First Amendment protection extends to internal party deliberations concerning how to advance a political message.  *See Am. Fed'n of Labor & Cong. of Indus. Organizations v. FEC*, 333 F.3d 168, 177 (D.C. Cir. 2003) ("[C]ompelled disclosure of internal planning materials, though less direct than regulation of political group leadership or structure, will similarly frustrate

those groups' decisions as to 'how to organize themselves, conduct their affairs, and select their leaders,' as well as their selection of a 'message and the best means to promote that message.'") (quoting *Eu*, 489 U.S. at 230–31) (alterations adopted); *see also Perry v. Schwarzenegger,* 591 F.3d 1147, 1162-63 (9th Cir. 2010) (noting the chilling effect on "participation" and "the free flow of information within campaigns" as result of "compelled disclosure of internal campaign communications.") (cert. denied).

77. The Salesforce Subpoena demands "[a]ll performance metrics and analytics related to email campaigns," including, but not limited to "delivery metrics," "engagement metrics," "time attributes," and "message attributes." It also demands "[a]ll records related to login sessions. . . into Salesforce's Marketing Cloud platform," Salesforce's own investigative analysis, and "all communications between Salesforce representatives and representatives of the RNC or the Trump Campaign concerning the 2020 Presidential election."

78. The Select Committee's all-encompassing Salesforce Subpoena strikes at the very heart of the Plaintiff's internal deliberations and strategy to develop effective political strategies and, by doing so, substantially burdens the Plaintiff's associational autonomy.

79. The Select Committee has no legitimate purpose for seeking the protected information demanded by the Salesforce Subpoena. This information will not meaningfully aid the Select Committee in any valid pursuit.

80. Even if it had a valid reason to seek protected information, the Select Committee has put in place no safeguards to protect the associational rights of the Plaintiff, its donors, volunteers, members, and supporters. It provided Plaintiff with no notice of the Salesforce Subpoena and has provided it with no opportunity to assert claims of privilege or other legal protections over the demanded information. The Select Committee has not established any provisions for a taint team

or analogous filter for privileged information.  The entirety of the demanded information, including that which is constitutionally or otherwise protected, will be turned over to the Select Committee to do with as it pleases.

81. Courts have long looked askance at governmental demands for information of donors and supporters of non-profit entities through which they associate, especially when those entities are engaged in political or other controversial speech or activities.

82. While the name, address, employer, and occupation of donors who have contributed more than $200 to the RNC in a calendar year are subject to public disclosure under the Federal Election Campaign Act, other information likely included in the requested records, such as which digital campaigns the supporters responded to, the coalitions they have joined, their volunteer activities, their propensity for contribution, and their support of various political positions are not public. The Salesforce Subpoena also would require Salesforce to produce RNC data that would include information regarding the millions of specific individuals who have contributed $200 or less in a calendar year to the RNC, and who therefore are not subject to public disclosure under federal campaign finance law.

83. Moreover, this data would include other information that is not publicly disclosed under campaign finance regulations, such as the names and other identifying information of persons who have volunteered for, or who merely support, the RNC and Republican candidates.

84. The release of this information exposes these donors, volunteers, members, and other supporters of the RNC and Republican candidates to the risk of "economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility" by individuals opposed to their association with the RNC and Republican candidates. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958).

85. The Salesforce Subpoena is therefore a transparent effort to chill the speech of the Select Committee members' political opponents.

86. The body that issued the Salesforce Subpoena is composed of nine members, seven of whom belong to the political party opposed to Plaintiff, and none of whom were recommended by Leader McCarthy, in violation of H. Res. 503.

87. While the Salesforce Subpoena serves no legitimate purpose given it has been issued by an irregularly formed and non-legislative special committee, it is substantially likely that allowing a partisan select committee of Congress to subpoena the private and proprietary political and donor information of the opposition political party will chill current and future political party officials' and donors' associational and free speech rights.

