**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| REPUBLICAN NATIONAL COMMITTEE, | ) ) ) |  |
| *Plaintiff,* | ) ) |  |
| v. | ) ) | **Case No. 1:22-cv-00659-TJK** |
| NANCY PELOSI, et al., | ) ) |  |
| *Defendants.* | ) ) ) |  |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Christopher O. Murray
Julian R. Ellis, Jr. (*pro hac vice pending; full admission pending*)
Brownstein Hyatt Farber Schreck LLP
410 17th Street, Suite 2200
Denver, CO 80202
Tel:  303.223.1100
Email:  cmurray@bhfs.com
          jellis@bhfs.com

*Attorneys for Plaintiff Republican National Committee*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iv

INTRODUCTION .............................................................................................................. 1

FACTUAL BACKGROUND .............................................................................................. 1

I.    H. Res. 503 Authorized the Formation of the Select Committee to Investigate
the January 6, 2021 Attack on the U.S. Capitol, but It Is Irregularly Constituted. ............. 1

II.   The Select Committee Subpoenaed Salesforce for Non-Public Information About
the RNC and Its Donors, Supporters, and Other Partners. ................................................... 3

III.  The Salesforce Subpoena Threatens the Constitutional Rights of the RNC and
Its Donors, Supporters, and Other Partners. ........................................................................ 5

IV.  The RNC Filed This Lawsuit to Protect Its Constitutional Rights. ..................................... 7

V.   Salesforce Initially Agreed Not to Respond to the Subpoena Pending Resolution
of This Lawsuit but Relented Under Pressure of Contempt. ............................................... 7

LEGAL STANDARD ......................................................................................................... 8

ARGUMENT ..................................................................................................................... 9

I.    The RNC Is Likely to Succeed on the Merits of Its Claims. ............................................... 9

    A.   The Salesforce Subpoena violates the First Amendment because it is not
tailored to the Select Committee's purpose. ............................................................. 9

        *1.*   *The First Amendment freedom of association applies with particular
force to political parties and prohibits compelled disclosure of
membership lists and internal party planning materials.* .............................. 10

        *2.*   *Compelled disclosure requirements must satisfy exacting scrutiny.* .............. 11

        *3.*   *The Salesforce Subpoena fails exacting scrutiny because its demands
are not tailored in support of a substantial governmental interest.* .............. 12

    B.   The Salesforce Subpoena violates the Fourth Amendment because it is
unreasonable. ....................................................................................................... 14

        *1.*   *The Salesforce Subpoena demands materials wholly irrelevant to the Select
Committee's investigation of the events of January 6, 2021.* ........................ 15

        *2.*   *Even if the material demanded is relevant to a valid legislative purpose,
the Salesforce Subpoena is still unreasonable under the Fourth Amendment
because the Select Committee afforded no opportunity for the RNC to object
to the subpoena and provided no means to protect irrelevant internal
deliberations and RNC data from being rummaged through.* ........................ 16

    C.   The Salesforce Subpoena serves no valid legislative purpose. ................................ 18

## TABLE OF CONTENTS (con't)

D.   The Salesforce Subpoena was not issued in accordance with H. Res. 503. ............ 20

E.   The Salesforce Subpoena violates the Stored Communications Act ...................... 22

II.   The RNC Will Be Irreparably Injured Absent a Preliminary Injunction. ........................... 23

III.   The Balance of Equities and Public Interest Strongly Favor Injunctive Relief. ................ 28

**CONCLUSION** ....................................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Fed'n of Labor & Cong. of Indus. Orgs. v. FEC,*
  333 F.3d 168 (D.C. Cir. 2003) ...........................................................................................10, 11

*Americans for Prosperity Found. v. Bonta,*
  141 S. Ct. 2373 (2021) ...............................................................................................11, 25, 26

*Americans for Prosperity Found. v. Harris,*
  No. 2:14-CV-09448-R-FFM, 2015 WL 769778 (C.D. Cal. Feb. 23, 2015) ...........................24

*Americans for Prosperity Found. v. Harris,*
  809 F.3d 536 (9th Cir. 2015) ...................................................................................................24

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.,*
  897 F.3d 314 (D.C. Cir. 2018) ..............................................................................................9, 24

*Buckley v. Valeo,*
  424 U.S. 1 (1976).....................................................................................................................26

*Carpenter v. United States,*
  138 S. Ct. 2206 (2018) .............................................................................................................14

*DeGuiseppe v. Vill. of Bellwood,*
  68 F.3d 187 (7th Cir. 1995) .....................................................................................................24

*Doe v. Mattis,*
  928 F.3d 1 (D.C. Cir. 2019) .....................................................................................................28

*Doe v. Reed,*
  561 U.S. 186, 196 (2010).........................................................................................................11

*Eastland v. U.S. Servicemen's Fund,*
  421 U.S. 491 (1975)..............................................................................................................1, 18

*Elrod v. Burns,*
  427 U.S. 347 (1976).................................................................................................................24

*Eu v. S.F. Cnty. Democratic Cent. Comm.,*
  489 U.S. 214 (1989)............................................................................................................10, 11

*In re Ford Motor Co.,*
  110 F.3d 954 (3d Cir. 1997).................................................................................................27, 29

*United States v. Fort,*
  443 F.2d 670 (D.C. Cir. 1970) .................................................................................................15

*Gordon v. Holder,*
  721 F.3d 638 (D.C. Cir. 2013) ...........................................................................................24, 28, 29

## TABLE OF AUTHORITIES (con't)

*Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016) ...................................................................................24

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020) ..............................................................................24, 28

*Katz v. United States*,
    389 U.S. 347 (1967) ..................................................................................................14

*Kilbourn v. Thompson*,
    103 U.S. 168 (1880) ..................................................................................................18

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ......................................................................................29

*Metro. Life Ins. Co. v. Usery*,
    426 F. Supp. 150 (D.D.C. 1976) ...............................................................................29

*Mills v. Dist. of Columbia*,
    571 F.3d 1304 (D.C. Cir. 2009) ................................................................................24

*NAACP v. Alabama ex rel. Patterson*,
    357 U.S. 449 (1958) .............................................................................................10, 27

*NAACP v. Button*,
    371 U.S. 415 (1963) .............................................................................................10, 11

*Nken v. Holder*,
    556 U.S. 418 (2009) ...............................................................................................9, 28

*O'Connor v. Ortega*,
    480 U.S. 709 (1987) ..................................................................................................16

*Okla. Press Pub. Co. v. Walling*,
    327 U.S. 186 (1946) ..................................................................................................15

*People for the Ethical Treatment of Animals, Inc. v. Gittens*,
    215 F. Supp. 2d 120 (D.D.C. 2002) ..........................................................................24

*PepsiCo, Inc. v. Redmond*,
    No. 94 C 6838, 1996 WL 3965 (N.D. Ill. 1996) .......................................................29

*Price v. Barr*,
    514 F. Supp. 3d 171 (D.D.C. 2021) ..........................................................................24

*Providence J. Co. v. FBI*,
    595 F.2d 889 (1st Cir. 1979) .....................................................................................29

*Quinn v. United States*,
    349 U.S. 155 (1955) ..................................................................................................18

## TABLE OF AUTHORITIES (con't)

*Roberts v. United States Jaycees*,
   468 U.S. 609 (1984) ................................................................................................10

*In re Sealed Case No. 98-3077*,
   151 F.3d 1059 (D.C. Cir. 1998) .........................................................................27, 29

*In re Search of Info. Associated with [redacted]@mac.com Stored at Premises
   Controlled by Apple, Inc.*,
   13 F. Supp. 3d 157 (D.D.C. 2014) ........................................................................14

*Sen. Select Comm. on Ethics v. Packwood*,
   845 F. Supp. 17 (D.D.C. 1994) ........................................................................16, 17

*Sherley v. Sebelius*,
   644 F.3d 388 (D.C. Cir. 2011) .............................................................................8, 9

*Simms v. Dist. of Columbia*,
   872 F. Supp. 2d 90 (D.D.C. 2012) .........................................................................28

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   205 F. Supp. 3d 4 (D.D.C. 2016) ............................................................................9

*Tashjian v. Republican Party of Conn.*,
   479 U.S. 208 (1986) ................................................................................................10

*Turner v. U.S. Agency for Glob. Media*,
   502 F. Supp. 3d 333 (D.D.C. 2020) ..........................................................24, 28, 29

*U.S. Servicemen's Fund v. Eastland*,
   488 F.2d 1252 (D.C. Cir. 1973) ...............................................................................1

*Watkins v. United States*,
   354 U.S. 178 (1957) ....................................................................................15, 18, 19

*Wheeldin v. Wheeler*,
   373 U.S. 647 (1963) ................................................................................................15

*Winter v. NRDC*,
   555 U.S. 7 (2008) .................................................................................................8, 9

**Constitutional Provisions**

U.S. Const. amend. I ............................................................................................. passim

U.S. Const. amend. IV ......................................................................................... passim

