**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> NANCY PELOSI, et al., ) <br> ) <br> Defendants. ) | Case No. 1:22-cv-00659-TJK |

***AMICUS CURIAE* BRIEF OF NATIONAL REPUBLICAN SENATORIAL COMMITTEE
IN SUPPORT OF PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION**

**LCVR 7(O)(5) & FRAP 29(A)(4)(E) STATEMENT**

Counsel for *amicus curiae* certify that the National Republican Senatorial Committee has no parent corporation, and no publicly held corporation owns ten percent or more of its stock.

Counsel for *amicus curiae* certify that no counsel for a party authored any part of this brief. No one other than *amicus curiae*, its members, or its counsel financed the preparation or submission of this brief.

## TABLE OF CONTENTS

LCvR 7(o)(5) & FRAP 29(a)(4)(E) STATEMENT ................................................................... ii

TABLE OF AUTHORITIES ..................................................................................................... iv

INTEREST OF *AMICUS CURIAE* ............................................................................................. 1

BACKGROUND ......................................................................................................................... 1

ARGUMENT ............................................................................................................................... 3

    I.    The Salesforce Subpoena Violates the First Amendment Rights of the RNC, the Republican Party, and its Constituents. ................................................. 3

        A.    Political Parties are Vital to American Democracy, and Digital Operations is one of their most important functions. ................................. 3

        B.    The Salesforce Subpoena Violates the First Amendment by Attempting to Obtain the RNC's Entire Digital Strategy. ......................... 4

        C.    A Party Committee and Its Donors have a Reasonable Expectation of Privacy, and Disclosure of Donor Information Can and Will Cause Grave Personal and Economic Harm. ............................................. 6

CONCLUSION ........................................................................................................................... 13

## TABLE OF AUTHORITIES

**Cases**

*Am. Fed'n of Labor & Cong. of Indus. Organizations v. FEC,* 333 F.3d 168 (D.C. Cir. 2003) .................................................................................................................................. 6

*American for Prosperity Foundation v. Bonta*, 141 S.Ct. 2373 (2021) ............................. 7, 10, 12

*Baird v. State Bar of Ariz.*, 401 U.S. 1 (1971) ................................................................................ 9

*Buckley v. Valeo,* 424 U.S. 1 (1976) ........................................................................................ 5, 11

*California Democratic Party v. Jones,* 530 U.S. 567 (2000) ......................................................... 3

*Colorado Republican Federal Campaign Comm. v. FEC,* 518 U.S. 604 (1996) .......................... 3

*Elrod v. Burns*, 427 U.S. 347 (1976) ............................................................................................. 7

*Eu. v. San Francisco Cnty. Democratic Cent. Comm.,* 489 U.S. 214 (1989) ............................ 4, 6

*Katz v. United States*, 389 U.S. 347 (1967) ................................................................................ 11

*McConnell v. FEC* 251 F. Supp. 2d 176 (2003) ......................................................................... 3, 4

*NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449 (1958) ......................................... 8, 9, 11, 12

*Ripon Society, Inc. v. National Republican Party*, 525 F.2d 567 (1975) (en banc), cert. denied, 424 U.S. 933 (1976) ..................................................................................................... 5

*Tashijan v. Republican Party of Conn.,* 479 U.S. 208 (1986) ....................................................... 4

**INTEREST OF *AMICUS CURIAE***

The NRSC is the national political party organization devoted to supporting and electing a Republican U.S. Senate majority. The NRSC maintains a database on the Salesforce platform and provides financial, data, and strategic support and assistance to current and prospective Republican U.S. Senate candidates. Support from the NRSC for Republican candidates comes in the areas of strategic data, budget planning, election law compliance, fundraising, communications tools and messaging, research, and strategy. The NRSC believes that First Amendment rights of political parties must be protected and that partisan opponents should not be allowed to infringe upon the associational rights of political party committees, candidates, and supporters through disclosure of strategic data.

