**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

REPUBLICAN NATIONAL COMMITTEE,

               Plaintiff,

   v.

NANCY PELOSI, *et al*.,

               Defendants.

Case No. 1:22-cv-00659-TJK

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515

SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004

ARNOLD & PORTER
601 Massachusetts Ave, NW
Washington, D.C. 20001

*Counsel for the Congressional Defendants*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................................ iii

INTRODUCTION ............................................................................................................................ 1

FACTUAL BACKGROUND ........................................................................................................... 3

A.   The RNC and the Trump Campaign Used Salesforce to Jointly Send Inflammatory
      Emails Challenging the Validity of the Election ................................................................ 5

B.   The January 6th Attack ...................................................................................................... 10

C.   The Salesforce Tools the RNC Used and Their Cessation After January 6th ................. 12

D.   The Formation of the Select Committee ........................................................................... 14

E.   The Select Committee's Subpoena to Salesforce ............................................................ 15

F.   Procedural History ............................................................................................................ 17

ARGUMENT ................................................................................................................................. 18

I.     LEGAL STANDARD .................................................................................................................. 18

II.    THE RNC CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE
        MERITS ....................................................................................................................................... 18

        A.   The Speech or Debate Clause Bars the RNC from Obtaining an Injunction ........ 18

        B.   The RNC's Constitutional Claims Are Without Merit ......................................... 24

              1.   The RNC's Challenge Under the First Amendment Lacks Merit ............. 25

              2.   The RNC's Challenge Under the Fourth Amendment Lacks Merit ......... 28

        C.   The Subpoena Serves a Valid Legislative Purpose ............................................... 31

        D.   The Select Committee Is Properly Composed. ..................................................... 33

        E.   Subpoena Compliance Will Not Violate the Stored Communications Act .......... 38

III.   THE RNC HAS FAILED TO DEMONSTRATE A LIKELIHOOD OF
        IRREPARABLE HARM ........................................................................................................... 39

IV.    THE BALANCE OF EQUITIES WEIGHS HEAVILY IN FAVOR OF THE
        SELECT COMMITTEE. .......................................................................................................... 43

i

V.   THE PUBLIC INTEREST SUPPORTS ALLOWING THE SELECT
     COMMITTEE TO CONDUCT ITS URGENT INVESTIGATION. ............................... 44

CONCLUSION .......................................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.,*
840 F. Supp. 2d 327 (D.D.C. 2012) ................................................................... 40

*Am. Fed'n of Labor & Cong. of Indus. Org. v. Fed. Election Comm'n,*
333 F.3d 168 (D.C. Cir. 2003) ........................................................................ 26

*Americans for Prosperity Found. v. Bonta,*
141 S. Ct. 2373 (2021) ................................................................................... 27

*Ark. Dairy Co-op Ass'n, Inc. v. USDA,*
573 F.3d 815 (D.C. Cir. 2009) ........................................................................ 18

*Baker v. Carr,*
369 U.S. 186 (1962) ....................................................................................... 33

*Barenblatt v. United States,*
360 U.S. 109 (1959) ................................................................................. 26, 43

*Barker v. Conroy,*
921 F.3d 1118 (D.C. Cir. 2009) ...................................................................... 37

*Bean LLC v. John Doe Bank,*
291 F. Supp. 3d 34 (D.D.C. 2018) .............................................................. 25, 27

*Brown & Williamson Tobacco Corp. v. Williams,*
62 F.3d 408 (D.C. Cir. 1995) ..................................................................... 21, 22

*Buckley v. Valeo,*
424 U.S. 1 (1976) ..................................................................................... 25, 26

*Carpenter v. United States,*
138 S. Ct. 2206 (2018) ................................................................................... 29

*Chaplaincy of Full Gospel Churches v. England,*
454 F.3d 290 (D.C. Cir. 2006) ................................................................... 18, 39

*ConverDyn v. Moniz,*
68 F. Supp. 3d 34 (D.D.C. 2014) .................................................................... 40

*Doe v. McMillan,*
412 U.S. 306 (1973) ....................................................................................... 23

*Donald J. Trump for President, Inc. v. Boockvar*,
    502 F. Supp. 3d 899 (M.D. Pa. 2020) ............................................................................ 8

*Eastland v. U.S. Servicemen's Fund*,
    421 U.S. 491 (1975)............................................................................ *passim*

*Exxon Corp. v. F.T.C.*,
    589 F.2d 582 (D.C. Cir. 1978)................................................................ 42, 44

*Ghandi v. Police Dep't of City of Detroit*,
    747 F.2d 338 (6th Cir. 1984) ................................................................ 42, 43

*Gravel v. United States*,
    408 U.S. 606 (1972)............................................................................ 18

*Gutierrez de Martinez v. Lamagno*,
    515 U.S. 417 (1995)............................................................................ 34

*Hearst v. Black*,
    87 F.2d 68 (D.C. Cir. 1936)................................................ 20, 21, 22

*INS v. Chadha*,
    462 U.S. 919 (1983)............................................................................ 33

*Judicial Watch, Inc. v. Schiff*,
    998 F.3d 989 (D.C. Cir. 2021)................................................................ 22

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020) ................................................................ 43

*Kilbourn v. Thompson*,
    103 U.S 168 (1880)............................................................................ 23

*Laird v. Tatum*,
    408 U.S. 1 (1972)............................................................................ 43

*Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp.*,
    5 F.3d 1508 (D.C. Cir. 1993)................................................................ 44

*McCarthy v. Pelosi*,
    5 F.4th 34 (D.C. Cir. 2021)................................................................ 19, 22

*McGrain v. Daugherty*,
    273 U.S. 135 (1927)............................................................................ 32, 43

*McPhaul v. United States*,
    364 U.S. 372 (1960)........................................................................................ 27, 29

*McSurely v. McClellan*,
    521 F.2d 1024 (D.C. Cir. 1975) ..................................................................... 19

*McSurely v. McClellan*,
    553 F.2d 1277 (D.C. Cir. 1976) (en banc) ..................................................... 22

*Metzenbaum v. FERC*,
    675 F.2d 1282 (D.C. Cir. 1982) ................................................................. 33, 34

*Nat'l Ass'n of Mfrs. v. Taylor*,
    582 F.3d 1 (D.C. Cir. 2009) ........................................................................... 25

*Nixon v. Freeman*,
    670 F.2d 346 (D.C. Cir. 1982) ....................................................................... 30

*Pentagen Techs. Int'l, Ltd. v. Comm. on Appropriations of U.S. House of Reps.*,
    20 F. Supp. 2d 41 (D.D.C. 1998) ................................................................... 19

*Rangel v. Boehner*,
    20 F. Supp. 3d 148 (D.D.C. 2013) ................................................................. 33

*Rangel v. Boehner*,
    785 F.3d 19 (D.C. Cir. 2015) .................................................................... 19, 23

*Senate Permanent Subcomm. v. Ferrer*,
    199 F. Supp. 3d 125 (D.D.C. 2016) ............................................................... 26

*Senate Permanent Subcomm. on Investigation v. Ferrer*,
    856 F.3d 1080 (D.C. Cir. 2017) ..................................................................... 22

*Senate Select Comm. on Ethics v. Packwood*,
    845 F. Supp. 17 (D.D.C. 1994) ...................................................................... 30

*Trump v. Thompson*,
    20 F.4th 10 (D.C. Cir. 2021) ................................................................. *passim*

*Trump v. Wis. Elections Comm'n*,
    506 F. Supp. 3d 620 (E.D. Wis. 2020) ............................................................ 8

*Trump v. Wis. Elections Comm'n*,
    983 F.3d 919 (7th Cir. 2020) ........................................................................... 8

*Turner v. U.S. Agency for Global Media*,
    502 F. Supp. 3d 333 (D.D.C. 2020) ......................................................... 43

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC*,
    933 F.3d 728 (D.C. Cir. 2019) .................................................................. 36

*United States v. Brewster*,
    408 U.S. 501 (1972) .................................................................................. 18

*United States v. Durenberger*,
    48 F.3d 1239 (D.C. Cir. 1995) .................................................................. 33

*United States v. Harriss*,
    347 U.S. 612 (1954) .................................................................................. 25

*United States v. R. Enterprises, Inc.*,
    498 U.S. 292 (1991) .................................................................................. 30

*United States v. Rostenkowski*,
    59 F.3d 1291 (D.C. Cir. 1995) .................................................................. 33

*Vander Jagt v. O'Neil*,
    699 F.2d 1166 (D.C. Cir. 1982) .......................................................... 34, 37

*Ward v. Jackson*,
    No. CV-20-0343-AP/EL, 2020 WL 8617817 (Ariz. Dec. 8, 2020)............. 8

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................ 18, 39, 42

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) .................................................................. 39

*Wood v. Raffensperger*,
    501 F. Supp. 3d 1310 (N.D. Ga. 2020) ..................................................... 8

*Wood v. Raffensperger*,
    981 F.3d 1307 (11th Cir. 2020) ................................................................. 8

## **Statutes**

2 U.S.C. § 5571(a) ........................................................................................ 46

18 U.S.C. § 2702(a)(1).............................................................................. 38, 39

18 U.S.C. § 2711(4) ...................................................................................... 39

**Constitutional Provisions**

U.S. Const. art. I, § 5, cl. 2 ................................................................................. 33

U.S. Const. art. I, § 6, cl. 1 ............................................................................. 3, 18

**Rules**

Federal Rule of Civil Procedure 65(a)(2) ............................................................ 3

**Legislative Authorities**

167 Cong. Rec. H37, 117th Cong. (daily ed., Jan 4, 2021) ................................. 36

167 Cong. Rec. H5748-69, 117th Cong. (daily ed., Oct. 21, 2021). ................... 35

H. Rep. No. 109-377, 109th Cong. (2006) .......................................................... 35

H. Res. 6, § 104(f)(1)(B), 116th Cong. (2019) ................................................... 36

H. Res. 6, § 201(b)(3), 116th Cong. (2019) ....................................................... 36

H. Res. 437, § 2(a), 109th Cong. (2005) ............................................................. 35

H. Res. 503, 117th Cong. (2021) ..................................................................... *passim*

H. Res. 567, § 2(a), 113th Cong. (2014) ............................................................. 36

H. Res. 730, 117th Cong. (2021) ......................................................................... 35

H. Res. 851, 117th Cong. (2021) ......................................................................... 35

Rule I.11, Rules of the U.S. House of Representatives, 117th Cong. (2021). ...... 35

**Other Authorities**

Allan Smith, *Capitol riot suspects ramped up donations to Trump after his election defeat*, NBC News (Mar. 24, 2021), https://www.nbcnews.com/politics/donald-trump/capitol-riot-suspects-ramped-donations-trump-after-his-election-defeat-n1261431. ......................... 11

Alex Thompson, *RNC assembles team to reelect Trump*, POLITICO (Mar. 1, 2019), https://www.politico.com/story/2019/03/01/trump-2020-rnc-1197115. ........................... 5

ARCHIVE OF POLITICAL EMAILS, https://politicalemails.org/ ....................................... 7

BLACK'S LAW DICT. (11th ed. 2019) ...................................................................... 36

December 23, 2020 TMAGAC Fundraising Email ................................................... 6

Fredreka Schouten, *Trump raises more than $207 million since Election Day as he pushes baseless election fraud claims*, CNN (Dec. 4, 2020), https://www.cnn.com/2020/12/03/politics/trump-fundraising-election-day/index.html. ... 7

Jason Koebler and Joseph Cox, *Salesforce 'Takes Action' to Prevent RNC Emails From Inciting Violence*, VICE (Jan. 11, 2021, 4:40 PM), https://www.vice.com/en/article/pkdmdv/ salesforce-takes-action-to-prevent-rnc-emails-from-inciting-violence. ............. 4, 6, 12, 41

