**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE, ) ) ) *Plaintiff*, ) ) v. ) ) NANCY PELOSI, et al., ) ) *Defendants*. ) ) | **Case No. 1:22-cv-00659-TJK** |

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Christopher O. Murray
STATECRAFT PLLC
1263 Washington Street
Denver, CO 80203
Tel:  602.362.0034
Email:  chris@statecraftlaw.com

*Attorney for Plaintiff Republican National Committee*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ........................................................................................................... 1

REPLY IN SUPPORT ..................................................................................................... 1

   I.   Legislative Immunity Under the Speech or Debate Clause Is No Jurisdictional Bar. ........ 1

       A.   Salesforce has no legislative immunity ...................................................... 2

       B.   The Congressional Defendants cannot claim legislative immunity because the Salesforce Subpoena serves no legitimate legislative purpose. .......................... 4

   II.   The RNC Is Likely to Succeed on the Merits of Its Claims. ............................... 8

       A.   The Salesforce Subpoena violates the First Amendment because it lacks tailoring specific to the Select Committee's purpose. ................................. 8

           1.   *The Salesforce Subpoena implicates the First Amendment rights of the RNC and its donors, supporters, and other partners.* ............................... 8

           2.   *Under* Bonta, *any compelled disclosure must be narrowly tailored to the substantial governmental interest.* ........................................... 10

           3.   *The Salesforce Subpoena is not narrowly tailored.* ........................ 11

       B.   The Salesforce Subpoena violates the Fourth Amendment because it is unreasonable. ................................................................................ 12

           1.   *The RNC has a reasonable expectation of privacy in its First Amendment protected records held by Salesforce.* ...................... 13

           2.   *The Salesforce Subpoena is unreasonable because it demands materials irrelevant to the Select Committee's purpose.* ........................ 18

           3.   *The Salesforce Subpoena is unreasonable because it provides no protections for the RNC's First Amendment and Fourth Amendment rights.* ................................................. 18

       C.   The Salesforce Subpoena was not issued in accordance with H. Res. 503. ............ 20

       D.   The Salesforce Subpoena violates the Stored Communications Act. ...................... 22

   III.   The RNC Will Suffer Irreparable Injury Without Preliminary Relief. ....................... 22

   IV.   The Balance of Equities and Public Interest Strongly Favor Injunctive Relief. ............... 24

CONCLUSION ............................................................................................................ 25

CERTIFICATE OF SERVICE ...................................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

*Cases*

*Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. FEC,*
   333 F.3d 168 (D.C. Cir. 2003) ..................................................................9, 10, 15

*Americans for Prosperity Found. v. Bonta,*
   141 S. Ct. 2373 (2021) ........................................................................................10

*Barenblatt v. United States,*
   360 U.S. 109 (1959) .............................................................................................10

*Brown v. FEC,*
   386 F. Supp. 3d 16 (D.D.C. 2019) .......................................................................23

*Buckley v. Valeo,*
   424 U.S. 1 (1976) .............................................................................................9, 19

*C.G.B. v. Wolf,*
   464 F. Supp. 3d 174 (D.D.C. 2020) .....................................................................22

*Camara v. Mun. Ct. of City & Cnty. of S.F.,*
   387 U.S. 523 (1967) .............................................................................................13

*Carpenter v. United States,*
   138 S. Ct. 2206 (2018) ............................................................................13, 15, 16

*Christoffel v. United States,*
   338 U.S. 84 (1949) ...............................................................................................21

*Doe v. McMillan,*
   412 U.S. 306 (1973) ...........................................................................................2, 3

*Eastland v. U.S. Servicemen's Fund,*
   421 U.S. 491 (1975) ......................................................................................2, 3, 4

*Exxon Corp. v. FTC,*
   589 F.2d 582 (D.C. Cir. 1978) ........................................................................20, 24

*Gordon v. Holder,*
   721 F.3d 638 (D.C. Cir. 2013) ................................................................22, 24, 25

*Gravel v. United States,*
   408 U.S. 606 (1972) ...........................................................................................2, 3

*Ex parte Jackson,*
   96 U.S. 727 (1877) ...............................................................................................17

*Karem v. Trump,*
   960 F.3d 656 (D.C. Cir. 2020) .............................................................................22

## TABLE OF AUTHORITIES (con't)

*Katz v. United States*,
  389 U.S. 347 (1967)........................................................................................13, 17

*Kyllo v. United States*,
  533 U.S. 27 (2001)................................................................................................16

*Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resol. Tr. Corp.*,
  5 F.3d 1508 (D.C. Cir. 1993)...............................................................................25

*McCutcheon v. FEC*,
  572 U.S. 185 (2014)................................................................................................9

*NAACP v. Alabama ex rel. Patterson*,
  357 U.S. 449 (1958)........................................................................................10, 15

*Nixon v. Freeman*,
  670 F.2d 346 (D.C. Cir. 1982).........................................................................18, 19

*O'Connor v. Ortega*,
  480 U.S. 709 (1987)..............................................................................................20

*Quinn v. United States*,
  349 U.S. 155 (1955)................................................................................................5

*Riley v. California*,
  573 U.S. 373 (2014)........................................................................................13, 16

*Senate Permanent Subcomm. on Investigations v. Ferrer*,
  856 F.3d 1080 (D.C. Cir. 2017)......................................................................23, 24

*Senate Select Comm. on Ethics v. Packwood*,
  845 F. Supp. 17 (D.D.C. 1994).............................................................................19

*Simms v. Dist. of Columbia*,
  872 F. Supp. 2d 90 (D.D.C. 2012)........................................................................24

*Smith v. Maryland*,
  442 U.S. 735 (1979)..............................................................................................17

*Trump v. Mazars USA, LLP*,
  140 S. Ct. 2019 (2020)....................................................................................3, 5, 7

*Trump v. Mazars USA, LLP*,
  940 F.3d 710 (D.C. Cir. 2019)............................................................................5, 7

*Trump v. Thompson*,
  20 F.4th 10 (D.C. Cir. 2021)......................................................................4, 5, 6, 18

*Turner v. U.S. Agency for Glob. Media*,
  502 F. Supp. 3d 333 (D.D.C. 2020)................................................................22, 24

## TABLE OF AUTHORITIES (con't)

*United States v. AT&T*,
   567 F.2d 121 (D.C. Cir. 1977) ..................................................................2, 3

*United States v. Cross*,
   170 F. Supp. 303 (D.D.C 1959) ....................................................................5

*United States v. Jacobsen*,
   466 U.S. 109 (1984) .....................................................................................17

*United States v. Jones*,
   565 U.S. 400 (2012) .....................................................................................16

*United States v. Miller*,
   425 U.S. 435 (1976) ...............................................................................14, 15

*United States v. N.Y. Tel. Co.*,
   434 U.S. 159 (1977) .....................................................................................17

*Watkins v. United States*,
   354 U.S. 178 (1957) ...................................................................................5, 7

*Yellin v. United States*,
   374 U.S. 109 (1963) .....................................................................................21

### Constitutional Provisions

U.S. Const. art. I, § 6, cl. 1 ...................................................................................2

U.S. Const. amend I .............................................................................. passim

U.S. Const. amend IV ........................................................................... passim

### Statutes

Federal Election Campaign Act,
   52 U.S.C. §§ 30101 to 30146 ........................................................................9

Stored Communications Act,
   18 U.S.C. §§ 2701 to 2712 ..........................................................................22

### Other Authorities

Cong. Defs.' Suppl. Letter Br., *Trump v. Mazars USA, LLP*,
   Nos. 19-715, 19-760 (U.S. May 8, 2020) ...................................................4

Hr'g Tr., *Budowich v. Pelosi*,
   No. 21-3366-JEB (D.D.C. Jan. 20, 2022) ..................................................23

H.R. Res. 503, 117th Cong. (2021) ...........................................................6, 20, 21

H.R. Res. 8, 117th Cong. (2021) ....................................................................20

## INTRODUCTION

Since the 2019 change in party control, Congress has made a cottage industry of litigating its subpoena powers.[1] This litigation appears aimed at using legislative immunity under the Speech or Debate Clause to turn a congressional demand for documents into a game of capture-the-flag. How does the game work? First, Congress subpoenas a third party holding the confidential information of the subpoena's true target, with no notice to the true target. This way, the true target cannot refuse compliance and force Congress to test its subpoena in court. Next, under congressional pressure the third party—which of course has little interest in incurring the ire of Congress—turns over the demanded material. At this point, the flag is captured. When the true target asks for judicial relief, legislative immunity prevents any remedy for dissemination and disclosure of the material once it is already in the hands of Congress.