88. Email campaigns are one of the most effective tools available to political organizations to disseminate campaign messaging and build associational support among the electorate.   The prospect of producing internal deliberations, political strategy, and metadata connected to recipients of email campaigns will frustrate the Plaintiff's ability to pursue political goals such as winning elections and advocating for its policies by revealing to political opponents its activities, strategies, and tactics.

89. Compelled disclosure also poses a substantial likelihood that the Select Committee's dragnet for sensitive campaign data will dissuade individuals from associating with the Plaintiff for fear of intrusion into their private associations—or even reprisal.  *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021) (citing *NAACP,* 357 U.S. at 464). The Select Committee's overbroad and cumulative Salesforce Subpoena is an unjustified intrusion into one of this nation's most cherished liberties: free speech and association with a party of one's choosing free from political vendetta or coercion.

90. Because the Salesforce Subpoena strikes at the heart of the RNC's and its supporters' First Amendment associational and speech rights and because the Salesforce Subpoena serves no legitimate purpose, it violates the First Amendment.

## CLAIM II

### (The Salesforce Subpoena violates the Fourth Amendment.)

91. Plaintiff restates the foregoing paragraphs as if set forth fully herein.

92. The Salesforce Subpoena instructs Salesforce to produce essentially all information on RNC email campaigns over a two-month period and all information regarding the RNC's use of the Salesforce Marketing Cloud platform over the same period.

93. The Select Committee provided no notice to Plaintiff of the information sought from the Salesforce Subpoena.

94. The Salesforce Subpoena demands non-public, highly confidential, and sensitive information regarding RNC donors and supporters.

95. The RNC and its donors and supporters have a reasonable expectation of privacy in this information.

96. The Fourth Amendment enumerates the right of private individuals to be free from unreasonable search and seizure by the government into their persons, houses, papers, and effects. It also protects a person's reasonable privacy expectations. *Katz v. United States*, 389 U.S. 347, 351 (1967).

97. The Fourth Amendment restricts the ability of the Select Committee to issue sweeping subpoenas untethered from any valid legislative purpose. *See Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 196 (1946).

98. If the government, including the Select Committee, seeks to obtain documents or data protected by the Fourth Amendment, it must do so by consent or as otherwise authorized by law.

Plaintiff has not provided its consent for Salesforce to produce its data related to its fundraising and other political activities to the Select Committee.  And for the reasons discussed above, the Salesforce Subpoena is invalid.

99. "Congress has no enumerated constitutional power to conduct investigations or issue subpoenas," but rather each House has an implied "power to secure needed information in order to legislate." *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020) (citing *McGrain v. Daugherty*, 273 U.S. 135, 161 (1927) (internal quotations omitted)).   A congressional subpoena is "justified solely as an adjunct to the legislative process" and "must serve a valid legislative purpose." *Id.* (internal quotations omitted). An all-encompassing subpoena for personal, nonofficial documents falls outside the scope of Congress' legitimate legislative power. *See id.* at 2040 (Thomas, J., dissenting.).

100. The Salesforce Subpoena is broad and indefinite as to exceed the purported lawfully authorized purpose of the Select Committee. It contains no limitations seeking to preserve applicable privileges or prevent violations of constitutional rights.

101. For the Select Committee to subpoena Salesforce for all of Plaintiff's political supporter records over a substantial period is entirely unreasonable.  Such a request is so broad, both temporally and with respect to the collected data, that the Select Committee exceeds any lawfully authorized purpose.

102. As the Salesforce Subpoena exceeds the lawfully authorized purpose of the Select Committee, full compliance with such subpoena would violate Plaintiff's and its supporters' Fourth Amendment protection against unlawful search and seizure.  The Salesforce Subpoena is thus invalid and unenforceable.

## CLAIM III

### (The Salesforce Subpoena does not advance a valid legislative purpose.)

103. Plaintiff restates the foregoing paragraphs as if set forth fully herein.

104. Congress' investigative powers are at most ancillary to its legislative authority. *Mazars USA, LLP*, 140 S. Ct. at 2031. Because of this tie between its investigative and legislative powers, Congress may only issue subpoenas that serve a "valid legislative purpose." *Id.*

105. The legislative purpose inquiry analyzes whether a particular subpoena serves a valid purpose, not whether an investigation as a whole serves a valid purpose. *See Mazars USA, LLP*, 140 S. Ct. at 2031.