**Statutes**

52 U.S.C. § 30101(14) ...............................................................................................5

Stored Communications Act, 18 U.S.C. §§ 2701 to 2712 ...................................7, 9, 22

## TABLE OF AUTHORITIES (con't)

§ 2702(a) ...................................................................................................................22, 23

§ 2702(a)(1) ...................................................................................................................22

§ 2702(a)(3) ...................................................................................................................22

§ 2702(b) ...................................................................................................................23

§ 2702(c) ...................................................................................................................23

§ 2702(c)(1) ...................................................................................................................23

§ 2703(a) ...................................................................................................................23

§ 2703(b)(1)(B)(i)–(ii) ...................................................................................................................23

§ 2711(4) ................................................................................................................... 23

**Rules**

Fed. R. Civ. P. 65(a) ...................................................................................................................8

**Other Authorities**

167 Cong. Rec. 3355 (2021) ...................................................................................................................1, 2

167 Cong. Rec. 3583, 3597 (2021) ...................................................................................................................2

167 Cong. Rec. 3597 (2021) ...................................................................................................................21

167 Cong. Rec. 3805, 3819–20 (2021) ...................................................................................................................2, 3, 22

Adam Schiff (@RepAdamSchiff), Twitter (Nov. 12, 2021, 4:54 PM) ...................................................................................................................19

Byron Tau, Republican National Committee Files Suit Against House Jan. 6 Committee, Wall St. J. (Mar. 9, 2022)...................................................................................................................3

Capitol Breach Cases, U.S. Dep't of Justice...................................................................................................................12

Chenue Her, Republicans Commit At Least $20 million, 600 Staffers in Georgia Senate Runoff Races, 11 Alive (Nov. 15, 2020)...................................................................................................................13

Def.'s Mot. to Dismiss, *Flynn v. Pelosi*, No. 8:21cv2946 (M.D. Fla. Feb. 25, 2022)...................................................................................................................21

H.R. Res. 503, 117th Cong. (2021)................................................................................................................... passim

H.R. Res. 8, 117th Cong. (2021)...................................................................................................................3, 20

Hugo Lowell, Capitol Panel to Investigate Trump Call to Willard Hotel in Hours Before Attack, Guardian (Dec. 27, 2021) ...................................................................................................................20

**TABLE OF AUTHORITIES (con't)**

Jacqueline Alemany, et al., *Texting Through an Insurrection*, Wash. Post
(Feb. 16, 2022)....................................................................................................28

Jamie Raskin (@RepRaskin), Twitter (Dec. 2, 2021, 5:40 PM) ...................................20

John Bellinger, *The D.C. District Court and the Jan. 6 Cases*, Lawfare Blog
(Jan. 3, 2022)......................................................................................................12

Josh Dawsey, Jacqueline Alemany, & Tom Hamburger, *Inside the Jan. 6
Committee's Effort to Trace Every Dollar Raised and Spent Based on
Trump's False Election Claims*, Wash. Post (Mar. 8, 2022) ..................................19

Mychael Schnell & Monique Beals, *These People Have Been Subpoenaed By the
Jan. 6 Panel*, The Hill (last visited Mar. 14, 2022). ...............................................3

Nik Popli & Julia Zorthian, *What Happened to Jan. 6 Insurrectionists Arrested in
the Year Since the Capitol Riot*, Time (Jan. 6, 2022).............................................12

Olivia Beavers & Heather Caygle, *McCarthy Makes His 5 GOP Picks for Jan. 6
Select Committee*, Politico (July 19, 2021) ............................................................22

Press Release, Bennie Thompson, Chairman, Select Comm. to Investigate the Jan.
6th Attack on the U.S. Capitol, *Chairman Thompson Announces
Representative Cheney as Select Committee Vice Chair* (Sept. 2, 2021) .................3

Press Release, Nancy Pelosi, Speaker, U.S. House of Representatives, *Pelosi
Statement on Republican Recommendations to Serve on the Select Committee
to Investigate the January 6th Attack on the U.S. Capitol* (July 21, 2021)...............3

Press Release, Republican Nat'l Comm., *RNC Members Condemn Violence at
U.S. Capitol*, GOP.com (Jan. 6, 2022)....................................................................2

Ronna McDaniel (@GOPChairwoman), Twitter (Jan. 6, 2021, 1:11 PM) ...................12

House Rules XI, cl. 2(d) ............................................................................................21

Zachary Cohen & Annie Grayer, *January 6 Committee Says It Would Make
Criminal Referrals If 'Appropriate,' But That Could Be a Long Way Off*,
CNN (Dec. 21, 2021)...........................................................................................19

Zeke Miller, *RNC to Spend At Least $20 million on Georgia's Senate Races*,
Associated Press (Nov. 13, 2020) ........................................................................14

## INTRODUCTION

When Congress issues a subpoena or request to a third party for another person's information or documents, the law allows the person whose information will be exposed to sue in federal court for an "injunction or declaratory judgment." *U.S. Servicemen's Fund v. Eastland*, 488 F.2d 1252, 1259 (D.C. Cir. 1973), *rev'd on other grounds*, 421 U.S. 491 (1975). Salesforce.com ("Salesforce") has been issued just such a subpoena demanding disclosure of a sweeping set of Republican National Committee ("RNC") records hosted by Salesforce in support of various electoral and fundraising activities of the RNC. These records, demanded by the U.S. House Select Committee to Investigate the January 6th Attack on the U.S. Capitol ("Select Committee"), include records for tens of millions of RNC supporters, donors, and other partners with whom the RNC communicates. They also include materials that would reveal crucial elements of the RNC's internal deliberations and digital strategy such as metrics on how certain content performs, what subject lines and text messages lead to contributions, how certain individuals respond to specific content, and the results of message testing.

Because the disclosure of these materials will cause major and irreparable constitutional injury to the RNC, its donors, supporters, and other partners, RNC has brought this suit. And since Salesforce is now—because of pressure from the Select Committee—unwilling to wait to produce these documents in the absence of a motion for emergency relief, the RNC brings this motion for preliminary injunction to prevent the compelled disclosure of these materials by Salesforce until this case may be resolved on the merits.

## FACTUAL BACKGROUND

**I.     H. Res. 503 Authorized the Formation of the Select Committee to Investigate the January 6, 2021 Attack on the U.S. Capitol, but It Is Irregularly Constituted.**

On January 6, 2021, a mob entered the U.S. Capitol. *See* H.R. Res. 503 ("H. Res. 503"), 117th Cong., 167 Cong. Rec. 3355 (2021) (describing the January 6th events in establishing the Select Committee to Investigate the January 6th Attack on the U.S. Capitol). Many in the mob intended to interfere with Congress's counting and certification of electoral votes for president

1

and vice president. *Id.* Some members of the mob attacked Capitol police officers, vandalized portions of the Capitol itself, and forced their way into the Senate Chamber. *See id.* The RNC immediately denounced the violence and described the events of January 6th as "an attack on our country and its founding principles." Press Release, Republican Nat'l Comm., RNC Members Condemn Violence at U.S. Capitol, GOP.com (Jan. 6, 2022), https://bit.ly/3tRSLOE.

Within weeks of the attack, leadership in the U.S. House of Representatives and Senate began to discuss the possibility of a joint congressional committee to investigate the attack. When these negotiations broke down, House Speaker Nancy Pelosi announced her intention to form a House-only select committee for the purpose of investigating the events of January 6, 2021. On June 30, 2021, the House of Representatives adopted H. Res. 503, establishing the Select Committee. H. Res. 503 § 1. Only two Republican Members, Liz Cheney of Wyoming and Adam Kinzinger of Illinois, voted in favor of H. Res. 503. *See* 167 Cong. Rec. 3355 (2021).

H. Res. 503 instructed the Speaker of the House to appoint thirteen members to the Select Committee, five of whom "shall be appointed after consultation with the minority leader." H. Res. 503 § 2(a). Speaker Pelosi appointed Rep. Bennie Thompson of Mississippi to serve as Chair of the Select Committee and appointed six additional Democrat members: Rep. Zoe Lofgren of California, Rep. Adam Schiff of California, Rep. Peter Aguilar of California, Rep. Stephanie Murphy of Florida, Rep. Jamie Raskin of Maryland, and Rep. Elaine Luria of Virginia. 167 Cong. Rec. 3583, 3597 (2021). House Republican Leader Kevin McCarthy recommended five Republican members to serve on the Select Committee, consistent with H. Res. 503: Rep. James E. Banks of Indiana to serve as Ranking Member, and Reps. Rodney L. Davis of Illinois, James D. Jordan of Ohio, Kelly M. Armstrong of North Dakota, and Troy E. Nehls of Texas. 167 Cong. Rec. 3805, 3819–20 (2021).