**BACKGROUND**

What Richard Nixon attempted with a faked burglary, a political party is now attempting through the January 6th Select Committee. In 1972 President Richard Nixon deployed a team of fake burglars to break into the Watergate office complex to steal confidential strategic information from the Democratic National Committee ("DNC"). Fifty years later, under the guise of Congressional committee action, the majority party is attempting to obtain its opponent's confidential political strategy. Make no mistake, this partisan Congressional committee is exploiting temporary subpoena power to investigate its political opponents through review – and possible release – of their highly confidential strategic political data.

The NRSC condemns political rioting and violence and, like the RNC, believes that anyone who assaults law enforcement should be prosecuted and punished. RNC Press Release, RNC Members Condemn Violence at U.S. Capitol, RNC (Jan. 6, 2021), https://gop.com/press-release/rnc-members-condemn-violence-at-us-capitol/. But this case is not about violence on January 6th; it is about the unconstitutional abuse of power a year later by one party's politicians.

1

In theory, there might be a circumstance where a properly authorized Congressional Committee could narrowly subpoena information from a political party that is sufficiently relevant to a legislative purpose. But that is not the case here. Here, one political party is using an unauthorized Committee—with no Members appointed by Republican leadership and no minority Ranking Member—to subpoena a broad swath of strategic and valuable data from the opposing political party. And it is doing so without even the pretext of such information being related to a legislative function. This is a digital-age Watergate.

One could also imagine a circumstance in which a law enforcement agency might narrowly subpoena information from a political party that is relevant to an ongoing criminal investigation. But this is also not such a case. The Committee here has no law enforcement function or authority, and it is operated not by apolitical law enforcement personnel but by Democratic politicians and their hand-picked, ideologically aligned staffers.

It is well established that healthy political party committees such as the NRSC and RNC (and for that matter the Democratic Senatorial Campaign Committee and DNC) are essential to democracy. The national political party committees form the foundation of successful political campaigns at all levels and are crucial to officeholders' ability to serve the public. For these reasons, when President Nixon and his team of advisers assessed a path for most effectively defeating his political opponents, they set their sights on obtaining the internal strategic files of the DNC. Today, the most valuable internal files are not located in a physical file cabinet at party headquarters. Instead, they live in digital files and on platforms such as Salesforce. Indeed, this is why Russian computer hackers set their sights on the RNC and DNC leading up to the 2016 presidential election. In 2022, Watergate-style subversion of political opposition would be accomplished by targeting and neutralizing the opposition's strategic data, including the personal

information of their supporters. For the RNC – and NRSC – such strategic and personal data is housed on Salesforce.

Allowing Democratic politicians and staffers to access the RNC's (their opposition) internal strategic data housed on Salesforce is not only toxic to our democracy, but, more specifically, it violates the First Amendment rights of the RNC and its members and donors because the subpoena here is not tailored to support any governmental interest, much less a substantial interest necessary to satisfy exacting scrutiny.

## ARGUMENT

**I.     The Salesforce Subpoena Violates the First Amendment Rights of the RNC, the Republican Party, and its Constituents.**

**A.     Political Parties are Vital to American Democracy, and Digital Operations is one of their most important functions.**

It is well established that political parties play an "important and legitimate role…in American elections." *Colorado Republican Federal Campaign Comm. v. FEC,* 518 U.S. 604, 618 (1996). "Representative democracy in any populous unit of governance is unimaginable without the ability of citizens to band together [in parties] in promoting among the electorate candidates who espouse their political views." *California Democratic Party v. Jones,* 530 U.S. 567, 574 (2000). In fact, "[t]he formation of national political parties was almost concurrent with the formation of the Republic itself." *Id*.

In *McConnell v. FEC* 251 F. Supp. 2d 176, 820-821 (2003) (internal quotations omitted) this Court stipulated four vital roles political parties play in maintaining a stable constitutional order within democracy. First, "parties have coordinated and reconciled various national, state, and local entities within our federal system of government." *Id.* at 820. Second, "parties encourage 'democratic nationalism' by nominating and electing candidates and by engaging in discussion about public policy issues of national importance." *Id.* This democratic nationalism is fostered by