Josh Dawsey, et al., *Inside the Jan. 6 committee's effort to trace every dollar raised and spent based on Trump's false election claims*, WASH. POST (Mar. 8, 2022) https://www.washingtonpost.com/politics/2022/03/08/jan-6-fundraising-trump/.............. 6

November 4, 2020 TMAGAC Fundraising Email.......................................................... 6

Philip Bump, *What the Trump family's new political committees can and can't do*, WASH. POST (Dec. 1, 2020), https://www.washingtonpost.com/politics/2020/12/01/what-trump-familys-new-political-committees-can-cant-do/................................................................. 5

*Statement by Donald J.Trump, 45th President of the United States of America*, SAVE AMERICA, WWW.DONALDJTRUMP.COM (Jan. 30, 2022)......................................................... 9

Press Release, Kevin McCarthy, H. Republican Leader, McCarthy Statement about Pelosi's Abuse of Power on January 6th Select Committee (July 21, 2021) ................................. 15

Press Release, Nancy Pelosi, Speaker, H.R., Pelosi Statement on Republican Recommendations to Serve on the Select Comm. To Investigate the Jan. 6 Attack on the U.S. Capitol (July 21, 2021) ................................................................................................................... 15

PRINCETON CORPUS OF POLITICAL EMAILS, https://electionemails2020.org/ ................................ 7

Salesforce Marketing Cloud, *Datorama Reports for Marketing Cloud*, YOUTUBE (Jan. 19, 2021) https://www.youtube.com/watch?v=rO4OzRkNB-U. ...................................................... 13

Salesforce, Master Subscription Agreement (Feb. 18, 2022). ...................................................... 38

Salesforce, *Overview of Data in Datorama Reports*, HELP.SALESFORCE.COM, https://help.salesforce.com/s/articleView?id=sf.mc_dat_data_overview.htm&type=5. .. 13

Shane Goldmacher and Rachel Shorey, *Trump Raised $255.4 Million in 8 Weeks as He Sought to Overturn Election Result*, N.Y. TIMES (Jan. 31, 2021, updated Mar. 9, 2021), https://www.nytimes.com/2021/01/31/us/politics/trump-voter-fraud-fundraising.html. 7, 8

Shane Goldmacher and Rachel Shorey, *Trump's Sleight of Hand: Shouting Fraud, Pocketing Donors' Cash for Future*, N.Y. TIMES (Feb. 1, 2021, updated Oct. 5, 2021), https://www.nytimes.com/2021/02/01/us/politics/trump-cash.html.................................. 8

Trump Fundraising Emails (@Trump Email), TWITTER ..................................................... 7, 9, 10

William Cummings, et al., *By the numbers: President Donald Trump's failed efforts to overturn the election*, USA TODAY (Jan. 6, 2021)........................................................................ 8, 9

Zoe Schiffer, *Salesforce says it has taken action against the RNC, but won't say how*, THE VERGE, (Jan. 11, 2021), https://www.theverge.com/2021/1/11/22225936/salesforce-stop-rnc-sending-emails-incite-violence.................................................................................. 12

## <u>INTRODUCTION</u>

In its Motion for Preliminary Injunction ("Motion"), Plaintiff Republican National Committee ("RNC") asks this Court to prevent Salesforce.com, Inc. ("Salesforce") from producing information sought by the House Select Committee to Investigate the January 6th Attack on the U.S. Capitol ("Select Committee").  The Select Committee is "investigating the single most deadly attack on the Capitol by domestic forces in the history of the United States" to determine the need for legislation to "ensur[e] the safe and uninterrupted conduct of [Congress's] constitutionally assigned business." *Trump v. Thompson*, 20 F.4th 10, 41–42 (D.C. Cir. 2021), *injunction denied*, 142 S. Ct. 680 (2022), *cert. denied*, No. 21-932 (Feb. 22, 2022). Through its subpoena to Salesforce ("Subpoena"), the Select Committee seeks information regarding "whether and how the Trump campaign used Salesforce's platform to disseminate false statements about the 2020 election in the weeks leading up to the January 6th attack." March 15, 2022 Declaration of Christian Schaeffer, ECF No. 8-2 ("Schaeffer Decl."), Exhibit A at 5.  Contrary to the RNC's suggestion, the Subpoena does not seek email content, individual-specific information, nor any information about whether email recipients made financial contributions.  Despite acknowledging that the January 6th attack was "an attack on our country and its founding principles," the RNC asks this Court to enjoin Salesforce from complying with the Subpoena.  For multiple reasons, the Court should deny this extraordinary application.

*First*, as the Supreme Court held in *Eastland v. U. S. Servicemen's Fund*, the Speech or Debate Clause operates as an "absolute bar" to the injunctive relief the RNC seeks.  421 U.S. 491, 503 (1975).  Because the investigation into the January 6th attack falls well within the "legitimate legislative sphere," the RNC may not use this civil action to interfere with that investigation.  *Id.*

1

*Second*, even if the RNC could overcome this absolute bar, the Court should reject its constitutional challenges, including its challenge based on the First Amendment.  Under any plausible balancing test, the public's interest in a thorough investigation of the January 6th attack strongly outweighs the RNC's speculative concern, *see* Mem. of P. & A. in Supp. of Pl.'s Mot. for Prelim. Inj., ECF No. 8-1 ("Pl.'s Mem.") at 13, that the Select Committee "could" use Salesforce's information to discern the RNC's digital political strategy.

*Third*, the Select Committee's request for five categories of documents from a period of from November 2020 through January 2021—the precise period when the RNC and the Trump campaign were using Salesforce to send emails that may have contributed to the January 6th attack—is sufficiently focused under any applicable Fourth Amendment requirements.

*Fourth*, the RNC's argument that the Select Committee lacks a valid legislative purpose is foreclosed by the D.C. Circuit's recent decision in *Trump v. Thompson*.  There, the D.C. Circuit held that "the January 6th Committee plainly has a 'valid legislative purpose' and its inquiry 'concerns a subject on which legislation could be had.'"  20 F.4th at 41.  The RNC fails to mention this controlling decision in its Motion, and there is no basis to depart from it.

*Fifth,* the RNC is not entitled to injunctive relief on the ground that the Subpoena was not issued in accordance with House Resolution 503 and other applicable House Rules.  Pl.'s Mem. at 20–22.  Congress is entitled to extreme deference when interpreting its own rules.  Like the other courts that have addressed similar arguments, this Court should refuse to usurp Congress's authority by substituting its own interpretation.

*Sixth,* the Subpoena does not violate the Stored Communications Act.  Contrary to the RNC's contention, the Subpoena does not seek the contents of stored communications.  Nor does the Act prohibit Salesforce's production of other records to a legislative body.

The RNC has also failed to demonstrate it is likely to suffer irreparable harm absent a preliminary injunction.  It has made no showing that Salesforce's compliance with the Subpoena will interfere with its ability to express its political views, fundraise, promote candidates, or advance policy goals.  Nor has it demonstrated that it will suffer competitive or monetary harm.

In addition, the public interest in allowing the Select Committee to obtain the information it needs to complete its investigation relating to the January 6th attack strongly outweighs any privacy interest of the RNC in keeping its marketing metrics confidential.

Finally, the Select Committee respectfully requests that, as permitted by Federal Rule of Civil Procedure 65(a)(2), the Court "advance the trial on the merits and consolidate it with the hearing."  The sole question—whether the Select Committee's Subpoena to Salesforce is a valid exercise of legislative power—will be fully briefed, and an additional round of legal arguments would yield no benefits.  This matter solely involves questions of law, and discovery is neither necessary nor permitted.  *See, e.g.*, U.S. Const. art. I, § 6, cl. 1; *Eastland*, 421 U.S. at 503 ("Legislators acting within the sphere of legitimate legislative activity should be protected not only from the consequences of litigation's results but also from the burden of defending themselves." (internal quotation marks omitted)).  Additionally, as explained below, given the Select Committee's extraordinary investigative need for these records to complete its investigation, this expedited procedure is justified.

For these and the other reasons set forth below, the RNC's motion for a preliminary injunction should be denied, and Salesforce should be left free to comply with the Subpoena.

## **FACTUAL BACKGROUND**

The Select Committee is investigating the facts, circumstances, and causes of the January 6th attack and issues relating to the peaceful transfer of power.  The inquiry includes

examination of how various individuals and entities coordinated their activities leading up to the events of January 6, 2021, as well as the influencing factors that fomented the attack on the United States Capitol.  The recipient of the subpoena at issue, Salesforce, reportedly had concerns that the RNC's use of its services could contribute to politically-incited violence. Salesforce stated that it was "deeply troubled by the terrible events of January 6th" and that it "took action" to prevent the RNC's use of Salesforce services in a way that could lead to further violence.[1]  Salesforce's decision to announce such concerns and take action with respect to the RNC—a long-standing customer—led the Select Committee to investigate further by issuing its subpoena.

The voluminous messaging from the RNC and other entities (described below), and public reporting about their activities, show that the RNC and others aggressively pushed false "stolen election" messaging in the time leading up to the attack on January 6th.  The statements of individuals charged with committing violence at the Capitol on January 6th indicate that the "stolen election" narrative motivated their violent attack.[2]  The Select Committee intends to investigate why the RNC (and certain other entities) aggressively pursued this post-election

---

[1] Jason Koebler and Joseph Cox, *Salesforce 'Takes Action' to Prevent RNC Emails From Inciting Violence*, VICE (Jan. 11, 2021, 4:40 PM), https://www.vice.com/en/article/pkdmdv/ salesforce-takes-action-to-prevent-rnc-emails-from-inciting-violence.

[2] A number of defendants in pending criminal cases have identified President Trump's allegations about the "stolen election" as a motivation for their activities at the Capitol.  *See, e.g.*, Compl., *United States v. Sandlin*, 1:21-cr-00088 (DLF) (D.D.C. Jan. 20, 2021), ECF No. 1-1 at 5 ("I'm going to be there to show support for our president and to do my part to stop the steal and stand behind Trump when he decides to cross the rubicon."); Indictment, *United States v. Neefe, et al.*, No. 21-cr-00567 (RCL) (D.D.C. Sep. 8, 2021), ECF No. 1 ¶ 22 ("Trump is literally calling people to DC in a show of force.  Militias will be there and if there's enough people they may fucking storm the buildings and take out the trash right there.").

messaging campaign despite the fact that President Trump's false claims were rejected by other federal officials and in lawsuit after lawsuit during the relevant timeframe.[3]

Consequently, the Select Committee is investigating the motivation for these organizations to spread a false narrative that, in turn, motivated violent attacks on the constitutional process at the Capitol on January 6th.  The Select Committee intends to consider whether the many millions of dollars raised shaped how Donald J. Trump for President Inc. (the "Trump Campaign"), the RNC, and Save America—President Trump's leadership political action committee ("leadership PAC") created shortly after the election[4]—continued a false messaging campaign after the election by soliciting small-dollar donations by email and text message.  These fundraising efforts are of interest to the Select Committee because they included the propagation of false claims that the election was stolen, a theme January 6th participants have identified as a motivating cause of their participation in the Capitol attack.

A.     **The RNC and the Trump Campaign Used Salesforce to Jointly Send Inflammatory Emails Challenging the Validity of the Election**

During the 2020 election cycle, President Trump and the RNC reportedly raised money jointly from small-dollar donors through the Trump Make America Great Again Committee (commonly referred to by its acronym TMAGAC and pronounced "T-Magic").[5]  These

---

[3] While this factual background cites publicly reported articles, the Select Committee does not view this as primary evidence in its investigation.  The reporting cited herein provides a basis for some aspects of the Select Committee's need to investigate matters related to the Salesforce subpoena.

[4] Philip Bump, *What the Trump family's new political committees can and can't do*, WASH. POST (Dec. 1, 2020), https://www.washingtonpost.com/politics/2020/12/01/what-trump-familys-new-political-committees-can-cant-do/ (explaining that unlike campaign funds, which have tight controls on spending, leadership PACs carry few restrictions on how money raised can be spent).