Here, the true target is the RNC and the third party is Salesforce. This case presents the circumstance Congress has tried to avoid. The RNC received notice that the Select Committee was demanding its highly sensitive information including data revealing internal deliberations regarding strategy and concerning its donors, supporters, and other partners, in time to seek an order preventing Salesforce's compliance with the Subpoena. Because no production of the materials has yet occurred, the Subpoena's unconstitutional demands are subject to this Court's judicial inquiry. The Court should issue a preliminary injunction enjoining Salesforce and preserving the Court's ability to determine this matter on the merits.

## REPLY IN SUPPORT

### I.    Legislative Immunity Under the Speech or Debate Clause Is No Jurisdictional Bar.

The RNC's Amended Complaint asserts claims against both the Congressional Defendants *and* Salesforce. The Congressional Defendants all but ignore this. To be sure, the Congressional Defendants raise a score of arguments in opposition to the RNC's request for an order enjoining Salesforce from disclosing materials in response to the Salesforce Subpoena.

---

[1] As of this filing, the RNC is aware of at least 33 reported decisions since 2019 dealing with congressional subpoenas.

Yet, they do not deal with the RNC's claims against **Salesforce** and that the RNC's Motion requests "**enjoining Defendant Salesforce**" from responding to the Subpoena. (Mem. in Supp. of Pl.'s Mot. for Prelim. Inj. ("Memo") at 29 (emphasis added); *see also* Proposed Order.) In many ways, this is fatal to the Congressional Defendants' opposition.

Even more, for the Congressional Defendants to claim legislative immunity, the challenged activity—the Salesforce Subpoena—must be in pursuit of a "legitimate legislative purpose." But it is not. Rather, the purpose of the Salesforce Subpoena is an attack on the RNC's data infrastructure by political rivals in breach of the constitutional protections afforded internal party deliberations, political strategy, and the RNC's members and supporters. This is case dispositive: the lack of a legitimate government purpose defeats the Congressional Defendants' claim of legislative immunity under *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491 (1975); it is also enough to warrant an injunction here.

    A.    **Salesforce has no legislative immunity.**

Legislative immunity provides the Congressional Defendants no relief from the RNC's claims against Salesforce—nor does Salesforce ask for such relief (*see generally* Salesforce's Resp. to RNC Mot. for Prelim. Inj. at 2 (taking no position on the merits of the claims or whether a preliminary injunction is warranted)). The Speech or Debate Clause protects "[t]he Senators and Representatives ... for any Speech or Debate in either House … ." U.S. Const., art. I, § 6, cl. 1. This legislative immunity shields Members and their legislative aides "against prosecutions that directly impinge upon or threaten the legislative process," *Gravel v. United States*, 408 U.S. 606, 616 (1972), and "is personal to [M]embers of Congress," *United States v. AT&T*, 567 F.2d 121, 130 (D.C. Cir. 1977) ("*AT&T II*"). But the U.S. Supreme Court has "ma[d]e perfectly apparent … that everything a Member of Congress may regularly do is not a legislative act within the protection of the Speech or Debate Clause." *Doe v. McMillan*, 412 U.S. 306, 313 (1973). The Court has taken "a decidedly jaundiced view towards extending the Clause so as to privilege illegal or unconstitutional conduct beyond that essential to foreclose executive control of legislative speech or debate and associated matters." *Gravel*, 408 U.S. at 620. Nor

2

does the immunity reach "private" actions, even when part of the legislative process. *McMillan*, 412 U.S. at 313–14 (private republication of documents introduced at a committee hearing not protected even though hearing was part of the legislative process).

To be clear, the Congressional Defendants make no argument that legislative immunity extends to Salesforce. Nor could they, as the D.C. Circuit has rejected a near-identical argument in *AT&T II*. There, a congressional subcommittee intervened and pressed legislative immunity to prevent judicial review of a lawsuit to stop AT&T from responding a subpoena. 567 F.2d at 128. The court found that legislative immunity and *Eastland*—the Congressional Defendants' primary authority—presented no barrier. *Id.* Whereas *Eastland* concerned claims against Members of Congress,[2] *AT&T II* concerned claims against the target of the subpoena. The court pointed out that a third party's lawsuit against a subpoena target (here, Salesforce) is equivalent procedurally to the third party (here, the RNC) refusing to respond to the subpoena and then contesting enforcement (including by raising constitutional defenses) in a criminal prosecution or civil enforcement action. *Id.* at 128, 129; *see also id.* at 129 ("[T]he fortuity that documents sought by a congressional subpoena are not in the hands of a party claiming injury from the subpoena should not immunize that subpoena from challenge by that party."); *Eastland*, 421 U.S. at 516 (Marshall, J., concurring) ("The Speech or Debate Clause cannot be used to avoid meaningful review of constitutional objections to a subpoena simply because the subpoena is served on a third party."); *cf. Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2035 (2020) (expressing concern with Congress "sidestep[ping] constitutional requirements any time … information is entrusted

---

[2] The plaintiff in *Eastland* filed suit against the subcommittee, the members of the subcommittee and its chief counsel, and the target bank. *Eastland*, 421 U.S. at 513 (Marshall, J., concurring). But the plaintiff was unable to serve the New York bank, *id.* at 513–14, and it did not participate in the case, *id.* at 495, nn.4, 5 (majority op.). By the time the case reached the Supreme Court, the only relief available was "a permanent injunction restraining the Members of the Subcommittee and its Chief Counsel from trying to enforce the subpoena by contempt of Congress or other means." *See id.* at 496; *see also id.* at 514 (Marshall, J., concurring) ("[T]he only parties that [plaintiff] brought before the courts were the Senators and their counsel."). The case therefore "d[id] not present the questions of … the proper procedure, and who might be the proper parties defendant, in an effort to get before a court a constitutional challenge to a subpoena duces tecum issued to a third party." *Id.* at 517 (Marshall, J., concurring).

to a third party—as occurs with rapidly increasing frequency"). No doubt the RNC's claims against the Salesforce Subpoena would overcome legislative immunity if the RNC was the target and refused to comply with the Subpoena; the same holds when another party (Salesforce) is entrusted with the RNC's information and the RNC sues that party to enjoin a response.