106. The Salesforce Subpoena extends far beyond the scope of any legitimate legislative purpose.

107. The Supreme Court has emphasized the need for specificity in Congress' stated legislative purpose. *See Mazars USA, LLP*, 140 S. Ct. at 2036. And in cases concerning documents purportedly sought to advance legislation that may raise constitutional issues, "it is 'impossible' to conclude that a subpoena is designed to advance a valid legislative purpose unless Congress adequately identifies its aims." *Id.*

108. The Select Committee has failed to consider or recommend any draft legislation related to the topics provided in the Salesforce Subpoena, nor has it provided any explanation for how its requests would further any valid legislative end. Any post-hoc rationalization will fail to justify the sweeping Salesforce Subpoena.

109. The Select Committee members have at times suggested the Select Committee may eventually make "recommendations" to "prevent" the events of January 6th from occurring again. *See* Jaqueline Alemany & Tom Hamburger, *The Jan. 6 Committee: What It Has Done And Where It Is Going*, WASH. POST (Jan. 4, 2022),

https://www.washingtonpost.com/politics/2022/01/04/january-6-committee-explainer/.      Such

broad statements could not conceivably be more "vague" and "loosely worded."  *Watkins v. United*

*States*, 354 U.S. 178, 201 (1957).

110. The Salesforce Subpoena seeks private and proprietary political and donor information

that is both temporally and logically disconnected from the events of January 6, and irrelevant to

any conceivable legislation.

111. This information has no bearing on any contemplated legislation, any generalized

purported legislative purpose for RNC information held by Salesforce is entirely pretextual.  It is

relevant only to serve the purpose members of the Select Committee have stated time and again:

to engage in ad-hoc law enforcement and harass its members' political adversary.  *See supra* ¶¶

31–44, 51-64.  Neither are permissible legislative purposes.

112. A desire to "expose for the sake of exposure" cannot sustain a congressional subpoena.

*Watkins v. United* States, 354 U.S. 178, 200 (1957).  "Bringing information to light" for the sake

of bringing it to light is not a valid legislative end.

113. Nor are law enforcement and the punishment of perceived legal wrongs valid legislative

purposes. "Congress may not issue a subpoena for the purpose of 'law enforcement,' because

'those powers are assigned under our Constitution to the Executive and the Judiciary.'"  *Mazars*,

140 S. Ct. at 2032 (quoting *Quinn v. United States*, 349 U.S. 155, 161 (1955)).  To the extent

Congress seeks to utilize subpoenas to investigate and punish perceived criminal wrongdoing, it

unconstitutionally intrudes on the prerogatives of the Executive Branch.

114. Yet again, the statements and actions of members of the Select Committee show the true

goals of its investigation are to provide "justice."  *See* @BennieGThompson, TWITTER, (Jan. 6,

2022, 8:31 AM), https://twitter.com/BennieGThompson/status/1479083311163232258.

115. The Select Committee has exceeded its authority to issue a subpoena while failing to offer any explanation as to how the Plaintiff's information in the custody of Salesforce may further its legislative interests. Furthermore, any pretextual legislative purpose has been controverted by the statements and actions of the Select Committee.

### CLAIM IV

### (The Select Committee lacks necessary congressional authorization.)

116. Plaintiff restates the foregoing paragraphs as if set forth fully herein.

117. The composition of the Select Committee is governed by Section 2 of H. Res. 503.

118. Speaker Pelosi appointed only nine members to the Select Committee: seven Democrats and two Republicans.  None of these members were appointed from the selection of five Republican congressmen put forth by Republican Leader Kevin McCarthy.  No ranking minority member was appointed to the Select Committee.