In what she acknowledged was an "unprecedented decision," Speaker Pelosi refused to appoint Rep. Banks, Leader McCarthy's choice for Ranking Member, and Rep. Jordan to the Select Committee. Press Release, Nancy Pelosi, Speaker, U.S. House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Committee to Investigate the

January 6th Attack on the U.S. Capitol (July 21, 2021), https://bit.ly/3CSAm8A. Instead,

Speaker Pelosi appointed Rep. Cheney and Rep. Kinzinger— the only two Republicans who

voted in favor of H. Res. 503—and left the other seats vacant after Leader McCarthy rescinded

his recommendations in protest. *See* 167 Cong. Rec. 3805, 3819–20 (2021).

House Resolution 8 ("H. Res. 8"), adopted January 4, 2021, sets forth the rules of the

117th Congress. Section 3(b)(1) of H. Res. 8 requires that the chair of a standing committee may

order the taking of depositions, including under a subpoena, but only upon "consultation with the

ranking minority member of such committee." H. Res. 503 expressly adopts this requirement of

consultation with the ranking minority member before ordering a deposition under a subpoena

from the Select Committee. H. Res. 503 § 5(c)(6)(A). But the Select Committee does not include

a ranking minority member. The Select Committee ***does*** have a "Vice-Chair" in Rep. Cheney.

Rep Cheney was named to this position by Chairman Thompson on September 2, 2021. *See*

Press Release, Bennie Thompson, Chairman, Select Comm. to Investigate the Jan. 6th Attack on

the U.S. Capitol, Chairman Thompson Announces Representative Cheney as Select Committee

Vice Chair (Sept. 2, 2021), https://bit.ly/3CIaHiO.

## II.     The Select Committee Subpoenaed Salesforce for Non-Public Information About the RNC and Its Donors, Supporters, and Other Partners.

The Select Committee has issued no less than 89 subpoenas targeting information related

to dozens of individuals and groups. *See* Mychael Schnell & Monique Beals, These People Have

Been Subpoenaed By the Jan. 6 Panel, The Hill, https://bit.ly/3MSP3gws (last visited Mar. 14,

2022). Indeed, there are approximately 26 lawsuits pending in federal courts across the country

challenging the enforcement of subpoenas issued by the Select Committee. *See* Byron Tau,

Republican National Committee Files Suit Against House Jan. 6 Committee, Wall St. J. (Mar. 9,

2022), https://on.wsj.com/3KN8NQA/.

On February 23, 2022, the Select Committee served the Salesforce Subpoena on

Salesforce. (*See* Decl. of C. Schaeffer ("Schaeffer Decl."), Ex. A (hereinafter the "Salesforce

Subpoena").) The Salesforce Subpoena includes a sweeping set of document requests for RNC

records hosted by Salesforce in support of various electoral and fundraising activities of the

RNC, including documents "referring or relating to" the following five categories:

> **[Item No. 1]** All performance metrics and analytics related to email campaigns by or on behalf of Donald Trump for President, Inc. ("Trump Campaign"), the Republican National Committee ("RNC"), or the Trump Make America Great Again Committee ("TMAGAC"), including but not limited to delivery metrics (send rates and bounce rates), engagement metrics (opens, open rates, click rates, and click-to-open rates), time attributes, and message attributes.

> **[Item No. 2]** All records related to login sessions by individuals associated with the Trump Campaign or the RNC into Salesforce's Marketing Cloud platform, including all related metadata.

> **[Item No. 3]** For the time period of January 1, 2021, to January 31, 2021, all documents and communications concerning investigative reports or analyses conducted by Salesforce regarding the protests, marches, public assemblies, rallies, or speeches in Washington, D.C. on January 5, 2021, or January 6, 2021 (collectively, the "Washington Rallies").

> **[Item No. 4]** For the time period of November 3, 2020, to January 31, 2021, all documents and communications concerning investigative reports or analyses conducted by Salesforce regarding the use of Salesforce's platforms by the RNC or the Trump Campaign and related materials.

> **[Item No. 5]** For the time period of November 3, 2021, all communications between Salesforce representatives and representatives of the RNC or the Trump Campaign concerning the 2020 Presidential election, the continued use of Salesforce's platforms by the RNC or the Trump Campaign, the Washington Rallies, or any of the facts and circumstances of the topics that are the subject of any of the above requests.

(Salesforce Subpoena at 3.)

The Select Committee provided no notification to the RNC that it had subpoenaed

Salesforce and demanded RNC data and information. (Decl. of J. Riemer ("Riemer Decl.") ¶ 9.)

Rather, the RNC first learned of the Subpoena on February 24, 2022, when Salesforce contacted

the RNC and informed its customer of the request, as required by the parties' contract. (*See id.*

¶ 8.) To this day, no member or staff of the Select Committee has reached out to the RNC about

the Salesforce Subpoena. (*Id.* ¶ 10.) Indeed, the Select Committee appears to be picking and

choosing when it engages with the RNC directly since it has contacted current and former RNC

staff to conduct voluntary interviews with the Select Committee regarding the RNC's work,

including about RNC fundraising activities. (*Id.* ¶ 7.) The RNC has been wholly cooperative with the Committee to date in facilitating meetings. (*Id.*)

### III.   The Salesforce Subpoena Threatens the Constitutional Rights of the RNC and Its Donors, Supporters, and Other Partners.

The RNC is the national party committee of the Republican Party. It is an unincorporated organization registered with the Federal Election Commission ("FEC") under 52 U.S.C. § 30101(14). The RNC exists to advance the Republican Party and its electoral prospects. It conducts party business, builds party infrastructure, supports Republican candidates and state parties, advances Republican policy goals, and raises funds to support these efforts. (Riemer Decl. ¶ 6.)

Digital communication is a critical component of the RNC's ability to conduct its political activities. (Schaeffer Decl. ¶ 11.) The RNC relies upon its ability to interact virtually with millions of Americans through email and other digital avenues to recruit volunteers, persuade voters to support Republican candidates and policies, encourage voting through its "Get Out the Vote" ("GOTV") activities, convey political messaging, and raise funds. (*Id.*) The RNC routinely engages such individuals with fundraising appeals, surveys, petition requests, and other messaging in furtherance of its political mission. (*Id.*) In recent years, the RNC has come to increasingly rely on digital efforts for fundraising to more effectively reach its members and convey its political messaging to supporters. (*Id.*) The RNC communicates digitally with tens of millions of individuals each month. (*Id.* ¶ 9.) The vast majority of these communications occur over email. (*Id.*)

Salesforce is a key data and digital communications vendor to the RNC. (*Id.* ¶ 14.) The Salesforce platforms utilized by the RNC are an integral part of the RNC's political operation. (*Id.*) These platforms assist the RNC in its core political functions such as recruiting volunteers, conveying political messaging in support of the RNC's preferred candidates and policies, GOTV efforts, and fundraising. (*Id.*) Salesforce houses data and records for tens of millions of RNC donors, supporters, and other partners with whom the RNC communicates. (*Id.* ¶ 15.) The RNC

uses three platforms provided by Salesforce: the "Sales Cloud," "Marketing Cloud" services, and "Datorama" platform. (*Id.* ¶ 16.) Sales Cloud is the RNC's customer relationship management ("CRM") platform, and maintains all RNC data regarding private individuals with whom the RNC has interacted through its digital communications and those interactions (i.e., user record data). (*Id.*) The Marketing Cloud serves as the RNC's email service provider ("ESP"), through which data flows in execution of RNC email sends. (*Id.*) The Datorama platform connects, unifies, and maintains the RNC's data across platforms. (*Id.*) The RNC maintains highly granular data across the Salesforce platforms, including data related to RNC supporters and other private individuals with whom it has engaged through digital communication. (*Id.* ¶ 17.) This includes, but is not limited to, email addresses (and data related to the response to e-mails), donations (including from donors not subject to disclosure to the FEC), volunteer activities, and responses to petitions and surveys. (*Id.* ¶ 17a–k.)

Between November 3, 2020 and January 6, 2021, the RNC was engaged in political operations that were separate and apart from the 2020 presidential election. (*Id.* ¶ 21.) For instance, during this time, the RNC engaged in extensive political activity in connection with the two 2021 U.S. Senate runoff elections in Georgia, in which the RNC was heavily invested because their outcome determined party control of the Senate. (*Id.*) The RNC also engaged in GOTV efforts for the presidential election, which had nothing to do with any post-election recount or litigation efforts. (*Id.*)

The Salesforce Subpoena demands material that would provide unfettered access to competitive and highly confidential information regarding RNC digital, political, and fundraising strategy, as well as personal information relating to millions of its supporters. (*Id.* ¶ 22.) The Salesforce Subpoena also demands materials that would reveal crucial elements of the RNC's digital strategy such as metrics on how certain content performs, what subject lines and text messages lead to contributions, how certain individuals respond to specific content, and the results of message testing. (*Id.* ¶ 25.) The proprietary data sought by the Salesforce Subpoena is of enormous monetary value to the RNC. (*Id.* ¶ 27.)