3

parties' efforts to "recruit and nominate candidates, aggregate public preferences and provide a means of democratic accountability." *Id.* Democratic nationalism is further bolstered by parties' pursuit of "increasing voter turnout, encouraging volunteer grassroots political participation, fostering broader electoral competition by supporting challengers against incumbents, and diluting the influence of organized interests." *Id.* Third, "parties act as critical agents in developing consensus in the United States." *Id.* at 821. "No other group could come close to political parties in moderating extreme views." *Id.* And finally, parties "cultivate a sense of community and collective responsibility in American political culture" and are "integral in forming a consensus on publicly divisive issues." *Id.*

Over the last 20 years, political parties have increasingly fulfilled these crucial roles through digital fundraising and communications. In 2022, political parties have entire digital departments dedicated to communicating with their supporters through e-mails, text messages, and social media. The political party committees are among the main players in the digital space because, unlike campaign committees, political party infrastructure lasts beyond any given election cycle. The party committees therefore provide irreplaceable expertise and institutional knowledge to support the party's candidates for election and conduct digital fundraising and communications to advance the party's electoral prospects and policy agenda.

> **B.     The Salesforce Subpoena Violates the First Amendment by Attempting to Obtain the RNC's Entire Digital Strategy.**

Like individuals and corporations, political parties have constitutional rights, including freedom of speech and association. Courts have repeatedly held that the First Amendment protects "a political party's discretion in how to organize itself, conduct its affairs and select its leaders." *Eu. v. San Francisco Cnty. Democratic Cent. Comm.,* 489 U.S. 214, 230 (1989); *see also Tashijan v. Republican Party of Conn.,* 479 U.S. 208, 224 (1986) ("The Party's determination of the

boundaries of its own association, and of the structure which best allows it to pursue its political goals, is protected by the Constitution."); *Buckley v. Valeo,* 424 U.S. 1, 64 (1976) ("We have long recognized that significant encroachments on First Amendment rights of the sort that compelled disclosure imposes cannot be justified by a mere showing of some government interest."). As the Court of Appeals for the District of Columbia Circuit has explained, "a party's choice, as among various ways of governing itself, of the one which seems best calculated to strengthen the party and advance its interests, deserves the protection of the Constitution.... [T]here must be a right not only to form political associations but to organize and direct them in the way that will make them most effective." *Ripon Society, Inc. v. National Republican Party*, 525 F.2d 567, 585 (D.C. Cir. 1975) (en banc), cert. denied, 424 U.S. 933 (1976) (emphasis deleted). Because of the essential role parties play in American democracy, and the fact their core function is political speech, the constitutional rights of party committees such as the RNC must be guarded with special care.

One of a political party committee's most valuable and closely held assets is its "house file": the universe of individuals who associate in some way with the committee. Every individual in the NRSC's house file has interacted with or contributed to the committee and has "opted in" to receive committee communications. Like the RNC and other national political party committees on both sides of the aisle, the NRSC expends vast resources to build and cultivate its house file. In the 2021-22 election cycle alone, the NRSC will spend tens of millions of dollars to develop its house file. Thus, the NRSC house file today represents hundreds of millions of dollars of investment and more than a decade of effort. It should go without saying that the house file, if compromised, is not an asset that could be rebuilt in a month – nor in a year, nor even in 5 years.

The Salesforce platform connects a political party committee such as the NRSC to the individuals in its house file, allowing the party to communicate directly with its supporters.

Salesforce therefore contains detailed personal information about these individuals, such as their personal identifying information, specific topics of interest, past donation information, survey responses, and more. The Salesforce Subpoena demands this information and more: performance metrics and analytics related to digital fundraising and messaging; time and message attributes; login records for the Salesforce Marketing Cloud; and all communications between Salesforce and representatives of the RNC or Trump Campaign regarding the 2020 election. In other words, what the Salesforce Subpoena demands is for the company to hand over the "Holy Grail" of the RNC's internal digital playbook. The breadth of this request indicates there was no attempt at all to tailor the subpoena to the needs (whether legitimate or not) of the Committee and therefore it directly contravenes the special First Amendment protection to which a political party is entitled.