[5] Alex Thompson, *RNC assembles team to reelect Trump*, POLITICO (Mar. 1, 2019), https://www.politico.com/story/2019/03/01/trump-2020-rnc-1197115.

organizations reportedly did this by utilizing Salesforce services.[6]  Immediately after the election, TMAGAC began sending fundraising emails that repeatedly asserted false claims that the 2020 Presidential election was stolen.  These emails indicated on their face that they were "Paid for by the Trump Make America Great Again Committee, a joint fundraising committee authorized by and composed of Donald J. Trump for President, Inc., and the Republican National Committee."[7]  After the formation of Save America, the emails indicated that they were "Paid for by the Trump Make America Great Again Committee, a joint fundraising committee authorized by and composed of Donald J. Trump for President, Inc., Save America, and the Republican National Committee."[8]

RNC employees reportedly drafted and tracked these emails, which were sent to millions of recipients and monitored using Salesforce-owned tools.[9]  As described below, these Salesforce tools allowed the RNC to observe aggregated information about its email campaign in real time, including how many emails or messages were opened, delivered, and clicked, but Salesforce did not include individual-specific information.  During the first month alone of President Trump's post-election challenges, his political operation and the RNC jointly sent out over 400 different

---

[6]  Koebler and Cox, *supra* note 1.

[7] *See* November 4, 2020 TMAGAC Fundraising Email, *available at* https://politicalemails.org/messages/293188.

[8] *See* December 23, 2020 TMAGAC Fundraising Email, *available at* https://politicalemails.org/messages/324994.

[9] Josh Dawsey, et al., *Inside the Jan. 6 committee's effort to trace every dollar raised and spent based on Trump's false election claims*, WASH. POST (Mar. 8, 2022) https://www.washingtonpost.com/politics/2022/03/08/jan-6-fundraising-trump/.

fundraising appeals via email.[10]  Hundreds more were sent before January 6, 2021.[11]  The content

of these fundraising emails is publicly available from multiple sources.[12]  And reporting indicates

these post-election stolen election claims were highly effective at raising money for President

Trump's political operation and the RNC.[13]

The Select Committee is concerned about reports showing that the post-election stolen

election claims, and related claims that the election could be reversed, were a significant

motivating factor for the donors that contributed to President Trump's fundraising efforts.

Notably, "records show that his fundraising fell sharply in December [2020] compared with

November [2020], with an especially notable dip after December 14, the day the Electoral

College formally cast its ballots to make Joseph Biden the nation's 46th president."[14]  In the two

weeks before the Electoral College vote, "Mr. Trump and the [RNC] had raised an average of

---

[10] Fredreka Schouten, *Trump raises more than $207 million since Election Day as he pushes baseless election fraud claims*, CNN (Dec. 4, 2020), https://www.cnn.com/2020/12/03/politics/trump-fundraising-election-day/index.html.

[11] The Twitter account Trump Fundraising Emails (@TrumpEmail), https://twitter.com/TrumpEmail, tracked fundraising emails sent on behalf of President Trump. As noted at the account's page, the complete set of emails is available at https://docs.google.com/spreadsheets/d/12RBc04a_b0CCbtJJbow6Hit40rwUEMCFFhnVuOAH GtI/edit#gid=217550794.

[12] ARCHIVE OF POLITICAL EMAILS, https://politicalemails.org/; PRINCETON CORPUS OF POLITICAL EMAILS, https://electionemails2020.org/; Trump Fundraising Emails (@TrumpEmail), TWITTER (Jan. 6, 2021), https://twitter.com/TrumpEmail/status/1346887173438636032?s=20.

[13] Shane Goldmacher and Rachel Shorey, *Trump Raised $255.4 Million in 8 Weeks as He Sought to Overturn Election Result*, N.Y. TIMES (Jan. 31, 2021, updated Mar. 9, 2021), https://www.nytimes.com/2021/01/31/us/politics/trump-voter-fraud-fundraising.html (noting "Mr. Trump's strongest fund-raising came in the immediate aftermath of the election, such as after major media organizations declared that Joseph R. Biden Jr. had won on Nov. 7").

[14] *Id.*

$2.9 million every day online; in the two weeks after, the average was $1.2 million."[15]  His

"extraordinary" fundraising success reportedly came "mostly from grass-roots and online

contributors" inspired by his repeatedly disproven claims about the election.[16]

     After Election Day, President Trump, his campaign, and his political allies received

repeated confirmation of the validity of the election results.[17]  When they filed dozens of lawsuits

asking federal and state courts to nullify the election results based on myriad unsubstantiated

claims of irregularities,[18] the courts rejected all of those challenges, except for one.[19]  By January

---

[15] *Id.*

[16] Shane Goldmacher and Rachel Shorey, *Trump's Sleight of Hand: Shouting Fraud, Pocketing Donors' Cash for Future*, N.Y. TIMES (Feb. 1, 2021, updated Oct. 5, 2021), https://www.nytimes.com/2021/02/01/us/politics/trump-cash.html.

[17] *See, e.g.*, Congressional Defendants' Brief in Opposition to Plaintiff's Privilege Assertions, *Eastman v. Thompson*, 8:22-cv-00099 (C.D. Ca. Mar. 3, 2022), ECF No. 164-1 at 3–16, 47–51.

[18] *See* William Cummings, et al., *By the numbers: President Donald Trump's failed efforts to overturn the election*, USA TODAY (Jan. 6, 2021), https://perma.cc/683S-HSRC (noting that "[t]he president and his allies filed 62 lawsuits in state and federal courts seeking to overturn election results in states the president lost").

[19] *Id.* (noting that "[o]ut of the 62 lawsuits filed challenging the presidential election, 61 have failed").  For relevant examples of decisions addressing President Trump's claims of fraud and irregularities, *see, e.g., Donald J. Trump for President, Inc. v. Boockvar*, 502 F. Supp. 3d 899, 906 (M.D. Pa. 2020) ("[T]his Court has been presented with strained legal arguments without merit and speculative accusations, unpled in the operative complaint and unsupported by evidence."); *Ward v. Jackson*, No. CV-20-0343-AP/EL, 2020 WL 8617817, at *2 (Ariz. Dec. 8, 2020) (plaintiff failed "to present any evidence of 'misconduct,' 'illegal votes' or that the Biden Electors 'did not in fact receive the highest number of votes for office,' let alone establish any degree of fraud or a sufficient error rate that would undermine the certainty of the election results"); *Trump v. Wis. Elections Comm'n*, 506 F. Supp. 3d 620 (E.D. Wis. 2020); *Trump v. Wis. Elections Comm'n*, 983 F.3d 919, 927 (7th Cir. 2020); *Wood v. Raffensperger*, 501 F. Supp. 3d 1310, 1331 (N.D. Ga. 2020); *Wood v. Raffensperger*, 981 F.3d 1307, 1310 (11th Cir. 2020); Op. & Order, *Costantino v. City of Detroit*, 20-014780-AW (Wayne Cty. Cir. Ct. Nov. 13, 2020).

6, 2021, the President and his associates had lost over sixty lawsuits in seven states, some of which directly raised and addressed allegations of fraud.[20]

The Electoral College met in the several states on December 14, 2020, and a majority of electors voted for Mr. Biden.  But President Trump continued to press a plan to overturn those results at the next milestone in the Electoral College process:[21]  the joint session of Congress on January 6th, during which the Congress would formally count the electoral votes.  This refusal to accept the election results was circulated in fundraising emails sent jointly by his political operation and the RNC after the states' certification.

For example, on December 22, 2020, TMAGAC fundraisers sent an email with the subject line "We're taking this to the Supreme Court" and the preheader "The fight isn't over." The body of the fundraising email stated, "The Democrats are trying to get away with **STEALING this election,** and only YOU can stop them."[22]  TMAGAC sent another email the same day that asked, "Do you want our Country to be run by Joe Biden, who would be an illegitimate President?"[23]  Similarly, on December 27, 2020, and January 4, 2021, TMAGAC

---

[20] Cummings, et al., *supra* note 18.

[21] President Trump's January 30, 2022 public statement acknowledges that he was attempting to "overturn" the election on January 6, 2021.  *Statement by Donald J.Trump, 45th President of the United States of America*, SAVE AMERICA, WWW.DONALDJTRUMP.COM (Jan. 30, 2022), https://perma.cc/6X2U-E6X2.

[22] Trump Fundraising Emails (@Trump Email), TWITTER (Dec. 22, 2020, 9:24 PM), https://twitter.com/TrumpEmail/status/1341570397729386497.

[23] *Id.* (Dec. 22, 2020, 12:20 PM), https://twitter.com/TrumpEmail/status/1341433522331017217.

again sent the same message to millions of President Trump's supporters that President Biden would be an illegitimate President.[24]

TMAGAC also directly solicited funds by claiming that the election could be overturned during the January 6th joint session of Congress.  On January 6, 2021, TMAGAC sent an email with the subject line "TODAY" and the preheader "This is our LAST CHANCE."  The body of the fundraising email stated, "We need to make sure you're aware of how important today is. Congress will vote this afternoon to certify, or object to, the Election results . . . The stakes have NEVER been higher.  President Trump needs YOU to make a statement and publicly stand with him and FIGHT BACK."[25]  Later that same day, TMAGAC sent the following fundraising email: "We have the TRUTH . . . TODAY will be a historic day in our Nation's history . . . Every single Patriot from across the Country must step up RIGHT NOW if we're going to successfully DEFEND the integrity of this Election.  President Trump is calling on YOU to bolster our **Official Defend America Fund**."[26]

## B.    The January 6th Attack

Less than an hour after that email was sent, domestic terrorists seeking to stop the peaceful transfer of power following the 2020 Presidential election launched a violent assault on the United States Capitol.  *Id.*; H. Res. 503, 117th Cong. (2021), Preamble.  As the RNC itself describes the event, "a mob entered the U.S. Capitol . . . to interfere with Congress's counting and certification of electoral votes for president and vice president.  Some members of the mob

---

[24] *Id.* (Dec. 27, 2020, 3:23 PM), https://twitter.com/TrumpEmail/status/1343291529943781378; *id.* (Jan. 4, 2021, 7:22 AM), https://twitter.com/TrumpEmail/status/1346069487800492033.

[25] *Id.* (Jan. 6, 2021, 11:29 AM), https://twitter.com/TrumpEmail/status/1346856536338030601.

[26] *Id.* (Jan. 6, 2021, 1:31 PM), https://twitter.com/TrumpEmail/status/1346887173438636032?s=20.

attacked Capitol police officers, vandalized portions of the Capitol itself, and forced their way into the Senate Chamber."  Pl.'s Mem. at 1–2 (internal citations omitted).  The RNC publicly denounced the violence and described the events of January 6th as "an attack on our country and its founding principles."  *Id.* at 2.

As the D.C. Circuit stated, "[t]he rampage left multiple people dead, injured more than 140 people, and inflicted millions of dollars in damage to the Capitol."  *Trump v. Thompson*, 20 F.4th at 15.

There is evidence that numerous defendants charged with violations related to the January 6th attack on the U.S. Capitol and others present on the Capitol grounds that day were motivated by false claims about the election.[27]  In fact, many defendants in pending criminal cases identified President Trump's allegations about the "stolen election" as a motivation for their activities at the Capitol; a number also specifically cited President Trump's messages asking that supporters come to Washington, D.C. on January 6th.[28]

---

[27] *See, e.g.*, Allan Smith, *Capitol riot suspects ramped up donations to Trump after his election defeat*, NBC NEWS (Mar. 24, 2021), https://www.nbcnews.com/politics/donald-trump/capitol-riot-suspects-ramped-donations-trump-after-his-election-defeat-n1261431.