This is not a novel concept and has been affirmed by the U.S. Supreme Court. Indeed, if the Congressional Defendants were right, the Court should have dismissed *Mazars* (and related case, *Trump v. Deutsche Bank AG*, No. 19-760). There, President Trump and related plaintiffs sued third-party banks and accounting firms to challenge congressional subpoenas issued by several congressional committees. *See* Cong. Defs.' Suppl. Letter Br. at 1–2, *Trump v. Mazars USA, LLP*, Nos. 19-715, 19-760 (U.S. May 8, 2020), *available at* https://bit.ly/3Dh486U. The Supreme Court requested supplemental briefs addressing whether the political question doctrine or related justiciability principles limited the Court's ability to adjudicate the cases. The congressional committees conceded the cases were "justiciable." *Id.* at 1. Citing *Eastland*, they accepted "that their authority to issue the subpoenas 'may be examined and determined by this court,'" *id.* at 5–6, and went so far as to argue that "[a] decision by this Court holding that a subpoena controversy … is not subject to judicial resolution would be a mistake." *Id.* at 7. The Court agreed and resolved the case on the merits. Despite this, the Congressional Defendants now urge a different result; but federal jurisdiction does not turn on its convenience to Congress.

What the D.C. Circuit approved of in *AT&T II* is precisely what the RNC seeks here: a preproduction injunction enjoining Salesforce from responding to the Subpoena because it is unlawful. Legislative immunity does not bar such a request.

**B.     The Congressional Defendants cannot claim legislative immunity because the Salesforce Subpoena serves no legitimate legislative purpose.**

The Congressional Defendants' legitimate-legislative-purpose retort is based entirely on a red herring. While the D.C. Circuit found in *Trump v. Thompson*, that the Select Committee is tasked with a "valid legislative purpose" 20 F.4th 10, 41 (D.C. Cir. 2021), it could not have answered whether the Salesforce Subpoena is necessarily "related to, and in furtherance of, a

legitimate task of the Congress." *See Watkins v. United States*, 354 U.S. 178, 187 (1957). This is the relevant question. The Supreme Court reminded in *Mazars* that "a congressional subpoena is valid ***only if*** it is 'related to, and in furtherance of, a legitimate task of the Congress.'" *Mazars*, 140 S. Ct. at 2031 (quoting *Watkins*, 354 U.S. at 187) (emphasis added). That is, "[t]he ***subpoena*** must serve a 'valid legislative purpose.'" *Id.* (emphasis added) (quoting *Quinn v. United States*, 349 U.S. 155, 161 (1955)). If a congressional committee could "subpoena information irrelevant to its valid legislative purpose, then the Constitution would in practice impose no real limit on congressional investigations." *Trump v. Mazars USA, LLP*, 940 F.3d 710, 739–40 (D.C. Cir. 2019), *vacated and remanded*, 140 S. Ct. 2019 (2020). The Supreme Court has described this as "a jurisdictional concept of pertinency." *Id.* (quoting *Watkins*, 354 U.S. at 206); *cf. United States v. Cross*, 170 F. Supp. 303, 306 (D.D.C 1959) ("[W]hen a duly constituted investigative committee questions a witness solely for a purpose other than to elicit facts in aid of legislation, that committee steps outside its authority and no longer acts as a competent tribunal."). Just the same, subpoenas issued "solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible." *Mazars*, 140 S. Ct. at 2032 (quoting *Watkins*, 354 U.S. at 187). And finally, congressional subpoenas cannot violate constitutional rights: "recipients of legislative subpoenas retain their constitutional rights throughout the course of an investigation." *Id.* at 2032; *see* subsections II.A and B, *infra*.

The Congressional Defendants avoid drawing a "connection" between the broad requests in the Salesforce Subpoena and the D.C. Circuit's view of the Select Committee's legislative purpose. The court found that the Select Committee's investigative purposes are to (1) "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol"; and (2) "'identify, review, and evaluate the cause of and the lessons learned' from the attack, including 'the structure, coordination, operational plans, policies, and procedures of the Federal Government, * * * particularly with respect to detecting, preventing, preparing for, and responding to targeted violence and domestic terrorism.'" *See Thompson*, 20 F.4th at 19. True, the court also found that, in the Select Committee's final report, it may recommend "corrective

measures," including "changes in law." *Id.* Such potential recommendations, however, are still cabined by the Committee's defined purposes. *See* H. Res. 503 § 4(a)–(b).

The striking breadth of the Salesforce Subpoena and the information it demands far exceeds the D.C. Circuit's view of the Select Committee's legislative purpose. The Subpoena requests "all documents or communications … referring or relating to":

- ***All*** performance metrics and analytics related to any RNC email campaign between November 3, 2020 and January 6, 2021, to include send rates, bounce rates, open rates, click rates, click-to-open rates, time attributes, and message attributes.
- ***All*** records related to login sessions to Salesforce's Marketing Cloud platform between November 3, 2020 and January 6, 2021, by any person associated with the RNC.
- ***All*** communications between the RNC and Salesforce between November 3, 2020 and January 31, 2021, related to the RNC's use of Salesforce platforms.

(Salesforce Subpoena at 3.) The Congressional Defendants appear to have acknowledged the Subpoena's overbreadth, and that the information demanded would include access to competitive and highly confidential information regarding RNC digital, political, and fundraising strategy, as well as personal and private political information relating to millions of the RNC's supporters. This information lacks any reasonable connection to the Select Committee's legislative purpose.

To remedy their overbreadth problem, the Congressional Defendants misstate the scope of the Committee's demands. Through selective omissions and ellipses, the Congressional Defendants attempt to narrow the Subpoena's scope. (*Compare* Cong. Defs.' Opp'n at 25 (claiming Salesforce Subpoena "only [seeks] metrics and analytics relating to email campaigns"); *id.* at 28 (claiming email "metrics" sought only include "the number of emails sent, how many Americans received them, how many opened them, and the portion of recipients that clicked on links," but not "the identities of donors and supporters or … [the RNC's] internal deliberative processes"); *id.* at 30 (claiming "the 'metrics' of the email campaign" does not include "the names of the recipients"), *with* Salesforce Subpoena 3 (seeking all "***message attributes***," "***delivery metrics*** (send rates and bounce rates), [and] ***engagement metrics*** (opens, open rates, clicks, click rates, and click-to-open rates)" "related to email campaigns on behalf of"

6

the RNC); *id.* (seeking "all related metadata" connected to Salesforce "login sessions by individuals associated with" the RNC) (emphasis added).)

But the Congressional Defendants' attempt to narrow the scope of the Salesforce Subpoena in their Opposition does not change the analysis. The Congressional Defendants still demand that Salesforce turn over the RNC's political operations data—in granular detail down to log-in data and email metrics and analytics, including send and open rates, click rates, click-to-open rates, time attributes, and message attributes—and about operations and activity wholly unrelated to the presidential election, post-election recount, or litigation efforts. This reveals the detachment between the Salesforce Subpoena and the Select Committee's legislative purpose.

Even more, the Congressional Defendants' attempted narrowing demonstrates their misunderstanding of the information sought—as well as key facts, including that the RNC still utilizes Salesforce products in its digital operations. (*See* Cong. Defs.' Opp'n at 41.) For instance, they state they are seeking "only metrics and analytics relating to email campaigns." (*Id.* at 25.) Not so. (*See generally* Salesforce Subpoena.) Rather, the Congressional Defendants' post hoc tailoring is an obvious attempt to avoid fatal constitutional implications. Nonetheless, the remedy for overbreadth is the same: to strike the Salesforce Subpoena and allow the Select Committee to issue a new subpoena. *See Mazars*, 140 S. Ct. at 2036 ("[C]ourts should insist on a subpoena no broader than reasonably necessary to support Congress's legislative objective," as "specificity of the subpoena's request" protects against "unnecessary intrusion."); 940 F.3d at 740–41 ("[I]f a committee could subpoena information irrelevant to its legislative purpose, then the Constitution would in practice impose no real limit on congressional investigations.").