119. Authorized congressional committees have subpoena authority implied by Article I of the Constitution. *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927).  The Select Committee, however, is not an authorized congressional committee because it fails to comport with its own authorizing resolution, H. Res. 503. Congress' failure to act in accordance with its own rules is judicially cognizable.  *Yellin v. United States*, 374 U.S. 109, 114 (1963).  This is particularly significant where a person's fundamental rights are involved.

120. The Select Committee as it currently stands—and stood at the time it issued the Salesforce Subpoena—has no authority to conduct business because it is not a duly constituted Select Committee.

121. The Committee is unconstitutionally attempting to exercise law enforcement authority, rather than engaging in lawmaking pursuits, in violation of fundamental separation of powers principles.

122. Congress' investigatory powers are ancillary to its legislative authority; it has no law enforcement power. *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020).

123. The Select Committee has exceeded the scope of its authorizing resolution by seeking campaign information that does not have a reasonable relation to the Committee's functions and purposes.

124. The Salesforce Subpoena is invalid and unenforceable.

## CLAIM V

### (The Salesforce Subpoena is excessively broad and unduly burdensome.)

125. Plaintiff restates the foregoing paragraphs as if set forth fully herein.

126. The Salesforce Subpoena seeks information unrelated to any potential legislation.

127. The Salesforce Subpoena seeks Plaintiff's campaign information including volunteer, donor coalition member, and organizational information.

128. The breadth of the Salesforce Subpoena is apparent in that it is in no way tailored to the Select Committee's purpose as articulated in H. Res. 503.  For example, the Salesforce Subpoena requests "[a]ll performance metrics and analytics related to email campaigns by or on behalf of. . . the Republican National Committee. . ." for the period of November 3, 2021 through January 6, 2022.  It also requests "[a]ll records related to login session by individuals associated with the. . . RNC into Salesforce's Marketing Cloud platform, including all related metadata" for the same period.

129. Included within the sweep of these "all" requests would be voluminous emails and logins associated with "get out the vote" efforts on the November 3rd Election Day, the Georgia U.S. Senate runoff elections held on January 5, 2022, and other political activity of the RNC unrelated to the presidential election.

130. This irrelevant information would not serve to inform any activity by the Select Committee, let alone any valid legislative action. Indeed, one struggles to fathom how confidential RNC political analytics would serve Congress in the permissible execution of its constitutional function.

131. The Salesforce Subpoena would capture donor, volunteer, and supporter information that in no way "pertain[s] to presidential activities on or around January 6th, or surrounding the election and its aftermath." *Trump v. Thompson*, 20 F.4th 10, 43 (D.C. Cir. 2021). This might include, for example, information related to Election Day itself, the 2022 Georgia U.S. Senate runoffs, and other political activities of the RNC unrelated to the presidential election.

132. In addition to seeking information that could not possibly bear on the passage of any law, the Salesforce Subpoena represents a novel and sweeping vision of Congressional investigative authority.

133. The Select Committee has taken upon itself to subpoena a third-party corporation to obtain minute information about RNC political activity analytics over a monthslong period.  The Salesforce Subpoena represents an attempt to extend Congressional fact-finding authority beyond even the powers of the Executive Branch, which cannot obtain this kind of information without a warrant.  And it does so with merely a perfunctory attempt at identifying a legislative purpose.

## CLAIM VI

### (The Salesforce Subpoena violates the Stored Communications Act.)

134. Plaintiff restates the foregoing paragraphs as if set forth fully herein.

135. The Stored Communications Act, 18 U.S.C. §§ 2701-2712, prohibits the Select Committee from obtaining the subpoenaed records from Salesforce.

136. The Select Committee's Salesforce Subpoena appears to seek the actual content of communications stored on Salesforce's servers by requesting the production of email and "message attributes" associated with Plaintiff's email campaigns, as well as the private communications of Plaintiff's staff that are stored on Salesforce's servers.

137. In its March 9 response to the Select Committee, Salesforce objected to the subpoena "to the extent it seeks the disclosure of the contents of electronic communications maintained on behalf of the RNC in violation of the Stored Communications Act, 18 U.S.C. § 2701, *et seq.* ("SCA")."