IV.     **The RNC Filed This Lawsuit to Protect Its Constitutional Rights.**

On March 9, 2022, the RNC filed this lawsuit against Speaker Pelosi; the Select Committee; and the Select Committee's members, Rep. Bennie Thompson, Rep. Elizabeth Cheney, Rep. Adam Schiff, Rep. Jamie Raskin, Rep. Zoe Lofgren, Rep. Elaine Luria, Rep. Peter Aguilar, Rep. Stephanie Murphy, and Rep. Adam Kinzinger. (*See* Compl. ¶¶ 11–22.) The RNC amended its Complaint on March 15, 2022, to add Salesforce as a defendant after Salesforce informed the RNC that it intended to respond to the Salesforce Subpoena absent an application for preliminary relief from this Court. (*See* Am. Compl. ¶ 23.)

The RNC's suit seeks declaratory and injunctive relief to prohibit the enforcement of the Salesforce Subpoena because it seeks non-public information on Republican donors, volunteers, and supporters and the internal deliberative processes of the RNC in violation of the Constitution and federal law. (*Id.* ¶ 1.) The Select Committee actions are unlawful because (1) the Salesforce Subpoena violates the RNC's First Amendment associational and speech rights because the Salesforce Subpoena serves no valid legislative purpose (*id.* ¶¶ 74–90); (2) the Salesforce Subpoena exceeds the lawfully authorized purpose of the Select Committee, as full compliance with such subpoena would violate the RNC's and its supporters' Fourth Amendment protection against unlawful search and seizure (*id.* ¶¶ 91–102); (3) the Select Committee has exceeded its authority to issue a subpoena (*id.* ¶¶ 103–15); (4) the Select Committee lacks necessary congressional authorization (*id.* ¶¶ 116–24); (5) the Salesforce Subpoena is excessively broad and unduly burdensome (*id.* ¶¶ 125–33); and (6) the Salesforce Subpoena violates the Stored Communications Act (*id.* ¶¶ 137–42). The RNC therefore seeks a declaration that the Salesforce Subpoena violates the Constitution and federal law and seeks a preliminary and permanent injunction enjoining enforcement of the Subpoena. (*See id.*, Prayer for Relief.)

V.     **Salesforce Initially Agreed Not to Respond to the Subpoena Pending Resolution of This Lawsuit but Relented Under Pressure of Contempt.**

After Salesforce notified the RNC of the Salesforce Subpoena on February 24, 2022, Salesforce and RNC conferred on RNC's objections to the Subpoena and its intention to file suit

to protect its constitutional rights. (Decl. of C. Murray (Murray Decl.) ¶ 7.) Salesforce agreed to withhold production during the pendency of any RNC lawsuit challenging the authority of the Select Committee to subpoena the materials demanded so long as Salesforce received notice of such suit before its deadline to comply with the Salesforce Subpoena. (*Id.* ¶ 8.) Accordingly, at 8:30am on March 9, 2022, the RNC informed Salesforce it would be filing this lawsuit. (*Id.* ¶ 9.)

Nonetheless, late in the afternoon on March 10, 2022, Salesforce informed the RNC that, after discussions with staff for the Select Committee during which staff took the position that the RNC's initiation of this action did not relieve Salesforce of its obligations under the Salesforce Subpoena, it was no longer willing to withhold production during the pendency of this matter. (*Id.* ¶ 10.)

Salesforce also indicated that the Select Committee had extended its deadline for production until on Wednesday, March 16, 2022, and that it agreed to move Salesforce's deposition to Wednesday, March 23, 2022. (*Id.* ¶ 11.) Salesforce represented to the RNC that absent a pending motion for preliminary relief from this Court, it would begin to produce documents to the Select Committee in compliance with the Salesforce Subpoena at 10:00am on Wednesday, March 16, 2022. (*Id.* ¶ 12.)

The RNC now files this motion for a preliminary injunction.

## LEGAL STANDARD

To obtain a preliminary injunction under Federal Rule of Civil Procedure 65(a), the moving party "must establish [1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that an injunction is in the public interest." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. NRDC*, 555 U.S. 7, 20 (2008)). Where the federal government is the opposing party, the balance of equities and public interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Before the U.S. Supreme Court's decision in *Winter*, the D.C. Circuit applied a "sliding-scale" approach to preliminary injunctions under which "a strong showing on one factor could

make up for a weaker showing on another." *Sherley*, 644 F.3d at 392. Since *Winter*, however, the D.C. Circuit has "suggested, without deciding, that *Winter* should be read to abandon the sliding-scale analysis in favor of a 'more demanding burden' requiring plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 26 (D.D.C. 2016) (quoting *Sherley*, 644 F.3d at 392–93); *see also Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) (observing *Winter* may be "properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned"). The RNC can show both a likelihood of success on the merits and irreparable harm; thus, it is entitled to a preliminary injunction under either approach.

## ARGUMENT

I. **The RNC Is Likely to Succeed on the Merits of Its Claims.**

The RNC is likely to succeed on the merits of its claims that the Salesforce Subpoena's expansive demands (a) violate the RNC's associational rights under the First Amendment, (b) violate the RNC's rights under the Fourth Amendment, (c) are not in support of a valid legislative purpose, (d) were not made in compliance with H. Res. 503, and (d) violate the Stored Communications Act, 18 U.S.C. §§ 2701 to 2712.

A. **The Salesforce Subpoena violates the First Amendment because it is not tailored to the Select Committee's purpose.**

The First Amendment prohibits the government from "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others." *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984). Protected association furthers "a wide variety of political, social, economic, educational, religious, and cultural ends," and "is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority." *Id.*

9

1.     *The First Amendment freedom of association applies with particular force to political parties and prohibits compelled disclosure of membership lists and internal party planning materials.*

The ability of citizens to associate into and through political parties is encompassed within this right. The First Amendment protects "a political party's discretion in how to organize itself, conduct its affairs, and select its leaders." *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 230 (1989); *see also Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 224 (1986) ("The Party's determination of the boundaries of its own association, and of the structure which best allows it to pursue its political goals, is protected by the Constitution."). This First Amendment protection extends to internal deliberations concerning how to advance a political message. *See Am. Fed'n of Labor & Cong. of Indus. Orgs. v. FEC*, 333 F.3d 168, 178 (D.C. Cir. 2003) (concluding Democratic National Committee and AFL-CIO have "substantial First Amendment interests in [preventing] the disclosure of their own internal materials" related to FEC investigation).

While Government infringement of this freedom of association "can take a number of forms," *Jaycees*, 468 U.S. at 622, compelled disclosure of affiliation with groups engaged in political activity or other advocacy "may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958) (*"NAACP v. Alabama"*). *NAACP v. Alabama* involved an effort to oust the NAACP from the state of Alabama. *Id.* at 452. In support of this effort, the Alabama Attorney General demanded the NAACP's membership lists. *Id.* at 453. Recognizing that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association," *id.* at 460, and noting "the vital relationship between freedom to associate and privacy in one's associations," *id.* at 462, the Supreme Court held that the First Amendment prohibited the compelled disclosure of the membership lists, *id.* at 466. Just last year, the Supreme Court held that California's attempt to compel disclosure of the major donors to tax-exempt organizations operating in the state violated the First Amendment rights of these organizations. *See Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2389 (2021). In

so holding, the Court noted that "the protections of the First Amendment are triggered not only by actual restrictions on an individual's ability to join with others to further shared goals. The risk of a chilling effect on association is enough, '[b]ecause First amendment freedoms need breathing space to survive.'" *Id.* (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).

The D.C. Circuit has expressly recognized that political parties' First Amendment right to association includes security in their internal materials and documents. In *American Federation of Labor & Congress of Industrial Organizations v. FEC*, the D.C. Circuit held that the FEC's regulation compelling public disclosure of Democratic National Committee and AFL-CIO internal planning materials obtained in an investigation violated the First Amendment rights of the political party and the labor union. 333 F.3d at 179. The court expressly accepted that, while compelled disclosure requirements are less direct restrictions on a party's rights than the regulation of political group leadership or structure, compelled disclosure similarly frustrates a group's decisions as to "how to organize themselves, conduct their affairs, and select their leaders," as well as their selection of a "message and the best means to promote that message." *Id.* (quoting *Eu*, 489 U.S. at 230–31 & n.21) (internal brackets omitted).

> 2. *Compelled disclosure requirements must satisfy exacting scrutiny.*

In *Bonta*, the Supreme Court confirmed that where a compelled disclosure requirement implicates First Amendment associational interests, the disclosure requirement must meet exacting scrutiny. 141 S. Ct. at 2383. This review requires that the proposed disclosure bears a substantial relationship to a sufficiently important governmental interest. *Id.* (citing *Doe v. Reed*, 561 U.S. 186, 196 (2010)). *Bonta* clarified that exacting scrutiny requires that the disclosure requirement "be narrowly tailored to the government's asserted interest." *Id.* Hence, in order for the Salesforce Subpoena to survive this challenge, it must have been issued in support of a sufficiently important governmental interest, and must be tailored to that interest.