The First Amendment protects parties' non-public political messaging strategy. "[C]ompelled disclosure of internal planning materials…will…frustrate those groups' decisions as to 'how to organize themselves, conduct their affairs, and select their leaders,' as well as their selection of a 'message and the best means to promote that message.'" *Am. Fed'n of Labor & Cong. of Indus. Organizations v. FEC,* 333 F.3d 168, 177 (D.C. Cir. 2003) (quoting *Eu,* 489 U.S. at 230-31) (alterations adopted). The Salesforce Subpoena demands disclosure of the RNC's internal data and digital strategy playbook, substantially burdening the RNC's associational autonomy and thereby violating the First Amendment.

### C. A Party Committee and Its Donors have a Reasonable Expectation of Privacy, and Disclosure of Donor Information Can and Will Cause Grave Personal and Economic Harm.

The digital revolution fundamentally changed the way political party committees communicate with their supporters, and digital platforms such as Salesforce are what makes this possible. Never in history has a party committee been able to communicate so quickly with so many of its supporters; now it may do so at the click of a button. These communications are

fundamental to the right of association between a political party and its supporters, and the Salesforce Subpoena therefore also burdens the associational autonomy of the RNC's members, supporters, donors, and volunteers who are subject to disclosure under the subpoena. Courts have "long understood as implicit in the right to engage in activities by the First Amendment a corresponding right to associate with others." *Americans for Prosperity Foundation v. Bonta*, 141 S.Ct. 2373, 2382 (2021) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)). Protected association furthers a wide variety of political, social, economic, educational, religious, and cultural ends, and is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority. *Id*.

Political affiliation, specifically, has long been protected, especially in situations where an individual is punished for such association. *Elrod v. Burns*, 427 U.S. 347, 355 (1976). And the prospects for backlash here are real, given this Committee's track record of leaking information gathered through its investigations to the press. Jacqueline Alemany, et al., *Texting Through An Insurrection*, Washington Post (Feb. 16, 2022), https://www.washingtonpost.com/politics/interactive/2022/texting-insurrection/; Hunter Walker, *EXCLUSIVE: Leaked Documents Show January 6th Rally VIPs*, The Uprising (Oct. 9, 2021), https://www.theuprising.info/p/exclusive-leaked-documents-show-january?s=r. Should the RNC's internal Salesforce data become public in the current toxic political environment, the party supporters whose details are leaked can reasonably expect retaliation.

The 2020 election was one of the most contentious in American history. Fueled by the polarizing pressures of partisan media, social media, and deeply rooted cultural, historical, and regional divides, partisan hostility is at an all-time high while civility is at an all-time low. According to a national survey conducted by the Cato Institute, more than 77% of Republicans are

fearful to share their political opinions. Emily Ekins, *Poll: 62% of Americans Say They Have Political Views They're Afraid to Share*, Cato Institute (Jul. 22, 2020), https://www.cato.org/survey-reports/poll-62-americans-say-they-have-political-views-theyre-afraid-share. More concerning still, over 60% of post-graduate Republicans are concerned that their employment will be impacted by their political beliefs. *Id.* This bears repeating: more than half of these young adults fear that their livelihoods may depend on staying silent about their political views.

Sadly these fears are not hypothetical. There is growing support for firing employees based on political beliefs, with over 50% of strong liberals supporting the firing of executives that donated to President Donald Trump. *Id.* Significant evidence shows that individuals are facing personal and financial repercussions for supporting Republican candidates. *See*, *e.g.*, Jacob Maslow, *Can Being a Trump Supporter, Get You Fired or Not Hired*, LegalScoops (Nov. 25, 2020), https://www.legalscoops.com/can-being-a-trump-supporter-get-you-fired-or-not-hired/.

Importantly, the Supreme Court has explicitly recognized the threat of reprisal that often stems from association with groups protected by the First Amendment. Indeed, in 1958, the Supreme Court prevented disclosure of the membership lists of the National Association for the Advancement of Colored People (NAACP). In *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 462 (1958), the state of Alabama sought to require the NAACP to disclose its membership list. The NAACP refused to turn over the list arguing, correctly, that disclosure of the list would invite repression of its members. In a unanimous decision, the Supreme Court held that "[i]mmunity from state scrutiny of petitioner's membership lists is here so related to the right of petitioner's members to pursue their lawful private interests privately and to associate freely with others in doing so as to come within the protection of the Fourteenth Amendment." *Id.* at 466.