[28] *See, e.g.*, *supra* note 2 ("Trump is literally calling people to DC in a show of force. Militias will be there and if there's enough people they may fucking storm the buildings and take out the trash right there."); First Superseding Indictment, *United States of America v. Caldwell, et al.*, 21-cr-28 (APM) (D.D.C. Feb. 19, 2021), ECF No. 27 ¶ 35.a. ("Trump . . . called us all to the Capitol and wants us to make it wild!!!  Sir Yes Sir!!!  Gentlemen we are heading to DC pack your shit!!"); Mot. to Revoke Detention Order and for Pretrial Release, *United States v. Fitzsimons*, 21-cr-158 (RC) (D.D.C. Aug. 27, 2021), ECF No. 34 at 3–4 (noting defendant "believed voter fraud [had] occurred" and that he was "[c]onvinced that the election results had been fraudulently reported, he was moved by the words of then-President Trump to travel to the District of Columbia for the 'Save America Rally'").

**C.      The Salesforce Tools the RNC Used and Their Cessation After January 6th**

In the aftermath of the attack on the U.S. Capitol, Salesforce reportedly believed that "there remains a risk of politically incited violence across the country."[29]  Salesforce viewed the RNC's continued use of their services as potentially exacerbating this risk.  In light of that risk, Salesforce stated, "The Republican National Committee has been a long-standing customer, predating the [Trump] Administration, and we have taken action to prevent its use of our services in any way that could lead to violence."[30]  Following Salesforce's action, the RNC announced that it had agreed to cease fundraising on all of its digital platforms, "including Salesforce."[31]  The Trump campaign's email account, contact@victory.donaldtrump.com, which had previously sent multiple emails each day, went "silent."[32]

Salesforce has yet to publicly elaborate on the connection it saw between the "use of [its] services" and the violence on January 6, 2021, or to explain the "actions" it took.[33]  But investigating the connection that Salesforce saw between these fundraising emails and violence is critical to the Select Committee's work.

Salesforce tracks broad analytics regarding email campaigns and presents them to the customer on dashboards.[34]  Such a platform allows the customer to make data-based decisions

---

[29] Koebler and Cox, *supra* note 1.

[30] *Id.*; Zoe Schiffer, *Salesforce says it has taken action against the RNC, but won't say how*, The Verge, (Jan. 11, 2021), https://www.theverge.com/2021/1/11/22225936/salesforce-stop-rnc-sending-emails-incite-violence.

[31] Koebler and Cox, *supra* note 1.

[32] *Id.*

[33] Schiffer, *supra* note 30.

regarding future email campaigns.  Salesforce's summary statistics dashboard let TMAGAC fundraisers see how their fundraising email campaigns performed in real-time and make decisions about future email campaigns based on those performance metrics.  The Select Committee understands that TMAGAC fundraisers reviewed such data in Salesforce's Datorama tool, which also produced "Datorama Reports."[35]

Salesforce publicly represents that "Datorama Reports for Marketing Cloud *doesn't display subscriber-level data or event-level data*.  However, subscriber-level data can be used to generate campaign-level analytics." *Id.* (emphasis added).  And, "[w]ith Datorama Reports for Marketing Cloud you can see how many emails or messages were opened, delivered, and clicked.  The data that is displayed is daily aggregated metrics." *Id.*  This description is consistent with conversations Select Committee staff had with counsel for Salesforce *prior to* the issuance of the subpoena to Salesforce.[36]  It is consistent with the language used in the subpoena the Select Committee issued, which seeks aggregated data, "including . . . delivery metrics (send rates and bounce rates), engagement metrics (opens, open rates, clicks, click rates, and click-to-open rates), time attributes, and message attributes."[37]  It is also consistent with the position Chairman Thompson took in a letter to Salesforce on March 21, 2022, reflecting the Select Committee's continuing understanding regarding Salesforce's operations.[38]

---

[34] Salesforce Marketing Cloud, *Datorama Reports for Marketing Cloud*, YOUTUBE (Jan. 19, 2021) https://www.youtube.com/watch?v=rO4OzRkNB-U.

[35] Salesforce, *Overview of Data in Datorama Reports*, HELP.SALESFORCE.COM, https://help.salesforce.com/s/articleView?id=sf.mc_dat_data_overview.htm&type=5.

[36] *See* Letter from Bennie G. Thompson to Salesforce.com, Inc. (March 21, 2022), Ex. 1 to Tatelman Decl.

[37] Schaeffer Decl., Ex. A at 6.

[38] *See supra* note 36.

**D.**     **The Formation of the Select Committee**

In response to the unprecedented attack, the House of Representatives adopted House Resolution 503, "establish[ing] the Select Committee to Investigate the January 6th Attack on the United States Capitol."  H. Res. 503, § 1.  That resolution authorizes the Select Committee to: (1) "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol"; (2) "identify, review, and evaluate the causes of and the lessons learned from the domestic terrorist attack on the Capitol"; and (3) "issue a final report to the House containing such findings, conclusions, and recommendations for corrective measures . . . as it may deem necessary."  H. Res. 503, § 4(a)(1)-(3).  The resolution further describes categories of potential corrective measures: "changes in law, policy, procedure, rules or regulations that could be taken" (1) "to prevent future acts of violence, domestic terrorism, and domestic violent extremism, including acts targeted at American democratic institutions"; (2) "to improve the security posture of the United States Capitol Complex while preserving accessibility of the Capitol Complex for all Americans"; and (3) "to strengthen the security and resilience of the United States and American democratic institutions against violence, domestic terrorism, and domestic violent extremism."  H. Res. 503, § 4(c).

To carry out those functions, House Resolution 503 authorizes the Speaker of the House to appoint up to thirteen Members to the Select Committee, five of whom "shall be appointed after consultation with the minority leader."  H. Res. 503, § 2(a).  Consistent with the Resolution, the Speaker initially appointed seven Democrats and one Republican, and then consulted with the House Minority Leader, who recommended five additional Republicans for appointment to the Select Committee.  The Speaker then spoke with the Minority Leader, advised that she would appoint three of the Members he had recommended, and asked the Minority Leader to

recommend two other Republicans.[39]  After the Minority Leader declined and, instead, withdrew all five recommendations, the Speaker named an additional Republican to the Select Committee.[40]

The Speaker appointed Representative Bennie Thompson as Chair of the Select Committee.  Amend. Compl. ¶ 67.  Chairman Thompson subsequently appointed Republican Representative Liz Cheney to serve as Vice Chair of the Select Committee.  *Id.* ¶ 71.  Since then, the Select Committee has operated with seven Democrats and two Republicans.  *Id.* ¶¶ 67, 70.

**E.     The Select Committee's Subpoena to Salesforce**

 In furtherance of its duty to "investigate the facts, circumstances, and causes" of the attack of January 6th, the Select Committee has issued subpoenas to government agencies, private businesses, and individuals.  On February 23, 2022, after consulting with Representative Cheney, Chairman Thompson issued the Subpoena to Salesforce at issue here.  In his cover letter, Chairman Thompson cited public reporting that, "between election day and January 6, 2021, the Trump campaign and the RNC jointly sent out hundreds of emails to supporters using a Salesforce-owned tool."  Schaeffer Decl. Ex. A at 3.  This public reporting described the tenor of those emails as "inflammatory, with nearly every email suggesting that the election was fraudulent, that Democrats had stolen the election, and that Congress needed to be pressured to overturn the results to keep Trump in power."  *Id.*  Chairman Thompson noted that evidence

---

[39] Press Release, Nancy Pelosi, Speaker, H.R., Pelosi Statement on Republican Recommendations to Serve on the Select Comm. to Investigate the Jan. 6 Attack on the U.S. Capitol (July 21, 2021), https://www.speaker.gov/newsroom/72121-2.

[40] Press Release, Kevin McCarthy, H. Republican Leader, McCarthy Statement about Pelosi's Abuse of Power on January 6th Select Committee (July 21, 2021), https://republicanleader.house.gov/mccarthy-statement-about-pelosis-abuse-of-power-on-january-6th-select-committee/.

indicated that numerous participants in the January 6th attack were motivated by these "false claims about the election." *Id.* at 4.  He also cited Salesforce's announcement that, considering the ongoing risk of "politically incited violence," it had taken action to prevent the RNC from using Salesforce's services "in any way that could lead to violence." *Id.*

Through the Subpoena, the Select Committee seeks information from Salesforce "regarding whether and how the Trump campaign used Salesforce's platform to disseminate false statements about the 2020 election in the weeks leading up to the January 6th attack." *Id.* Specifically, the Select Committee seeks a total of five categories of documents.  Only the first two categories seek documents relating to the RNC's digital marketing campaign, and both requests are narrowly tailored to the two-month period between November 3, 2020, and January 6, 2021.  *Id.* at 5.  The first request seeks "metrics" from the RNC's email campaigns, such as how many emails were sent ("send rates"), how many bounced back ("bounce rates"), how many were opened ("open rates"), and how often a recipient clicked on a link in the email ("click rates").  *Id.*  This aggregated data would provide essential information about the reach and impact of the fundraising emails by detailing how many emails were sent, when they were sent, and how often recipients opened them and clicked through to donation pages.  The second request seeks user metadata concerning when and how often the orchestrators of the inflammatory email campaign logged into the Salesforce platform.  Such information would help identify who at the Trump Campaign or the RNC was logging into Salesforce's software to review the aggregated data, the very purpose of which was to craft fundraising messages in the future and send those emails.  These records only reflect access logs and the Select Committee's request is expressly limited to cover the time period during which the platform was used to bombard millions of Americans with claims about a stolen election.  Significantly, for purposes

of this case, neither request seeks the identities of the recipients of the emails, a list of RNC donors, or internal strategic plans.

The remaining categories of requests in the Subpoena do not seek documents directly relating to the RNC's digital strategic communications.  The third and fourth categories seek reports and analyses prepared by Salesforce, not by the RNC.  The fifth and final category seeks communications between Salesforce and representatives of the RNC or the Trump campaign concerning the events leading up to the January 6th attack and their continued use of Salesforce's platforms.  *Id.*

On February 24, 2022, the day after the Select Committee issued the Subpoena, the RNC received notice of the Subpoena from Salesforce.  Am. Compl. ¶ 41.

## F.    Procedural History

Thirteen days after receiving notice of the Subpoena, on March 9, 2022, the RNC filed the Complaint.  Less than a week later, the RNC filed an Amended Complaint, which includes six claims and seeks 14 categories of relief, including declaratory judgments that the Subpoena is unlawful, an order modifying the Subpoena to seek only "unprivileged information," and an injunction quashing the Subpoena.  Am. Compl. at 29–30.  On March 16, the RNC filed the Motion for Preliminary Injunction seeking to enjoin Salesforce from producing information in response to the Subpoena.  The Court set a briefing schedule and will hear argument April 1.

## ARGUMENT

### I.      LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  To obtain this extraordinary remedy, a plaintiff must show: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest.  *See Winter*, 555 U.S. at 20.

A failure to show likelihood of success on the merits is enough to defeat a motion for a preliminary injunction.  *See Ark. Dairy Co-op Ass'n, Inc. v. USDA*, 573 F.3d 815, 832 (D.C. Cir. 2009).  Likewise, a failure to show irreparable harm is a sufficient ground to deny the preliminary injunction "even if the other three factors entering the calculus" weigh in favor. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

### II.     THE RNC CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS

#### A.      The Speech or Debate Clause Bars the RNC from Obtaining an Injunction

The RNC cannot demonstrate a likelihood of success because the Speech or Debate Clause bars its lawsuit and its application for injunctive relief.  The Clause provides that "any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1.  By "freeing the legislator from executive and judicial oversight that realistically threatens to control his conduct," *Gravel v. United States*, 408 U.S. 606, 618 (1972), the Clause both "preserve[s] the independence and . . . integrity of the legislative process," *United States v. Brewster*, 408 U.S. 501, 524 (1972), and "reinforc[es] the separation of powers," *Eastland*, 421 U.S. at 502.  "[I]t is long settled that the Clause's

protections range beyond just the acts of speaking and debating." *McCarthy v. Pelosi*, 5 F.4th 34, 38 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 897 (Jan 24, 2022).  Indeed, the "Supreme Court has consistently read the Speech or Debate Clause 'broadly' to achieve its purposes." *Rangel v. Boehner*, 785 F.3d 19, 23 (D.C. Cir. 2015) (quoting *Eastland*, 421 U.S. at 501).  The protections of the Clause extend not only to Congress, but to its committees as well.  *See, e.g.*, *Eastland*, 421 U.S. at 501; *McSurely v. McClellan*, 521 F.2d 1024, 1036–37 (D.C. Cir. 1975); *Pentegen Techs. Int'l, Ltd. v. Comm. on Appropriations of U.S. House of Reps.*, 20 F. Supp. 2d 41, 43–45 (D.D.C. 1998).