At bottom, the Court need not question the legitimacy of the Select Committee's overarching legislative purpose to find that the Salesforce Subpoena is not "related to, and in furtherance of, a legitimate task of the Congress." *See Watkins*, 354 U.S. at 187. The Select Committee's Subpoena is unprecedented, and, most critically, does not serve a valid legislative purpose. Instead, it is an open attempt by political foes to unearth a competing political party's

internal deliberations and political and digital strategy through a subpoena. The Speech or Debate Clause therefore does not immunize the Congressional Defendants' actions from review.

## II.      The RNC Is Likely to Succeed on the Merits of Its Claims.

### A.      The Salesforce Subpoena violates the First Amendment because it lacks tailoring specific to the Select Committee's purpose.

The First Amendment protects against the compelled disclosure of information regarding a political party's donors, volunteers, and supporters. It also protects against the compelled disclosure of a political party's internal deliberations and strategy. The Salesforce Subpoena seeks this information. At a minimum, the data sought includes, but is not limited to information regarding anyone the RNC emailed over a two-month period, including the subject lines for those emails and information detailing the recipients' interactions with and responses to these emails. It would also include the RNC's internal deliberations and strategy regarding email messaging and fundraising, including but not limited to information regarding how the RNC targets its email campaigns and group recipients of emails. Because this information is precisely the sort of data protected against compelled disclosure by a political party, the Subpoena must meet exacting scrutiny. And because it requests information wholly irrelevant to the Select Committee's inquiry, the Subpoena cannot satisfy exacting scrutiny and Salesforce's production of the demanded RNC data must be enjoined.

1.      *The Salesforce Subpoena implicates the First Amendment rights of the RNC and its donors, supporters, and other partners.*

The Congressional Defendants argue that, because the Salesforce Subpoena "only" demands metrics and analytics relating to the RNC's email campaigns, the Subpoena does not implicate the RNC's and its members' rights of free association under the First Amendment. (Cong. Defs.' Opp'n at 25.) This without any attempt to engage the uncontroverted declaration of the RNC's CDO, Christian Schaeffer. In his declaration, Mr. Schaeffer unequivocally states that the metrics and analytics demanded by item one of the Salesforce Subpoena would permit anyone in possession of them to create a mosaic of the RNC's confidential digital political strategies. (Schaeffer Decl. ¶ 18). This information would also permit anyone in possession of it

to create a mosaic of RNC supporters' political activities and beliefs.[3] (*Id.*) Such information—particularly of a political party—is unquestionably protected by the First Amendment. *See Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. FEC*, 333 F.3d 168, 178 (D.C. Cir. 2003) (concluding Democratic National Committee and AFL-CIO have "substantial First Amendment interests in [preventing] the disclosure of their own internal materials" related to FEC investigation).

Nor is it material that some campaign finance information of political parties must be disclosed to the FEC.[4] As argued in the RNC's Motion, the Subpoena demands information related to individuals whose contributions and other associational activity with the RNC is not subject to disclosure to the FEC, such as, surveys with which they interacted, or coalition groups they joined. Indeed, contrary to Congressional Defendants' apparent contention, any email addresses in the "to," "from," "cc," or "bcc" lines of an email are included in the term "message attributes." And the RNC expressly argued—again based on an uncontroverted declaration—that disclosure of the information demanded by the Salesforce could result in the disclosure of information for many of the tens of millions of RNC supporters, donors, and others with whom the RNC communicates, and that information of this nature could be used, as it has been used in the past, to facilitate reprisals and harassment of these individuals. (Memo at 13; Schaeffer Decl. ¶¶ 15, 18–20.) Congressional Defendants offer no evidence to contradict the RNC's assertions, nor could they: it is plainly obvious (*see* Schaeffer Decl. ¶¶ 17, 21, 26), in today's political climate that the revelation of someone's unknown political affiliation with the Republican party or other organizations that promote conservative ideas and communications on hotly debated

---

[3] Indeed, the Congressional Defendants try to have it both ways. At different points in their argument they assert that the Salesforce Subpoena does not demand what it plainly demands (*see* Cong. Defs.' Opp'n at 25–26, 28, 30, 38 (asserting that the Subpoena only seeks mere email campaign "metrics")), and then pivot to contentions that the materials sought may impact the "free functioning of our national institutions" (*id.* at 26–27), or be otherwise of a grave nature (*id.* at 28 ("[T]he Select committee may well find that emails [sent by the RNC] included inflammatory disinformation that incited the January 6th attack.")).

[4] Of course, the Supreme Court has repeatedly held that even disclosure under the Federal Election Campaign Act is limited by the First Amendment. *See Buckley v. Valeo*, 424 U.S. 1, 51 (1976); *McCutcheon v. FEC*, 572 U.S. 185, 205–10 (2014).

topics necessarily make it more likely that individual will be subject to reprisals or harassment by others who disagree with his or her affiliation or communication as disclosed. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958) ("*NAACP v. Alabama*") (concluding "revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility" constituted a violation of the First Amendment).

    2.  Under Bonta*, any compelled disclosure must be narrowly tailored to the substantial governmental interest.*

   The Congressional Defendants next argue their subpoena is not subject to exacting scrutiny under *Americans for Prosperity Foundation v. Bonta*, 141 S. Ct. 2373 (2021), as a compelled disclosure requirement implicating First Amendment associational interests, but must rather satisfy only the older garden-variety balancing of "competing private and public interests at stake in the particular circumstances shown." *Barenblatt v. United States*, 360 U.S. 109, 126 (1959). *Bonta* forecloses this argument. The decision does not turn on the type of disclosure requirement, but only on whether the target of a compelled disclosure is an associative entity. *See Bonta*, 141 S. Ct. at 2383 ("Regardless of the type of association, compelled disclosure requirements are reviewed under exacting scrutiny.").

   It is of course true that *Bonta* did not deal with a congressional subpoena and no case has yet applied this less than a year-old decision to such a subpoena. (Cong. Defs.' Opp'n at 27.) But the Select Committee's activity here—an investigation—is precisely the sort of activity where compelled disclosure requirements most commonly arise. *See, e.g.*, *NAACP v. Alabama*, 357 U.S. at 453 (state attorney general demanding NAACP membership lists); *Am. Fed'n of Lab.*, 333 F.3d at 178 (addressing disclosure of materials of Democratic National Committee collected by FEC pursuant to a campaign finance investigation). To be sure, application of exacting scrutiny is particularly appropriate here where the target of the compelled disclosure—the RNC—is a political association of the sort contemplated in the announcement of the exacting scrutiny standard. *See Bonta*, 141 S. Ct. at 2383. The fact a congressional subpoena attempts to

effect a compelled disclosure does not alter the fact that any government compelled disclosure of the sort of associative information demanded here must survive exacting scrutiny.