138. The production of such materials is unlawful because, under the Stored Communications Act, Salesforce may "not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service" and may "knowingly divulge a record or other information pertaining to a subscriber to or customer of such service . . . to any governmental entity." § 2702(a)(1) and (3).

139. Furthermore, Congress lacks the authority to subpoena those materials from an electronic communication service. *See generally* 18 U.S.C. § 2702(a) and (b). Although content can be disclosed to a "governmental entity" under specific, narrow circumstances, Congress is not a "governmental entity" because, as the legislative branch, it is not a "department or agency of the United States." 18 U.S.C. § 2711(4). And no other provision in the Act authorizes Congress to access the content sought by the Salesforce Subpoena.

140. Section 2702(a)(1) therefore prohibits knowing disclosure of "the contents of a communication" stored by Salesforce to the Select Committee absent an express statutory exception outlined in Section 2702(b).

141. None of the statutory exceptions in Section 2702(b) apply to the Salesforce Subpoena.

142. The Select Committee cannot obtain the subpoenaed records under Section 2702(c)(1) because disclosure would not be "as otherwise authorized in section 2703." 18 U.S.C. § 2702(c)(1). Specifically, on information and belief, the Select Committee has not obtained and cannot obtain "a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction," as would be required to obtain records "in electronic storage in an electronic communications system for one hundred days or less." *Id.* § 2703(a). Nor has the Select Committee provided Plaintiff or Salesforce with "prior notice" and obtained either (i) "an administrative subpoena authorized by a Federal or State statute or a Federal or State grand jury or trial subpoena" or (ii) "a court order," as would be required to obtain records "in electronic storage . . . for more than one hundred and eighty days." *Id.* § 2703(a), (b)(1).

**PRAYER FOR RELIEF**

Wherefore, Plaintiff asks the Court to enter judgment in its favor and against Defendants and to order the following relief:

    a.  A declaratory judgment that the Salesforce Subpoena violates Plaintiff's First Amendment rights;

    b.  A declaratory judgment that the Salesforce Subpoena violates Plaintiff's Fourth Amendment rights;

    c.  A declaratory judgment that the Salesforce Subpoena serves no valid legislative purpose and exceeds the Select Committee's constitutional authority;

d.  A declaratory judgment that the Salesforce Subpoena is excessively broad and unduly burdensome.

e.  A declaratory judgment that Salesforce's compliance with the Salesforce Subpoena would violate the Stored Communications Act;

f.  A declaratory judgment that the Select Committee lacks necessary congressional authorization;

g.  A declaratory judgment that the Salesforce Subpoena is ultra vires, unlawful, and unenforceable;

h.  In the alternative, an order modifying the Salesforce Subpoena to seek only unprivileged information that does not infringe on Plaintiff's constitutional rights;

i.  An injunction quashing the Salesforce Subpoena and prohibiting its enforcement by Defendants;

j.  In the alternative, an injunction prohibiting Salesforce from producing RNC documents and information in response to the Salesforce Subpoena.

k.  An injunction prohibiting Defendants from imposing sanctions for noncompliance with the Salesforce Subpoena;

l.  An injunction prohibiting Defendants from inspecting, using, maintaining, or disclosing any information obtained as a result of the Salesforce Subpoena;

m.  An award in favor of Plaintiff for its reasonable expenses, including attorneys' fees and costs, incurred as a result of the Salesforce Subpoena; and

n.  Any and all other relief that the Court deems just and proper.

Respectfully submitted this 15th day of March, 2022.

BROWNSTEIN HYATT FARBER SCHRECK, LLP

By:     *s/ Christopher O. Murray*
          Christopher O. Murray
          Julian R. Ellis, Jr.*(pro hac vice pending; full admission pending)*
          410 17th Street, Suite 2200
          Denver, CO 80202
          Telephone:  303.223.1100
          Fax:  303.223.1111
          Email:  cmurray@bhfs.com
                  jellis@bhfs.com

*Attorneys for Plaintiff Republican National Committee*