      3.     *The Salesforce Subpoena fails exacting scrutiny because its demands are not tailored in support of a substantial governmental interest.*

For a governmental interest to be substantial, it must first be lawful. The RNC does not question that a lawful investigation into the events of January 6, 2021, represents a substantial governmental interest. Indeed, the RNC has consistently condemned and maintained that the events of that day were an appalling attack on our country and its founding principles. RNC Members Condemn Violence, *supra*; Ronna McDaniel (@GOPChairwoman), Twitter (Jan. 6, 2021, 1:11 PM), https://bit.ly/36itVzh. Those responsible for the events of that day should be—and largely are—being held responsible through the country's criminal justice system. *See, e.g.*, Nik Popli & Julia Zorthian, What Happened to Jan. 6 Insurrectionists Arrested in the Year Since the Capitol Riot, Time (Jan. 6, 2022), https://bit.ly/3q3XZWf; John Bellinger, The D.C. District Court and the Jan. 6 Cases, Lawfare Blog (Jan. 3, 2022), https://bit.ly/3IgroTz; Capitol Breach Cases, U.S. Dep't of Justice, https://bit.ly/36kGWsi (last visited Mar. 14, 2022) (collecting cases). While the governmental interest in investigation regarding the events of January 6th by the proper authorities is clearly substantial, under the Constitution, it is law enforcement and the Executive Branch that must pursue such an investigation, not Congress and the Select Committee. As argued in subsection I.C *infra*, the Select Committee did not issue the Salesforce Subpoena in support of a valid legislative purpose as required for the exercise of Congress's limited subpoena power. Moreover, as argued in subsection I.D *infra*, even if the Select Committee could be said to have a valid legislative purpose, it has not authorized the Salesforce Subpoena in the manner required by its authorizing legislation, H. Res. 503.

However, the Court need not pass on these broad questions of the Select Committee's authority to enter a preliminary injunction here because the Salesforce Subpoena is not at all tailored to the governmental interest in an investigation into the events of January 6th. This lack of tailoring, combined with the fact that the Salesforce Subpoena seeks materials documenting non-public information regarding RNC donors, supporters, and other partners, as well as

documents revealing internal deliberative processes of the RNC, renders the Salesforce Subpoena unenforceable under exacting scrutiny.

As detailed in the Declaration of Christian Schaeffer, the first two items in the Salesforce Subpoena demand records that would likely result in the disclosure of data and records for tens of millions of RNC donors, supporters, and other partners with whom the RNC communicates. (Schaeffer Decl. ¶ 15, 17.a–k.). This data is "highly granular" including "[a]ll email addresses acquired by the RNC" including from volunteers, individuals contacted through voter registration drives, GOTV efforts, and coalition signups. (*Id.* ¶ 17.a.). The data would include information on all donors to the RNC, including the millions of donors who have given less than $200.00 in a year to the RNC and who are therefore not disclosed to the FEC. (*Id.* ¶ 17.b.) The RNC records demanded from Salesforce would also include information on how individuals responded to surveys, petitions, information on specific volunteer activities supporting the RNC, and even their voter histories. (*Id.* ¶ 17.i, 19.)

The production of this data would cause significant harm to the RNC's operations and to the RNC's voters and supporters. The data and analytics hosted by Salesforce, if produced as demanded by the Select Committee, could be used to create a mosaic of the RNC's confidential, and highly sought after, digital political strategy. (*Id.* ¶ 18.) The data and analytics could also be used to create a mosaic of the RNC's supporters' intimate political activities and beliefs. (*Id.*) Information of this nature could easily facilitate reprisals and harassment of RNC supporters.

Beyond the sensitive nature of the data, by requesting all data for the period of November 3, 2020 through January 6, 2021, the Select Committee unquestionably includes within its dragnet materials bearing no relationship to the events of January 6, 2021. For example, for almost the entire period requested, the RNC was engaged in extensive political activity in connection with the two 2021 U.S. Senate runoff elections in Georgia. (*Id.* ¶ 21.) That the RNC was heavily involved in these races was well-known and unsurprising given the races' outcomes determined party control of the Senate. (*Id.*) *See also* Chenue Her, Republicans Commit At Least $20 million, 600 Staffers in Georgia Senate Runoff Races, 11 Alive (Nov. 15, 2020),

https://bit.ly/3w9VHsv; Zeke Miller, RNC to Spend At Least $20 million on Georgia's Senate Races, Associated Press (Nov. 13, 2020), https://bit.ly/37yam6O. By demanding these materials, the Select Committee demonstrates it has utterly failed to tailor the Salesforce Subpoena. It therefore necessarily fails exacting scrutiny.

Finally, the RNC acknowledges that there may be some documents responsive to items three, four, and five in the Salesforce Subpoena that are not RNC records, but are truly documents generated by and held by Salesforce. Unfortunately, the nature and breadth of the Salesforce Subpoena mean that in each of the final three categories of documents there are certain to be materials which either contain or substantially reflect RNC data subject to First Amendment protection. For this reason, the RNC must, at a minimum, be permitted to review non-privileged material Salesforce believes may be responsive to items three, four, and five so the RNC can lodge any objections on a document-by-document basis before their production.

### B.    The Salesforce Subpoena violates the Fourth Amendment because it is unreasonable.

The Fourth Amendment to the Constitution prohibits the government from conducting unreasonable searches and seizures of a person's house, papers, and effects. U.S. Const. Amend. IV. The Fourth Amendment generally protects a person's reasonable privacy expectations. *Katz v. United States*, 389 U.S. 347, 351–53 (1967). As established above, a political party may reasonably expect nonpublic information about its donors, supporters, volunteers, and internal deliberative processes to remain private. This is true even if a third party like Salesforce temporarily stores some of this data. *See Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018). Ordinarily, any government seizure of such information would be subject to the requirement that the government secure a search warrant authorized by a competent magistrate on an appropriate showing of probable cause. *See, e.g.*, *In re Search of Info. Associated with [redacted]@mac.com Stored at Premises Controlled by Apple, Inc.*, 13 F. Supp. 3d 157, 163 (D.D.C. 2014).

Congressional subpoenas are not exempt from the requirements of the Fourth Amendment. *Okla. Press Pub. Co. v. Walling*, 327 U.S. 186, 209 (1946); *Watkins v. United States*, 354 U.S. 178, 188 (1957). Indeed, this circuit has observed that "an unreasonable search and seizure is no less illegal if conducted pursuant to a subpoena of a congressional subcommittee than if conducted by a law enforcement official." *United States v. Fort*, 443 F.2d 670, 678 (D.C. Cir. 1970). Courts analyzing congressional subpoenas in light of the Fourth Amendment generally require that the congressional subpoena—which will effect a search and/or a seizure—be "reasonable." That is, (1) the subpoena must demand material reasonably relevant to a valid legislative purpose, *Watkins*, 354 U.S. at 200–01, and (2) must be issued consistent with the legislation authorizing it, *see Wheeldin v. Wheeler*, 373 U.S. 647, 649–51 (1963) (holding no private right of action for damages arising out of congressional subpoena issued by investigator without approval of House Committee on Unamerican Activities). The lack of any valid legislative purpose and the Select Committee's irregular issuance of the subpoena are argued below. However, as with the RNC's First Amendment claim, the Court need not reach these broad questions of the Select Committee's authority and propriety in issuing the Salesforce Subpoena to enter a preliminary injunction. The Salesforce Subpoena is not reasonable under the Fourth Amendment because it demands materials wholly irrelevant to the events of January 6, 2021, and the Select Committee has provided no opportunity for the RNC to object to the Subpoena or to protect the high volume of irrelevant and sensitive data from review by the Select Committee.

1.  *The Salesforce Subpoena demands materials wholly irrelevant to the Select Committee's investigation of the events of January 6, 2021.*

The Salesforce Subpoena includes at least three unreasonably broad demands. *First*, item one requires Salesforce to produce essentially all information on RNC email campaigns over a two-month period. This demand will capture immense quantities of data wholly unrelated to the Select Committee's investigation of the events of January 6, 2021. For example, it will include data on thousands of emails sent relating to the Georgia U.S. Senate runoff elections held on

January 5, 2021. (Schaeffer Decl. ¶ 21.) *Second*, item two demands the production of all information regarding the RNC's use of the Salesforce Marketing Cloud platform over the same two-month period. This platform serves as the RNC's email service provider and will similarly include volumes of information completely unrelated the events of January 6, 2021. (*Id.* ¶ 16.) *Third*, items four and five demand communications between the RNC and Salesforce over an almost three-month period and "analyses conducted by Salesforce regarding the use of Salesforce's platforms by the RNC … and related materials." (Salesforce Subpoena at 3.) Because of their breadth, these requests will certainly capture irrelevant information within the dragnet of items one and two and possibly other irrelevant material.