Further, the Court held that freedom to associate with organizations dedicated to the "advancement of beliefs and ideas" is an inseparable part of the Due Process Clause of the Fourteenth Amendment. *Id.* at 460. Justice Harlan wrote that the state's obtaining the names of the NAACP's membership would likely interfere with the free association of its members, so the government interest in obtaining the records was superseded by the constitutional rights of the petitioners. *Id.* at 466.

So too here. The court in *NAACP* contended that "[i]t is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association…." *Id.* at 462. Indeed, disclosure of the information demanded by the Salesforce Subpoena to political opponents will subject the RNC's donors, supporters, volunteers, and members to the risk of "economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." *Id.*

When it comes to "a person's beliefs and associations," "[b]road and sweeping state inquiries into these protected areas . . . discourage citizens from exercising rights protected by the Constitution." *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6 (1971).  While certain information regarding political contributions is subject to public disclosure under the Federal Election Campaign Act ("FECA"), such as the name, address, and employer and occupation information for all donors who contribute over $200 in an election cycle, the NRSC's (and RNC's) Salesforce database contains a vast amount of sensitive and non-public information about the committees' donor communications.  For example, the subpoena demands "all . . . engagement metrics," meaning all data regarding the ways in which a private individual interacted with a given message: their clicks, views, responses, and the like.  In addition, grassroots donors (those who give less than $200 in an election cycle), who are the primary focus of digital fundraising, are not publicly

9

disclosed under FECA. These donors – numbering in the hundreds of thousands – have a reasonable expectation of privacy, as FECA does not require their identities to be publicly disclosed. Indeed, it is reasonable to conclude that many of these individuals contribute low amounts precisely for the purpose of maintaining their privacy. Enforcing the Salesforce subpoena would therefore breach these donors' privacy rights and would discourage both large and small-dollar donors from exercising constitutionally protected rights in the future.

Recently, the Supreme Court invalidated a California statute that required charitable organizations to submit an unredacted copy of their organization's Internal Revenue Service ("IRS") form 990, Schedule B holding the "…[the] disclosure requirement imposes a widespread burden on donors associational rights." *Americans for Prosperity*, 141 S.Ct. at 2389. Schedule B is used by tax-exempt organizations to report to the IRS the contributor name, address, and contribution amount for every person who donated to the organization during its fiscal year. In his opinion for the majority, Justice Roberts re-emphasized the chilling effect disclosure of private information has on effective advocacy noting "the vital relationship between freedom to associate and privacy in one's associations." *Id.* at 2382 (quoting *NAACP,* 357 U.S. at 462). And unlike in this case, where the January 6 Committee may make the collected information public in a partisan "report," the information in *Americans for Prosperity* was only privy to the state of California, not made public. The Court nonetheless held that "each governmental demand for disclosure brings with it an additional risk of chill." *Id.* at 2389. Justice Roberts addressed the Defendant's argument that because the state's disclosure requirement is confidential it does not result in any chilling of speech: "We are unpersuaded. Our cases have said that disclosure requirements can chill association "[e]ven if there [is] no disclosure to the general public." *Id.* at 2388 (quoting *Shelton v. Tucker,* 364 U.S. 479, 231, 247 (1960)).

So much more information is at stake in this case than even in *Americans for Prosperity*. Not only will non-public identifying information including names, addresses, and contribution amounts be disclosed, but also other non-public and sensitive details about how individuals interact with and respond to political messaging. Importantly, the stakes of this case are high for the NRSC even if it never receives a similar subpoena. Once conservative-leaning individuals learn that their identities and political preferences are not private and can be "outed" at the whim of a partisan body, the chilling effect will spread to all prospective conservative donors – not just the RNC's. To put it bluntly, enforcement of the incredibly broad Salesforce Subpoena is likely to damage or destroy Republican prospects for digital fundraising for years to come. And given the makeup of this Committee, perhaps that is the point.