In *Eastland*, the Supreme Court applied the Speech or Debate Clause to reject a challenge to a subpoena issued by a Senate subcommittee.  In connection with its investigation of subversive activities, the subcommittee issued the subpoena to a bank for records relating to the United States Servicemen's Fund, Inc. ("USSF"), a nonprofit organization fomenting opposition to the United States' involvement in Southeast Asia.  421 U.S. at 494–95.  Upon learning of the subpoena, USSF brought an action against the members of the subcommittee and the bank, arguing that the subpoena served to "harass, chill, punish and deter (USSF and its members) in their exercise of their rights and duties under the First Amendment."  *Id.*  As in this case, the USSF asked the court to enjoin the "bank from complying with the subpoena."  *Id.* at 495–96.

The Supreme Court held that, because the subcommittee was acting "within the legitimate legislative sphere," the Speech or Debate Clause operated as an "absolute bar" to USSF's action.  *Id.* at 503.  The Supreme Court reasoned that a holding to the contrary would allow private litigation to "delay and disrupt the legislative function" and subject Congress to "judicial power" in such a way that would "imperil" Congress's "legislative independence."  *Id.*  The Court further held that the "absolute nature of the speech or debate protection" prohibited

19

the Judiciary from intervening even if USSF alleged that its First Amendment rights had been infringed.  *Id.* at 509-10.  Although the Court acknowledged the "potential for abuse" created by the Clause, the Court noted this was the "conscious choice of the Framers."  *Id.* at 510–11.

The D.C. Circuit has repeatedly confirmed the same broad scope of Congressional independence in its investigations guaranteed by the separation of powers precludes the entry of injunctive relief to impede a congressional investigation.  In *Hearst v. Black*, 87 F.2d 68 (D.C. Cir. 1936), the plaintiff sought to enjoin a Senate Special Committee from using documents that had been obtained from local telegraph companies pursuant to "blanket subpoenas" for all communications involving the plaintiff over a seven-month period.  When the companies did not cooperate with the subpoenas—which were far broader than the subpoena here—the Senate committee worked with the Federal Communications Commission to locate and copy thousands of telegrams to and from the target of its investigation.  *Id.* at 68.  Among the telegrams were messages that "had no connection with the subject matter of the investigation" and which, the plaintiff argued, would "result in the disclosure of . . . privileged and private information relating to his private business affairs."  *Id.* at 69.  As here, the plaintiff argued that the investigation thereby violated his constitutional rights.  *Id.* at 68–69.  In reviewing the district court's dismissal of the action, the D.C. Circuit accepted all the uncontested allegations of the plaintiff as true, and further assumed that the seizure of the messages was unlawful.  *See id.* at 69.  Nevertheless, the unanimous panel held that no court could interfere with a Congressional investigation by suing the members of the committee, holding that, "the universal rule, so far as we know it, is that the legislative discretion in discharge of its constitutional functions, whether rightfully or wrongfully exercised, is not a subject for judicial interference."  *Id.* at 71.

*Hearst* based its holding on the separation of powers principles that animate the Speech or Debate Clause.  As the court made clear, "[n]othing is better settled than that each of the three great departments of government shall be independent and not subject to be controlled directly or indirectly by either of the others."  *Id.* at 72; *see also Eastland*, 421 U.S. at 502 ("[The Clause] reinforc[es] the separation of powers.").  And the court relied on the same constitutional principles in rejecting the plaintiff's contention that such judicial deference to the Congress and its committees in the way they conducted their investigations would lead to unaddressed constitutional violations.  As it concluded, "[i]f it be insisted that this is the acknowledgment of a power whose plenitude may become a cataclysm, the answer is that the Congress is as much the guardian of the liberties and welfare of the people as the courts.'"  *Hearst*, 87 F.2d at 72 (internal quotation marks omitted).

The D.C. Circuit reaffirmed the rule that the judiciary may not interfere with Congressional investigations in *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408 (D.C. Cir. 1995), even where it was alleged that Members of Congress were proceeding improperly.  In that case, a paralegal at a law firm representing a tobacco manufacturer had stolen copies of internal, and presumptively privileged, documents, and provided them to two Members of Congress.  62 F.3d at 411-12.  After the press began publishing stories about the documents, one of the Congressmen publicly admitted that he had, in fact, received documents that were apparently stolen.  *Id.* at 412.  The company then sought to obtain copies of the documents in the Congressmen's possession through its own subpoenas directed to the two Members.

Writing for a unanimous panel, Judge Silberman began his analysis by accepting "that the documents in question were in fact stolen (and that they were privileged)."  *Id.* at 417.

Nevertheless, the court held that the Speech or Debate Clause barred the subpoenas against the congressmen. *Id.* at 423. The court explained that the protection of the Clause precluded even inquiries that would "provide clues as to what Congress is doing, or might be about to do." *Id.* at 420. And the court again held that the Clause "serves to insulate Members of Congress from distractions that divert their time, energy, and attention from their legislative tasks," and that "the touchstone is interference with legislative activities." *Id.* at 421 (internal quotations omitted).

Most recently, in *Senate Permanent Subcommittee on Investigation v. Ferrer*, 856 F.3d 1080 (D.C. Cir. 2017), the D.C. Circuit confirmed its rulings in *Hearst* and *Brown & Williamson*, and once again held that the courts lack jurisdiction to interfere with Congressional investigations. In *Ferrer*, the plaintiff had partially complied with Congressional investigators and, upon conclusion of the investigation, sought an order directing the subcommittee "to return, destroy, or refrain from publishing the produced documents." *Id*. at 1083. The Court, however, held that such relief was "barred by the separation of powers, including the Speech or Debate Clause." *Id.* The court expressly reaffirmed that "*Brown & Williamson* and *Hearst* [] make clear that" under the separation of powers, "[t]he judiciary has the duty of not lightly interfering with Congress' exercise of its legitimate powers." *Id*. at 1086 (internal quotation marks omitted).

Indeed, since *Eastland*, the D.C. Circuit has applied the Speech or Debate Clause in numerous cases to bar challenges to various actions by Congress. *See, e.g.*, *Judicial Watch, Inc. v. Schiff*, 998 F.3d 989 (D.C. Cir. 2021) (holding that House committee's issuance of subpoenas was "a legislative act protected by the Speech or Debate Clause" and dismissing action brought by nonprofit to obtain copies of the subpoenas and responses thereto); *McCarthy v. Pelosi*, 5 F.4th 34, 39 (D.C. Cir. 2021) (dismissing challenge to House resolution that enabled Members to vote by proxy), *cert. denied*, 142 S. Ct. 897 (Jan. 24, 2022); *McSurely v. McClellan*, 553 F.2d

1277, 1286 (D.C. Cir. 1976) (en banc) ("[I]nformation gathering, whether by issuance of subpoenas or field work by a Senator or his staff, is essential to informed deliberation over proposed legislation.").

In a recent case in this District, the court applied these cases to conclude that it lacked jurisdiction to consider a challenge to a subpoena issued by the Select Committee: "I believe that I do not have jurisdiction to consider this matter because of the Speech or Debate Clause." *Budowich v. Pelosi*, Civ. No. 21-3366 (JEB), Jan. 20, 2022 Tr. at 33:9–16 (attached as Exhibit A).

Like *Eastland*, here the Speech or Debate Clause serves as an "absolute bar" to the RNC's application for injunctive relief.  As the D.C. Circuit has already held (and as discussed further in Section II.C, *infra*), in investigating the January 6th attack and requesting information to advance that investigation, the Select Committee "plainly has a 'valid legislative purpose' and its inquiry 'concern[s] a subject on which legislation could be had.'"  *Trump v. Thompson*, 20 F.4th at 41 (affirming denial of preliminary injunction to prevent national archivist from producing records in response to request from Select Committee (internal citations omitted)). Because the Select Committee's Subpoena to Salesforce is within this legitimate legislative sphere, the Court may not interfere with Congress's independence by entertaining the RNC's Motion.

The consistent decisions of the Supreme Court and D.C. Circuit mandate denial of the injunction.  The RNC's argument that the subpoenas and the Select Committee are illegitimate does not change the analysis.  As the D.C. Circuit has explained, similar arguments are "made in almost every Speech or Debate Clause case" and have "been rejected time and again."  *Rangel*, 785 F.3d at 24.  The Clause prevents a court from exercising jurisdiction when "a plaintiff

alleges that [the act] violated the House Rules . . . or even the Constitution." *Id.* at 24 (citing *Kilbourn*, 103 U.S. at 203, and *McMillan*, 412 U.S. at 312–13). "Such is the nature of absolute immunity, which is—in a word—absolute." *Id.*

The Court should deny the motion and dismiss this action based on the Speech or Debate Clause.

**B.      The RNC's Constitutional Claims Are Without Merit**

The Supreme Court definitively held in *Eastland* that Members of Congress cannot be subject to constitutional claims in relation to the issuance of congressional subpoenas as part of an authorized Congressional investigation. 421 U.S. at 509–11. Rejecting an organization's argument that a Congressional subpoena violated its First Amendment rights and that the subpoena's purposes was to "'harass, chill, punish and deter' them in the exercise of their First Amendment rights," the Court explained that it "ignore[d] the absolute nature of the speech or debate protection." *Id*. at 509–10. Rather, the Court observed, reading the Speech or Debate Clause to permit a constitutional exception "would create an exception not warranted by the language, purposes, or history of the Clause" and that the "consistently broad construction of the . . . Clause" given by the Court "rest[ed] on the belief that it must be so construed to provide the independence which is its central purpose." *Id*. at 510–11. The Clause thus "provides an absolute immunity from judicial interference." *Id*. at 510 n.16.

The *Eastland* decision forecloses the RNC's constitutional challenges to the Subpoena. Although *Eastland* specifically addressed a First Amendment challenge, the reasoning fully applies to the RNC's Fourth Amendment claim—otherwise, the "absolute immunity from judicial interference" that *Eastland* promises would not amount to much at all. *Id*. at 510.

1.        **The RNC's Challenge Under the First Amendment Lacks Merit**

The RNC's claim that the subpoena violates its First Amendment rights is squarely

foreclosed by *Eastland*.  There, the Supreme Court rejected an organization's argument that a

Congressional subpoena's purpose was to "'harass, chill, punish and deter' [it] in the exercise of

[] First Amendment rights," explaining that the typical First Amendment balancing test "plays no

part" when a Congressional subpoena is involved, and the Speech or Debate Clause "provides an

absolute immunity from judicial interference."  *Id.* at 510 n.16.

The RNC's First Amendment argument fails for two additional reasons.