<em>3.      The Salesforce Subpoena is not narrowly tailored.</em>

The Select Committee asserts that the Salesforce Subpoena satisfies exacting scrutiny because it is "narrowly tailored to obtain information about whether and how political communications from the RNC and the Trump campaign contributed to the January 6th attack." (Cong. Defs.' Opp'n at 27.) This assertion cannot be squared with the plain language of the Subpoena. Indeed, Congressional Defendants misstate the nature of the Subpoena's demands in their Opposition. The first item in the Salesforce Subpoena does not merely demand "metrics." (*Id.* at 28.) It demands "*[a]ll* performance ***metrics and analytics*** related to email campaigns … ***including but not limited*** to delivery metrics … engagement metrics … time attributes, and message attributes." (Salesforce Subpoena at 3 (emphasis added).) The second item does not merely demand "metadata" (Cong. Defs.' Opp'n at 28), but "***[a]ll records related to login sessions*** by individuals … into Salesforce's Marketing Cloud platform, ***including all related metadata***" (Salesforce Subpoena at 3 (emphasis added)). As argued, these demands will require the production of "to," "from," "cc," and "bcc" lines for every email the RNC sent in the two-month period, along with the subject line for every email sent and granular data on how the recipient of each email interacted with it. These demands will also require the revelation of the RNC's internal deliberative and strategic processes regarding audience segmentation, email list naming conventions, digital fundraising and communications targeting.

Chairman Thompson's post-Complaint, March 21, 2022 letter to Salesforce (which was not sent to the RNC) attempts to narrow these capacious requests post hoc—but his letter does not alter the Subpoena's language. If the Select Committee truly does not seek the identity of the RNC's donors and supporters or information reflecting the RNC's internal deliberative processes, the Select Committee is free to rescind the Subpoena and issue a narrower subpoena. The fact the Select Committee has not done so demonstrates the Subpoena is not narrowly tailored to the Select Committee's purpose as required to satisfy exacting scrutiny.

Finally, the Congressional Defendants attempt to wave away the logical certainty that the final three items of the subpoena are likely to include documents generated by Salesforce that include or reflect protected information. (Cong. Defs.' Opp'n at 28.) The RNC data demanded by items one and two of the Subpoena include data protected by the First Amendment. Of course Salesforce documents regarding "all … investigative reports or analyses … regarding the use of Salesforce's platforms by the RNC or the Trump Campaign and related materials" (item four), and "all communications between Salesforce representatives and representatives of the RNC or the Trump Campaign concerning the 2020 Presidential election" (item five), will include or reflect some information demanded in items one and two (and likely other associational information not responsive to these demands). While it is possible that "all documents and communications concerning investigative reports or analyses … regarding the protests, marches, public assemblies, rallies, or speeches in Washington, D.C. on January 5, 2021, or January 6, 2021" (item three), might not include any information protected from disclosure under the First Amendment, the RNC has no way of knowing whether Salesforce might produce the RNC's First Amendment-protected material in response to this demand due to the Subpoena's broad scope. Hence, the RNC's proposed remedy—review by the RNC's attorneys with a prompt motion for in camera review in the event the RNC believes protected material is included in the proposed production—is reasonable and tailored to protect the RNC's First Amendment rights without unduly delaying Salesforce's production of its own records to the Select Committee.

### B.     The Salesforce Subpoena violates the Fourth Amendment because it is unreasonable.

The RNC has a reasonable expectation that nonpublic information about its donors, supporters, volunteers, and internal deliberative processes shared with Salesforce will remain private. The Fourth Amendment therefore also protects this information from unreasonable search and seizure. Because the Subpoena both demands materials irrelevant to the Select Committee's purpose and does not take steps to protect such irrelevant material from improper disclosure, it is unreasonable and therefore violates the Fourth Amendment.

   1.     *The RNC has a reasonable expectation of privacy in its First Amendment
          protected records held by Salesforce.*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV.

The "basic purpose of this Amendment … is to safeguard the privacy and security of individuals

against arbitrary invasions by governmental officials." *Camara v. Mun. Ct. of City & Cnty. of

S.F.*, 387 U.S. 523, 528 (1967). As noted recently by the Supreme Court, "[t]he Founding

generation crafted the Fourth Amendment as a 'response to the reviled "general warrants" and

"writs of assistance" of the colonial era, which allowed British officers to rummage through

homes in an unrestrained search for evidence of criminal activity.'" *Carpenter v. United States*,

138 S. Ct. 2206, 2214 (2018) (quoting *Riley v. California*, 573 U.S. 373, 403 (2014)).

The Supreme Court has uniformly held that the application of the Fourth Amendment

depends on whether one invoking its protection can claim a justifiable, reasonable or legitimate

expectation of privacy that has been invaded by government action. This inquiry normally

embraces two discrete questions. The first is whether the target of government action, by its

conduct, has subjectively shown it "seeks to preserve [something] as private." *Katz v. United

States*, 389 U.S. 347, 351 (1967). The second question is whether this subjective expectation of

privacy is objectively "justifiabl[e]" under the circumstances. *Id.* at 353.

Here, there can be no question that the RNC has subjectively sought to keep its data and

information demanded by the Salesforce Subpoena private. The data was shared with Salesforce

under a contractual agreement that requires Salesforce to keep the data confidential in the same

manner as it protects its own data and requires Salesforce to give notice to the RNC of any

compelled disclosure and reasonable assistance when the RNC contests any compelled

disclosure. (*See* Suppl. Decl. of C. Schaeffer ("Schaeffer Suppl. Decl."), Ex. A, ¶ 13.) The RNC

also controls access to this data; only those RNC officials and personnel who must have access to

it do, and then only pursuant to confidentiality agreements (*Id.* ¶¶ 16–18.)

                              *        *        *

The only question remaining is whether the RNC's subjective expectation that the identity of its donors, volunteers, and other partners along with its internal deliberative materials remain private is justifiable under the circumstances where the RNC has shared this information with a third party, Salesforce. The answer is yes. *First*, because the entirety of the data demanded by the Subpoena is First Amendment protected material that the RNC has no choice but to share with a third-party vendor like Salesforce in order to participate in modern political exchange, it is not subject to the third-party exception to the attachment of Fourth Amendment rights articulated in *United States v. Miller*, 425 U.S. 435 (1976). *Second*, even if the data were subject to this third-party exception—and it is not—significant portions of the data demanded by the Select Committee constitute content for which Salesforce is a mere conduit and which therefore does not fall within the third-party exception under *Miller*.

**The Third-Party exception does not apply.** In their Opposition, the Congressional Defendants argue that because the RNC disclosed the data at issue to a third party, it cannot have a reasonable expectation of privacy in the data. (Cong. Defs.' Opp'n at 29.) The idea that a person loses any reasonable expectation of privacy when it shares documents with a third party largely traces its roots to *Miller*. There, the government investigated Mitchell Miller for evasion of tax to be paid on distilled spirits. *Miller*, 425 U.S. at 436–38. During its investigation, the government subpoenaed Miller's banks, seeking months of canceled checks, deposit slips, and statements. *Id.* at 437–38. The Supreme Court rejected a Fourth Amendment challenge to the records collection. The Court first reasoned that Miller could "assert neither ownership nor possession" of the documents; they were "business records of the banks." *Id.* at 440. The Court also investigated the nature of the records, which confirmed Miller's limited expectation of privacy, because the checks were "not confidential communications but negotiable instruments to be used in commercial transactions," and the statements contained information "exposed to [bank] employees in the ordinary course of business." *Id.* at 442. The Court concluded that Miller had "take[n] the risk, in revealing his affairs to another, that the information [would] be conveyed by that person to the Government." *Id.* at 443.

14

This case is not *Miller*. *First*, the RNC owns and possesses the data. The RNC's agreement with Salesforce makes clear that the RNC's data belongs to the RNC and that, to the extent Salesforce uses any of the RNC's materials, it does so only pursuant to a license (Schaeffer Suppl. Decl. ¶¶ 13–14 (noting Salesforce Agreement § 6.3).) The RNC has possession of the data—albeit non-exclusive possession. (Schaeffer Suppl. Decl. ¶ 14.)