> 2.   *Even if the material demanded is relevant to a valid legislative purpose, the Salesforce Subpoena is still unreasonable under the Fourth Amendment because the Select Committee afforded no opportunity for the RNC to object to the subpoena and provided no means to protect irrelevant internal deliberations and RNC data from being rummaged through.*

Where a congressional subpoena seeks information reasonably related to a valid legislative purpose, a court must nonetheless "[balance] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Sen. Select Comm. on Ethics v. Packwood*, 845 F. Supp. 17, 22 (D.D.C. 1994) (quoting *O'Connor v. Ortega*, 480 U.S. 709, 719 (1987)). Here, even if this Court determines the Salesforce Subpoena demands information reasonably related to a valid legislative purpose, it must balance the RNC's reasonable expectations of privacy in its First Amendment protected material against the Select Committee's interest in examining these materials, and the manner of the Select Committee's proposed examination. The manner of the proposed examination of the RNC's First Amendment protected data reveals the Salesforce Subpoena is unreasonable under the Fourth Amendment.

Initially, the Select Committee provided the RNC with no notice of the Salesforce Subpoena. (Riemer Decl. ¶ 9.) RNC only learned of the Salesforce Subpoena from Salesforce. (*Id.* ¶ 8.) The RNC has been provided no opportunity to object to the Salesforce Subpoena or

otherwise lodge claims of privilege or legal protection. And, while Salesforce initially committed to withhold production pending the resolution of this lawsuit, the Select Committee took the position that Salesforce could not wait to respond to the Salesforce Subpoena until the resolution of this case. (*See* Murray Decl. ¶ 10.) Finally, the Select Committee has put in place no safeguards to protect the associational rights of the RNC, its donors, volunteers, members, and supporters. The Select Committee has not established any provisions for a taint team or analogous filter for privileged information or other protected information. The entirety of the demanded information, including that which is constitutionally or otherwise protected, will be turned over to the Committee to do with as it pleases.

The Select Committee's approach stands in stark contrast to the procedure approved by this court in *Packwood*. There, the Senate's Select Committee on Ethics sought a U.S. Senator's personal diaries in support of an ethics investigation of him. *Packwood*, 845 F. Supp. at 20. Despite the fact that the Senator was the target of the investigation and the fact—recognized by the court—that the Senate Select Committee on Ethics may be the only tribunal with authority to punish the Senator's misconduct, the Select Committee in that case "propose[d] to conduct a focused, temporally limited review of a fraction of the diaries of most recent origin with many passages masked to protect the most vital of Senator Packwood's interests in privacy." *Id.* at 22. The Select Committee in *Packwood* further provided that the examination of the Senator's diaries would "occur in the presence of Senator Packwood's counsel, and the original diaries will be returned immediately to Senator Packwood, marked only to identify the entries perceived as relevant by the Committee for Senator Packwood to copy for it." *Id.*

If such protections can be afforded for the diaries of a target of a congressional ethics investigation, surely the First Amendment protected materials of one of the nation's two major political parties and its donors, supporters, and other partners could be afforded some protection from wholesale "rummage" by the Select Committee. That the Select Committee elected to eschew any such protections for the RNC demonstrates that even if the Salesforce Subpoena

were reasonably related to a legitimate legislative purpose—and it is not—it is nevertheless unreasonable under the Fourth Amendment.

### C.     The Salesforce Subpoena serves no valid legislative purpose.

The Salesforce Subpoena lacks a legitimate legislative purpose and thus violates the Constitution and separation of powers. The requirement that a congressional subpoena be issued in service of a "valid legislative purpose" flows from the Constitution. "The powers of Congress … are dependent solely on the Constitution," and "no express power in that instrument" allows Congress to investigate individuals or to issue boundless records requests. *Kilbourn v. Thompson*, 103 U.S. 168, 182–89 (1880); *see also Watkins*, 354 U.S. at 200 ("We have no doubt there is no congressional power to expose for the sake of exposure."). Congress's power to investigate "is justified solely as an adjunct to the legislative process." *Watkins*, 354 U.S. at 197. "Congress is not invested with a general power to inquire into private affairs. The subject of any inquiry always must be one on which legislation could be had." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 n.15 (1975); *see also Quinn v. United States*, 349 U.S. 155, 161 (1955) ("[T]he power to investigate" does not "extend to an area in which Congress is forbidden to legislate."). For this reason, congressional subpoenas may not be used in pursuit of "any of the powers of law enforcement." *Quinn*, 349 U.S. at 161. Congressional investigations conducted "for the personal aggrandizement of the investigators" or "to punish those investigated," are "indefensible." *Watkins*, 354 U.S. at 187. The Select Committee's limited purposes and authorized activity are established by H. Res. 503. This resolution provides that the Select Committee's investigative "purpose" is: (1) "[t]o investigate and report upon the facts, circumstances, and causes" relating to January 6, as well as "influencing factors"; (2) "[t]o examine and evaluate evidence developed by relevant Federal, State, and local government agencies regarding the facts and circumstances surrounding" the attack; and (3) "[t]o build upon the investigations of other entities and avoid unnecessary duplication of efforts by reviewing the investigations, findings, conclusions, and recommendations of other" investigations into the attack. H. Res. 503 § 3. The Select Committee's "Function," including issuance of a final report,

is limited to activities in furtherance of this defined and limited purpose. § 4(a)–(b). Notably, the Select Committee expressly is forbidden from marking up legislation. § 4(d).

In light of H. Res. 503, it is unclear what, if any, legislative purpose is served by the Select Committee's overly broad Salesforce Subpoena for proprietary and confidential RNC data. Indeed, the Select Committee itself appears not to know. Chairman Thompson's cover letter transmitting the Salesforce Subpoena states that the Select Committee intends to "identify and evaluate lessons learned and to recommend to the House and its relevant committees corrective laws, policies, procedures, rules or regulations." (Salesforce Subpoena at 1.) However, a recent news article reports that the Select Committee may seek to justify its unconstitutional subpoena with vague reference to amending campaign finance law. *See* Josh Dawsey, Jacqueline Alemany, & Tom Hamburger, Inside the Jan. 6 Committee's Effort to Trace Every Dollar Raised and Spent Based on Trump's False Election Claims, Wash. Post (Mar. 8, 2022), https://wapo.st/3MPWViL. But such activity is clearly outside the scope of the Select Committee's limited purview of investigating the January 6 attack and its causes. Indeed, if this professed interest in potentially passing remedial legislation is all the Constitution requires for a "valid legislative purpose," then, *contra Watkins*, there is no limit to the investigations upon which Congress can embark.

Indeed, since the passage of H. Res. 503, Speaker Pelosi and members of the Select Committee have made countless public statements consistent with a view that the purpose of the Select Committee is not legislative at all. For example, Rep. Schiff tweeted, "We will expose those responsible for Jan 6. No one is above the law." Adam Schiff (@RepAdamSchiff), Twitter (Nov. 12, 2021, 4:54 PM), https://bit.ly/3wbcpYQ. And in an interview on December 29, 2021, Rep. Kinzinger stated, "[w]e'll be able to have out on the public record anything [the] Justice Department needs maybe in [sic] in pursuit of [a crime]." Zachary Cohen & Annie Grayer, January 6 Committee Says It Would Make Criminal Referrals If 'Appropriate,' But That Could Be a Long Way Off, CNN (Dec. 21, 2021), https://cnn.it/3tcuDHe. Rep. Raskin has also affirmed the law enforcement purpose of the investigation when he stated on multiple occasions

19

that no privilege (neither attorney-client nor executive) "operate[s] to shield participants in a crime from an investigation into a crime." Hugo Lowell, Capitol Panel to Investigate Trump Call to Willard Hotel in Hours Before Attack, Guardian (Dec. 27, 2021), https://bit.ly/3tdj56I; *see also* Jamie Raskin (@RepRaskin), Twitter (Dec. 2, 2021, 5:40 PM), https://bit.ly/3MRfu6a ("Exec. privilege doesn't cover criminal misconduct, like insurrections or coups … .").

To be clear, criminal investigation into the attack on January 6, 2021, and criminal prosecution of those responsible for the event are entirely appropriate. But Congress through its Select Committee is not the branch of government to do it. The Executive Branch (through law enforcement and prosecutors) and the Judiciary (by hearing and deciding prosecutions) are the branches to accomplish this task.

Even if the Select Committee had a valid legislative purpose, the Salesforce Subpoena is far too broad to bear a reasonable relationship to that purpose. It demands voluminous documents protected by the First Amendment that have no relationship to the events of January 6, 2021. Because the Salesforce Subpoena was not issued in support of any legitimate legislative purpose, and because even if the Select Committee's law-enforcement-like investigation untethered to any legislative purpose were legitimate, the Salesforce Subpoena's requests are not reasonably related to that purpose and the RNC is likely to prevail on the merits of this claim.

### D.     The Salesforce Subpoena was not issued in accordance with H. Res. 503.

The Select Committee also suffers from legal infirmity rendering its purported use of the Congressional subpoena power *ultra vires*. On January 4, 2021, Congress adopted H. Res. 8, which provides for the Rules of the One Hundred Sixteenth Congress. Section 3(b)(1) of H. Res. 8 provides that "the chair of a standing committee, ***upon consultation with the ranking minority member of such committee***, may order the taking of depositions, including pursuant to subpoena, by a member or counsel of such committee." (Emphasis added.) This requirement that the Chairman consult with the "ranking minority member" before issuing a subpoena is expressly applied to the Select Committee. H. Res. 503 § 5(c)(6)(A). The Select Committee,

however, has no ranking minority member with whom Chairman Thompson could consult before issuing the Salesforce Subpoena.