Individuals have a reasonable expectation of privacy from disclosure of such information. There is a vital relationship between freedom of association and privacy in one's associations. *NAACP*, 357 U.S. at 462; *see also Katz v. United States*, 389 U.S. 347, 351 (1967). Even when compelled disclosure has been upheld, Courts have repeatedly found that such disclosure can "seriously infringe on privacy of association" and that "the invasion of privacy of belief may be as great when the information sought concerns the giving and spending of money as when it concerns the joining of organizations." *Buckley,* 424 U.S. at 64-66. The right to privacy is especially important for groups who espouse dissident beliefs. *NAACP*, 357 U.S. at 462. Private information about individual donors, such as their survey responses and the political topics in which they are most interested, is the exact kind of information that warrants protection.

If the Court allows the Committee to obtain the information it requests, there is no doubt that such disclosure will prevent donors and supporters from showing their support for Republican causes in the future. This harms the RNC and the NRSC, as both parties rely upon individual

support to fulfill and fund their political advocacy activity, and ultimately, such compelled disclosure harms democracy at-large. Courts have long recognized that effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, *NAACP*, 257 U.S. at 460, which is why it is so pernicious for Democrat politicians and staff to launch this cynical assault on Republicans by targeting their Salesforce data.

Given the rising concerns regarding personal and economic retaliation based on political affiliation, especially among Republicans, broad disclosure of personal, identifying information will certainly prevent donors and supporters from engaging with both the RNC and NRSC in the future. This chilling effect is in itself enough to trigger "the protections of the First Amendment" as was recently explained by the Supreme Court in *Americans for Prosperity*, 141 S. Ct. at 2389.

The broad nature of RNC information subpoenaed by the Committee from Salesforce is of the sort that demands exacting scrutiny under *Americans for Prosperity*, and must be "narrowly tailored to the government's asserted interest." *Id.* at 2383. The Committee here is not a law enforcement agency, so any limited subpoena power that it possesses would need to be in furtherance of a valid legislative purpose. And then, even if there were a valid legislative purpose, such substantial interest would need to be narrowly tailored to the subpoena.

It strains credulity to assert that production of the data and records for tens of millions of RNC donors and supporters is in any way tailored to the events of January 6th, which the Committee is supposedly investigating. *See,* ECF No. 8-2 at ¶¶ 15, 17. In fact, the breathtaking scope of the subpoenaed information here forces the conclusion that the events of that horrible day have become a pretext for Democratic politicians and staff to burglarize the Republican party and rummage through its priceless data, accessing Republican strategy and chilling the participation of Republican donors and supporters.

## CONCLUSION

Political party committees, like other non-profit advocacy organizations, are entitled to First Amendment protection for internal information and donor privacy. Enforcement of the Salesforce Subpoena would dangerously chill speech across the country, silencing conservatives who could no longer trust that interactions with and donations to their chosen political party would remain private. As the Supreme Court recently reinforced in *Americans for Prosperity,* a governmental effort to obtain such information is therefore subject to exacting scrutiny – a standard that the Salesforce Subpoena is far too broad to meet.

For the foregoing reasons, the Court should grant Plaintiff's Motion for Preliminary Injunction.

Respectfully Submitted, on March 23, 2022.

/s/ Charles R. Spies
Charles R. Spies, Bar ID: 989020
Jessica G. Brouckaert
DICKINSON WRIGHT PLLC
1825 Eye Street, N.W., Suite 900
Washington, D.C. 20006
Telephone: (202) 466-5964
Facsimile: (844) 670-6009
cspies@dickinsonwright.com

*Attorneys for NRSC*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the filing complies with the Local Civil Rules relating to formatting and page limits, being double-spaced, prepared in 12-point proportionally-spaced font, and not exceeding the allotted page or word limits.

/s/ Charles S. Spies
Charles S. Spies (Bar ID: 989020)

## CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2022, I caused a true and correct copy of the foregoing document to be served upon all counsel of record registered with the Court's ECF system, by electronic service via the Court's ECF transmission facilities.

/s/ Charles S. Spies
Charles S. Spies (Bar ID: 989020)