*First*, although the First Amendment protects the RNC and its members' rights of free

association, those rights are not implicated by the Subpoena.  As the D.C. Circuit has explained,

"[m]ore than fifty years ago, the Supreme Court held that the public disclosure of 'who is being

hired, who is putting up the money, and how much' they are spending to influence legislation is

'a vital national interest.'"  *Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 6 (D.C. Cir. 2009) (citing

*United States v. Harriss*, 347 U.S. 612, 625–26 (1954)) (holding that campaign finance law that

required disclosure of donors' identifying information did not violate First Amendment).  With

regard to the RNC, the Subpoena seeks, and Salesforce will be disclosing, only metrics and

analytics relating to email campaigns—information that is far less substantive than the

information in *Taylor*.  *See also Bean LLC* v. *John Doe Bank*, 291 F. Supp. 3d 34, 45–48

(D.D.C. 2018) (declining to enjoin Congressional subpoena to bank for records relating to

political consulting firm and finding the firm did not have "some special First Amendment

protection from subpoenas").

Associations seeking protection from compelled disclosure based on the First

Amendment generally must demonstrate a "reasonable probability that the compelled

disclosure . . . will subject them to threats, harassment, or reprisals from either Government

officials or private parties." *Buckley v. Valeo*, 424 U.S. 1, 66 (1976).  The RNC does not

contend, let alone demonstrate, a reasonable probability that Salesforce's production of

documents to the Select Committee will subject the RNC and its members to threats, harassment,

or reprisals.  Rather, the RNC claims that the data "could" be used to reverse engineer its digital

political strategy and to glean its supporters' political beliefs.  Pl.'s. Mem. at 13.  This is an

insufficient basis to challenge the Subpoena under the First Amendment.  Moreover, unlike in

the cases cited by the RNC, the Select Committee is not seeking membership lists or other

information that would reveal the identity of the RNC's donors, volunteers, and employees.  *See,*

*e.g.*, *Am. Fed'n of Labor & Cong. of Indus. Org. v. Fed. Election Comm'n*, 333 F.3d 168, 176

(D.C. Cir. 2003) (addressing First Amendment implications of compelled disclosure of the

"names of hundreds of volunteers, members, and employees").  Thus, even if the RNC could

demonstrate that its members, like those of the NAACP, face a risk of reprisals, there is no

reason to believe that disclosure of Salesforce's documents would increase that risk.  No case

cited by the RNC (and no case the Select Committee is aware of) holds that metrics of a political

party's email campaign or user metadata in the possession of a third-party software service

implicates the First Amendment.

  *Second*, even if this information merits First Amendment protection, as the RNC

contends, Salesforce should be permitted to produce documents in response to the Subpoena.

"[T]he protections of the First Amendment, unlike a proper claim of the privilege against self-

incrimination under the Fifth Amendment, do not afford a witness the right to resist inquiry in all

circumstances."  *Barenblatt v. United States*, 360 U.S. 109, 126 (1959).  In such cases, courts

must balance the "competing private and public interests at stake in the particular circumstances

shown."  *Id.*  Some government interests, especially those involving the "free functioning of our

national institutions" are "sufficiently important to outweigh the possibility of infringement." *Buckley*, 424 U.S. at 66; *see also Senate Permanent Subcomm. v. Ferrer*, 199 F. Supp. 3d 125, 138 (D.D.C. 2016) (holding that Congressional investigation interests "substantially outweighed" any intrusion on subpoena recipient's "incidental" First Amendment rights), *vacated as moot,* 856 F.3d 1080 (D.C. Cir. 2017).  The Select Committee is investigating the deadliest attack on the Capitol "in the history of the United States" to make "legislative recommendations" to prevent future acts of such violence.  *Trump v. Thompson*, 20 F.4th at 16, 41–42.  The Select Committee's interest in obtaining documents from Salesforce necessarily involves the "free functioning of our national institutions" and substantially outweighs any theoretical, incidental harm identified by the RNC.

The RNC further contends that, in addition to balancing the competing private and public interest, the Court should determine whether the Subpoena is "narrowly tailored" to promote the government's interest.  Pl.'s. Mem. at 11 (citing *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2385 (2021)).  But it cites no case (and the Select Committee is not aware of any) in which a court has applied this standard to a Congressional subpoena.  Indeed, courts that have had the occasion to examine the scope of a legislative subpoena generally "only inquire as to whether the documents sought by the subpoena are 'not plainly incompetent or irrelevant to any lawful purpose [of the Committee] in the discharge of [its] duties.'"  *Bean LLC*, 291 F. Supp. 3d at 44 (quoting *McPhaul v. United States*, 364 U.S. 372, 381 (1960)).  Regardless, this Subpoena meets the standard urged by the RNC.  The Subpoena is narrowly tailored to obtain information about whether and how political communications from the RNC and the Trump campaign contributed to the January 6th attack.

As the RNC acknowledges, only two of the five categories in the Subpoena call for its records.  Pl.'s. Mem. at 13–14.  Both categories call for data only from the two-month period between Election Day and January 6, 2021.  The first seeks "metrics" to help the Select Committee determine the number of emails sent, how many Americans received them, how many opened them, and the portion of recipients that clicked on links in the emails.  This information may assist the Select Committee in assessing the types and quantities of mass email campaigns to target in any potential legislation to combat dangerous political disinformation.  The second request for "metadata" will help the Select Committee identify individuals who logged on to the Salesforce system to author and execute the inflammatory email campaigns.  The Select Committee may then have an opportunity to question these key witnesses to learn more.  Contrary to the RNC's suggestion, the Subpoena does not call for the disclosure of the identities of donors and supporters or reveal its internal deliberative processes.[41]  Pl.'s. Mem. at 12–13.  No such information should be contained in the "metrics" or "metadata" sought by the Select Committee.  Moreover, the fact that some of the communications may have related to the run-off elections for U.S. Senate in Georgia does not render them irrelevant to the Select Committee's inquiry.  On the contrary, the Select Committee may very well find that emails relating to these run-off elections also included inflammatory disinformation that incited the January 6th attack.  Finally, the RNC provides no factual basis for its argument that documents called for in the other three categories of the Subpoena—reports or analyses created by Salesforce and direct communications between Salesforce and the RNC concerning the RNC's use of Salesforce's platform—may contain sensitive data that implicates the First Amendment.

---

[41] *See* Letter from Bennie G. Thompson to Salesforce.com, Inc. (March 21, 2022), Ex. 1 to Tatelman Decl.

Accordingly, there is no basis to delay the Select Committee's collection of this information by allowing the RNC to conduct a "document-by-document [review]."  Pl.'s. Mem. at 14.

### 2.    The RNC's Challenge Under the Fourth Amendment Lacks Merit

The Court should similarly reject the RNC's argument that the Subpoena violates its rights under the Fourth Amendment.  The Subpoena does not implicate the RNC's Fourth Amendment rights because it does not have a reasonable expectation of privacy with respect to documents held by Salesforce.  As the Supreme Court explained in *Carpenter v. United States*, "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties . . . even if the information is revealed on the assumption that it will be used only for a limited purpose."  138 S. Ct. 2206, 2216 (2018) (internal quotation marks omitted).  Thus, the government is generally "free to obtain such information from the recipient without triggering Fourth Amendment protections."  *Id.*  The Subpoena to Salesforce does not implicate the historical location information for which *Carpenter* identified an exception to this rule.

Moreover, even if the RNC had a reasonable expectation of privacy in the data it voluntarily provided to Salesforce, the Subpoena does not violate the Fourth Amendment.  A subpoena is "reasonable" under the Fourth Amendment if it calls for documents or testimony within the scope of the Congressional inquiry at issue.  *See McPhaul*, 364 U.S. at 382.  The D.C. Circuit recently held that "Congress's power to obtain information is broad and indispensable . . . and encompasses inquiries into the administration of existing laws, studies of proposed laws, and surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them."  *Thompson*, 20 F.4th at 24 (internal punctuation omitted).  The Court continued, noting that "the January 6th Committee plainly has a valid legislative purpose and its

inquiry concern[s] a subject on which legislation could be had." *Id.* at 41 (internal quotation marks omitted).  Given this holding, the Subpoena is reasonable under the Fourth Amendment.

As described above, the scope of the Select Committee's inquiry includes examining the January 6th attack as well as its "circumstances" and "causes" to inform a consideration of "changes in law, policy, procedures, rules, or regulations."  H. Res. 503 § (3)(1), 4(c). The documents sought in the Subpoena, which relate to "whether and how" Salesforce's platform was used "to disseminate false statements about the 2020 election in the weeks leading up to the January 6th attack" are well within the scope of this inquiry.  *See Eastland*, 421 U.S. at 509.

The RNC's argument that the Subpoena "demands materials wholly irrelevant to the events of January 6, 2021" is wrong.  When a Congressional subpoena is challenged on relevance grounds, the subpoena should be enforced "unless the district court determines that there is no reasonable possibility that the category of materials [the committee] seeks will produce information relevant to the general subject of the . . . investigation."  *Senate Select Comm. on Ethics v. Packwood*, 845 F. Supp. 17, 21 (D.D.C. 1994) (citing *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 301 (1991)).  Here, there is no question that the documents sought from Salesforce have a reasonable probability of being relevant to the Select Committee's investigation of the circumstances and causes of the January 6th attack.

The RNC mischaracterizes the Subpoena.  It first complains that the Subpoena seeks "all information on RNC email campaigns over a two-month period."  Pl.'s Mem. at 15.  This is false.  The Select Committee does not seek the content of the emails, the names of the recipients, or any information other than the "metrics" of the email campaign.  Second, the RNC objects that the Subpoena seeks "all information" regarding its use of Salesforce's platform.  *Id.* at 16. This is also false.  The Select Committee is seeking only log-in information.  It is not seeking

information concerning how much the RNC paid for Salesforce's services, the duration of the

RNC's contract with Salesforce, or details concerning the various products the RNC was entitled

to use.  In any event, none of the RNC's objections implicate the privacy associated with "diaries

or other communications respecting personal matters" that the Fourth Amendment is most

concerned with.  *Nixon v. Freeman*, 670 F.2d 346, 354 (D.C. Cir. 1982).  The RNC also suggests

that the Subpoena violates the Fourth Amendment because it "[i]nitially" did not receive direct

notice of the Subpoena from the Select Committee.  Pl.'s Mem. at 16–18.  The RNC cites no

authority for the proposition that the Select Committee had to give direct notice of the Subpoena

within a certain period.  Nor is there any reason to adopt the protocol proposed in *Packwood* for

reviewing a Senator's personal diaries for the Select Committee's review of data concerning

millions of emails that may have incited a historical attack on the U.S. Capitol.

### C.      The Subpoena Serves a Valid Legislative Purpose

The RNC next argues that Salesforce should be enjoined from complying with the

Subpoena because the Select Committee lacks a valid legislative purpose.  Pl.'s Mem. at 18.  The

D.C. Circuit has already rejected this argument, and its holding governs here.

In *Trump v. Thompson*, 20 F.4th at 10, the former President sued the Select Committee

and the National Archives to enjoin the latter from producing to the Select Committee records

concerning the January 6th attack.  The district court denied the requested injunction, and the

D.C. Circuit affirmed.  As to the Select Committee's purpose, the D.C. Circuit explained:

> The very essence of the Article I power is legislating, and so there would
> seem to be few, if any, more imperative interests squarely within Congress's
> wheelhouse than ensuring the safe and uninterrupted conduct of its
> constitutionally assigned business. Here, the House of Representatives is
> investigating the single most deadly attack on the Capitol by domestic
> forces in the history of the United States.

*Id.* at 35.  Based on this reasoning, the D.C. Circuit concluded that "the January 6th Committee plainly has a 'valid legislative purpose' and its inquiry 'concern[s] a subject on which legislation could be had.'"  *Id.* at 42.

The D.C. Circuit's ruling is directly on point and bars the RNC's argument that the Select Committee lacks a legitimate legislative purpose.  Two other federal courts, including one in this District, have likewise recognized that the Select Committee is pursuing legitimate legislative purposes.  *Budowich v. Pelosi*, 21-cv-3366 (JEB) (D.D.C., Boasberg, J.), Jan. 20, 2022 Oral Arg. Tr. at 34; *Eastman v. Thompson*, 8:22-cv-00099-DOC-DFM (C.D. Cal., Carter, J.), ECF No. 43 at 9 & n.12 (Jan. 25, 2022).