*Second*, the nature of the data could hardly be more sensitive. The metrics and analytics demanded by item one of the Salesforce Subpoena would permit anyone in possession of them to create a mosaic of the RNC's confidential digital political strategies. (Schaeffer Decl. ¶ 18). This information would also permit anyone in possession of it to create a mosaic of RNC supporters' political activities and beliefs. (*Id.*) Such information—particularly of a political party—is unquestionably protected by the First Amendment. *See Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. FEC*, 333 F.3d 168, 178 (D.C. Cir. 2003) (concluding Democratic National Committee and AFL-CIO have "substantial First Amendment interests in [preventing] the disclosure of their own internal materials" related to FEC investigation). So too is information related to individuals whose contributions and/or other associational activity with the RNC is not subject to disclosure to the FEC. *NAACP v. Alabama*, 357 U.S. 449, 452–53 (1958). For example, item one of the Subpoena demands information which will necessarily include information regarding tens of millions of RNC supporters, donors and others with whom the RNC communicates. Information of this nature could be used to facilitate reprisals and harassment of these individuals. (Memo at 13, Schaeffer Decl. ¶¶ 15, 18–20.) This makes these records different than those records held by third parties which have been held to be outside the zone of privacy.

The Supreme Court's recent decision in *Carpenter* confirms that the simple fact a third-party has records does not end the inquiry into whether there is a reasonable expectation of privacy. There, the Court declined to extend *Miller* to cell site location information ("CSLI") generated and held by cellular telephone companies. *Carpenter*, 138 S. Ct. at 2217. In doing so, the Court held that even where the first prong of the *Miller* test is unquestionably satisfied—the person whose location is tracked by his cell phone company doesn't own or possess his CSLI—

15

the sensitivity of that data may mean the data must nevertheless be protected by the Fourth Amendment. *See id.* at 2218–20. Indeed, the Court expressly noted that the time-stamped data at issue in *Carpenter* is akin to GPS data which the Court has also recently held protected because it can provide an "intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, ***political***, professional, religious, and sexual associations.'" *Id.* at 2217 (quoting *United States v. Jones*, 565 U.S. 400, 415 (2012) (opinion of Sotomayor, J.)) (emphasis added). The data at issue in this case is the equivalent of CLSI or GPS data for a political party. It must be afforded the same Fourth Amendment protection.

Such protection makes sense for another reason. As the Court in *Carpenter* noted, because "cell phones and the services they provide are 'such a pervasive and insistent part of daily life' that carrying one is indispensable to participation in modern society," 138 S. Ct. at 2220 (quoting *Riley*, 573 U.S. at 385), persons using them cannot be reasonably said to have voluntarily "shared" their CLSI. *Id.* So too here. The RNC cannot reasonably be said to have made a choice about whether to "share" its data with a third party like Salesforce. The use of technology like Salesforce's is essential to the RNC's ability to engage in—First Amendment protected—political activity in the modern world. (Schaeffer Decl. ¶ 11). To strip a political party of Fourth Amendment protection for this sort of data because it engaged a vendor of the sort it quite simply cannot do without would leave the constitutional rights of the party—and other associative entities like it—"at the mercy of advancing technology." *Kyllo v. United States*, 533 U.S. 27, 35 (2001). The Court should not countenance the radical expansion of the third-party exception advanced by Congressional Defendants.

***Much of the data demanded is content protected from disclosure even under the third-party doctrine.*** Even if the Court were to incorrectly apply the third-party exception to the RNC's data, much of this data is the content of communications for which Salesforce is a mere conduit, and is therefore still protected by the Fourth Amendment. In 1877, the Supreme Court held that the content of a mailed letter was protected under the Fourth Amendment, while the information exposed to the public, such as the address written on the outside of an envelope, was

16

not. *Ex parte Jackson*, 96 U.S. 727, 733 (1877). This approach continues to be followed for physical mail and packages. *See United States v. Jacobsen*, 466 U.S. 109, 114 (1984) ("Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy; warrantless searches of such effects are presumptively unreasonable."). The dichotomy between information broadcast to a third party to facilitate the transmission of content and the content itself was further developed in *Katz* and *Smith v. Maryland*, 442 U.S. 735 (1979). In *Katz*, the Court protected the content of the communication at issue (Mr. Katz's voice phoning in illegal gambling information). The Court opined that a caller in a phone booth is "surely entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world." *Katz*, 389 U.S. at 352. On the other hand, *Smith* left non-content information—the numbers Smith dialed to make his calls—unprotected. 442 U.S. at 744. The Court reasoned that the use of a pen register to track the numbers called does not allow law enforcement to "hear sound" and "[n]either the purport of any communication between the caller and the recipient of the call, their identities, nor whether the call was even completed is disclosed[.]" *Id.* at 741 (quoting *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 167 (1977)).

Here, the Subpoena necessarily demands the content of RNC communications and internal deliberations. Item one's demand for "message attributes" will certainly include information including the subject line of e-mails and the groups of persons to whom the RNC sent certain messages, including how the RNC names, categorizes and markets to these groups. (*See* Schaeffer Decl. ¶ 17; Schaeffer Suppl. Decl. ¶ 15.) The very aggregate-level "metrics" the Congressional Defendants attempt to reduce this demand to are integral to the audience segmentation strategy of the RNC: the naming and labeling of audiences and sub audiences the RNC has developed will be revealed by this data. (*Id.* ¶ 15.) Similarly, item two demands all records related to login sessions into Salesforce's Marketing Cloud Platform. Because this data and information reflect the content of the RNC's communications and internal deliberations, the RNC has a reasonable expectation of privacy even if the Court determines its use of a third-party platform means its non-content data is not protected by the Fourth Amendment.

17

    2.    *The Salesforce Subpoena is unreasonable because it demands materials irrelevant to the Select Committee's purpose.*

The Congressional Defendants argue that the Subpoena must necessarily be reasonable under the Fourth Amendment, because it requests documents allegedly relevant to whether and how the Salesforce platform was used to "disseminate false statements about the 2020 election in the weeks leading up to the January 6th attack." (Cong. Defs.' Opp'n at 30.)  This simply is not reconcilable with the Select Committee's purpose as determined by the D.C. Circuit and the Subpoena's demands. As noted above, the D.C. Circuit found the Select Committee's investigative purposes are to (1) "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol"; and (2) "'identify, review, and evaluate the cause of and the lessons learned' from the attack, including 'the structure, coordination, operational plans, policies, and procedures of the Federal Government, * * * particularly with respect to detecting, preventing, preparing for, and responding to targeted violence and domestic terrorism.'" *See Trump v. Thompson*, 20 F.4th 10, 19 (D.C. Cir. 2021).

As previously argued, the Salesforce Subpoena is astounding in its breadth. (*See* subsection I.B, *supra*.) That the Congressional Defendants want Salesforce to turn over the RNC's political data and about operations and activity wholly unrelated to the presidential election, post-election recount, or litigation efforts, reveals the problem. There is simply no reasonable possibility that such information will produce information relevant to subject of the Select Committee's investigation.