Instead, the Select Committee has a "Vice Chair." Representative Cheney was named to this position by Chairman Thompson on September 2, 2021. *See* Chairman Thompson Announces Representative Cheney as Select Committee Vice Chair, *supra*. To the extent Chairman Thompson effectively appointed Rep. Cheney the Select Committee's Vice Chair, this appointment violated House Rules. House Rule XI, clause 2(d) instructs that a committee chair shall designate "[a] member of the majority party … as the vice chair of the committee." Rep. Cheney is a member of the Republican Conference of the House of Representatives. She is not a member of the current majority party. Moreover, H. Res. 503 does not mention a "vice chair," much less authorize the chair to appoint a "vice chair." *See generally* H. Res. 503. Defendants have all but admitted there is no ranking member on the Select Committee. In a court pleading filed on February 25, 2022, the Defendants described Rep. Cheney as the "Vice Chair" of the Committee and, according to Defendants, the "most senior Republican Member of the Select Committee" "for purposes of consultation prior to issuance of a subpoena under H.R. 503." Def.'s Mot. to Dismiss at 18, *Flynn v. Pelosi*, No. 8:21cv2946 (M.D. Fla. Feb. 25, 2022).

The Select Committee's lack of a ranking member for mandatory pre-subpoena consultation is born of a larger infirmity in the Select Committee: it is not composed as required under H. Res. 503. H. Res. 503 instructs the Speaker of the House to appoint thirteen members to the Select Committee, only five of which "shall be appointed after consultation with the minority leader." § 2(a). Speaker Pelosi appointed Chairman Thompson to serve as Chair of the Select Committee and appointed six additional Democrat members: Rep. Zoe Lofgren of California, Rep. Adam Schiff of California, Rep. Peter Aguilar of California, Rep. Stephanie Murphy of Florida, Rep. Jamie Raskin of Maryland, and Rep. Elaine Luria of Virginia. 167 Cong. Rec. 3597 (2021). House Republican Leader Kevin McCarthy recommended five Republican members to serve on the Select Committee, consistent with H. Res. 503: Rep. James E. Banks of Indiana to serve as Ranking Member and Reps. Rodney L. Davis of Illinois, James D. Jordan of Ohio,

Kelly M. Armstrong of North Dakota, and Troy E. Nehls of Texas. 167 Cong. Rec. 3805, 3819–20 (2021); Olivia Beavers & Heather Caygle, McCarthy Makes His 5 GOP Picks for Jan. 6 Select Committee, Politico (July 19, 2021), https://politi.co/37D5flX.

In what she acknowledged was an "unprecedented decision," Speaker Pelosi refused to appoint Rep. Banks, Leader McCarthy's choice for Ranking Member, and Rep. Jordan to the Select Committee. Pelosi Statement on Republican Recommendations to Serve on the Select Committee, *supra*. Instead, Speaker Pelosi appointed Rep. Adam Kinzinger and Rep. Liz Cheney—the only two members of the Republican caucus who voted in favor of H. Res. 503—and left the other seats vacant after Leader McCarthy rescinded his recommendations in protest. *See* 167 Cong. Rec. 3805, 3819–20 (2021).

## E.   The Salesforce Subpoena violates the Stored Communications Act.

In the event the Court finds the RNC is unlikely to prevail on any of the claims argued above—and only in that event—the Stored Communications Act, 18 U.S.C. §§ 2701 to 2712, prohibits the Select Committee from obtaining some of the subpoenaed records from Salesforce. Specifically, item one of the Salesforce Subpoena seeks the actual content of communications stored on Salesforce's servers by requesting the production of "message attributes" associated with the RNC's email campaigns, as well as the private communications of the RNC's staff that are stored on Salesforce's servers. Items three and four of the Salesforce Subpoena request Salesforce documents highly likely to include such material as well. Salesforce's production of such materials would be unlawful because, under the Stored Communications Act, Salesforce may "not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service" and may not "knowingly divulge a record or other information pertaining to a subscriber to or customer of such service … to any governmental entity." § 2702(a)(1), (3).

Furthermore, Congress lacks the authority to subpoena those materials from an electronic communication service. *See generally* § 2702(a), (b). Although content can be disclosed to a "governmental entity" under specific, narrow circumstances, Congress is not a "governmental

22

entity" because, as the legislative branch, it is not a "department or agency of the United States." § 2711(4). And no other provision in the Act authorizes Congress to access the content sought by the Salesforce Subpoena. Section 2702(a) therefore prohibits knowing disclosure of "the contents of a communication" or any other customer record stored by Salesforce to the Select Committee absent an express statutory exception outlined in § 2702(b) or (c).

And none of the statutory exceptions in § 2702 apply to the Salesforce Subpoena. The Select Committee cannot obtain the subpoenaed records under § 2702(c)(1) because disclosure would not be "as otherwise authorized in section 2703." § 2702(c)(1). Specifically, the Select Committee has not—and cannot—obtain "a warrant issued using the procedures described in the Federal Rules of Criminal Procedure … by a court of competent jurisdiction," as would be required to obtain records "in electronic storage in an electronic communications system for more than one hundred and eighty days." § 2703(a). Nor has the Select Committee provided Plaintiff or Salesforce with "prior notice" and obtained either (i) "an administrative subpoena authorized by a Federal or State statute or a Federal or State grand jury or trial subpoena" or (ii) "a court order," as would be required to obtain records "in electronic storage … for more than one hundred and eighty days." § 2703(a), (b)(1)(B)(i)–(ii). Hence, to the extent the Court determines the RNC is unlikely to prevail on the merits of any of the claims argued above, the Court should nonetheless enter a preliminary injunction prohibiting disclosure of materials in response to items one, three, and four of the Salesforce Subpoena under the Stored Communications Act.

## II.      The RNC Will Be Irreparably Injured Absent a Preliminary Injunction.

The unlawful Salesforce Subpoena has, and will continue to cause, irreparable harm to the RNC and its donors, supporters, and other partners. "'[A] prospective violation of a constitutional right constitutes irreparable injury for ... purposes' of 'seeking equitable relief.'" *Karem v. Trump*, 960 F.3d 656, 667 (D.C. Cir. 2020) (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)); *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) ("[T]he deprivation of constitutional rights constitutes irreparable injury ...

to the extent such deprivation is shown to be likely."). This is particularly true for First Amendment rights. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (quoting *Mills v. Dist. of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (internal quotation marks omitted); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) (same). Even the potential for chilling First Amendment rights is a violation, and in turn, irreparable harm. *See DeGuiseppe v. Vill. of Bellwood*, 68 F.3d 187, 192 (7th Cir. 1995) ("[R]etaliation need not be monstrous to be actionable under the First Amendment; it need merely create the potential for chilling … speech on matters of public concern.").

Courts in this District routinely find irreparable harm when government action infringes First Amendment protections. *See, e.g.*, *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 386 (D.D.C. 2020), *appeal dismissed*, No. 20-5374 (D.C. Cir. May 17, 2021) (irreparable harm to journalists' speech rights relating to "defendants' taking or influencing personnel actions against individual journalists or editors, attempting to influence content through communications with individual journalists or editors, and investigating purported breaches of journalistic ethics"); *Price v. Barr*, 514 F. Supp. 3d 171, 195 (D.D.C. 2021) (irreparable harm to filmmaker's speech rights related to "commercial filming plans" due to "unconstitutional permitting restrictions" for films on government property); *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 215 F. Supp. 2d 120, 127, 134–35 (D.D.C. 2002) (irreparable harm to PETA's speech rights related to refusal "to accept its … sad circus elephant design in the Party Animals public art exhibit"). *See also Americans for Prosperity Found. v. Harris*, No. 2:14-CV-09448-R-FFM, 2015 WL 769778, at *1–2 (C.D. Cal. Feb. 23, 2015) (irreparable harm to foundation's First Amendment rights related to compelled disclosure of confidential information including donor rolls), *vacated and remanded*, 809 F.3d 536 (9th Cir. 2015), *overruled on other grounds sub nom. Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373 (2021).

Disclosure of the information demanded in the broad categories in the Salesforce Subpoena will result in analogous irreparable harm—both direct and indirect. The direct harm

includes harm to the RNC, as well as people who associate with the RNC and the Republican candidates (e.g., donors, supporters, and other partners). Salesforce "is a key data and digital communications vendor to RNC" (Schaeffer Decl. ¶ 14), housing data and records of tens of millions of RNC donors, supporters, and other partners. (*Id.* ¶ 15.) The Salesforce platforms are integral to the RNC's political operation, assisting with its "core political functions such as recruiting volunteers, conveying political messaging in support of the RNC's preferred candidates and policies, GOTV ["Get Out to Vote"] efforts, and fundraising." (*Id.* ¶ 14.) Production of the RNC's underlying "data and analytics hosted on these platforms [will] cause significant harm" to the RNC's political operations and could "be used to create a mosaic of the RNC's confidential, and highly sought after, digital political strategy." (*Id.* ¶ 18.)