Despite indicating an awareness of these multiple lawsuits challenging subpoenas issued by the Select Committee, Pl.'s Mem. at 3, the RNC fails to cite or discuss any of these decisions in its Motion and makes plainly incorrect arguments.  The RNC suggests that the House Resolution's prohibition on holding a "marking up [of] legislation," a specific procedure that occurs later in the legislative process, means the Select Committee's function has no relationship to legislation.  Pl.'s Mem. at 18–19.  The RNC ignores the other sections of the Resolution, which expressly authorize the Select Committee to recommend "corrective measures," including "changes in law, policy, procedures, rules, or regulations, that could be taken."  H. Res. 503 § 4(c).  Based on these sections, the D.C. Circuit concluded, "House Resolution 503 expressly authorizes the Committee to propose legislative measures."  *Trump v. Thompson*, 20 F.4th at 41–42.

The RNC also selectively quotes from public comments by members of the Select Committee to suggest that the exclusive purpose of the Select Committee is to pursue criminal justice.  This is false.  As noted above, the Select Committee's mission includes recommending

corrective measures.  Moreover, regardless of any relationship the investigation may have to the

disclosure of crimes, courts should "presume that the action of the legislative body was with a

legitimate object, if it is capable of being so construed."  *McGrain*, 273 U.S. at 178–80 (rejecting

objection to investigation on the ground that "it might possibly disclose crime or wrongdoing").

As the D.C. Circuit has already held, the Select Committee has a valid legislative purpose.

The Subpoena to Salesforce is in furtherance of that legislative purpose.  As noted above,

the RNC and President Trump used Salesforce's services to propagate false claims that the

election was stolen—a mistaken belief that motivated January 6th participants to engage in the

Capitol attack.  The Select Committee is charged with investigating the facts and circumstances

that helped cause the attack, which will help it and Congress determine whether and how to

legislate to prevent its recurrence.  Therefore, the Subpoena is squarely within the Select

Committee's ambit.

### D.      The Select Committee Is Properly Composed

The RNC's various challenges to the Select Committee's composition and adherence to

the House Rules are incorrect.

Under the Rulemaking Clause of the Constitution, "[e]ach House may determine the

Rules of its Proceedings."  U.S. Const. art. I, § 5, cl. 2; *see Baker v. Carr*, 369 U.S. 186, 217

(1962).  That provision is a critical aspect of the Legislative Branch's constitutional design as it

"grants the House the power to make its own Rules about its internal proceedings," *Rangel v.

Boehner*, 20 F. Supp. 3d 148, 167 (D.D.C. 2013), which "only empowers Congress to bind

itself," *INS v. Chadha*, 462 U.S. 919, 955 n.21 (1983).

Courts have long emphasized the deference owed to Congress in determining its own

rules. "[J]udicial interpretation of an ambiguous House Rule runs the risk of the court intruding

into the sphere of influence reserved to the legislative branch under the Constitution."  *United*

*States v. Rostenkowski*, 59 F.3d 1291, 1306 (D.C. Cir. 1995).  Thus, a court's jurisdiction to interpret internal rules of a House of Congress is limited to situations where such interpretation "requires no resolution of ambiguities."  *United States v. Durenberger*, 48 F.3d 1239, 1244 (D.C. Cir. 1995).  "Where, however, a court cannot be confident that its interpretation is correct, there is too great a chance that it will interpret the Rule differently than would the Congress itself; in that circumstance, the court would effectively be making the Rules—a power that the Rulemaking Clause reserves to each House alone."  *Rostenkowski*, 59 F.3d at 1306–07; *accord Metzenbaum v. FERC*, 675 F.2d 1282, 1287 (D.C. Cir. 1982) ("To decide otherwise would subject Congressional enactments to the threat of judicial invalidation on each occasion of dispute over the content or effect of a House or Senate rule.").

Another judge in this district recently recognized the judiciary's limited role in reviewing Congressional rules in the context of the Select Committee's composition.  In *Budowich, supra,* the court explained that it would reject arguments similar to those the RNC makes here:  the court would "have to defer to Congress in the manner of interpreting its rules," and would be "usurping Congressional authority" were it to hold that the Select Committee was not validly composed.  Jan. 20, 2022 Oral Arg. Tr. 34:1–5, 8–10, *Budowich v. Pelosi*, No. 21-cv-3366 (JEB) (D.D.C. Jan. 20, 2022); *see also Eastman*, ECF No. 43 at 9 & n.12; *Vander Jagt v. O'Neil*, 699 F.2d 1166, 1175–77 (D.C. Cir. 1982) (affirming dismissal of relief sought by 14 House Republican members claiming discrimination regarding committee assignments and rejecting the "startlingly unattractive idea, given our respect for a coequal branch of government, for us to tell the Speaker" whom to appoint to committees).  For the same reasons, the RNC's challenge to the Select Committee's composition rests on arguments not subject to judicial review.

*First*, the RNC complains that the Select Committee "is not composed as required under H. Res. 503." Pl.'s Mem. at 21.  H. Res. 503, however, does not require that *all* thirteen Members be appointed at once for the Select Committee to function, nor does the authorization to appoint thirteen Members require the appointment of that precise number.  *See Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 432 n.9 (1995) (recognizing that "shall" sometimes means "may").  Indeed, there is House precedent for such a select committee having fewer than its full allotment of Members.  In the 109th Congress, for instance, the House created the Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, which allowed for twenty Members, using similar language.  *See* H. Res. 437, § 2(a), 109th Cong. (2005) ("The select committee shall be composed of 20 members appointed by the Speaker . . . .").  House Speaker Dennis Hastert appointed only eleven Members, all of whom were from the Republican majority party.  *See* H. Rep. No. 109-377, ii, 109th Cong. (2006) (listing Members appointed by Speaker Hastert).  In fact, the Resolution even contemplates the possibility of "vacancies" but does not provide a specific timeline for filling them.  H. Res. 503, § 2(c).  Nor does the Resolution provide that the Select Committee becomes invalid or that it must suspend all action when vacancies arise.  *Id.*

The fact that the full House has affirmatively ratified actions of the Select Committee confirms the Select Committee is duly constituted.  The full House approved the Select Committee's criminal referrals of Steven Bannon and Mark Meadows for contempt of Congress. *See* H. Res. 730, 117th Cong. (2021) (Bannon); H. Res. 851, 117th Cong. (2021) (Meadows).  Both resolutions were reported by the Select Committee and approved by the full House.  *See* 167 Cong. Rec. H5748-69, 117th Cong. (daily ed., Oct. 21, 2021); *id.* at H7667-76 (daily ed.,

Dec. 14, 2021).  The full House's ratification of the referrals shows that the RNC's objections to its composition are mistaken.

*Second*, the RNC complains that the Select Committee is improperly formed because "Speaker Pelosi refused to appoint Rep. Banks, Leader McCarthy's choice for Ranking Member . . . to the Select Committee . . . and left the other seats vacant after Leader McCarthy rescinded his recommendations in protest."  Pl.'s Mem. at 22.  This argument is also incorrect. The power to appoint House Members to select Committees rests exclusively with the Speaker of the House.  *See* Rule I.11, Rules of the U.S. House of Representatives, 117th Cong. (2021) ("House Rules") ("The Speaker shall appoint all select, joint, and conference committees ordered by the House.")[42]; 167 Cong. Rec. H37, 117th Cong. (daily ed. Jan. 4, 2021) (authorizing Speaker to "accept resignations and to make appointments authorized by law or by the House"). This is consistent with longstanding House precedent.  *See* 8 *Cannon's Precedents of the U.S. House of Representatives*, § 2172 (citing "instances in which the majority declined to recognize minority recommendations for committee assignments").

House Resolution 503 is not to the contrary.  Had the House intended a binding role for the Minority Leader, it could have legislated one, as it has in the past.  *See* H. Res. 6, § 104(f)(1)(B), 116th Cong. (2019) (Select Committee on the Climate Crisis); *id.* at § 201(b)(3) (Select Committee on the Modernization of Congress).

In contrast, when creating the Select Committee, the House required only that Members be chosen "after *consultation* with the Minority Leader," H. Res. 503, § 2(a) (emphasis added), which allows the Speaker greater authority regarding the appointment of minority party

---

[42] *Available at* https://rules.house.gov/sites/democrats.rules.house.gov/files/117-House-Rules-Clerk.pdf.

Members. "Consultation" means to "seek[] advice or information of.'" *United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 750 (D.C. Cir. 2019) (internal quotation marks omitted); *see* BLACK'S LAW DICT. (11th ed. 2019) (defining "consultation" as "[t]he act of asking the advice or opinion of someone"). This language is consistent with House practice and precedent:  The same language was used in the resolutions that created both the Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina, *see supra*, and the Select Committee on the Events Surrounding the 2012 Terrorist Attack in Benghazi, *see* H. Res. 567, § 2(a), 113th Cong. (2014).

Here, House Resolution 503 was followed:  the Minority Leader *was* consulted.  Indeed, as the RNC notes, the Minority Leader made several suggestions to the Speaker regarding minority party Members to serve on the Select Committee, Pl.'s Mem. at 22.  The fact that the Speaker—using her authority under House Rules; the January 4, 2021, Order of the House; and House Resolution 503—made different selections as to two Members, and that the Minority Leader subsequently withdrew his recommendations, does not make the Select Committee improperly constituted, nor does it invalidate any of its actions.  There is no basis for a court to substitute its interpretation of the terms "shall" and "consultation" for the House's view.  *See Barker v. Conroy*, 921 F.3d 1118, 1130 (D.C. Cir. 2009); *Eastman*, ECF No. 43 at 9 & n.12; *Vander Jagt*, 699 F.2d at 1175.

*Finally*, the RNC argues that the Court should enjoin Salesforce from complying with the Subpoena because Chairman Thompson failed to consult with a "ranking minority member" before issuing the Subpoena.  Pl.'s Mem. at 20–21.  This argument is also wrong.  House Resolution 503 does not require consultation with the ranking minority Member before issuing a subpoena for *documents*; instead, it provides that the "chair of the Select Committee may

authorize and issue subpoenas pursuant to clause 2(m) of [House] rule XI." *See* H. Res. 503, § 5(c)(4).  In turn, House Rule XI.2(m) permits issuance of subpoenas for documents when the power to authorize and issue subpoenas has been "delegated to the chair of the committee under such rules and under such limitations as the committee may prescribe." *Id.*  Because House Resolution 503 specifically delegates to the Chairman of the Select Committee the power to authorize and issue documents subpoenas, such as the one issued to the RNC, it is consistent with House Rule XI.2(m)(3)(A)(i).

### E.  Subpoena Compliance Will Not Violate the Stored Communications Act

Finally, the RNC contends that Salesforce should be enjoined from producing some documents because doing so would violate the Stored Communications Act.  This is wrong as a matter of law because nothing in the Act limits the ability of a Congressional committee to obtain records from a "person or entity providing an electronic communication service to the public" via a lawful and duly authorized subpoena.  18 U.S.C. § 2702(a)(1).

Contrary to the RNC's contention, the Subpoena does not seek the "actual content of communications stored on Salesforce's servers."  Pl.'s Mem. at 22.  The RNC contends that the request for "message attributes" in the first item of the Subpoena calls for such content.  This is incorrect.  "Message attributes" refers to metadata associated with the emails sent through Salesforce's platform, including the number of recipients, the presence of any attachments or links, the subject of the email, and the date of the email.  Message attributes, like the other metrics and analytics sought by the Subpoena, do not include content.  The RNC also contends that items three and four of the Subpoena are likely to contain the content of stored communications.  *Id.*  But those items, which call for investigative reports and analyses "conducted by Salesforce" concerning the "Washington Rallies" and the RNC's use of

Salesforce's platform, are likely to contain Salesforce's own commentary and conclusions concerning the activities leading up to January 6th.  Salesforce commits in its Master Subscription Agreement to protect the "confidentiality and integrity of Customer Data."[43]  The RNC suggests no reason to believe that Salesforce copied and pasted the content of the RNC's stored emails into any of these reports.  Because the Subpoena does not seek communication contents, Salesforce's compliance with the Subpoena would not violate 18 U.S.C. § 2702(a)(1).