    3.    *The Salesforce Subpoena is unreasonable because it provides no protections for the RNC's First Amendment and Fourth Amendment rights.*

The Congressional Defendants use *Nixon v. Freeman*, 670 F.2d 346 (D.C. Cir. 1982), to support their contention that "none of the RNC's objections implicate the privacy associated with 'diaries or other communications respecting personal matters' that the Fourth Amendment is most concerned with." (Cong. Defs.' Opp'n at 31 (citing *Freeman*, 670 F.2d at 354).) One could be forgiven for thinking this deliberately obtuse. Of course, the RNC does not keep a diary. It is a political party. As a political party, it does, however, keep granular and detailed records

regarding private business and political associative activity, which is no less protected by the Fourth Amendment than a diary. The court in *Freeman* recognized the legitimacy of interests of privacy in business and First Amendment associative activity while noting that these interests are—of course—circumscribed for someone who voluntarily assumes the highest public office in the land. As to a former president's business dealings, *Freeman* correctly articulated that there is no reasonable expectation of privacy because those dealings are necessarily public business. *See Freeman*, 670 F.2d at 354 (making the distinction between the business records of a president, which are presumptively public and the purely personal communications, and diaries of a president for which there is still a reasonable expectation of privacy). This is not the case for the business records of a private association like the RNC. Perhaps most relevant here, *Freeman* also recognized that even a president has a right to the protection of his "involvement with partisan politics." *Id.* at 355 (citing *Buckley v. Valeo*, 424 U.S. 1, 27 (1976)). And, tellingly, the court approvingly noted the former president would have the ability to appeal—administratively and judicially—the decision to disclose any tape recording that revealed such information. *Id.*

Here, as the Select Committee knows well, once the materials it demands are in the possession of Congress, the Speech or Debate Clause immunizes Members and their aides and thus hamstrings the RNC's ability to claw back or prevent further disclosure. The Select Committee could have provided for procedures to safeguard the RNC's rights post-production, as in *Senate Select Committee on Ethics v. Packwood*, 845 F. Supp. 17 (D.D.C. 1994). It chose not to. (*See* Cong. Defs.' Opp'n at 31 ("Nor is there any reason to adopt the protocol proposed in *Packwood* for reviewing a Senator's personal diaries for the Select Committee's review of data concerning millions of emails … .").) The RNC's only opportunity to meaningfully challenge disclosure is before its protected data is in the hands of the Select Committee. This is why the Select Committee's failure to give the RNC ***any*** notice of the Subpoena is relevant: because it goes to the Select Committee's deliberate attempt to avoid judicial balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Packwood*, 845 F. Supp. at 22

19

(quoting *O'Connor v. Ortega*, 480 U.S. 709, 719 (1987)). The Select Committee's attempt to avoid scrutiny and the lack of safeguards render the proposed examination of the RNC's First Amendment protected data unreasonable under the Fourth Amendment.

### C.     The Salesforce Subpoena was not issued in accordance with H. Res. 503.

The Congressional Defendants contend that the Salesforce Subpoena was validly issued because Chairman Thompson was only required to consult the (non-existent) ranking member for *deposition* subpoenas, not *document* subpoenas. (*See* Cong. Defs.' Opp'n at 37–38 (citing H. Res. 503 § 5(c)(4).) This argument, however, ignores the subpoena requirements of H. Res. 503 and the scope of the Subpoena.

Starting with the authorizing resolution, section 3(b)(1) of H. Res. 8 provides that Chairman Thompson may issue subpoenas for depositions "***upon consultation with the ranking minority member of such committee***," H. Res. 8 § 3(b)(1), 117th Cong. (2021) (emphasis added), which is expressly adopted in Section 5(c)(6)(A) of H. Res. 503. The Congressional Defendants do not appear to dispute that the Select Committee lacks a ranking minority member. (*See* Cong. Defs.' Opp'n at 33–38.) Nor could they. The Select Committee has only a "Vice Chair." (*See* Memo at 21.) Thus, even if Chairman Thompson so desired, he could not have made the requisite consultation prior to issuing any subpoena, let alone the Subpoena here.

Even more, despite the Congressional Defendants' argument that no ranking member consultation is required for *document* subpoenas, the Subpoena plainly seeks documents *and* sets a deposition for one week after the production deadline. (Salesforce Subpoena 1.) This fact was not lost on the Congressional Defendants when issuing the Subpoena; they attached a copy of H. Res. 8 § 3(b)(1)—i.e., the provision requiring the chairs of committees to consult the ranking minority member before issuing deposition subpoenas—to the Salesforce Subpoena. (Salesforce Subpoena 9.) Because the Subpoena pertains to documents and depositions, the Subpoena is invalid under H. Res. 503's unambiguous subpoena provisions. *See Exxon Corp. v. FTC*, 589 F.2d 582, 592 (D.C. Cir. 1978) ("To issue a valid subpoena … a committee or subcommittee must conform strictly to the resolution establishing its investigatory powers … .");

*see also Yellin v. United States*, 374 U.S. 109, 121 (1963) (legislative committees must follow their own rules). The Court should reject the Congressional Defendants' attempt to avoid the very requirements they acknowledged—and presented to Salesforce—in issuing the Subpoena.

The flaws in the Congressional Defendants' issuance of the Salesforce Subpoena are indicative of larger problems in the Select Committee's formation. Specifically, the Select Committee is not composed as required under H. Res. 503, which provides that the Speaker "***shall*** appoint 13 Members to the Select Committee, five of whom ***shall*** be appointed after consultation with the minority leader." § 2(a) (emphasis added). Contrary to these clear requirements, the Select Committee is only composed of nine members, with the remaining seats left vacant. (*See* Memo at 21–22.) Neither Speaker Pelosi nor the Select Committee may pick and choose which portions of the duly passed House Resolution they choose to observe. Failure to follow the authorizing resolution's composition rule alone is enough to render each action of the improperly constituted Select Committee invalid. *See Yellin*, 374 U.S. at 120–21 (failure of committee to comply with its rules rendered contempt proceeding invalid); *Christoffel v. United States*, 338 U.S. 84, 88–90 (1949) (explaining that a committee's failure to adhere to its perjury conviction rules rendered the conviction invalid).

The Congressional Defendants try to cure the Select Committee's compositional flaws. *First*, they argue that the Select Committee was validly formed because a separate select committee—the Select Committee to Investigate the Preparation for and Response to Hurricane Katrina—failed to meet its compositional member threshold. (*See* Cong. Defs.' Opp'n at 35.) This select committee's composition, however, was never challenged in a lawsuit, rendering its composition irrelevant here. *Second*, the fact that the full House ratified two Select Committee criminal referrals is equally irrelevant because neither vote asked the House to affirm the validity of the Select Committee's composition, or change its formation requirements. (*Id.* at 35–36.) In sum, the Select Committee's failure to adhere to its own authorizing requirements renders the Salesforce Subpoena invalid.

21

    **D.**      **The Salesforce Subpoena violates the Stored Communications Act.**

The Congressional Defendants argue that the Salesforce Subpoena does not violate the Stored Communications Act ("SCA") because it does not demand the content of any of the RNC's stored communications. For the reasons argued in subsection II.B.1 *supra*, item one of the Subpoena unequivocally demands content, including but not limited to information regarding the RNC's audience segmentation email list naming conventions and message testing results. Similarly, items thee and four of the Subpoena request internal Salesforce analyses that are likely to contain RNC content. Salesforce's obligation under its Master Services Agreement is to protect the confidentiality of the RNC's data which means it would not include the RNC's data in such reports. While it is possible Salesforce has not included any RNC content in its internal analyses and reports, there is a way to be certain before an irreversible unlawful production of such content to Congress: targeted preliminary injunctive relief prohibiting disclosure of materials in response to items one, three, and four of the Salesforce Subpoena under the SCA.