Production of the materials as demanded by the subpoena would inflict competitive and monetary harm on the RNC by providing its political opponents and fundraising competitors with unfettered access to "highly confidential information regarding RNC digital, political, and fundraising strategy, as well as personal information relating to millions of its supporters," thereby eroding "the RNC's competitive advantage over other groups that compete to target similar demographics in conveying political messaging and fundraising." (*Id.* ¶ 24.) This information would reveal to the RNC's competitors and political opponents "crucial elements of the RNC's digital strategy such as metrics on how certain content performs, what subject lines and text messages lead to contributions, how certain individuals respond to specific content, and the results of A/B testing." (*Id.* ¶ 25.) This information not just important in terms of the RNC's ability to compete politically, it has independent monetary value that will be diluted as soon as it is produced to the Select Committee. (*Id.* ¶ 27.)

Additionally, the RNC associational strength is a direct product of its ability to keep certain information confidential. Critically, this includes how donors, supporters, and other partners interact and communicate with the RNC through Salesforce platforms. If these individuals' associational contacts with the RNC are revealed (including non-public emails and phone numbers; RNC-initiated communications they opened, clicked on, or otherwise interacted

with; and responses to RNC communications) (*id.* ¶ 17.a–k), they are less likely to engage with the RNC through these critical mediums, *see Buckley v. Valeo*, 424 U.S. 1, 68 (1976) ("It is undoubtedly true" that mandatory disclosures "will deter some individuals who otherwise might contribute" and "may even expose contributors to harassment or retaliation."); *Bonta*, 141 S. Ct. at 2388 ("Our cases have said that disclosure requirements can chill association '[e]ven if there [is] no disclosure to the general public.'").

The direct harm is not limited to the RNC. Its donors, supporters, and other partners have and will be harmed by Defendants' overly broad subpoena requests. *First*, the Salesforce Subpoena seeks information reaching the identity of RNC-affiliated individuals, infringing on their right to privacy in political affiliation. This is particularly problematic for small-dollar donors (i.e., those giving less than the $200 reporting threshold), volunteers, and other supporters whose association with the RNC may not be public. (*Id.* ¶ 17.a–k.) *Second*, as explained, the Salesforce Subpoena is astounding in scope, seeking

- performance metrics and analytics related to email campaigns;
- delivery metrics (send rates and bounce rates), engagement metrics (opens, open rates, click rates, and click-to-open rates), time attributes, and message attributes;
- login sessions by individuals associated with the Trump Campaign or the RNC into Salesforce's Marketing Cloud platform; and
- all communications between Salesforce representatives and representatives of the RNC or the Trump Campaign concerning any of the facts and circumstances of the topics that are the subject of any of the above requests.

(Salesforce Subpoena at 3.) This fishing-expedition-type request for associational contacts between the RNC's and millions of other Americans (donors, supporters, and other partners) is guaranteed to infringe First Amendment protections of these individuals. For example, using the information that the Salesforce Subpoena demands, the government and members of the public would be able to determine an individual's position on controversial issues and the candidates they support by examining how they responded to specific RNC communications including surveys, petitions, and fundraising appeals. (Schaeffer Decl. ¶ 19.) This sort of injury is

26

especially troubling considering Defendants' infinitesimally small interest in information from individuals who had no connection to the January 6th attack on the United States Capitol. *Third*, donors, supporters and other partners will be harmed by the disclosure of nonpublic emails, phone numbers, and data underlying message interactions with the RNC. If this information is disclosed, "the very right sought to be protected" will be destroyed. *In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1065 (D.C. Cir. 1998) (quoting *In re Ford Motor Co.*, 110 F.3d 954, 963 (3d Cir. 1997)).

The threat of irreparable indirect harm is real as well. The release of the information requested in the Salesforce Subpoena will expose donors, supporters, and other partners of the RNC and Republican candidates to the risk of "economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility" by individuals opposed to their association with the RNC ,Republican candidates, and Republican policies. *NAACP v. Alabama*, 357 U.S. 449, 462 (1958). Undoubtedly, some individuals associate and interact with the RNC on the basis on anonymity. Disclosure of their relationship with the RNC, as well as granular data related to their relationship, which is surely to be mined by political foes, risks subjecting these individuals to a flood of hostile responses—from being cancelled on social media (less severe), to economic reprisal or loss of employment (more severe), to threats of life and limb (most severe). Disclosure also arbitrarily and unfairly associates these individuals to the events of January 6th. Absent relief from this Court, such irreparable harm looms.

To be clear, there has been no assurances that this information will be protected, including failing to establish safeguards for privileged information or other information protected by the First Amendment. Further, the Select Committee has demonstrated that it cannot be trusted to keep private information secure. For example, in at least one instance, information regarding private communications only available to the Select Committee was leaked to the *Washington Post*. *See* Jacqueline Alemany, et al., Texting Through an Insurrection, Wash. Post (Feb. 16, 2022), https://wapo.st/3CLZXzV. This demonstrates the reality of the irreparable harm

the RNC and its supporters will face if Salesforce is forced to turn over the information demanded by the Select Committee.

The Court should preliminarily enjoin disclosure in response to the Salesforce Subpoena to stop Defendants from irreparably harming the RNC and its donors, supporters, and other partners, including by trampling foundational associational rights

## III.   The Balance of Equities and Public Interest Strongly Favor Injunctive Relief.

Where a party seeks a preliminary injunction against the government, the balance of equities and public's interest "merge." *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)); *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 385 (D.D.C. 2020), *appeal dismissed*, No. 20-5374 (D.C. Cir. May 17, 2021). The inquiry therefore "generally call[s] for weighing the benefits to the private party from obtaining an injunction against the harms to the government and the public from being enjoined." *Doe v. Mattis*, 928 F.3d 1, 23 (D.C. Cir. 2019). That this factor favors the RNC is "self-evident": "'[T]he Constitution is the ultimate expression of the public interest,' and consequently, government actions in contravention of the Constitution are 'always contrary to the public interest,'" *Turner*, 502 F. Supp. 3d at 386 (citations omitted) (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)); *Simms v. Dist. of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) ("It is always in the public interest to prevent the violation of a party's constitutional rights." (internal quotation omitted)).

Absent preliminary relief, the RNC's constitutional rights, including significant First Amendment rights, will be eviscerated. The information Defendants request is imbued with multiple layers of constitutional protections that must be afforded due consideration prior to any disclosure. Indeed, unless the status quo is maintained (nondisclosure of the requested information), "the very right[s] sought to be protected" will be destroyed. *In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1065 (D.C. Cir. 1998) (quoting *In re Ford Motor Co.*, 110 F.3d 954, 963 (3d Cir. 1997)); *cf. Providence J. Co. v. FBI*, 595 F.2d 889, 890 (1st Cir. 1979) ("Once the documents are surrendered … confidentiality will be lost for all time. The status quo could never

28

be restored."); *Metro. Life Ins. Co. v. Usery*, 426 F. Supp. 150, 172 (D.D.C. 1976) ("Once disclosed, such information would lose its confidentiality forever."); *PepsiCo, Inc. v. Redmond*, No. 94 C 6838, 1996 WL 3965, at *30 (N.D. Ill. 1996) ("[J]ust as it is impossible to unring a bell, once disclosed … confidential information lose[s] [its] secrecy forever … .").

Further, granting injunctive relief will cause no harm to Defendants other than preventing them from enforcing an overly broad an unlawful subpoena against Salesforce. "There is generally no public interest in the perpetuation of unlawful [government] action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "Put simply, '[t]he Constitution does not permit [the government] to prioritize any policy goal over' constitutional rights." *Turner*, 502 F. Supp. 3d at 386 (quoting *Gordon v. Holder*, 721 F.3d at 653). Even more, as argued above, the Select Committee is unlawfully constituted, and, even so, lacks the legislative authority to issue the Salesforce Subpoena. Thus, granting injunctive relief will do no harm to Defendants, while ensuring the RNC's constitutional rights remain intact. The balance of the equities therefore weigh decidedly in favor of granting preliminary injunctive relief.

## CONCLUSION

Based on the foregoing, the RNC respectfully requests that the Court grant its motion for preliminary injunction and enter an order enjoining Defendant Salesforce from producing information, or sitting for a deposition, in response to the Salesforce Subpoena.

Respectfully submitted this 15th day of March, 2022.

BROWNSTEIN HYATT FARBER SCHRECK, LLP

By:      *s/ Christopher O. Murray*
               Christopher O. Murray
               Julian R. Ellis, Jr. *(pro hac vice pending; full admission pending)*
               410 17th Street, Suite 2200
               Denver, CO 80202
               Telephone:  303.223.1100
               Fax:  303.223.1111
               Email:  cmurray@bhfs.com
                     jellis@bhfs.com

               *Attorneys for Plaintiff Republican National Committee*