While the Act prohibits the disclosure of the contents of communications to "any person or entity," it expressly permits the disclosure of non-content records to "any person other than a governmental entity."  18 U.S.C. § 2702(a)(1), (a)(3), (c)(6). The Act's definitional terms make clear that Congress did not intend for "governmental entity" to include Congress.  18 U.S.C. § 2711(4).  The RNC acknowledges this in its Motion: "Congress is not a 'governmental entity' because, as the legislative branch, it is not a "department or agency of the United States."  Pl.'s Mem. at 22–23 (citing 18 U.S.C. § 2711(4)).

Thus, because the Select Committee does not seek the content of communications stored on Salesforce's servers and because the Select Committee is not a "governmental entity" under § 2711(4), Salesforce's production of documents in response to the Subpoena will not violate the Stored Communications Act.

## III.    THE RNC HAS FAILED TO DEMONSTRATE A LIKELIHOOD OF IRREPARABLE HARM

The Court should deny the RNC's Motion for the independent reason that it has not established a likelihood of irreparable injury.  A plaintiff seeking a preliminary injunction must

---

[43] Salesforce, Master Subscription Agreement (Feb. 18, 2022), https://www.salesforce.com/content/dam/web/en_us/www/documents/legal/salesforce_MSA.pdf (last visited Mar. 20, 2022).

"demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). Because a preliminary injunction is an "extraordinary remedy," a mere "possibility" of irreparable injury is not sufficient. *Id.*

The D.C. Circuit applies a "high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The alleged injury "must be both certain and great; it must be actual and not theoretical." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). And it must be "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* To meet this standard, a movant "must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future." *Id.* The movant must also show "that the alleged harm will directly result from the action which the movant seeks to enjoin." *Id.*

Economic or monetary loss generally does not constitute irreparable harm. *Id.* The only circumstance in which the D.C. Circuit has endorsed a finding of irreparable harm based on "monetary loss" is where "alleged losses 'threaten[ ] the very existence'" of an entity. *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 47 (D.D.C. 2014) (quoting *Wisconsin Gas*, 758 F.2d at 674). The "loss of business opportunities, market share, and customer goodwill are typically considered to be economic harms" that do not amount to irreparable harm. *Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012).

In its effort to meet this high standard, the RNC relies on a single declaration from its Chief Digital Officer and makes a host of conclusory and speculative assertions that fail to demonstrate that it or its members will suffer any harm, let alone imminent irreparable harm.

*First*, the RNC asserts that Salesforce's production "could" be used by its opponents and competitors to create a mosaic of its confidential digital political strategy and, thereby, erode its advantage in "targeting" certain demographics for fundraising and political messaging.  Pl.'s Mem. at 25.[44]  According to the RNC this would result in "monetary harm."  *Id.*

Even assuming that the Select Committee could glean the RNC's entire digital political strategy from two months of historical metrics and metadata, it is unclear how the Select Committee's mere possession of this mosaic could harm the RNC.  Nor would it be likely to help RNC's competitors, as this information is likely to be stale and provide no insight into the RNC's strategy for the 2022 or 2024 election cycles, especially considering reports that the RNC has stopped using Salesforce.  Koebler and Cox, *supra* note 1.  Finally, as the RNC acknowledges, any such harm would be "monetary."  In the absence of evidence that this monetary harm would represent an existential threat to the RNC, it necessarily would not be "irreparable."

*Second*, the RNC asserts that, following any disclosure of information by Salesforce, its supporters are less likely to engage with it through digital platforms.  Pl.'s Mem. at 26.  The RNC offers no evidence for these predictions other than the conclusory assertions of its Chief Digital Officer.  Even if the RNC's predictions are correct, any reduction in engagement or support is the equivalent of a loss of customer goodwill and, like any reduction in fundraising, amounts to economic, not irreparable, harm.

*Third*, the RNC contends that any production by Salesforce will cause direct harm to its supporters by disclosing their private information, exposing them as Republican supporters, and

---

[44] Although the RNC presents these as two different categories of harm, they both appear to amount to the same contention that confidential information relating to its digital marketing will confer a benefit to others and result in a monetary loss to the RNC.

revealing their positions on issues and candidates.  Pl.'s Mem. at 26.  According to the RNC, the supporters could then find themselves "cancelled" from social media, fired from their jobs, or face threats of "life and limb."  Pl.'s Mem. at 27.[45]  The RNC has not submitted any declarations from its supporters or other evidence for these propositions.  Instead, its own Chief Digital Officer, Christian Schaeffer, claims that "based on [his] experience," the RNC's supporters have "general concerns regarding their political activities being publicized."  Schaffer Decl. ¶ 20. Schaeffer goes on to describe his "belie[f]" that this "stems from a general culture where individuals who express conservative and Republican views are attacked and vilified."  The RNC offers no explanation for why these "general concerns" apply only to supporters who contribute less than $200, while larger donors, whose identities are required by law to be disclosed, are not deterred.  Regardless, it cannot establish irreparable harm based on the mere beliefs and speculations of its Chief Digital Officer, who did not even provide a factual basis that such private information would be disclosed in response to the subpoena.

Moreover, all the categories of purported harm identified by the RNC require some intervening event for it to suffer any injury.  For example, its concerns about its digital marketing strategy are irrelevant unless the Members of the Select Committee use the Salesforce data for their own political purposes or distribute the data to the RNC's competitors.  Similarly, no purported harm will befall the RNC's supporters unless the Select Committee is able to determine identifying information from the metrics and metadata it receives from Salesforce, chooses to compile such information, and then widely publicizes it.  None of these events flow directly or imminently from Salesforce's production of documents to the Select Committee.  The

---

[45] The RNC again attempts to present these harms as different categories in multiple paragraphs, but they all involve potential harm to its supporters because of their exposure.

fact that they might possibly occur is insufficient to warrant a preliminary injunction.  *See Winter*, 555 U.S. at 22; *see also Exxon Corp. v. F.T.C.*, 589 F.2d 582, 589 (D.C. Cir. 1978) ("The courts must presume that the committees of Congress will exercise their powers responsibly and with due regard for the rights of affected parties.").

Nor can the RNC demonstrate irreparable harm by alluding generally to the risk of its First Amendment rights being "chilled."  *See Ghandi v. Police Dep't of City of Detroit*, 747 F.2d 338, 347 (6th Cir. 1984) (noting that injunctive relief is not available based merely on conclusory assertions that "the exercise of first amendment rights is being 'chilled' by the mere existence, without more, of a governmental investigative and data-gathering activity" (quoting *Laird v. Tatum*, 408 U.S. 1, 10 (1972)).  This case is nothing like those cited in the RNC's brief for this proposition.  *See, e.g.*, *Karem v. Trump*, 960 F.3d 656, 667 (D.C. Cir. 2020) (enjoining White House's revocation of journalist's press privileges without due process); *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 385 (D.D.C. 2020) (finding that censorship of opinions on Voice of America caused irreparable harm).

In short, the RNC has failed to demonstrate that it is likely to suffer any harm at all, let alone imminent irreparable harm, from Salesforce's production to the Select Committee of two months of metrics and metadata.

## IV.   THE BALANCE OF EQUITIES WEIGHS HEAVILY IN FAVOR OF THE SELECT COMMITTEE

The balance of the equities strongly supports denial of the requested injunction.  As noted above, the RNC has not proven that it would suffer any injury at all from the production of two months of data concerning its email campaign leading up to the January 6th attack.  Indeed, to the extent it suffers at all, it would suffer in the same manner as countless entities—including entities directly involved in protected speech activities—that routinely produce emails and other

communications in response to civil discovery subpoenas, government administrative subpoenas or civil investigative demands, grand jury subpoenas, and the like.

By contrast, the Select Committee's interests in prompt compliance with the subpoena are of the highest order.  *See supra* at 26 (citing *Barenblatt*, 360 U.S. at 111); *see also McGrain*, 273 U.S. at 175 ("[W]here the legislative body does not itself possess the requisite information—which not infrequently is true—recourse must be had to others who do possess it.").

Here, the Select Committee is investigating matters of immense national importance. And any role the RNC played in orchestrating, executing, and profiting from the disinformation campaign that led up to the January 6th attack is critical to that investigation.  The Select Committee's interest in proceeding with its investigation is self-evident, and injunctive relief would directly hinder and frustrate that ongoing investigation.  The balance of the equities thus heavily favors denial of the RNC's Motion.

## V.     THE PUBLIC INTEREST SUPPORTS ALLOWING THE SELECT COMMITTEE TO CONDUCT ITS URGENT INVESTIGATION

For the same reasons, the public interest strongly supports denial of the Motion.  Even in the less pressing context of administrative investigations, which derive from statutory authority (whereas Congress's power of investigation is derived from the Constitution itself), the D.C. Circuit has "recognized a strong public interest in having" such "investigations proceed 'expeditiously and without impediment.'"  *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp.*, 5 F.3d 1508, 1514 (D.C. Cir. 1993) (internal quotation marks omitted).  *A fortiori*, the public interest in expeditious and unimpeded Congressional investigations is compelling.  *See Exxon Corp.*, 589 F.2d at 593 (there is a "clear public interest in maximizing the effectiveness of the investigatory powers of Congress").  The welfare of the public is a factor to be weighed in determining whether or not to issue an injunction, and "the

investigatory power is one that the courts have long perceived as essential to the successful

discharge of the legislative responsibilities of Congress[.]").  It is difficult to imagine a

Congressional investigation of greater national significance.  The public interest in permitting the

Select Committee to proceed with its investigation thus compels rejection of the RNC's Motion.

## CONCLUSION

The RNC has failed to meet the high burden necessary to obtain the extraordinary remedy

of a preliminary injunction.  For the reasons set forth above, its Motion should be denied, and

this case should be dismissed.

Respectfully submitted,

/s/  *Douglas N. Letter*
DOUGLAS N. LETTER
  *General Counsel*
TODD B. TATELMAN
  *Principal Deputy General Counsel*
ERIC R. COLUMBUS
  *Special Litigation Counsel*
MICHELLE S. KALLEN
  *Special Litigation Counsel*
STACIE M. FAHSEL
  *Associate General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C.  20515
(202) 225-9700
Douglas.Letter@mail.house.gov

-and-

SHER TREMONTE LLP
Justin M. Sher
Michael Tremonte[*]
Noam Biale

Maya Brodziak[*]
Kathryn E. Ghotbi[*]
90 Broad Street, 23rd Floor
New York, New York 10004
(212) 202-2600
JSher@shertremonte.com
MTremonte@shertremonte.com
NBiale@shertremonte.com
MBrodziak@shertremonte.com
KGhotbi@shertremonte.com

-and-

ARNOLD & PORTER
John A. Freedman
Paul Fishman
Amy Jeffress
601 Massachusetts Ave, NW
Washington,  D.C. 20001
(202) 942-5000
John.Freedman@arnoldporter.com
Paul.Fishman@arnoldporter.com
Amy.Jeffress@arnoldporter.com

[*] Appearing pursuant to 2 U.S.C. § 5571(a).

Dated:  March 23, 2022

**CERTIFICATE OF SERVICE**

I hereby certify that on March 23, 2022, I caused the foregoing document to be filed via the CM/ECF system for the U.S. District Court for the District of Columbia, which I understand caused a copy to be served on all registered parties.

/s/ Douglas N. Letter
Douglas N. Letter