**III.**    **The RNC Will Suffer Irreparable Injury Without Preliminary Relief.**

The Congressional Defendants' legislative immunity and merits arguments bring into focus the irreparable injury that would befall the RNC absent a preliminary injunction. Initially, the Congressional Defendants hardly acknowledge (*see* Cong. Defs.' Opp'n at 43 (dedicating total of two sentences to the argument)), the well-established precept that "'a prospective violation of a constitutional right constitutes irreparable injury for ... purposes' of 'seeking equitable relief.'" *Karem v. Trump*, 960 F.3d 656, 667 (D.C. Cir. 2020) (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)). (*See also* Memo at 23 –24 (collecting cases).) Put directly, when a plaintiff seeks only equitable relief for prospective violations of its constitutional rights, any resulting constitutional harm constitutes irreparable injury. *See, e.g.*, *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 385 (D.D.C. 2020) (existing and prospective violation of First Amendment rights "are sufficient to demonstrate irreparable harm"); *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 217–18 (D.D.C. 2020) ("Plaintiffs who have shown a likelihood of success on their Fifth Amendment claims … have also established irreparable

harm."); *Brown v. FEC*, 386 F. Supp. 3d 16, 34 (D.D.C. 2019) (Kelly, J.) (showing a likelihood of success on the merits of First Amendment claim "typically" results in irreparable injury). Because the RNC is likely to succeed on the merits of its constitutional claims under the First and Fourth Amendments, irreparable harm necessarily follows.

While this is enough to show irreparable injury, the Congressional Defendants' legislative immunity argument spells out the irreparable character of the claimed harm. Without an injunction, Salesforce has indicated it intends to comply with the Subpoena. (*See* Murry Decl. ¶¶ 11–12.) This is critical because, if Salesforce produces in response to the Subpoena, the Congressional Defendants argue that the Court lacks jurisdiction to order any relief. (*See* Cong. Defs.' Opp'n at 23 (citing Hr'g Tr. at 33:9–16, *Budowich v. Pelosi*, No. 21-3366-JEB, (D.D.C. Jan. 20, 2022) (attached to and cited as Cong. Defs.' Opp'n as Ex. A)).) That is, once the Select Committee is in possession of the requested material, the Congressional Defendants claim courts lack jurisdiction to "order[] a congressional committee to return, destroy, or refrain from publishing the subpoenaed documents." *Senate Permanent Subcomm. on Investigations v. Ferrer*, 856 F.3d 1080, 1086 (D.C. Cir. 2017). Indeed, in *Budowich*, counsel for the Congressional Defendants argued that once Congress is in possession of the subpoenaed material, no one can challenge the Committee's subpoena:

> THE COURT: Let's go back to the jurisdictional issue. So for Speech or Debate, … your argument … is that once Congress is in possession of documents, that it is not for the Court to tell them to disgorge such documents.
>
> But do you take the position that, even if a committee did not have a proper legislative purpose, or that a subpoena at issue was plainly invalid or overbroad or otherwise defective, that no one could challenge a committee's ability to use those documents?
>
> MR. LETTER: Yes, Your Honor. …

(Cong. Defs.' Opp'n, Ex. A at 19:1–11.) The Congressional Defendants make many of the same arguments here—and cite much of the same authority—as they did in *Budowich*.

Yet, the Congressional Defendants maintain that "RNC has failed to demonstrate that it is likely to suffer any harm at all, let alone imminent irreparable harm, from Salesforce's

production to the Select Committee." (*Id.* at 43.) This cannot be reconciled with the Congressional Defendants' absolutist position on immunity. Per the Congressional Defendants, this case is over absent preliminary relief enjoining Salesforce from producing in response to the Subpoena—because the Court would lack jurisdiction to order the Select Committee "to return, destroy, or refrain from publishing the subpoenaed documents." *See Ferrer*, 856 F.3d at 1086. This is very definition of harm that cannot be redressed without preliminary relief.

Nor do the Congressional Defendants' arguments assuage the likelihood of harm to the RNC's associational strength (as one of two major political parties in this country), competitive advantage, and monetary harm (as to goodwill and damaged relationships), and the real harm the RNC's members, supporters, and other partners will endure as result of the mass release of their confidential data. (*See* Memo at 24–27 (outlining harm).)

In the end, the Congressional Defendants' irreparable-injury response amounts to a "heads I win, tails you lose" situation. Absent a preliminary injunction, the RNC could show a likelihood of success on the merits of its claims but nonetheless lose its constitutional protected material to the legislative-immunity abyss. That the Congressional Defendants advance such a position reveals the irrationality of their irreparable-injury arguments.

## IV.   The Balance of Equities and Public Interest Strongly Favor Injunctive Relief.

The D.C. Circuit has made it abundantly clear that "[t]he Constitution does not permit Congress to prioritize any policy goal over" constitutional rights, *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013), no matter the "[c]ongressional investigation['s] … greater national significance" (*see* Cong. Defs.' Opp'n at 45). Put simply, "'the Constitution is the ultimate expression of the public interest,' and consequently, government actions in contravention of the Constitution are 'always contrary to the public interest.'" *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 386 (D.D.C. 2020) (quoting *Gordon*, 721 F.3d at 653); *see, e.g.*, *Simms v. Dist. of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012).

The Congressional Defendants do not deny this. (*See* Cong. Defs.' Opp'n at 44–45 (citing *Exxon Corp. v. FTC*, 589 F.2d 582, 590 (D.C. Cir. 1978) (no constitutional rights were alleged to

24

be violated) and *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resol. Tr. Corp.*, 5 F.3d 1508, 1511 (D.C. Cir. 1993) (same)).) Instead, they make the unremarkable point that courts have recognized "a strong public interest" in timely congressional investigations. (*Id.* at 44 (quoting *Linde Thomson*, 5 F.3d at 1514.) But whatever public interest the Select Committee might have in investigating the events of January 6th, it must yield to the RNC's constitutional rights. The "enforcement of an unconstitutional law" or subpoena "is ***always*** contrary to the public interest." *See Gordon*, 721 F.3d at 653 (emphasis added).

This is especially true here: the Congressional Defendants boldly claim that, once the Select Committee possesses the subpoenaed material, this Court would lack jurisdiction to redress any constitutional violation. (*See* Section III, *supra*.) It is hard to imagine a greater imbalance of the equities, particularly when the Select Committee has not articulated any specific harm it might suffer. (*See* Cong. Defs.' Opp'n at 44 (generically arguing "injunctive relief would directly hinder and frustrate th[e] ongoing investigation").) Again, the balance of the equities and public interest weigh decidedly in favor of granting preliminary injunctive relief.

## CONCLUSION

The RNC respectfully requests that the Court grant the RNC's motion for preliminary injunction and enter an order enjoining Defendant Salesforce from producing information, or sitting for a deposition, in response to the Salesforce Subpoena.

Respectfully submitted this 29th day of March, 2022.

STATECRAFT PLLC

By:      *s/ Christopher O. Murray*
         Christopher O. Murray
         1263 Washington Street
         Denver, CO 80203
         Tel:  602.362.0034
         Email:  chris@statecraftlaw.com

*Attorney for Plaintiff Republican National Committee*

**CERTIFICATE OF SERVICE**

I certify that on March 29, 2022, I filed this **Reply Memorandum of Points and Authorities in Support of Plaintiff's Motion for Preliminary Injunction** via the CM/ECF system for the U.S. District Court for the District of Columbia, which will cause a copy to be served on all registered parties.

*s/ Christopher O. Murray*
Christopher O. Murray

27