# EXHIBIT 1

(April 1, 2022, Hearing Transcript)

1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

2

_____

3    Republican National Committee,   ) Civil Action
                                      ) No. 1:22-cv-00659-TJK
4                       Plaintiff,    )
                                      ) **Preliminary Injunction**
5    vs.                              )
                                      )
6    Nancy Pelosi, et al.,            ) Washington, D.C.
                                      ) **April 1, 2022**
7                       Defendants.   ) Time:  2:00 p.m.

8    _____

              **Transcript of Preliminary Injunction**
9                       **Held Before**
            **The Honorable Timothy J. Kelly**
10              **United States District Judge**

11

                  A P P E A R A N C E S
12

     For the Plaintiff:       **Christopher O. Murray**
13                            STATECRAFT PLLC
                              1263 Washington Street
14                            Denver, Colorado 80203

15   For the Defendants Nancy Pelosi, et al.:
                              **Eric R. Columbus**
16                            **Douglas N. Letter**
                              U.S. HOUSE OF REPRESENTATIVES
17                            Office of General Counsel
                              5140 O'Neill House Office Building
18                            Washington, D.C. 20515

19   For the Defendant Salesforce.com, Inc.
                              **Jacob A. Sommer**
20                            **Marc J. Zwillinger**
                              ZWILLGEN PLLC
21                            1900 M Street, Northwest, Suite 250
                              Washington, D.C. 20036

22

23

24

25

2

1    _____

2    Stenographic Official Court Reporter:
                        Nancy J. Meyer
3                       Registered Diplomate Reporter
                        Certified Realtime Reporter
4                       333 Constitution Avenue, Northwest
                        Washington, D.C. 20001
5                       202-354-3118

6    _____

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

1

2  THE COURTROOM DEPUTY:  Your Honor, we're on the

3  record in Civil Action 22-659, Republican National Committee v.

4  Nancy Pelosi, et al.

5  I'm going to start with plaintiff's counsel.  Please

6  approach the podium and state your appearance for the record,

7  introduce any parties at your table.

8  MR. MURRAY:  Good morning [sic], Your Honor.  Chris

9  Murray with Statecraft PLLC on behalf of the Republican

10  National Committee.  Joining me at counsel table is

11  Justin Riemer, who is chief counsel for the Republican National

12  Committee.

13  THE COURT:  Welcome.  And you may -- I guess I should

14  have -- I could have issued you this instruction beforehand.

15  If you are vaccinated, you -- and you are comfortable, when

16  you're at the podium, you may remove your mask.

17  MR. MURRAY:  Your Honor, I'll probably prefer to keep

18  mine on, if that's okay, but if at any point I'm not clear,

19  please let me know.

20  THE COURT:  That's perfectly fine.  Very well.

21  THE COURTROOM DEPUTY:  Defense counsel, please.

22  MR. SOMMER:  Good afternoon, Your Honor.  Jacob

23  Sommer, with my colleague Marc Zwillinger, for defendant

24  Salesforce.

25  THE COURT:  Good afternoon.

1          MR. LETTER:  Good afternoon, Your Honor.  I'm

2    Doug Letter.  I'm general counsel of the United States House of

3    Representatives.  With me today is Eric Columbus from my

4    office -- Mr. Columbus will be delivering the argument today

5    for the House -- and Ms. Amanda Wick, who is from the

6    January 6th Select Committee.

7          THE COURT:  All right.  Welcome.

8          All right.  Obviously, I'll hear from the movant, the

9    plaintiffs first, but let me just describe how I intend to

10    handle these kinds of arguments.

11          I'll give -- I have a set of questions that I want to

12    ask each side.  I'll ask whoever arguing on their -- on each

13    party's behalf those questions, and then I'll turn it to you

14    and just sort of give you an open-ended -- if there's something

15    we haven't touched on that -- a point you want to make, I'll

16    give you kind of an open-ended opportunity to make any of those

17    points maybe we haven't hit on.

18          Then I'll turn to the -- the committee, hear from them.

19    I also do have a few questions for the Salesforce folks.  And

20    then I'll -- and then I'll give each side a chance to rebut or

21    respond to anything the other side has said.

22          So with that being -- with that as the lead-in, are

23    there any preliminary things either side wants to raise with me

24    before we begin?

25          MR. MURRAY:  None from plaintiff, Your Honor.

1          THE COURT:  All right.  I'll take the shaking of the

2     heads as a no.

3          So, Mr. Murray, if you'll approach.

4          All right.  So my first -- just a few, kind of, really

5     procedural things.  I know the committee requested that I

6     consolidate the PI with the merits.  Do you-all -- I'm going to

7     ask them if I could have a little bit more time to do that,

8     because courts typically -- if the pathways to resolving the

9     case are sometimes not as quick and easy when we're talking

10    about the full -- the merits.  So do you-all have -- I assume

11    you-all don't have any objection to that as long as they agree

12    to keep the subpoena in abeyance for whatever period of time we

13    agree to?

14          MR. MURRAY:  We -- we have no objection, Your Honor.

15          THE COURT:  All right.  And then just, again, another

16    kind of procedural question.  If I were to -- I hate to begin

17    this way because it sounds like I'm already skeptical of your

18    motion, but if I weren't to grant you -- your client all the

19    relief you seek, either none of it or not all of it, how would

20    you suggest that I -- it struck me that given the procedural

21    posture here -- and I've been doing this long enough now to

22    know that I'm not the final word on any of this -- that -- that

23    you-all will want to appeal.  You would want to -- probably, if

24    I didn't give you all the relief you sought, might want to

25    appeal that.

 1          How -- we'd then be in a posture, though, where I'd be

 2     denying your motion.  There would be no order from me one way

 3     or the other.  And even taking it to its logical complete

 4     extreme, you know, the House says I don't have jurisdiction

 5     over the entire case.  So let's just say I agree with that, how

 6     would we preserve your right to seek an appeal before the --

 7     before these documents would be turned over?  What can I

 8     turn -- is there anything I can do to --

 9          MR. MURRAY:  I would say -- well, I'd say -- and

10     then, obviously, in that situation, I'll -- I'll be arguing why

11     we shouldn't be --

12          THE COURT:  I know.  And I hate to start this way.

13          MR. MURRAY:  No, no.

14          THE COURT:  But I wouldn't want to forget it, because

15     it's important.

16          MR. MURRAY:  No.  Absolutely.  So I think under

17     Rule 62, you could enter a stay pending appeal, and you

18     could -- you could stay the effect of the denial of your order.

19          THE COURT:  But I don't think that gets you -- my

20     point is I don't think that -- so even if I did that --

21          MR. MURRAY:  Uh-huh.

22          THE COURT:  -- that just means there's no -- you have

23     no protection and the material would be turned over; right?

24     It's not a normal situation --

25          MR. MURRAY:  Right.

1          THE COURT:  -- where if I stay my own ruling, then

2     the plaintiffs -- you know, the status quo is preserved.  It

3     wouldn't necessarily be preserved --

4          MR. MURRAY:  So --

5          THE COURT:  -- in this case.

6          MR. MURRAY:  -- I now follow, Your Honor.  And I

7     think that your -- your conundrum there is precisely why

8     preliminary relief must be entered in this case.

9          THE COURT:  All right.  Maybe you're right.  I mean,

10    I may be --

11         MR. MURRAY:  Even if it's preliminary relief to

12    afford the ability to appeal a denial on the merits.

13         THE COURT:  Okay.  I mean, there may be also an

14    administrative stay option or --

15         MR. MURRAY:  Yep.

16         THE COURT:  -- or -- or -- that I could stay the --

17    the effect of the opinion -- of the -- not -- not my ruling,

18    but the subpoena, solely for them to be able to -- solely for

19    you to be able to, you know, hit the circuit and -- and argue

20    for -- to -- well, argue for whatever kind of emergency relief

21    you'd be asking for.  Anyway, if that -- if something else

22    comes to mind, I'm all ears because, you know, again, I'm --

23    I've been doing this long enough to know that one -- whichever

24    way it comes out, I'm not going to be the final word.

25         All right.  So I think the -- where I'd like to start is

1    just to clarify what is being requested.  There are plenty of

2    reasons -- I think both sides have argued to me that, Judge,

3    you know, it doesn't matter.  You don't get to poke around

4    in this.  Or at least the committee argues that.  But I think

5    it would be helpful to clarify what they are -- what the

6    committee is seeking, because there's, you know, some back and

7    forth in the papers about this.

8        I -- as I read the record at this point, I don't see the

9    committee -- depending upon how they, I suppose, define the

10    term message attributes, I don't see any personally -- personal

11    information at issue from donors or individuals who may have

12    received a fundraising email from the RNC at issue.  I'm not --

13    you know, so I guess I just want -- and that -- certainly your

14    initial motion, I think, made a lot of the possibility that

15    donors and anyone who -- even if you didn't donate, you may

16    have received a fundraising email from the RNC during this

17    period that your personal information, your donor history,

18    maybe your email, would be -- would be subject to the subpoena.

19        So tell me what you think -- I don't -- at least the way

20    that this has been clarified, I don't see that that's the case,

21    but I want to hear why you think otherwise.

22        MR. MURRAY:  So, Your Honor, I think that there's --

23    there's two aspects to the answer to that question.  But let's

24    go first into if -- if we credit the committee's post hoc

25    narrowing of their subpoena through Chairman Thompson's letter

1    and the representations that are in the response brief -- which

2    I'll get to in a moment why I don't think that's appropriate

3    for the Court to do.

4         THE COURT:  Okay.  I definitely want to hear that,

5    because I'll just say, as a -- you know, as a district judge, I

6    have folks coming before me all the time -- right? -- about --

7    disputes about subpoenas.  And one party says, actually, Judge,

8    we're not -- you know, the other side says we want this.

9    Judge, we're not looking for that.  What we want is this.

10   Let's fight over this.  And all the time I say, okay, then we

11   don't have a dispute there for me to resolve.

12        So I think, you know -- I want to hear why you don't

13   think their representations -- and particularly if they repeat

14   those representations to me right here today.  Okay?  We can

15   argue about whether a letter on behalf of someone during the

16   litigation, you know, definitively does that, but if they

17   represent to me, Judge, we're not seeking this material, why

18   that doesn't sort of resolve that matter at least.

19        MR. MURRAY:  Right.  So we'll -- so, first, let's get

20   into what, even if we credit the narrowing, looks like it's

21   still being asked for.

22        THE COURT:  Okay.

23        MR. MURRAY:  Okay.  So the item -- Item 1 of the

24   subpoena, which is by far the -- the broadest one, it's the one

25   we have the biggest beef.  We've got a beef with Item 2, but it

1    just requests less; right?  So let's start with Item 1.

2         Item 1 requests -- so, first thing, all performance

3    metrics and analytics related to email campaigns by or on

4    behalf of the Trump campaign, the Republican National

5    Committee, or the Make -- Trump Make America Great Again

6    Committee.  And it says including, but not limited to, delivery

7    metrics, engagement metrics -- I'm leaving out the

8    parentheticals -- time attributes, and message attributes.

9         Okay.  So what does that mean?

10        All performance metrics -- and I guess I should preface

11   this, by the way.  There's actually two categories of

12   First Amendment-protected information that are at risk of a

13   compelled disclosure here.  The first one the Court has

14   identified -- right? -- which is donor information --

15   basically, information about people who have chosen to

16   affiliate with the Republican National Committee, whether it's

17   by donating, volunteering, phone banking, whatever.  That's the

18   first category.

19        And, Your Honor, you're absolutely right that that is

20   probably what jumped off the page in our preliminary injunction

21   motion.  Okay?

22        I'll say that there's a second category, which was also

23   raised in our preliminary --

24             THE COURT:  And just -- on the first category, the

25   language that would cover that would be message attributes, do

1    you agree?  I don't know what other language --

2              MR. MURRAY:  It would also -- so -- that's totally

3    fair, Your Honor.  So let's stick to the first category first.

4    I think that's a good way to go about it.

5              So -- no.  So, actually, all performance metrics; right?

6    Here's how it will cover it.  We know that there would be at

7    least these metrics because the RNC uses them through

8    Salesforce.  There would be:  opens grouped by individual

9    recipient; clicks grouped by individual recipient; and

10   petitions signed by individual recipient.  There would also be

11   donations given by individual recipient.  Those are all regular

12   metrics, performance metrics, that are kept by the Republican

13   National Committee on Salesforce.

14             THE COURT:  So it would be -- just to be super clear,

15   it would be the -- the metric, if you will, would be a list --

16   at least as you interpret it, it would be a list of everyone

17   who responded to a given email in a particular way, either --

18   or signed up for a petition in a particular way or -- or

19   whatever?

20             MR. MURRAY:  Well, this is a database.  So it

21   wouldn't look like a list, but it could be turned into one;

22   right?

23             THE COURT:  Okay.  It's a --

24             (Indiscernible simultaneous cross-talk.)

25             MR. MURRAY:  -- create that list.  That's right.

1     THE COURT:  It's a database that would include that

2     information?

3         MR. MURRAY:  Right.  And I'll go a little further,

4     too, because there's a few more that I think are included in

5     all performance metrics category.

6         All coalitions joined by an individual, calls made by

7     the individual on behalf of the RNC, because there's --

8     basically, it keeps track of folks who make calls for us using

9     their cell phone on a dialer program.  And interactions by

10    individuals with vote.gop.  And, again, grouped by individual,

11    which usually will be around voter registration requests, an

12    absentee ballot request, or a commitment to vote in an

13    election.  And then, finally, unsubscribed grouped by

14    individuals.  So unsubscribes -- you know, so basically who --

15    who decided to unsubscribe and why by individuals.

16        THE COURT:  Right.  I mean, at least some of what

17    you're describing, I don't understand how it would be covered

18    by a performance metric related to an email campaign.  In other

19    words, if you were -- you volunteered or something, what does

20    that have to do with an email campaign?

21        MR. MURRAY:  Well, because if you responded to an

22    email campaign that asked you to volunteer --

23        THE COURT:  I see.

24        MR. MURRAY:  -- and then started volunteering, and --

25        THE COURT:  And you have reason to believe during

1    that window of time that this is being requested that there

2    were such --

3              MR. MURRAY:  Absolutely.

4              THE COURT:  -- solicitations?

5              MR. MURRAY:  The Georgia Senate -- for example, the

6    Georgia Senate runoff was going off [sic], and the RNC was

7    actively soliciting volunteers.

8              THE COURT:  All right.

9              MR. MURRAY:  So those are in -- in the first

10   category -- right? -- which is the -- and I'm sorry.  That's

11   the first category on Item 1.  Okay?  So maybe I'll -- maybe

12   I'll stick to Item 1 and talk about the second category --

13             THE COURT:  Okay.

14             MR. MURRAY:  -- the First Amendment-protected

15   information.

16        The second category of First Amendment-protected

17   information -- right? -- is information regarding the

18   strategy -- right? -- and internal deliberations of the RNC.

19             THE COURT:  Right.  That's -- that's different.  I

20   mean, with -- that's obviously a different animal.  So let's --

21   we can talk about that later.  I'm not saying it's not

22   protected by the First Amendment.  I'm not saying it is or

23   isn't, but that's not my question for the moment.

24             MR. MURRAY:  Okay.

25             THE COURT:  The first -- I really want to get at this

1    issue, though, of -- of -- of folks -- because I think, again,

2    you-all led with it pretty strongly.  I'm not criticizing you

3    for that, but -- and it's something that I think, you know,

4    people out in the country are certainly, I'm sure, interested

5    in -- care very much whether their personal information that

6    may have wound up in an RNC bank of some kind is -- is at issue

7    here.

8           MR. MURRAY:  And I should be clear, Your Honor.  If

9    their personal information is in Salesforce, they gave it to

10   the Republican National Committee.  That's a result of them

11   making an --

12          THE COURT:  Right.

13          MR. MURRAY:  -- affirmative choice to opt in to an

14   RNC email list and to affiliate with us.

15          THE COURT:  Sure.  Actually -- all right.  So we've

16   got the information you described in Category 1 for the moment,

17   as far as personal -- personally identifiable information for

18   individuals.

19          MR. MURRAY:  Right.

20          THE COURT:  Tell me about where else that

21   information, you think, shows up in here.

22          MR. MURRAY:  Sure.  So then -- then I think it takes

23   us to Item 2 -- right? -- which is a narrower item.  But in

24   Item 2, we've looked into it, and we think that the specific

25   information that would be, you know, personal -- right? -- so

1    in that category would be the user ID for each person using the

2    Salesforce Marketing Cloud, the username or email of the person

3    who accessed the Marketing Cloud -- so basically their

4    identity -- right? -- and any action that that person took in

5    the marketing cloud.

6              THE COURT:  Okay.  But that's not -- to be clear, and

7    I'm not -- again, I don't mean to just brush off this

8    information.  It is personal information.  You're right.  But

9    it's personal information of people who were working at the RNC

10   or working with the Trump campaign or some related entity.

11   It's not just someone out there who made a donation?

12             MR. MURRAY:  That's absolutely correct, Your Honor.

13   But, again, we'll say that the RNC has an interest in

14   protecting that information.

15             THE COURT:  Absolutely.

16             MR. MURRAY:  They also have an interest protecting --

17             THE COURT:  I'm not -- I'm not disputing that, but I

18   just want to be clear.

19        So as far as just what would -- it's really that first

20   category that you said that is -- as you described it, that is

21   sort of a wider group of -- much wider group of people out

22   there in the country who have had some interaction with the RNC

23   in some way?

24             MR. MURRAY:  Maybe the easiest way to put it, to

25   answer your question, Your Honor, if what you're wondering

1    is, hey, where could the personal information of people getting

2    the emails be versus people sending the emails, it would be

3    Item 1.

4                 THE COURT:  Right.  I think that's right.  Okay.

5    So -- all right.  I think it's helpful to clarify that.

6                 Now, again, I'm -- I'm going question the committee

7    about this.  I think they'll say -- I mean, my reading in the

8    aggregate of the record here at this point and the briefs is

9    that they are going to say they don't want any of that, what

10   you've described, but we'll see.

11               There is a little ancillary thing I have to -- I'm going

12   to ask you-all -- and I will ask them as well -- and that is

13   this:  So I have no idea -- I mean, before I was a judge, I'm

14   pretty confident I contributed at some point to the RNC.  I

15   probably did.  I certainly contributed to Republican

16   candidates.  Since I've been a judge, which is the time frame

17   here, of course I'm not -- I'm not -- I -- I'm prohibited

18   from -- by the judicial code of conduct for making any

19   donations.

20               So I have no idea whether my -- whether my email at some

21   point is a part of this database.  I -- I have no idea

22   whether -- I haven't looked at an email that has solicited any

23   action from me from -- for any political reason for as long as

24   I've been a judge.  So I really have no idea.

25               I guess the question is whether -- I'm going to ask them

1    as well -- whether you're comfortable with me deciding the case

2    with that uncertainty.  You -- you-all probably don't object,

3    but I'm going to ask both sides whether they object.

4            MR. MURRAY:  We -- we don't have any objection,

5    Your Honor.

6            THE COURT:  All right.  All right.  So I think --

7    so -- so is it your understanding that despite -- I mean,

8    we started by saying you -- you started by saying let's

9    assume their narrowing is -- I should credit it.  So you

10   think even after their narrowing, they're asking for the kind

11   of, we'll call it, email recipient information that you

12   described?

13           MR. MURRAY:  I think so.  And they may get up and say

14   they don't want it.  I'll say that we're not even sure that it

15   can be -- because this is a database.

16           THE COURT:  Right.

17           MR. MURRAY:  These aren't, like, lists that are going

18   to be produced.  These are databases.  And we're not sure it

19   can be taken out.

20           THE COURT:  Right.

21           MR. MURRAY:  Maybe the Salesforce guys can handle it.

22   We just don't know; right?

23           THE COURT:  Okay.

24           MR. MURRAY:  But, yeah, I mean, we do think that --

25   they're still asking -- they keep saying -- in fact, in their

1   response papers, I think their favorite term is metrics.  All

2   we want is metrics.  Well, these are metrics; right?  And

3   they're metrics that we keep, and they're grouped by

4   individual, at least as the RNC uses them.  That's the way the

5   RNC maintains them.

6           THE COURT:  Okay.  All right.  Walk me through what

7   the kinds of things -- I mean, again, I have the -- the

8   subpoena here in front of me.

9           Walk me through kind of a high level of generality, I

10  guess, of what you think is covered, highlighting the things

11  you think are objectionable, as to the remaining -- I get No. 1

12  and I get the issue you're raising.  But as far as point -- or

13  paragraph 2, 3, 4, and 5, I guess, just describe to me what --

14  based on what you know, what sorts of things are covered by

15  each of those categories.

16          MR. MURRAY:  Sure.  So I'll say I think -- you know,

17  Item 2, I think it's -- it's a request for -- it's going to ask

18  for all the information for folks who -- and, by the way, do

19  you want me to stay in this category of personal information of

20  people who -- I just want to make sure I'm answering the

21  question you're posing.

22          THE COURT:  I totally understand.  My assumption is

23  that 2, 3, 4, and 5 are not -- none of those -- none of those

24  paragraphs include the personal information of, we'll call it,

25  email recipients, but maybe not.  And so you -- you -- you can

1    tell me.  No, I would say an open-ended -- because it's,

2    frankly, you know, hard for me to know what's out there that's

3    being requested.  So at -- at a high level, what types of

4    things you think are covered by the remaining categories.

5          MR. MURRAY:  Yeah.  So when it again comes to, sort

6    of, email recipients -- right? -- I would say Item 2 does

7    not -- should not show any -- show any information like that

8    beyond what I just talked about --

9          THE COURT:  Right.

10          MR. MURRAY:  -- right?  And that's really for people

11    at the RNC.  That's individuals at the RNC.  In 3, 4, and 5,

12    I'm, sort of, in the same position as the Court, which is why

13    we asked for the relief we asked for; right?  We don't -- in

14    4 and 5, just based on what's being asked for, it's highly

15    likely that there is the second category of protected

16    information, which is internal RNC information.  It's

17    strategies and deliberations which are necessary to its

18    effective use of its First Amendment rights, and which are

19    protected.

20          I'll say, though, again, that it's also possible that

21    that's in 3.  It's possible it's not 2.  3, it's possible

22    there's none of our information there.  We don't know.  And,

23    again, that's why we asked for the relief we asked for, which

24    is to take a look and object to you before it goes out the

25    door.

1      When it comes to personal information of email

2  recipients, I will -- I would say it seems less likely that it

3  would be there, but I don't know because we don't know what's

4  there.  We haven't been able to review it.  And, you know,

5  frankly, we haven't been part of this process at all.  Part of

6  the -- part of our issue here is that this went -- all this

7  dialogue back and forth of the third party about our rights

8  puts us in a very difficult position.  So we -- you know, you

9  mentioned a typical discovery fight.  This ain't a typical

10  discovery fight.

11      THE COURT:  Well, that I grant you.  That I grant

12  you.

13      But you're telling me there's been no discussion even

14  since the lawsuit's been filed that -- no discussion between

15  you-all and the committee about -- about, sort of, what

16  their -- and I get that the subpoena is not directed at you.

17      MR. MURRAY:  Right.

18      THE COURT:  But no discussion between the committee

19  and the RNC about what this covers?

20      MR. MURRAY:  No, they haven't talked to us once.  And

21  it's actually surprising, Your Honor, because the RNC -- they

22  have contacted the RNC, actually through Mr. Riemer, who is

23  sitting at counsel table here, to inquire as to interviews with

24  employees and former employees.  And the RNC has been

25  cooperative with that.  But that letter that was attached both

1     to Salesforce's response and also to the committee's response,

2     the first time we saw it was when it showed up on PACER.

3             THE COURT:  All right.  So tell me why you don't

4     think -- again, let's assume for the moment that counsel for

5     the committee stands up here and says, Judge, we want X, we

6     don't want Y.  I'm not saying that would resolve all your

7     objections, obviously.  But at least as to why, why shouldn't

8     I, sort of, consider why resolved if they're going to -- if

9     a -- if a member of the bar of this court is going to stand up

10    in court and tell me we are not seeking this --

11            And I'll add, on top of that -- if -- you have

12    Salesforce here.  If Salesforce tells me, in fact, the

13    committee has not sought that data and we found a way to

14    desegregate it in some way and we're -- you know, pending my

15    ruling, we're getting ready to respond to that subpoena and we

16    are not preparing data Y for production.

17            MR. MURRAY:  Okay.  I appreciate the question,

18    Your Honor.

19            Here -- so the overarching reason why is because it

20    doesn't change the letter of the subpoena.  And if there's a

21    mistake here, our rights are gone forever.  Period.  Under the

22    congressional defendants' argument -- right? --  what their

23    position is -- right? -- is, hey, once we've got it --

24    right? -- and I don't -- I'm going to use the hook or by crook

25    thing, but they're not doing it by hook and crook --

1          THE COURT:  Uh-huh.

2          MR. MURRAY:  -- here like we're in a proceeding;

3     right?  But no matter how we get it, once it's over here, it's

4     gone forever and you can't do anything about it; right?  And so

5     this is -- when I said it's not a typical discovery fight --

6          THE COURT:  Well, that's one of the reasons I started

7     where I did with what do I do in the event I would have ruled

8     against you, in part, to preserve those rights, but --

9          MR. MURRAY:  Right.  No, no.  And I appreciate that,

10    Your Honor.  But I -- the reason why you can't credit it --

11    so let me -- let me go through -- I guess, let me count the

12    ways, if you'll forgive me; right?

13          So I think, first -- and please don't think me crude for

14    saying this; right?  But I think the first thing is it's

15    judicial respect for Congress, because to the extent there's an

16    order from this Court that -- because I'll say, for example, at

17    a bare minimum -- right? -- this Court absolutely should grant

18    preliminary relief, taking them up on what they -- how they

19    said they want to limit this; right?  But I'll say that that's

20    at a bare minimum in terms of fairness.  I'm not sure in terms

21    of judicial respect for a co-equal branch of government --

22    right? -- that it's the right thing to do.

23          You know, in the *Trump v. Mazars* case, the Supreme Court

24    pointed out that courts should --

25          THE COURT REPORTER:  Hold on.  You have to slow down.

```
 1              MR. MURRAY:  I apologize.

 2              THE COURT REPORTER:  This is what I have.  "The

 3     Supreme Court pointed out that courts should" . . .

 4              MR. MURRAY:  Insist on a subpoena no broader than

 5     reasonably necessary to support Congress's legitimate

 6     legislative objective.

 7              Second, I think it's the incentives that set us up.  As

 8     we pointed out in our reply, there's been a lot of litigation

 9     over those subpoenas recently.  This is my first rodeo here,

10     but I think Mr. Letter has been doing this for quite a bit of

11     time.  And the incentives that this sets up -- if the Court

12     says, oh, well, I'm going to credit the narrowing, well, what's

13     the incentive now for any congressional committee?

14              Ask for the moon and the stars; right?  See what you can

15     get away with -- right? -- and then back off of it if somebody

16     comes with an argument to back you off and you think you have

17     to save face in front of a court; right?

18              I don't think that's the right remedy at all.  I mean,

19     they've subpoenaed the national committee of one of the two

20     major political parties in this country for documents that

21     nobody -- I mean, the confidential information of a major

22     political party being demanded by a congressional committee

23     dominated by people from the other party --

24              THE COURT:  Uh-huh.

25              MR. MURRAY:  -- candidly, Your Honor, that's a
```

1    scandal; right?

2         Third, tailoring; right?  I mean, so -- tailoring an

3    overbroad disclosure law that -- so in other context because,

4    we're talking about the First Amendment here; right?  Let's

5    talk about other context; right?  Not a discovery dispute, but

6    let's talk about when the First Amendment comes up in a

7    compelled disclosure context, because that's what this is.

8    It's an attempted compelled disclosure.

9         And in the compelled disclosure context, what do courts

10   typically do when a law or regulation tries to effect or compel

11   disclosure?  The courts don't blue pencil the law.  The courts

12   throw the law out entirely.  They throw it out facially and say

13   it's done, try it again.  And look -- I mean, I'll just say,

14   Your Honor, it's a heck of a lot harder to pass a new law or a

15   regulation than it is for these guys to issue a new subpoena.

16   They could have done it before this hearing, and they haven't;

17   right?  They're here seeing what they can get away with.

18        And that's why I don't think that that's the appropriate

19   remedy.  I do understand from a judicial economy point of

20   view -- right? -- and sitting as a trial court why it is

21   tempting.  I'm not -- I'm not trying to say that that seems

22   outlandish to me.  I'm a trial lawyer.  It actually seems like

23   this would be my instinct -- right? -- if our roles were

24   reversed.  And I recognize that I'm arguing something that --

25   you know, it probably sounds -- I'm saying it in English, but

1     it sounds strange; right?

2              THE COURT:  No.  No.  I understand your point.  I

3     think it's a judicial economy point.  It's a -- you know, like,

4     you talk about incentives.  You also want parties to have -- I

5     mean, you also want parties -- not political parties.  I mean

6     any organization or person that's litigating a subpoena -- to

7     have an incentive even once the subpoena is issued to

8     compromise and discuss.

9              But, again, it may be -- I mean, I -- I -- I didn't

10    mean, I guess, in -- I think the concepts we're discussing

11    are -- and the economy of them are relevant to make this

12    seem like a normal discovery dispute, but for all the reasons

13    you're going into, it's -- I understand the constitutional

14    issues, all the rest of it.  It's not that.  But the question

15    is whether this principle should apply this -- in this

16    circumstance.

17             And I get -- I mean, I guess I take your point about

18    laws that force the -- that compel First Amendment-protected

19    material to be disclosed.  That's what courts do.  I mean, I

20    think -- you know, it's hard to draw a specific analogy between

21    a law and a subpoena, but I take your point -- I take your

22    point.

23             MR. MURRAY:  Well, a subpoena has the force of law,

24    Your Honor.  And I'll just say there's one final reason; right?

25    So three -- the final reason, actually -- and it may actually

1   be the most important -- right? -- which is, you know, the post

2   hoc narrowing from the committee -- I mean, I would say it is

3   evidence -- right? -- that the committee knows that its

4   subpoena is too broad.  And if the subpoena is too broad under

5   *Watkins* -- right? -- it is not in service of a legitimate

6   legislative purpose.

7            And if it is not in service of a legitimate legislative

8   purpose, if it's overbroad for that, then the subpoena is

9   invalid.  Period.  It's case dispositive.  And it takes away

10  even the congressional -- it takes away the congressional

11  defendants' claim of immunity, and it disposes of the

12  subpoena's validity.  And so there's nothing to compromise on

13  if the subpoena is wiped out.

14           THE COURT:  Well, I want to talk to you about that --

15  about that question.

16           MR. MURRAY:  Yep.

17           THE COURT:  Let me get to the next -- there's one

18  more threshold question I wanted to raise.  Obviously, it's

19  the -- hold on one second.

20           The -- we've kind of danced around it here, but we may

21  as well get it to.  So, you know, you understand the House's

22  overarching threshold question is that -- or argument is that

23  the Speech or Debate Clause prevents me from asserting

24  jurisdiction over the case.

25           MR. MURRAY:  Uh-huh.

1          THE COURT:  And we, kind of, didn't get to it, and we

2    really, kind of -- the issue wasn't really joined until your

3    reply, I would say.  So, you know, looking at all the cases on

4    this that both parties have cited, it's a strange -- it's a

5    strange procedural posture.

6          But I could not find a case in which a committee of the

7    House was sued, you know, over a subpoena directly -- no matter

8    what other entity was also part of the case -- in which a court

9    didn't conclude that Speech or Debate robbed the court of

10   jurisdiction, I think, over the whole suit.  So I -- in fact,

11   in all the cases, I think, that are out there in which that

12   fact pattern is presented, the opposite has happened.  They've

13   all found that they don't have jurisdiction.

14         So tell me why -- what have I got wrong, if -- if that's

15   the way I'm reading the cases.

16         MR. MURRAY:  Sure.  So I would say -- before you even

17   get to Speech or Debate -- right? -- there's a threshold

18   question; right?  So the -- if the subpoena's not in service of

19   a legitimate legislative purpose, the immunity does not

20   attached.

21         THE COURT:  Correct.

22         MR. MURRAY:  But second, the most -- I would say --

23   so that's the threshold question just in general.

24         THE COURT:  I want -- I will get to that in a moment.

25   So let's put that aside.

1          MR. MURRAY:  Okay.  But, anyway, that's a justiciable

2   question.  The Court absolutely has to decide that.

3          THE COURT:  Clearly.

4          MR. MURRAY:  Okay.  Second, Speech or Debate Clause

5   immunity, legislative immunity, simply doesn't apply to a third

6   party.  Salesforce is a defendant in this case.  They're a

7   third party.  And the courts have actually made clear, as

8   recently as *Mazars* -- right? -- that if you've got -- if you've

9   got your rights being compromised -- right? -- by a third

10  party, the thing to do is seek relief against them.

11         And what are we here seeking, Your Honor?  We're seeking

12  relief against Salesforce to prevent them from complying with

13  the subpoena.

14         THE COURT:  But in that case, you didn't -- no one

15  raised Speech or Debate, did they?  I mean, there was no --

16         MR. MURRAY:  Right.

17         THE COURT:  The House, as I read it, intervened and

18  never -- and never raised the issue of Speech and -- Speech or

19  Debate.  So I -- I take your point.  But this case was

20  initially brought against -- you know, against the committee.

21  Salesforce you added later.

22         In any case where the House has been made a party by

23  the -- by the plaintiff -- as strange as it may seem, you know,

24  there -- I'm going to certainly press the House on this.  It

25  seems to me, the courts have come out the other way and say --

1  including, for example, just another -- another that -- as you

2  mentioned, there's been a lot of litigation about this.  The

3  House attached the transcript of a TRO before Judge Boasberg

4  where I think it was exactly the same posture.

5          No?  You're not telling me it's not?  But -- but tell me

6  why it wasn't.

7          MR. MURRAY:  Well, it was a different posture

8  because there -- right?  So, actually, I'll say, here's

9  what the posture in -- I think it was -- oh, what's the -- I

10  forget the -- I forget -- the name of the -- interesting

11  name of the plaintiff in that case.  But it was in front of

12  Judge Boasberg.

13          THE COURT:  Budowich.

14          MR. MURRAY:  Budowich.  That's right.  Budowich.  And

15  I was trying to think of the name of the organization he was

16  affiliated with, but we'll call it Budowich.

17          In the *Budowich* case -- actually, the posture of that

18  case was almost exactly -- just like the posture of the

19  *Eastland* case, which the House defendants make a lot of.  So --

20  and before I go into this, I also just want to say, if the

21  Court concludes that making the House a party -- right?  Well,

22  you just can't do that.  They have to, kind of, come in on

23  their own if they want to come in; right?  So that robs me of

24  jurisdiction.

25          Please.  Go ahead and dismiss the House defendants if

1    you conclude they have a valid legislative purpose, and then we

2    can continue against Salesforce.

3        I'll bet the House defendants will intervene.  Why?

4    Because that's what they've done in every other case.  The way

5    this case proceeded, initially relief was not necessary against

6    Salesforce because Salesforce made a commitment to the

7    Republican National Committee that, hey, if the Republican

8    National Committee wants to have its day in court against --

9    against the House committee, go ahead and do it and we'll wait

10   to produce until that's worked out, when you can test

11   legislative purpose and any other constitutional objections.

12       They changed their mind after a meeting with the House

13   committee and said, no, we're actually going to produce.  So

14   they had to be added to the case.  So, please -- and I think

15   that if you think legislative immunity bars from hauling the

16   House defendants in, then the thing to do is dismiss them from

17   the case, but Salesforce doesn't leave.

18           THE COURT:  I don't know why -- I mean, you really

19   think that adding them -- that if they weren't a party, I

20   wouldn't be able to enjoin them from producing?

21           MR. MURRAY:  I think that is a -- oh, if Salesforce

22   wasn't a party that you wouldn't be able?

23           THE COURT:  Yeah.

24           MR. MURRAY:  I think that's a harder question.  I

25   mean -- and, actually -- and let me say why I think it's a

1    harder question.  Because I'll get back to the *Budowich*

2    case -- right? -- and what posture I think it's in because --

3    the *Budowich* case, I think, is in a posture very similar to the

4    *Eastland* case; right?  I mentioned that.

5        So -- and in the *Eastland* case -- right? -- which the

6    House defendants make much of -- right? -- they don't point out

7    the -- the one critical factor in *Eastland* -- right? -- which

8    is there was supposed to be a third party in that case; right?

9    The third-party target of the subpoena, the bank -- right? --

10   was named in the suit, and then they never served them.  They

11   never participated in the case.

12       And so Justice Marshall, by the time it -- by the time

13   it came up to the Supreme Court said, hey, look, the only

14   relief available at this point is against the Congress, and we

15   think Speech or Debate keeps us from granting relief against

16   the Congress.  And the bank hasn't been served so we don't

17   think that you can get relief against them either; right?  Too

18   bad.  And *Budowich* is basically the same situation.  In

19   *Budowich* -- I think it was J.P. Morgan was the --

20            THE COURT:  A bank or --

21            MR. MURRAY:  The bank was the holder of the records.

22   And I can't figure out exactly when the production happened,

23   but bottom-line was -- is -- you know, there was some salty

24   emails and pleadings in that case about Christmas Eve filings

25   and all that.  And then the -- I think the bank at some

1    point -- clearly by the time of the hearing in front of

2    Judge Boasberg, the bank had decided to go ahead and cough up

3    the documents; right?  And at that point, the posture of that

4    case was, well, now the documents are in our hands; right?  And

5    I think -- I think Mr. Letter basically said it didn't matter

6    how Congress got the documents.  Once they're in Congress,

7    there's no relief available against Congress.  So your question

8    about --

9              THE COURT:  Okay.

10             MR. MURRAY:  -- wouldn't you be free to enjoin

11   Salesforce if they're not here, I'm not sure.  But I think what

12   the case law has shown us is -- is that where you've got a

13   third party who's going to go produce and compromise your

14   rights -- *Mazars* and the *AT&T* II decision say you've got to go

15   after the third party too.

16             THE COURT:  All right.  I just haven't seen -- is

17   there any case, though, out there where the House was a party,

18   made a party by the plaintiff?  Again, we can argue about why

19   this should have -- I mean, why this should matter is, sort of,

20   another question, frankly.  But there's no case out there, you

21   would agree, though, in which the plaintiff made Congress, the

22   House, a party -- the Senate, I guess, in theory -- and no

23   matter who else was in the case, even if the party -- the third

24   party -- the relevant third party was or was not -- whether

25   they were or were not made a part of the case, where the Court

1    said, no, we think we do have jurisdiction to go forward

2    against the third -- I mean, I guess in this theory, to go

3    forward against the third party, even though the House was in

4    the -- in the case?

5              MR. MURRAY:  So I'm not aware, Your Honor, of a case

6    where -- because, basically, that's saying I'm not aware of a

7    case where Speech and Debate immunity has been extended to the

8    third-party target of a subpoena.  I'm not aware of a case like

9    that.

10         The *Eastland* case is probably the closest -- right? --

11   where the case did go forward even though the -- and the third

12   party was on the pleading but wasn't served --

13             THE COURT:  Right.

14             MR. MURRAY:  -- right?  And then by the time it

15   was -- by the time the Supreme Court was reviewing the

16   D.C. Circuit -- right? -- it said, look, the only relief

17   available is against the parties in the case.  You don't have

18   the third party here so you lose; right?  I'm not aware of a

19   case where simply because the House was named -- which, by the

20   way, again, you can do to challenge the legitimate legislative

21   purpose of a subpoena; right?

22             THE COURT:  Sure.  Right.

23             MR. MURRAY:  So I'm not aware of a case like ours

24   where there's initially a legitimate legislative purpose --

25   right? -- and associated -- you know, illustrative

1    constitutional harms challenge -- right? -- and then the third

2    party who's saying, don't worry, I'm not going to produce your

3    stuff, says, actually, never mind.  I'm going to go ahead and

4    do it.  I feel like I have to; right?  They get added; right?

5    And then -- I'm actually not aware of a case in that posture at

6    all.

7                 THE COURT:  Right.  All right.

8                 MR. MURRAY:  Yeah.  But would I just say for the

9    Court, I think what matters is -- right? -- Speech or Debate

10   immunity is personal to members of Congress.  It is then

11   derivative to their aides -- right? -- in certain

12   circumstances.

13        Speech or Debate immunity does not apply to Salesforce.

14   Salesforce is a defendant in this case.  Relief is available

15   against them whether or not it's available against the

16   congressional defendants.

17                 THE COURT:  And your -- your position is the presence

18   of the House, by virtue of which -- which the -- as I recall in

19   the *AT&T* case, there's language in there that sort of suggests

20   that had -- that -- that no Congress person had been made a

21   defendant in that case.  But my -- so I guess my point is:  You

22   don't believe that the presence of --

23                 MR. MURRAY:  No.

24                 THE COURT:  -- the presence of the House does not act

25   to deprive me of jurisdiction over the entire lawsuit --

```
 1              MR. MURRAY:  No.

 2              THE COURT:  -- only those claims against the

 3      committee?

 4              MR. MURRAY:  No, Your Honor, I don't.  So provided

 5      that you find that -- if you were to find --

 6              THE COURT:  Right.

 7              MR. MURRAY:  -- that the immunity attaches --

 8              THE COURT:  Sure.

 9              MR. MURRAY:  -- I do not believe a personal immunity

10      that attachments to one party shields a party that is not

11      entitled to it.

12              THE COURT:  Okay.  Let's talk about that -- that

13      legislative purpose.  Or, actually, before we get to that,

14      let's talk about the issue of the committee and its

15      constitution.  You have a claim in the lawsuit about -- that

16      the committee was not properly constituted.

17          I couldn't -- you know, it seems to me that courts have

18      really steered pretty clear of trying to parse this, and -- and

19      there's really old precedent that I'm sure you're familiar

20      with -- the *Coffin* case going back to 1808, the number of cases

21      that have affirmed it since then -- where you can sort of

22      string out a lot of hypotheticals, crazy hypotheticals, in

23      which a court may say, well, okay, that committee wasn't

24      validly constituted because --

25              MR. MURRAY:  Right.
```

1        THE COURT:  -- you know, it was a couple of guys on

2    the street who got together to say, we're a congressional

3    committee now.  But, basically, courts have steered pretty

4    clear and said, look, we don't get into the business of

5    determining that question.

6        So do I really have -- on the facts here, I -- I

7    can't -- I couldn't find any case, really, in which a -- a

8    case -- you know, a case talking about -- in which the House

9    has been -- where the speech -- for -- where a court is trying

10   to determine this for Speech or Debate immunity purposes, where

11   a court has found that a congressional committee is not

12   constituted properly.  And -- and it seems to me on the facts

13   that we all agree on here, it would be very hard for me to do

14   that.

15        MR. MURRAY:  Sorry.  The last part I didn't catch

16   you.  It would or it wouldn't be very --

17        THE COURT:  It would be very hard for me to do that;

18   for me to conclude that this committee was not properly

19   constituted for the purposes of a Speech or Debate question.

20        MR. MURRAY:  I mean, I guess -- and, again, I'm

21   not -- I'm not trying to be cute with you, Your Honor; right?

22   I guess it depends on your definition of hard.  I think that --

23        THE COURT:  I mean, give me -- there's no -- there's

24   virtually no precedent for that; correct?

25        MR. MURRAY:  So I agree with that --

1          THE COURT:  Okay.

2          MR. MURRAY:  -- virtually.

3          THE COURT:  There's a first time -- you know, first

4     time -- you know, things happen for the first time.  I get it,

5     but --

6          MR. MURRAY:  But I will say that -- right -- when --

7     when is it okay in general -- right? -- for a court to say,

8     hey, look, the House's pronouncement -- right? -- is

9     justiciable; right?  And that's when it's unambiguous and it's

10    clear; right?

11         H. Res. 503 says the committee shall be composed of

12    13 members.  It's not.  Never has been; right?  And what we get

13    back in response says, well, Denny Hastert a few years ago had

14    a committee and it was -- it was short a couple, so.  Yeah,

15    well, nobody challenged Speaker Haster's committee at that

16    time; right?

17         And, Your Honor, I guess I have to say if there was

18    going to be a first time from the Court's point of view, this

19    is the case.  Because look at what this committee is doing

20    right now; right?  I mean, I'm not talking about anything the

21    committee has done before now; right?  I'm talking about this

22    case.  We have got an irregularly -- a committee that's

23    shorthanded, has no members appointed by the ranking minority

24    member from this political party; right?  It is dominated by

25    members from the other party.

1      And, candidly, the only two Republicans members that sit

2   on that committee are the two that voted for 503, and they have

3   since been censured by the Republican National Committee;

4   right?  That's who is issuing the subpoena for the confidential

5   records of the Republican Party in this country.  So there's a

6   reason why we made this argument.

7      I -- I will concede to you now, Your Honor -- I'll climb

8   a little bit down from my high horse on that, and I'll say --

9   I'll concede to you that, yes, that -- you know, that's a --

10   that is a tougher argument, I think especially for a district

11   court to say, oh, boy, I'm going to blow up this committee;

12   right?  But I'll tell you, we made that argument because we

13   stand by it, and we think it's correct because the committee is

14   short 13 members and the committee does not have a ranking

15   member for consultation for purposes of the subpoena.

16      We can -- we can get into the debate about document

17   subpoenas versus testimonial subpoenas.  I'll just note

18   that the rule that was attached to this subpoena -- I

19   think appropriately, because it also calls for a deposition --

20   was the testimonial subpoena rule.  And it wasn't followed

21   if there's no ranking member.  So while I think it would

22   be -- I will -- I don't want to just say I think.  I will

23   concede to Your Honor, it would be hard.  Okay.  Be very hard.

24            THE COURT:  Well --

25            MR. MURRAY:  But -- but -- but I will say, it is more

1    hard in terms of -- I -- you know, saying shall means shall

2    when it comes to 13 members.  And I think here, the reason to

3    rule that way, in light of what has been permitted to happen

4    because of the irregular makeup of this committee, I think it

5    animates this case.

6             THE COURT:  Fair enough.  Well, it definitely -- fair

7    enough.

8        Let's talk about the legitimate legislative purpose

9    issue which, as you said, is sort of -- no question that's a

10   part of what I can decide.

11            MR. MURRAY:  And you mentioned that earlier, and I

12   realize I'm missing one thing, Your Honor.

13            THE COURT:  Please.

14            MR. MURRAY:  You jumped off of it.  So I don't know

15   how I thought I was going to, like, dart away and not -- but

16   anyway.

17            THE COURT:  It's all right.

18        That is something that, clearly, looked at from -- from

19   a high level, I can decide; and something I have to decide if

20   I'm -- if, indeed, Speech or Debate applies, one way or the

21   other, I suppose.  The way -- let me -- and I'm going to go

22   through this with the House as well.  But let me just throw out

23   what I think feels like the right framework, and -- and it's,

24   sort of, an amalgamation of the -- all the cases you-all have

25   thrown at us.  And you tell me where -- where I've gone right

1    or wrong.

2         So I think of it as, sort of, three levels that you can

3    look at this on; right?  You've got the question of whether the

4    committee has a legitimate legislative purpose.

5         MR. MURRAY:  Right.

6         THE COURT:  And I think -- it seems to me that's

7    probably already been answered by the circuit.

8         MR. MURRAY:  By *Trump v. Thompson*.

9         THE COURT:  Right.

10        MR. MURRAY:  Yep.

11        THE COURT:  So --

12        MR. MURRAY:  I mean, at least for now, yes,

13   Your Honor.

14        THE COURT:  For now.  Right.  Fair enough.

15        So -- so that's the first level.

16        The second level is, I do look at -- the precedent seems

17   to suggest -- I do look at the subpoena, just at a -- at a

18   level of determining is that subpoena furthering a legitimate

19   legislative purpose.  And I can do that, and that -- that, as I

20   see it, is part of the analysis I have to undertake here.

21        The third level of it -- and so if I were to rule -- if

22   I were to rule -- that the subpoena was, you know, valid, it --

23   again, it furthered a legitimate legislative purpose or

24   legislative activity, that I don't go to the next level of,

25   sort of, specificity to look at -- and I'm sure you're going

1    to -- you may not agree, but this is, kind of, how I looked at

2    these cases -- that I don't look at the -- the granularity of

3    what the subpoena is asking for and second-guess that.  I don't

4    say, oh -- and there's some language in -- I think it's the

5    *Doe v. McMillan* case that I think suggests this.  That I

6    don't -- okay? -- look at this document and that document, say,

7    geez, why do they need that?

8         You know, as long as the subpoena itself at some sort of

9    higher level of generality is -- meets the test, then I don't

10   go further.  Now, if it doesn't -- and if it doesn't meet the

11   test, than the analysis ends there too.

12        Is that -- so tell me whether you think that is, kind

13   of, the right way to look at it.  I mean, I thought your

14   argument about the nitty-gritty of the subpoena kind of mixed

15   and matched cases where some of them didn't have anything to do

16   with speech -- you know, Speech or Debate.  And I think that's

17   a pretty big distinction.

18            MR. MURRAY:  And then -- so I think -- I guess I'll

19   say, I can understand the Court's -- so I actually think --

20   what -- what the -- what maybe the debate is about is what's

21   Step 2; right?  Is -- how detailed must Step 2 be?

22            THE COURT:  Right.  That's an another way to put it.

23            MR. MURRAY:  Right.  Okay.  So -- so I think --

24   because I don't think that there's -- I think that's -- if

25   it -- for Step 1, I think the Court's absolutely right on.

1   Does the committee have a legitimate legislative purpose, you

2   know, as an entity --

3            THE COURT:  Yeah.

4            MR. MURRAY:  -- right?

5        By the way, I don't -- I will say, just to be clear --

6   right? -- while I think the *Trump v. Thompson* case addresses

7   whether the committee has a legitimate legislative purpose --

8   right? -- it does -- it did not in the context of finding

9   that -- it sort of addressed the purpose -- right? -- not

10  whether it was properly constituted.

11           THE COURT:  Yeah.

12           MR. MURRAY:  And so that was not before the Court in

13  *Trump v. Thompson*.  And so to the extent there's an infirmity

14  in the committee's constitution, then I believe that this Court

15  is free to hold that there's no legitimate legislative purpose

16  because the committee is not properly formed.

17           THE COURT:  Okay.

18           MR. MURRAY:  Just -- just want to be clear.

19           THE COURT:  Well -- okay.  I'll think about that.

20  Fair enough.

21           MR. MURRAY:  I think -- I think, second, you know,

22  I'll just say that -- I guess I don't -- you know, the

23  nitty-gritty's kind of -- you know, kind of a loaded term;

24  right?  So I -- I don't know that it's the nitty-gritty; right?

25  But it can't -- the subpoena -- I don't think -- to have a

1  legitimate legislative purpose, it can't ask for swaths of

2  information that have nothing to do with that -- with the --

3  with the legislative purpose of the committee.  And that's what

4  we've got here.

5       Item 1 of the subpoena -- right? -- so let's leave aside

6  the distinction between personal identifying information for

7  donors, you know, information on their affiliation versus the

8  internal deliberative and strategy of the -- deliberative

9  process and strategy of the RNC.  Let's leave aside that

10  distinction for a moment.

11       Let's just talk about the fact that other than the date

12  range limitation, there is nothing to tailor Item 1 --

13  right? -- to the committee's purpose of investigating the

14  facts, circumstances, and cause -- and by the way, this is

15  coming from the *Trump v. Thompson* case; right?  What the --

16  what the *Trump v. Thompson* case found was a legitimate

17  legislative purpose to investigate the facts, circumstances,

18  and causes relating to the domestic terroristic attack on the

19  Capitol and to identify, review, and evaluate the cause of, and

20  the lessons learned.

21       There's -- you know, for example, Item 1 -- right? -- it

22  asks for all emails and all -- sorry.  Not all emails.  All --

23  all records -- you know, all analytics and metrics -- right? --

24  including but not limited to certain categories related to

25  emails during this two-month period.

1          Well, as the committee's laid out -- and, frankly,

2     the -- the congressional defendants have just sort of said, ah,

3     you know, maybe those will be relevant too; right?  There's

4     going to be -- I mean, not just scores.  I mean, volumes of

5     emails related to the Georgia Senate runoff, which happened to

6     happen during that period.  There's going to be Christmas

7     greeting messages and holiday --

8               THE COURT:  You're talking about 2 now?

9               MR. MURRAY:  I'm sorry?

10              THE COURT:  Which --

11              MR. MURRAY:  I'm talking about Item 1.

12              THE COURT:  Item 1.  Okay.

13              MR. MURRAY:  Item 1.  There's -- there's going to be,

14     you know, holiday greeting messages in there.  There's going to

15     be all sorts of stuff that has nothing to do with the

16     presidential election, its aftermath, challenges to different

17     votes in different states, or the rallies in -- in

18     Washington, D.C., on January 5th and 6th that -- that preceded

19     the attack on the Capitol on the 6th; right?  There's just

20     necessarily going to be a lot of stuff in there that won't do

21     anything to help Congress figure out what to do about the

22     January 6th attack, if anything.

23          So on the first -- I'll just say, first, I don't think

24     that's a nitty-gritty concern.  I think that is a broad,

25     high-level concern with Item 1 of the subpoena at the very

1    least, especially when you consider the sort of data that

2    they're seeking, which, again, is -- and I'll -- I'll go into

3    this when I have the opportunity -- right? -- is

4    First Amendment protected; whether it is the personal

5    identifying information of donors, supporters, or members, or

6    whether it is the internal deliberative material and strategic

7    considerations of the Republican National Committee.

8         Second, I guess I'd also say, you know, there -- you

9    know, it -- the subpoena has to be in service of something --

10   right? -- an interest, on which legislation could be had;

11   right?  And -- and I would say here that this committee --

12   right? -- is not authorized to mark up legislation.  It may --

13   may propose something, but it's not authorized -- specifically

14   not authorized to mark up legislation.  And it's also

15   seeking -- you know, again, when you think about, like, this

16   other, I'm going to say, like, nonpost-presidential election

17   material -- right? -- that's clearly captured within the scope

18   of Item 1 -- right? -- what could possibly be legislated on

19   there?  You know, so -- so you -- you can only send a certain

20   number of emails after an election?  There's no way that stands

21   up under the First Amendment.

22        THE COURT:  Well --

23        MR. MURRAY:  You can only communicate about certain

24   things after an election?  I don't think that's possible to

25   legislate on either.

```
 1              THE COURT:  This is -- I guess, you know, this does
 2     go to the question of how granular you get in evaluating the
 3     subpoena against the legislative purpose; right?  I mean, I
 4     don't disagree with you when you get very granular about it.
 5     It's hard -- you know, it -- it raises the -- the burden, I
 6     would say, on -- on the House to justify that.  And as you get
 7     further away from it, you know, do you -- do you -- do you
 8     dispute that investigating, for example, you know, the
 9     January 6th event, that is a legitimate legislative purpose?
10              MR. MURRAY:  It is as long as there's legislation
11     that can be had on it; right?
12              THE COURT:  And --
13              MR. MURRAY:  Especially --
14              THE COURT:  Well, can there be there?
15              MR. MURRAY:  Especially --
16              THE COURT:  So I'm asking you the question.
17              MR. MURRAY:  Oh, sure.
18              THE COURT:  Can there be?
19              MR. MURRAY:  Oh, sure.  I mean, I'm certain
20     legislation could be had on it, but not by this committee.
21     They can't mark up legislation.
22              THE COURT:  Okay.  So that -- so actually you --
23     that's -- the RNC's position is that because they can't mark up
24     legislation, there's nothing they could do -- they can't issue
25     any subpoenas?
```

1      MR. MURRAY:  No, that's not the position we've taken

2   in this case, Your Honor.

3           THE COURT:  Well, you just said --

4           MR. MURRAY:  The position we've taken --

5           THE COURT:  -- they can't mark up -- how could they

6   have a valid legislative purpose if they can't mark up any

7   legislation?

8           MR. MURRAY:  Sorry.  I'm sorry.  I'm conflating --

9   now -- now I follow you.

10           THE COURT:  Okay.

11           MR. MURRAY:  Your Honor, yes, we actually think

12   that's a fatal defect, but we think that's been decided for us

13   already in the *Trump v. Thompson* case.  And we -- you're bound

14   by precedent; right?  We're not trying to say you're not.

15       So when -- when I say that's not the position we took in

16   this case, it's just because here, like we're -- we're

17   asserting that, yes.  Right?

18           THE COURT:  I understand.

19           MR. MURRAY:  But -- but there's nothing that you can

20   do about it on that point.

21           THE COURT:  I gotcha.

22           MR. MURRAY:  Okay.

23           THE COURT:  Okay.

24           MR. MURRAY:  And, again, I would just say, taking --

25   taking a step back for a second -- right? -- I -- I think that

1    the inclusion of a request for information regarding the emails

2    that, everybody will agree, have absolutely nothing to do with

3    January 6th, that the House may stand up and say, oh, well,

4    they actually -- any email that was sent during that time --

5    right? -- you know, even if it was a Merry Christmas to you and

6    your family, has something to do with January 6th.  Frankly,

7    that's preposterous.  It just doesn't make any sense.

8           And the fact that -- especially given that we're talking

9    about First Amendment-protected information and that the

10   standard typically there -- right? -- is exacting scrutiny

11   requiring narrow tailoring to a substantial government

12   interest.  And I get it.  If the House is immune --

13              THE COURT:  Right.

14              MR. MURRAY:  -- I get it; right?  But that doesn't

15   apply to Salesforce; right?

16           So given the place that we're in -- right? -- I

17   think the fact that it would be easy for the House to tailor

18   the subpoena even just a little bit -- right? --  to take

19   that argument away from me, and they haven't done it,

20   suggests that it is not in service of a legitimate legislative

21   purpose.

22              THE COURT:  All right.  Two more questions.  And then

23   I'll -- and then I'll ask if there's anything we haven't hit

24   that you want to -- you want to hit with me.

25           One is you referenced earlier, you know, the concept of

1    dismissing the House.  Let me just say, are you -- in the

2    complaint that exists today, are you-all asserting all claims

3    in the complaint against both the committee and Salesforce?

4              MR. MURRAY:  Yes.

5              THE COURT:  And so -- even the constitutional claims,

6    for example?

7              MR. MURRAY:  Yes.

8              THE COURT:  You think you have constitutional claims

9    against Salesforce?

10             MR. MURRAY:  We do.

11             THE COURT:  All right.

12             MR. MURRAY:  And we think *Mazars* makes that clear,

13   and I guess I'll -- I'll quote to you.  And -- and you know, I

14   apologize.  This one of those times where I had my, you know,

15   PIN quote for *Mazars* ready and then I lost it.  So I had to

16   print it out in an email.  So now I'm not going to be able to

17   give you the perfect page cite, and so I lose --

18             THE COURT:  Well --

19             MR. MURRAY:  -- that moment.

20             THE COURT:  -- you know, the great thing is we have

21   Westlaw.  So it's all right.

22             MR. MURRAY:  So -- but I'll just say that the

23   Supreme Court said in addition -- right? -- and here it was

24   separation of powers concerns.  But those are -- those are

25   competing constitutional interests, which is what we have

1    here -- right? -- are no less palpable simply because the

2    subpoenas were issued to third parties; right?  Congressional

3    demands for information present -- and here, again, it's an

4    intermittent branch of conflict -- no matter where the

5    information is held, and were it otherwise -- Congress could

6    sidestep constitutional requirements any time in this case --

7    it's President's private information -- is entrusted to a third

8    party as occurs with rapidly increasing frequency.

9         We think *Mazars* settles this.  We absolutely can

10   bring -- where challenging a congressional subpoena, you can

11   bring those constitutional claims against the third party that

12   has got your records and is ready to cough them up.

13        THE COURT:  All right.  That's No. 1.

14        No. 2, just a quick -- I mean, again, I -- I do think

15   the way for me to handle this is to consolidate.  And we'll see

16   how -- whether the committee gives me the time I think I need

17   to do that.  You don't need to -- I mean, you-all don't need to

18   be pinging back and forth on a PI when -- when you-all just

19   want to get on with it in terms of reviewing the merits, but --

20   but let me ask about irreparable harm, though, really quickly.

21        MR. MURRAY:  Of course.

22        THE COURT:  The -- as I see it, you have -- I see

23   your harm as falling into two baskets.  One is constitutional,

24   and you cite a bunch of cases.  I think you're -- largely --

25   well, you cite a bunch of cases for the proposition that

1   constitutional -- that infringement on constitutional rights

2   is -- as long as that is likely to be the case, is irreparable.

3   And that's one basket.

4       The other basket, I would say -- I guess maybe I

5   shouldn't -- maybe I shouldn't make these two totally separate

6   baskets.  But at least some -- much of your statutory and other

7   claims -- may be even some of your constitutional claims --

8   struck me as, in part, depending upon things that may happen

9   downstream from the disclosure.

10      But that, you know -- and -- on a PI, I think courts in

11  this -- judges in this courthouse routinely say, look, maybe

12  that'll happen.  Maybe it won't.  But I can't issue a PI

13  because of something that might happen or could happen.  For

14  example, I think it's, you know, reasonable given the way the

15  world works that you-all would be concerned about the

16  committee -- you know, about information that would go

17  missing -- or not go missing.

18          MR. MURRAY:  Well, it wouldn't go missing.

19          THE COURT:  Wind up in other --

20          MR. MURRAY:  It would be found, Your Honor.

21          THE COURT:  Wind up in other places and in -- in the

22  media and all the rest.

23      But, you know, that's a contingent thing that could

24  happen.  It is not a thing that is definitely going to happen.

25  So I guess -- and I think maybe some of your constitutional

1    claims are based on that kind of thing.  Not all.  Not all, to

2    be fair.  But some of your irreparable harm is based on these

3    contingent things.  So isn't that a flaw, at least as to some

4    of that -- that harm argument?

5            MR. MURRAY:  I mean, so I guess I'll say, I think

6    that the Court's observation that in compelled disclosure

7    cases -- right? -- there's always some -- you know, there's

8    always, sort of, and then-what-happens -- right? -- piece to

9    it; right?  This is especially true in the case of, like,

10   reprisals and harassment; right?

11           But I'll say that in the compelled disclosure context --

12   and I think maybe the *Bonta* case, *Americans for Prosperity v.*

13   *Bonta*, is the best one to point to.  But what the Supreme Court

14   said the harm is is the disclosure.  And, by the way, there it

15   was disclosure to a government agency that had an obligation to

16   keep the filing private when another government agency in the

17   federal government already had the records; right?  And the

18   Supreme Court said that's a First Amendment harm.  The

19   disclosure is actually the harm.

20           And so we actually don't think that there are -- and

21   I think it is a fair observation by the Court.  Yeah,

22   there's -- there's the disclosure and then other bad things

23   could happen; right?  I think that's fair.  And, Your Honor,

24   I don't think there's any question -- right? -- what will

25   happen to the propriety data of the RNC if it gets into the

1    hand of a Democratic-dominated committee.  I know what will

2    happen to that data, but that's not what we're arguing here

3    today.

4         What we're saying is the harm to our First Amendment

5    rights is the minute it goes out the door.  We're harmed by its

6    disclosure -- right? -- because now it's no longer confidential

7    to us.  Other people know about it -- right? -- and that's the

8    harm.

9         THE COURT:  And that argument, actually, as you just

10   articulated there and -- is actually not based -- is not

11   necessarily based on a constitutional argument, though.  In

12   other words, there are plenty of times --

13        MR. MURRAY:  Oh, sure.

14        THE COURT:  -- when the courts say, okay, there is

15   irreparable harm here.  Forget this has nothing to do with the

16   Constitution.  It's proprietary data that, you know, Company A

17   has, and if Company B gets it, oh, goodness gracious, they're

18   going to be able to, you know, use it against them.

19        Now, I'm not -- I'll have to look and see whether you

20   made that showing; but, conceptually, that's -- that's

21   something that I think is -- I have to look at.  There are --

22   well, it's mostly -- it's, sort of, trade -- there are

23   trade-secret cases where -- where courts have found irreparable

24   harm even though -- I suppose an argument can be made that's

25   all reducible to money.  But I think there is a line of cases

1    that would support that.

2              MR. MURRAY:  I mean, I -- and -- and so I agree with

3    you, Your Honor, and I -- I've litigated some trade-secret

4    matters.  And it's -- you know, why litigate a trade-secret

5    matter when you've got the First Amendment.

6              THE COURT:  Right.  Right.  No, I get it.

7              MR. MURRAY:  But -- but -- but I would say that

8    Mr. Schaeffer's initial declaration -- and maybe his

9    supplemental -- but I think really his first declaration makes

10   clear -- right? -- that this is all highly confidential, it's

11   proprietary, and it's worth a lot of money; right?  So it's got

12   the indicia of trade secrets; right?  We're not suing the House

13   for violating our trade secrets.  We're suing --

14             THE COURT:  No.  Right.

15             MR. MURRAY:  -- because our trade secrets are about

16   how we exercise our First Amendment rights.  And that's --

17   that's what we're complaining about.

18             THE COURT:  All right.  Let me -- let me just ask

19   you.  Is there something we haven't hit, any particular --

20   believe me when I tell you, I've read all your -- I've read

21   everything you've submitted.  But is there -- is there

22   something we haven't hit, a point that you think is

23   particularly important that you want to make sure I don't miss?

24             MR. MURRAY:  I appreciate that, Your Honor.  And I

25   guess, you know, I should say, too, as the first one out of the

1    box -- I'm sure my colleagues will say the same thing -- I

2    appreciate the specificity and the depth with which you're

3    treating this and the time that you've afforded.  And,

4    especially, allowing us to come in here in person today, and I

5    appreciate that opportunity.

6         I guess the only thing I want to hit on -- right? -- is

7    to -- it is a big point -- right? -- the second category of

8    First Amendment harm.  We haven't spent a lot of time talking

9    about that, but it is just as protected as personal identifying

10   information when it comes to this information in the hands of a

11   political party.  Okay?  And so, just quickly -- and I think

12   the case to look --

13        THE COURT:  It is what makes this very -- well, it's

14   one of many features that makes this unusual.  Do you know of

15   any circumstance -- I don't -- I don't know whether, you

16   know -- how this impacts what the law requires me to do.  But

17   are you aware of any case in which Congress, in exercising its

18   legislative function, subpoenaed a major political party for

19   this kind of information?

20        MR. MURRAY:  So for this kind of information, no.

21   And I'm not aware of --

22        THE COURT:  I mean, I guess, this kind of information

23   would be relatively recent.  But, you know, confidential

24   proprietary information.

25        MR. MURRAY:  So I'm not aware of that with -- but I

1    will say, I'm not aware of litigation over it.  But I do

2    believe that there were some congressional subpoenas -- there

3    may have been congressional subpoenas to the Republican

4    National Committee in condition -- in -- in association with

5    the Watergate impeachment.  I think they were very narrow and

6    targeted.

7         And I believe there were congressional subpoenas in -- I

8    think it was either during the Clinton impeachment or -- this

9    one is a little -- little hazier on me.  But I think there were

10   congressional subpoenas to the Democratic National Committee,

11   which were also very narrow and targeted, but they did not

12   result in litigation.

13        And, frankly, I'll -- this is one place where I would

14   absolutely defer to my colleagues.  They'll probably know.

15        THE COURT:  All right.  All right.  Anyway, sorry to

16   get you off track.

17        MR. MURRAY:  Okay.  So I really -- so I do have to

18   hit on the second category, because while I -- I mean, what the

19   Court said at the very outset of this hearing, that personal

20   identifying information of -- let's call them everyday

21   Republicans -- right? -- that's something that people around

22   the country might say, jeez Louise, that doesn't look good if

23   that's really what they're going to get; right?

24        But I've got to say, when it comes to the Constitution,

25   jeez Louise is just as appropriate -- right? -- for the

1    internal planning, strategy, and deliberations of a political

2    party determining how best to communicate its message and

3    effectuate its First Amendment rights.  And the case -- I'm

4    sure you've spent time with it.  So I'm not going to -- you

5    know, I'm not going to lecture you on it.  But I'll just say,

6    *AFL-CIO DNC* -- right? -- *v. the FEC* is -- it's -- this is

7    maybe -- it's not -- it's not in the context of a congressional

8    subpoena.  That's fair; right?  But it is -- it is the closest

9    thing to this that we could find.

10         Because there what happened in -- in *AFL-CIO DNC*, the

11   Federal Election Commission -- by the way, on the basis -- I

12   don't know this for sure, but I'll bet it was on the basis of a

13   complaint by a Republican -- right? -- or -- or somebody

14   affiliated with the Republican Party.  Somebody got mad that

15   the elections didn't go well and filed a complaint and said the

16   unions and the DNC, they must be coordinating.  You know, they

17   must be getting together and doing things that they're not

18   allowed to do under campaign finance law; right?

19         And this is well before *Citizens United* and the

20   limitations -- and *McCutcheon* and the limitations on the FEC's

21   jurisdiction that we have now; right?  So the FEC issued

22   subpoenas, and the Democratic National Committee and the

23   AFL-CIO turned over a bunch of documentation, and a years-long

24   investigation took place; right?  And that investigation, I

25   think, was ended without any real conclusion by the commission;

1    right?

2          But they had a regulation on the books which said -- by

3    the way, that aversion of this regulation is still there --

4    which said, hey, we're going to go ahead and turn over -- or I

5    shouldn't say still there.  It was readopted later.  But we're

6    going to go ahead and turn over -- or basically disclose --

7    right? -- all of this information that we've already got.

8          Nobody raised an objection to the first disclosure under

9    the subpoena; right?  The second disclosure, though, the DNC

10   and the AFL-CIO said, hey, wait a second; right?  We turned

11   over planning memoranda, information about how we try to win

12   elections, basically our secret sauce.  You're holding our

13   secret sauce.  And if this gets published, the Republicans are

14   going to get it -- right? -- and anybody else who wants to do

15   harm to us.

16         Well, what did the D.C. Circuit say?  It said, you're

17   absolutely right.  When it comes to a political party,

18   political parties are protected from the disclosure of that

19   information.  By the way, in that case the protection extended

20   to the union.

21         And political parties, why are they protected from that?

22   Well, because what is the core First Amendment function of a

23   political party?  To win elections, to promote its message --

24   right? -- to communicate with its voters.  And it's necessarily

25   highly competitive, especially in this country, because, for

1  better or worse, you've only got two of us; right?  There's two

2  major political parties.  And the court said, look, the

3  First Amendment protects that against compelled disclosure.  So

4  with all that, I guess -- should I say table setting on DNC?

5          I'd just like to walk the Court through what sort of

6  information like that is in the two different items of the

7  subpoena.

8          THE COURT:  Please.

9          MR. MURRAY:  Because I think that -- that would be

10  helpful.  Unfortunately, it's a much longer list, and I'll be

11  very surprised if counsel for the House gets up and says, oh,

12  we don't actually want any of that; right?

13          So, first, in Item 1, on the -- all performance metrics

14  -- right? -- all of these metrics that I'm about to list off

15  for you, Your Honor -- right? -- will be grouped by an RNC name

16  send -- or an RNC send name.  Okay?  The RNC send name --

17  without it, I don't know how you could interpret this data;

18  right?  But here's the problem.  The RNC send name -- okay?

19          THE COURT:  What is the word --

20          MR. MURRAY:  You know, it's a send name.

21          THE COURT:  Send name?

22          MR. MURRAY:  S-e-n-d.

23          THE COURT:  N-a-m-e.  Okay.

24          MR. MURRAY:  N-a-m-e.  That's right.  Yeah, I should

25  have thought about saying that and talking through a mask, but,

1    anyway, there we go.

2         The send name is, actually, itself going to include both

3    types of First Amendment-protected information; both

4    information about individuals within that send -- not every

5    send name does both.  Some of them do one or the other.  Some

6    do both.  But the send name -- because I'll illustrate this for

7    you in just a second.  Okay?

8         The send name may have First Amendment-protected

9    information about individuals, and it may also have -- and it

10   will also have strategic information about the RNC's naming

11   conventions, almost always; right?  And -- and about how it

12   targets groups to email; okay?

13        So in the first category -- right? -- you could have a

14   name for an email -- and these are not actual names from

15   emails, but examples that I developed -- right? -- based off of

16   looking at some of these; right?  First, exclude -- like, you

17   know, so -- you know, you send X, Y, Z subject; right?  Exclude

18   all users attending Los Angeles rally.  Okay.  Date; right?  So

19   what that name just says is -- and, again, if you've got a

20   database -- right? -- you're going to be able to figure out --

21   right? -- who the folks are in the list; right?

22        Again, even if you don't have the PII -- right? --

23   you're just going to have aggregated data, you're going to know

24   that that email just excluded people who attended a rally in

25   Los Angeles; right?  You might instead get email to all

1    attendees of rally -- a Los Angeles rally date; right?  Now you

2    know that email went -- every -- every person who received that

3    email, if they got it, they chose to affiliate and associate

4    with the Republican National Committee at a specific rally on a

5    specific date; right?

6         THE COURT:  But they wouldn't -- I'm not trying to

7    minimize what you're saying.  They wouldn't have the identity

8    of those people, but they'd have an email that would -- I

9    guess, an email that went out to them?

10        MR. MURRAY:  Again -- again, that depends.  Like I

11   said, on the subpoenas -- on the subpoenas -- words of the

12   subpoena, they would have information to get those people's

13   identity.  Could it be possible to scrub all that information

14   regarding identities from the database?  I don't know.  But if

15   it is, you're still going to know that this email went to --

16   there was a subset of people -- right? -- who affiliated with

17   the party at X event; right?  And another -- another name like

18   that that somehow might be common -- right? -- would be,

19   like -- I don't know -- Detroit volunteers; right?  You know,

20   June 2020 or something like that; right?

21        But the second category is present in every name, and

22   that is:  How does the RNC organize this data?  How does it

23   make it usable?  It's no secret that the Republican National

24   Committee -- right? -- is -- it is by far more effective at

25   digital fundraising than the Democratic National Committee.  It

1    is.  That may change, but it is by far more effective at it.

2    And part of the reason it is so effective at it is that it has

3    developed ways -- right? -- to get higher levels of

4    engagement -- right? -- from its email lists.

5          And it does that -- part of the way it does that is by

6    breaking down groups, analyzing how they perform, and targeting

7    them on -- on a specific basis that it has developed.  That is

8    the RNC's secret sauce for this stuff.  And, candidly, Your

9    Honor, I think that's what the congressional defendants are

10   really after.  That's what they want.

11         And maybe they'll get up and say we don't want any of

12   that.  But at that point, I don't know what's left.  But -- so

13   now I've gone on about RNC -- what the send names are and what

14   they reveal; right?  They would be necessary in order to

15   understand email send rates -- these are all performance

16   metrics -- right? -- bounce rates, open rates, click rates,

17   click-to-open rates, the cost for each send, the unsubscription

18   rate for each send, the donations for each send, the aggregate

19   opens for each send, the aggregate clicks, the aggregate send

20   numbers, and the aggregate unsubscribes.  You would need those

21   RNC names in order to make sense of it.

22         Second, you know, I would say that --

23         THE COURT:  When you say -- I'm sorry, Mr. Murray.

24   But send names, like, give me an example of a send name --

25         MR. MURRAY:  Sure.

1          THE COURT:  Or not -- not an example -- a real

2     example, but a hypothetical.

3          MR. MURRAY:  Right.  I've got one.  So here's one.

4     So send to all users Virginia poll watcher signup.  Exclude all

5     users Los Angeles rally.

6          THE COURT:  All right.  So that's --

7          MR. MURRAY:  That's a send.

8          THE COURT:  It's a -- it's a -- it's almost a command

9     to include or exclude from a -- from a mailing folks in -- in a

10    larger database?

11         MR. MURRAY:  Right.  That's right.  Yeah, and the

12    send name is not the subject of the email.

13         THE COURT:  Right.  Or even -- it's just a command to

14    include some subset of people, maybe, or to exclude some subset

15    of people --

16         MR. MURRAY:  And --

17         THE COURT:  -- from a larger database?

18         MR. MURRAY:  And subsets of people -- right? -- that

19    were created by the Republican National Committee and that

20    nobody else knows the committee has.

21         THE COURT:  All right.  Fair enough.

22         MR. MURRAY:  I would also say there's -- there's a

23    special category of metrics included in this -- right? --

24    that -- just the disclosure of the metric is a First Amendment

25    harm.  I'm aware of four metrics that the Republican National

1    Committee developed for its Salesforce database -- right? --

2    that only the RNC uses.  As far as they know, nobody tracks

3    email using these metrics.  Revealing the metrics themselves --

4    right? -- is a First Amendment injury to the party.

5         So even if the Court were to say, hey, let's scrub out

6    the anonymizing -- you know, the personal identifying

7    information-- right? -- and I hear you on the sends, let's find

8    a way to scrub out information there that might hurt the party

9    under the First Amendment, these metrics, the names of these

10   metrics and the fact that they exist and are in the database,

11   those are First Amendment privilege to the Republican National

12   Committee.

13        THE COURT:  Again, just so I understand, so the

14   metric is -- for each send name, there's an email that goes

15   out --

16        MR. MURRAY:  Yep.

17        THE COURT:  -- to some group of people.  And the

18   metric is -- without getting into the details, obviously, for

19   obvious reasons, they measure -- they measure that -- they

20   measure that email -- that set of emails that went out in some

21   way?

22        MR. MURRAY:  Right.

23        THE COURT:  Is that fair?

24        MR. MURRAY:  That's -- that's fair, yes.  And so --

25   that's fair.  That's fair.

1          So then I'll also say, under Item 1 -- right? -- all

2     analytics.  So we were just talking about -- right? -- all

3     performance metrics.  What I just talked to you about were

4     metrics -- right? -- which is the congressional defendants'

5     favorite word, that we only want metrics; right?  Well, they're

6     also asking for all analytics; right?  And in all analytics,

7     what this means is is that you're going to get all the RNC's

8     CRM data, customer relationship management, that's housed in

9     the Sales [sic] cloud platform -- right? -- at Salesforce.  And

10    this is going to include the time -- the time attributes --

11    right? -- for each RNC-named email send -- right? -- in

12    aggregate -- right?  Not -- not individually, but one of these

13    without -- sorry.  Go ahead.

14             THE COURT:  You've thrown out a bunch of terms that I

15    just don't know what they mean.

16             MR. MURRAY:  I apologize.

17             THE COURT:  No, you don't have to apologize.  But

18    when you say you're going to get all -- I'm just -- I'm looking

19    at the transcript of what you said.  All the RNC CRM,

20    commercial relationship -- so what -- what -- what do those

21    terms mean that you started talking about?

22             MR. MURRAY:  Sorry.  And I apologize.  I must not

23    have been clear or I was speaking too fast again.  Yeah.  So it

24    would be -- CRM means customer relationship management.

25             THE COURT:  Okay.

1          MR. MURRAY:  It's used in the commercial world all

2     the time.  It's used -- basically, how do I -- right? -- make

3     sure I'm keeping you -- right? -- to the extent you want to be,

4     engaged with the emails and other materials that I'm putting

5     out.  Okay?  That's what's going to be in all analytics.  And

6     included in that -- right? -- will be the time attributes for

7     each RNC email.  Okay?

8          THE COURT:  Okay.  It just means when it was sent by

9     the --

10          MR. MURRAY:  Correct.  Correct.  Right.  And so

11     the -- it's a better way to put it.

12          THE COURT:  No, I --

13          MR. MURRAY:  I've been calling this attribute

14     language.

15          But, yes, it'll be when it was sent.  And by itself --

16     right? -- for a given email, who cares.  It's just when an

17     email was sent; right?  In aggregate, though, in this database,

18     what it's going to reveal is information regarding the cadence

19     by which the Republican National Committee sends emails.  And

20     that cadence, by the way, is part of how the Republican

21     National Committee is effective in its digital political

22     strategy.

23          The Republican National Committee developed that

24     cadence.  Mr. Schaeffer, who is the declarant in this case, is

25     one of the people who developed it.  It was developed before

1    him, but he's certainly refined it.

2         Also, that -- that timing information will, in

3    aggregate, with the performance metrics that we talked about --

4    right? -- reveal what times of day and what cadence generate

5    better results -- right? -- in terms of engagement -- you know,

6    whether it's getting people to volunteer, getting people to

7    phone bank, getting people to contribute, getting people to,

8    you know, register to vote, whatever it is; right?  And in

9    aggregate, again, there's -- I don't know any way to produce

10   this data that doesn't reveal that.

11        And I'll also -- so there's just a couple more

12   categories here.  You'll also have the message attributes --

13   right? -- for each RNC email -- right? -- which will include

14   the subject -- the -- it'll also, again, include the RNC name.

15   And it also will include -- you know, sort of -- if there's any

16   internal name for the email beyond the RNC send name, that will

17   also be included there.  There's not always such a name, but

18   sometimes there is.

19        And -- I just want to make sure.  Oh, that -- no, those

20   are -- those are the big issues under Item 1; right?  Those are

21   the big issues, in sort of this second category, this sort of

22   political party internal materials piece that will be disclosed

23   in response to Item 1.

24        With Item 2, it's a much smaller list, mercifully.  And,

25   really, you know, these are -- the -- the data that will be

1    revealed if Item 2 -- and I'm talking about proprietary

2    internal deliberative -- you know, deliberative data for the

3    party that will be revealed under Item 2 -- would be, first,

4    the password for each person that uses the Salesforce Marketing

5    Cloud.  Salesforce has that.  Actually, the RNC only has very

6    limited access to that.  The time and date of each session from

7    log in to log out, the names of files accessed on the Marketing

8    Cloud; and it will, again, reveal the names of the email sends.

9         Now, the RNC on -- by the way, on Marketing Cloud

10   doesn't have direct access to all that information, but we know

11   that Salesforce has it.  Because in the situation where there's

12   a security breach or a fired employee, like, you know, happens

13   every now and wants to get in and monkey around with stuff,

14   Salesforce -- you can call Salesforce and ask for their help

15   tracking down, hey, what happened with this login session?

16   Like, you know, why was this email sent?  It wasn't supposed to

17   be sent.

18        So we know that Salesforce has that.  Salesforce may,

19   indeed, have additional data that they use to help us access

20   our data, and that's been developed off of our data on their

21   end.  But that was the biggest point I wanted to make,

22   Your Honor, is that all of that material -- and, again, I

23   understand the temptation to say, hey, there's a big difference

24   between personal identifying information of Joe Republican on

25   the street and the internal information, deliberative

1    information for the Republican National Committee.  And I think

2    in terms of the average person, there probably is a difference;

3    right?  In terms of --

4          THE COURT:  Sure, for the average person.  But that

5    doesn't mean they're different to you, and you're the party

6    here.  So --

7          MR. MURRAY:  And -- right.  And -- and that doesn't

8    mean that they're different under the Constitution.

9          THE COURT:  Correct.

10         MR. MURRAY:  And we don't think they are.  A

11   compelled disclosure is a compelled disclosure because this

12   isn't narrowly tailored.  It doesn't satisfy exacting scrutiny.

13         And for the reasons I said, the right remedy for this

14   Court -- and I agree you can do it in terms of a final

15   judgment -- would be to simply permanently enjoin -- I mean,

16   again, unless -- if you find the legitimate legislative

17   purpose, then I think you can strike down the subpoena; right?

18   If you find a legitimate legislative purpose and that this is

19   related to it -- right? -- which I don't think you can do given

20   the overbreadth -- but if you find that, then the proper remedy

21   is a permanent injunction against Salesforce from responding to

22   the subpoena and -- I don't know.  Hopefully the Congress --

23   the congressional committee will give us a call and we can try

24   and work this out.

25         THE COURT:  All right.  Very well.  Thank you,

1    Mr. Murray.

2              MR. MURRAY:  Thank you very much, Your Honor.

3              THE COURT:  And I'll hear from counsel for the

4    committee next, please.

5              So good afternoon.  Thank you for being here.  Some --

6    some of this is going to seem maybe a little bit repetitive,

7    but, first, let's go through some of these just -- some of the

8    real quick, sort of, procedural things.

9              First, on consolidation, I'm happy to do it.  I think --

10   you know, I will say the level of issues here -- usually

11   when judges agree to do that, they get a little bit of extra

12   time to do their homework.  So let me ask the committee about

13   whether -- right now I had thought I was deciding a PI by the

14   6th.  Can the committee hold the committee -- hold the subpoena

15   in abeyance another two weeks to get a final ruling on the

16   merits by the 20th?

17             MR. COLUMBUS:  If that's the time you need, then

18   that's the time you need.  Certainly.

19             THE COURT:  All right.  Very well.  I appreciate it.

20   I mean -- well, we'll -- in part, I think, you know, as I

21   mentioned to Mr. Murray, some of these final issues didn't get

22   really -- I would say, the Speech and Debate issue didn't

23   really get joined until they filed their reply.  So I really

24   wasn't able to delve into it as deeply as I think I'm going to

25   have to if I'm going to resolve the case in full.

1          So with that -- and with that representation, then I

2     will -- I will endeavor to do that, give you a final ruling on

3     the merits by the 20th, as long as -- and I'll talk to the

4     Salesforce folks and make sure they will hold the production

5     until then.

6          I guess the second question is whether -- we'll go

7     through, I guess, the issue of clarifying what's in the request

8     in a moment.

9          The other two quick issues are:  How -- if I rule for

10    you-all -- and, again, you're -- if you're comfortable, you may

11    take off your mask.  You don't have to.  I'm just repeating

12    that.  But if you're more comfortable with it on, please keep

13    it on.

14         As far as the -- what -- what is the committee's view

15    about what I should do if I -- let's just say I buy your

16    argument that I don't have jurisdiction and end up dismissing

17    the case on that basis, let's say the entire case, the RNC

18    would be left, it seems to me, in a strange place.  I can't --

19    as I mentioned to Mr. Murray, there's nothing for me to stay at

20    that point.  And so they would be in a position where the

21    documents would be, presumably, produced upon my resolution of

22    the case in that way and they wouldn't have any ability to

23    appeal it before that would happen.

24         So if I were interested in preserving -- making sure

25    their appellate rights are preserved, how would the -- does

1    the -- does the committee have any suggestions about how I

2    might do that?

3              MR. COLUMBUS:  You're asking me to argue against

4    interest here.

5              THE COURT:  A little, but not really, because, you

6    know, again, I'm assuming for the purposes of this question

7    that I -- I've ruled in favor of you.  So I guess I -- only in

8    the sense that you're -- you're -- only in the sense that you

9    might -- may be making a suggestion to preserve their appellate

10   rights.

11             MR. COLUMBUS:  That's fair.  Certainly you could

12   enter an injunction -- very limited injunction pending their

13   efforts to get a stay from the circuit.

14             THE COURT:  You think I could -- even if I didn't

15   have jurisdiction in the case?  I mean, that's the question in

16   my mind.  If I were to find that I don't have jurisdiction,

17   whether I would have the authority to do that.  If it's -- I

18   mean, I realize it's not something you briefed today.

19             MR. COLUMBUS:  Yes, that's -- hard to answer it on

20   the fly.

21             THE COURT:  Fair enough.  Fair enough.

22        So before, again, we get into the clarification of what

23   the committee actually wants, I have to -- I have to -- the --

24   the other issue that I have to put before you is whether you're

25   comfortable with me deciding the case.  As I mentioned, I --

1    I'm sure somewhere in the RNC an old email of mine is sitting

2    there, not because of anything I've done since I've been on the

3    bench.  I have no idea whether I received any of these emails

4    that are in question.  I have no idea whether my personal

5    information is, theoretically, at issue here.  You mentioned --

6    I think you're going to tell me that you don't want any of that

7    information anyway so you're comfortable.

8         But I feel like I should at least disclose that it's

9    possible that an email associated with me got one or more of

10   these email solicitations, although I have no way of knowing

11   that.

12             MR. COLUMBUS:  We're comfortable with you deciding

13   the case.

14             THE COURT:  All right.  Very well.

15        So let's talk about what the -- what -- what you're --

16   what you're asking for.  I -- to me, I mean, I don't know the

17   most efficient way to do this.  We could walk through each -- I

18   mean, I think I looked at it as two general, sort of, pots of

19   information that I think the RNC raises.  One is this idea of

20   information that's linked to a donor or a -- or -- or even just

21   a recipient of the -- of an email message.  Tell me about

22   whether in any of these categories that's something you-all are

23   seeking.

24             MR. COLUMBUS:  We are not seeking any information

25   that would individually identify any donor, any volunteer,

1    anyone who is on the receiving end of anything from the RNC.

2            THE COURT:  So no -- if I'm -- if I'm a donor and I

3    received an email, you're not looking for that person's email?

4            MR. COLUMBUS:  Not their email, not their name, not

5    their address.  Nothing.

6            THE COURT:  Not their date of birth --

7            MR. COLUMBUS:  Correct.

8            THE COURT:  -- not their giving history, not their

9    social security number?  I have no idea if the RNC has that

10   information.  But not that either?

11           MR. COLUMBUS:  Correct.

12           THE COURT:  All right.  With regard -- then why don't

13   you walk me through -- then I think you are -- is it fair to

14   say that the other types of information Mr. Murray has

15   described that he's saying the RNC wishes to -- believes is

16   First Amendment protected, which is to not produce, that some

17   of that information you are seeking?

18           MR. COLUMBUS:  Yes.

19           THE COURT:  Okay.  So why don't you walk through what

20   information as just sort of a practical matter -- you've

21   presumably had discussions with Salesforce about, sort of, what

22   you are looking for, and what -- at least in each of these

23   categories, what you think -- not what you think -- but what

24   you've talked to them about actually receiving.

25           So can you walk through [sic] me what you think is

1    covered regardless of what is on the paper in terms of -- that

2    the -- that the subpoena could be construed to be seeking a

3    much -- a broader set of data.  What do you-all think you're

4    getting with regard to each of those five categories?

5              MR. COLUMBUS:  I think -- we'll go item by item.

6              THE COURT:  Sure.

7              MR. COLUMBUS:  The first item, we're basically trying

8    to get, broadly speaking, information on how well each email

9    performed.  And we're looking, obviously, to find out the role

10   that these -- that the RNC and Trump campaigns' emails played

11   or did not play in getting people mad enough to come to D.C.

12   and storm the Capitol.  There were -- many of these emails

13   were, basically, feeding people lies about the stolen election

14   and -- and many were not.  As Mr. Murray mentioned, some of

15   them have just, you know, Christmas greetings and things of

16   that nature.

17        And we're trying to get information -- metrics,

18   analytics -- on how -- how the emails performed so we can line

19   them up and say, well, when they were -- these -- the Stop the

20   Steal emails did really well.  That's why they did it.  And

21   they performed better than the Christmas emails or they were

22   using them as a strategy at certain times and certain dates and

23   that was associated with certain responses.  And -- and

24   that's -- and that's basically the top-level description of

25   what it is we're asking.

1          THE COURT:  Have -- has Salesforce indicated to you

2     that it's able -- as far as the types of things you're going to

3     go through, that you're interested in, that they're able to

4     separate the personal information associated with donors or

5     email recipients from the information they're going to provide

6     to you?

7          MR. COLUMBUS:  I believe the answer is -- is yes,

8     although I suggest you direct that to Salesforce here.

9          THE COURT:  Okay.  All right.  So that's -- that's

10    No. 1.  Why don't we go through the other categories too.

11         MR. COLUMBUS:  No. 2, records related to login

12    sessions is basically trying to figure out who are the people

13    that might have more information about these email campaigns by

14    the RNC and the Trump campaign that were so inflammatory.  And,

15    basically, what we're interested in is the names of these

16    people -- and, again, by definition, these -- by -- these are

17    only people associated with the Trump campaign or the RNC who

18    were logging in, who were pulling out this data and, basically,

19    falsifying it, when they were doing it.

20         THE COURT:  And basically --

21         MR. COLUMBUS:  Sorry.  And also finding out when they

22    were doing it.

23         THE COURT:  Right.  Okay.  So I think when Mr. Murray

24    went through, he indicated that it wouldn't -- it could include

25    a password, somebody's password to get into the system.  Is

1    that something --

2              MR. COLUMBUS:  We're certainly not interested in

3    their passwords at all.

4              THE COURT:  Okay.  So it's when somebody works for

5    the Trump campaign, somebody works at the RNC, they are logging

6    into this -- you call it a Salesforce Marketing Cloud platform,

7    doing some work on it.  Maybe that's -- they're sending emails,

8    they're causing certain emails to be sent, and then they're

9    logging off.  And you're trying to identify who those people

10   are?

11             MR. COLUMBUS:  Who those people are, basically, yeah.

12             THE COURT:  All right.  All right.  Categories 3, 4,

13   and 5.

14             MR. COLUMBUS:  3 and 4 are looking at analyses that

15   Salesforce themselves conducted -- investigative reports or

16   analyses is the phrase used -- regarding the use of their

17   platform by the RNC, trying to get a sense of whether there

18   were things in there that Salesforce was concerned about, about

19   how their platform was used.

20             We know that on -- on January 11th, 2021, Salesforce put

21   out a statement where they said -- and I'll -- I'll just quote

22   from it.  They said, "Sadly, there remains a risk of

23   politically incited violence across the country.  The RNC has

24   been a long-standing customer, predating the current

25   administration, and we've taken action to prevent its use of

1   our services in any way that could lead to violence."

2          It really was that statement that first piqued the

3   interest of the Select Committee, and -- because it suggested

4   that there was -- Salesforce had reason to believe that its

5   platforms had been used to fan the flames that led to

6   January 6th.  And so we're interested in finding out any work

7   product there is by Salesforce itself --

8          THE COURT:  Right.

9          MR. COLUMBUS:  -- relating to that.

10          THE COURT:  The -- at some point in the record, the

11   committee assured somebody -- probably Salesforce.  I'm trying

12   to remember -- that it wasn't seeking -- maybe it's -- maybe

13   it's Salesforce made this representation.  That you're not

14   looking for stored communications here.  So you're not --

15   you're looking for the actual reports or analysis that might

16   have been done by Salesforce as opposed to emails -- internal

17   emails from Salesforce saying, geez, we should -- we should

18   write a report.  Is that accurate?

19          MR. COLUMBUS:  Sorry.  Let me just return to the

20   subpoena.

21          To the extent that there were communications regarding

22   the investigative reports, I believe we are looking for that

23   as well.  And my colleagues can correct me if -- if that's --

24   if that's not correct.  But I believe that emails -- documents

25   or communications regarding the reports could be covered by it.

```
 1              With regard to the Stored Communications Act --

 2              THE COURT:  Right.

 3              MR. COLUMBUS:  -- internal emails are not in and of

 4    themselves covered by the Stored Communications Act.  It's only

 5    if you're, kind of, acting as, like, a --

 6              THE COURT:  A provider.

 7              MR. COLUMBUS:  As a provider.  It's not the precise

 8    word, but yes.

 9              THE COURT:  Right.  That's not the precise word, but

10    right.  You're not looking for, you know, emails that are

11    hosted by a third party.

12              MR. COLUMBUS:  That's right.

13              THE COURT:  But you are looking for internal

14    Salesforce emails, to the extent they exist, about those

15    reports.

16              MR. COLUMBUS:  As far as --

17              THE COURT:  To the extent they exist.

18              MR. COLUMBUS:  As far as I'm aware, we are.  That is

19    covered by the subpoenas.

20              THE COURT:  Okay.  And then --

21              MR. COLUMBUS:  Yes.  I'm sorry.

22              THE COURT:  And then -- sorry.  No.  Anything --

23              MR. COLUMBUS:  Again, that is -- that is covered --

24    that is -- that is internal to Salesforce.

25              THE COURT:  Right.  Understood.
```

1          And then -- and then 5.

2          MR. COLUMBUS:  5 is communications between Salesforce

3     and the RNC or the Trump campaign regarding the election or the

4     continued use of its platforms or any of the topics above.  So

5     that -- that is emails back and forth.

6          THE COURT:  Okay.  All right.  So in various ways,

7     the record reflects a narrowing of your requests over time.

8     And I'll just pose the same question to you that I posed to

9     Mr. Murray, which is:  Look, you know, either -- either through

10    a letter from Representative Thompson or other -- in other

11    ways, you-all -- and you've represented here today, you're

12    looking for certain things, not looking for other things.  Do

13    you -- I assume -- is it your position that, like, to the

14    extent that you made those representations, I should view the

15    matter as, sort of, not one that's in dispute between the

16    parties and one that I don't need to resolve?

17         MR. COLUMBUS:  It's certainly not in dispute between

18    Salesforce.  And -- and I can't speak for what the RNC disputes

19    or not.

20         THE COURT:  Sure.

21         MR. COLUMBUS:  But you certainly can -- can take the

22    committee as -- at its word on that, and Salesforce is -- as --

23    I believe, based upon what they submitted, they are assuming

24    that that is, in fact, what we are asking them to produce.

25         THE COURT:  All right.  So let's go right at, then,

1    the -- the issue that -- we kind of ended with -- on

2    Mr. Murray, the -- putting aside your representations that

3    you're not looking for any, you know, email, other personal --

4    other, you know, personal information of a donor or an email

5    recipient, you still have -- you are looking for information

6    that the RNC is -- I guess the shorthand would be that they

7    consider some of their secret sauce in terms of advancing their

8    political views and the interests of their -- you know, that

9    political party.

10         That's -- you know, I mean, are you-all aware of any

11   other time when Congress has asked for that kind of

12   information?  Look, I'm not saying this -- this may or may not

13   make a difference as far as what the law requires.  I get that.

14   So just put that aside for a moment.

15         It's still an extraordinary kind of request for

16   information, you know, frankly, just given the politics of the

17   situation.  Where one -- I mean, it is a congressional

18   committee.  You represent a congressional committee.  I

19   understand that.  It's -- it's still one that is mostly staffed

20   by one political party that would be receiving the

21   information -- again, using that phrase -- sort of the secret

22   sauce of another political party.  That's pretty unusual.

23         Do you think that has -- I mean, how should that factor

24   into the way -- or does it have any -- first of all, do you

25   agree it's almost unusual to the point of being unprecedented?

1    And two, do you think that -- do you think that does have any

2    impact on the way the law applies here?

3              MR. COLUMBUS:  We certainly agree that it's unusual.

4    And I can't, off the top of our head -- my head, think of a

5    precedent that would be comparable.  On the other side,

6    however -- and I think you know what I'm about to say -- it's

7    equally unusual for a political party to try to fundraise,

8    hand and glove, with a presidential candidate after the

9    presidential election based on the theory that the election was

10   stolen when they're -- they've uncovered zero evidence in

11   support of that, where the President has -- the candidate has

12   lost every single effort to try to challenge the election, and

13   when the eventual outcome of all this was an unprecedented

14   attack on the Capitol that led to deaths and destruction.  So

15   unprecedented events cause -- call for unprecedented

16   investigations.

17             THE COURT:  Let me ask you about your threshold

18   argument about Speech or Debate.  Is it -- so I'm amazed that

19   the -- this sort of procedural posture -- I don't want -- that

20   the procedural posture of the case can matter so much in terms

21   of Speech and Debate -- Speech or Debate.  Is it the House's

22   view that if the RNC had from the outset only sued Salesforce,

23   that speech -- and even if the House intervened at some point,

24   that Speech or Debate would not apply?

25             MR. COLUMBUS:  In that case, it would be very similar

1      to *Mazars* and the posture.

2                  THE COURT:  Right.

3                  MR. COLUMBUS:  And Speech or Debate was not at issue

4      in that case.

5                  THE COURT:  It wasn't -- the House did not assert it?

6                  MR. COLUMBUS:  Correct.

7                  THE COURT:  All right.  And is it the

8      committee's position that Speech or Debate -- given the posture

9      here, that Speech or Debate bars the entire lawsuit, not just

10     the claims against the House?  And not just -- not just the

11     claims against the House, and not just claims for preliminary

12     injunctive relief; that it's -- A, it goes to the whole suit,

13     not just the motion, and, B, that it goes to the whole suit;

14     meaning, the whole suit to include any claims against

15     Salesforce?

16                 MR. COLUMBUS:  Our position is that it bars only

17     claims against the House.

18                 THE COURT:  Only claims against the House.

19                 MR. COLUMBUS:  (Nods head.)

20                 THE COURT:  So if I dismiss -- I'm only dismissing --

21     I'm not dismissing the whole lawsuit.  I'm only dismissing

22     claims against the House?

23                 MR. COLUMBUS:  We would -- we would hope you would

24     dismiss the whole lawsuit --

25                 THE COURT:  I understand.

84

1          MR. COLUMBUS:  -- of course.

2          THE COURT:  But -- but your -- your immunity argument

3     is only as to the claims against the House?

4          MR. COLUMBUS:  Yes.  That is correct.

5          THE COURT:  All right.  So let's return to, sort of,

6     the issue of legitimate legislative purpose that I kind of --

7          MR. COLUMBUS:  Yes.

8          THE COURT:  The way I -- you know, I want to make

9     sure I -- I -- we're on the same page about this.  I don't

10    know if you recall the way I laid it out to the -- to

11    Mr. Murray, but the way I kind of see it is a, kind of, you

12    know, three-tiered -- a kind of three-tiered approach.  And

13    maybe -- maybe you-all -- I think like him -- might think that

14    Steps 2 and 3 kind of merge together a little bit, but.  So I

15    looked to whether the committee itself has a legitimate

16    legislative purpose.  I think we're in agreement that -- that

17    is -- that that is foreclosed and has already been decided by

18    the circuit.

19         Then I look to whether the subpoena has a legitimate

20    legislative purpose.  And in doing that, it seems to me the

21    question is whether I just, sort of, look at the subpoena at a

22    high level or look at it in terms of -- kind of at a more

23    granular level; whether I try to look at each particular

24    document that might be requested by the subpoena, sort of say

25    does that have a legitimate legislative purpose -- does that

1    have a legitimate legislative purpose?  As I see it, I look to

2    the subpoena at some slightly higher level of generality.  Is

3    that what you-all agree?

4              MR. COLUMBUS:  Yes.

5              THE COURT:  Okay.  And so let me follow up for a

6    moment on your answer before.  So if I were to dismiss the case

7    against the House -- or the committee, how would that -- I

8    mean, I would still have claims pending against Salesforce.

9    And why would that mean -- and I -- would that mean that I

10   would still -- if I found -- if I found that the RNC had a --

11   more than -- if I'm going to resolve the case itself, if I

12   found that they -- well, if I found that they -- if I found for

13   them on the other claims, the claims against Salesforce, then

14   the committee would not get the documents that it's -- it's

15   requesting; isn't that fair?

16             MR. COLUMBUS:  Meaning if you -- if you enjoined --

17             THE COURT:  If I enjoined Salesforce; correct.

18             MR. COLUMBUS:  Yes.

19             THE COURT:  Okay.  But your position is the -- that

20   nothing in the Speech or Debate clause does not foreclose that

21   path for me?

22             MR. COLUMBUS:  Correct.

23             THE COURT:  I'm not trying to prejudge the issues.

24             MR. COLUMBUS:  Of course.  I understand.

25             THE COURT:  I'm just trying to procedurally

1    understand what you're -- what you're -- what you're telling me

2    as far as what you think the Speech or Debate immunity does in

3    this case and how it affects it.

4              MR. COLUMBUS:  That's correct.  The entry could

5    still -- the injunction could still run against Salesforce.

6              THE COURT:  Against Salesforce?

7              MR. COLUMBUS:  Yes.

8              THE COURT:  Okay.  Let me ask -- and let me ask then

9    my catchall question.  What do you think I'm missing that --

10   what haven't we discussed that you think is important enough

11   that you want to make sure I don't miss it?

12             MR. COLUMBUS:  Let me look through.  I guess -- would

13   it be appropriate to respond to things?

14             THE COURT:  Well, I'll give you the chance to do that

15   after I -- I give them a chance, but I just thought -- I

16   thought if there's something we haven't covered in -- that

17   you -- an affirmative point that you want to make, I would give

18   you the option first to, kind of, address -- address that.  But

19   I'm going to give you-all a -- I'm going give them a chance to

20   respond.

21             But however you want to do it.  I just -- whether there

22   was anything affirmative you wanted to mention that we haven't

23   gotten to or, I suppose, if there's something Mr. Murray --

24   yeah, it might be easier to do it that way.  If you want to

25   respond to something he said, please go ahead.

1          MR. COLUMBUS:  I'm looking for my sticky notes, which

2     have vanished into the binder somewhere.

3          I'll start by going through the comments, some things

4     regarding Mr. Murray.

5          Regarding the narrowing of the subpoena, I would just

6     note that there's nothing -- nothing unique about what we would

7     say would be clarifying the scope of the subpoena in this case

8     and -- and making clear to Salesforce that we are not, in fact,

9     seeking things that they read the subpoenas possibly seeking.

10    And with regard to that, actually, Salesforce did have some

11    concerns about the Stored Communications Act.

12          And I would like to point out, actually, a place in our

13    brief where we incorrectly cited what we were seeking.  Page 38

14    of our brief, we said that we were seeking, among other things,

15    the subject lines of emails.  We are not, in fact, seeking

16    those.

17          THE COURT:  Okay.  Page -- I'm sorry.

18          MR. COLUMBUS:  38 of our brief.  It refers to the

19    subject of the email, and we are not seeking that.  In the

20    fifth line from the bottom.

21          THE COURT:  Page 38 by the count of -- at the bottom

22    of the page or the --

23          MR. COLUMBUS:  Yes, five lines from the bottom.

24          THE COURT:  Okay.  Very well.

25          MR. COLUMBUS:  Regarding the legitimate legislative

1    purpose of the subpoena, the H. Res. 503 charges the Select

2    Committee with investigating the facts, circumstances, and

3    causes of January 6th, with an eye to proposing corrective

4    action, including legislation.  One obvious cause of

5    January 6th was the fact that a mass of extremely angry people

6    descended on Washington, D.C., because they were furious about

7    what they believed was an election -- what they falsely

8    believed was an election stolen.  And some of those people went

9    on to storm the Capitol.

10           Now, it's certainly within the remit of the Select

11   Committee to figure out why that happened.  And one possible

12   reason is that the Trump campaign, who's the beneficiary of --

13   of all this -- Mr. Trump hoped to be the beneficiary of all

14   this -- was sending out tons of inflammatory emails via an

15   agreement with the RNC, in order to rile people up.  And the

16   Select Committee is certainly justified in figuring out the

17   extent to which that contributed to the mass of unjustified

18   anger, people believing lies that they have been told, and some

19   of them coming to Washington and some of them then going on to

20   storm the Capitol.

21           We don't think that we need to tie it necessarily to

22   legislation that could come from each specific factor.  We

23   think that it's -- you can't even get to legislation before you

24   look at what the cause -- what the causes were of the event.

25   But even if for some reason we did happen to tie it to specific

1    legislation, one could imagine -- for example, looking at the

2    time period between the election and January 6th, and if you

3    found that there was a kind of cumulative effect of all these

4    angry emails, perhaps suggesting that we move much closer to

5    the day when the Electoral College meets so there isn't, kind

6    of, an attempt to rile people up in quite the same way.

7         One could imagine looking at, for example, laws

8    requiring email solicitations to -- not to mislead people in

9    what their money is going to be used for.  We suspect that some

10   of the funds that were being raised for, quote, an election

11   defense fund were not actually going to that purpose.  And

12   whether or not these laws make sense could come from -- could

13   be influenced by the information that is received as produced

14   in response to the subpoena.

15        I don't have any personal knowledge of whether, in fact,

16   the Select Committee is looking at these laws, but these are

17   certainly laws that could possibly come out of something like

18   that.  But, again, we don't believe that one even needs to

19   identify specific legislation in order to find that the

20   subpoena furthers a legitimate legislative purpose because the

21   subpoena is targeted to finding out -- looking at the causes

22   of -- of January 6th.

23        The -- Mr. Murray mentioned, correctly, that the

24   committee is -- Select Committee is not allowed to do markups.

25   That does not in any way limit the ability of other committees

1    to perform markups based upon the information made public by

2    the Select Committee, which is charged with producing a final

3    report in H. Res. 503.  So we don't believe that argument holds

4    any merit at all.

5         There's talk about whether this information will be the,

6    quote, secret sauce, as Mr. Murray puts it.  Somehow --

7         THE COURT:  I may have put it that way.  I'm not

8    sure.

9         MR. MURRAY:  I'll have to give you credit,

10   Your Honor.

11        MR. COLUMBUS:  This is not -- Mr. Murray suggested,

12   somewhat surprisingly, that this is the real motivation behind

13   the subpoena.  I do not believe that is a correct statement.  I

14   don't think that the members of the committee have any interest

15   in basically ferreting out the information and handing it off

16   to the DNC or some other adversary plaintiff.

17        As we noted in page 43 of our brief, the *Exxon* case in

18   the D.C. Circuit says that courts must presume congressional

19   committees will exercise their powers responsibly and with due

20   regard for the rights of affected parties.  So I think the

21   Select Committee is entitled to a little bit of a presumption

22   of regularity in that regard.  This is, by no means, the only

23   type of secret sauce information that gets into the hands of

24   Congress.  And I do recognize that it is unusual for it to

25   involve a political committee.  And that's, again, because --

1    as I said already, because of the unusual nature of the event

2    that transpired and the role of that committee in working with

3    Mr. Trump to -- to peddle falsehoods to its recipients.

4          In cases such as *Bonta* and the *NAACP* case, compel

5    disclosure cases, that in many ways the -- are cited here as

6    rationales in favor of plaintiff's argument, it's a very

7    different class of disclosures.  And -- and Mr. Murray

8    mentioned in *Bonta* the harm was the disclosure.  That was a

9    disclosure of donors.  It is a disclosure of -- of individuals

10   who had hoped to remain private and were being forced by the

11   State of California to provide information to the state.  And

12   that's very different from the information that is -- is at

13   issue here.  To the extent there's competitive harm, loss of

14   consumer goodwill, those are remediable by -- in the due course

15   of litigation by -- financially.

16         Mr. Murray also said that the *AFL-CIO* case is the one

17   that's closest to this case.  The materials sought here are

18   very different from the materials sought in that case.  In that

19   case, the FEC's regulation would have required the release of

20   detailed descriptions of training programs; member mobilization

21   campaigns; pulling data of state-by-state strategies; names of

22   hundreds of volunteers, members, and employees; and extensive

23   interference with political groups and trolling operations and

24   their effectiveness.  And that is really a far cry from what I

25   believe is the only issue here, which is the audience

1    segmentation work that is being done by the RNC and that could

2    be revealed by the production.  The way they segment their

3    audience and the way they send out emails at certain times or

4    certain days in conjunction with that segmentation.

5         Mr. Murray mentioned that there were four metrics used,

6    disclosure themselves, to be a First Amendment harm.  That is

7    not something that was in his brief or the declarations, if --

8    unless I missed it or in the declarations of Mr. -- I believe

9    it was Mr. Schneider [sic], their chief data officer.  So I was

10   a little surprised to hear that mentioned.

11        Mr. Murray mentioned that we did not -- the subpoena

12   came as a surprise to them because it was sent to Salesforce.

13   The subpoena, of course, was -- was sent to Salesforce.  I do

14   not believe there was any discussion to -- with the RNC

15   beforehand, but at the same time, this -- this -- we had not

16   heard anything from them about their objecting to the subpoena

17   at all before their filing of this lawsuit.

18        Regarding the -- let's see.  I think the argument that

19   the committee's improperly constituted, I believe Your Honor

20   kind of -- kind of hit the nail on the head when you suggested

21   that it was not something that courts tend to weigh in on.  And

22   the *Rostenkowski* case says that under the rulemaking clause

23   they -- under the rulemaking clause of the Constitution, a

24   sufficiently ambiguous House rule is nonjusticiable.  To the

25   extent that there is doubt that the use of "shall" in this

1    context refers to having -- refers to something more akin to

2    "may" as the Supreme Court has suggested happens in the

3    *Gutierrez* case.  To the extent there is any ambiguity there,

4    the Court should refrain from -- from addressing it.

5         It seems to be kind of odd to suggest that the committee

6    would be fine if -- if Speaker Pelosi named four other members

7    to it, but with nine members, it somehow is not.  And the

8    shall/may distinction, I think, is -- the manner in which

9    "shall" can be used as "may" is one example of that

10   hypothetical.  If the resolution had said the committee shall

11   issue document subpoenas and deposition subpoenas, let's say

12   the chairman said, ah, you know, depositions are a waste of

13   time.  I'm not going to do any and just issue document

14   subpoenas.  The recipient of such a document subpoena would not

15   find much success in challenging it on the grounds that the

16   committee has not been also issuing deposition subpoenas, even

17   though my hypothetical resolution said that it shall issue

18   deposition subpoenas.

19        I would further note that the RNC has been cooperating

20   with the -- as they've noted in their brief, there's some

21   instances in which the RNC has been cooperating with the

22   Select Committee, which would be rather odd if they thought it

23   was an illegal entity from the very start.  Ms. Cheney is

24   clearly the ranking minority member.  Mr. Murray correctly

25   notes that the deposition rules require the chair to consult

1    with the -- the ranking member prior to issuing a deposition

2    subpoena.

3         We didn't mention this specifically in our brief, which

4    we didn't actually note they were also challenging the

5    deposition, but upon further review, we noticed that in their

6    conclusion they did, in fact, mention the deposition.  But as

7    we've noted in other briefs -- in fact, coincidentally, the

8    brief that they attached to their amended complaint in the

9    *Flynn* case, clearly, the vice chair is the ranking minority

10   member.  She is a member of the minority party, and she was the

11   first such member appointed to the -- to the committee.

12        THE COURT:  Mr. Sommer [sic], I think I understand

13   the committee's arguments on these points.  I must say, as I'm

14   sitting here, I'm trying to think through -- I think our time

15   is better spent on this question.  How do I put this?  The --

16   the committee wanted me to expedite resolving this case on the

17   merits.

18        MR. COLUMBUS:  Uh-huh.

19        THE COURT:  As is common in -- in a PI case.  And --

20   and I think it makes sense to do that.  But what is the -- I

21   had assumed that the -- let's put it this way:  Before I get to

22   the next -- the first question I had to decide was the Speech

23   or Debate question.  And, you know, depending on that,

24   obviously, if I -- if I resolved it in the committee's favor,

25   that could -- that -- I had assumed that would resolve the case

1     and that's why the committee wanted me to act in that way.

2         But now I -- I mean, given your -- the committee's

3     position that, in fact, it doesn't resolve the case and there

4     would be outstanding claims against Salesforce, I -- in order

5     for me to give you what you want, I think I have to resolve

6     those claims against Salesforce as well.

7         Now, it may be that -- I don't know what -- and -- and

8     we are here.  I have all your briefs.  I don't have anything

9     from them about what their views, one way or the other, are on

10    the merits of the claims against them in this suit.  So do I --

11    if -- if I'm going to do as you asked in the -- in your -- in

12    the follow-up in your briefing, don't I have to give them the

13    opportunity to respond to the substance?

14        And I know -- I know Salesforce did file something that

15    said, essentially, they take no position on these matters and

16    maybe that will be -- maybe there's nothing more for them to

17    say.  But as of right now, I don't -- if I'm going to resolve

18    this suit so that it's appealable one way or the other -- I

19    mean, obviously, if -- if your position is that Speech or

20    Debate takes care of you-all, that's fine, but that doesn't

21    necessari- -- well, that alone doesn't resolve the entire case.

22        And for me to be able to give you that -- for me to be

23    able to definitively one way or the other give the

24    plaintiffs -- either give them relief or deny them relief, I

25    have to resolve those claims against Salesforce then too, don't

1      I?

2                  MR. COLUMBUS:  Yes.  That's why we briefed the

3      merits, which apply equally to claims against us and claims

4      against Salesforce.

5                  THE COURT:  Right.  So you think the merits -- I

6      mean, again, they -- they've said they take no -- again, I'm

7      looking at their -- at what they submitted.  I think they say

8      they take no -- well, I didn't read it carefully for this

9      purpose.

10                 MR. COLUMBUS:  I have it here, actually.  It says,

11     "For its own part Salesforce takes no position on the

12     merits" --

13                 THE COURT:  Okay.

14                 MR. COLUMBUS:  -- "of the RNC's constitutional or

15     statutory arguments or whether preliminary injunction is

16     warranted."

17                 THE COURT:  All right.

18                 MR. COLUMBUS:  And obviously they're here so in

19     case --

20                 THE COURT:  Right.  No.  I'm going to ask them the

21     question.  I mean, I hear what you're saying.  I hadn't -- it's

22     not -- I hadn't -- I hadn't thought things would proceed in

23     this way, which is fine.  That's why we have hearings; right?

24     And that's why we have argument.  But I do have to -- in order

25     to resolve the merits, I think I do have to resolve all the

1    claims, including the claims against Salesforce.  You agree?

2              MR. COLUMBUS:  Yes.  And we don't believe that

3    those -- we believe that those claims do not raise any

4    additional issues separate from the claims against us, which

5    are fully briefed.

6              THE COURT:  Right.  Well, but they're -- for example,

7    I mean, to the extent there's, you know, Fourth Amendment --

8    just to take one of the claims; right?  To the extent there's a

9    Fourth Amendment claim, whether that -- whether that applies --

10   how that applies to the committee versus how it applies to a

11   third party is different.

12             Now, I understand -- and your position is that in any

13   event, it is -- it is something that you think is not

14   meritorious.  I get it.  But it's a different posture, you

15   would agree?

16             MR. COLUMBUS:  It -- I mean, depending on how one

17   interprets the law, it may or may not lead to different

18   outcomes.

19             THE COURT:  Right.  Okay.  Fair -- fair enough.  Fair

20   enough.

21             Is there anything else?  I -- I understand your

22   arguments about the committee and how it was -- and how it was

23   constituted.  I understand -- I don't -- I don't need to hear

24   from you on it.  I do understand it.  It's just -- you know,

25   again, I hadn't thought of how your argument in your -- in your

1    papers was, again, largely that because of Speech or Debate,

2    courts don't weigh in -- you know, that there's a lot of

3    deference given and courts are very reluctant to tell the House

4    one way or the other, gee, this committee isn't properly

5    constituted or, gee, there's no legislative purpose here.  I

6    guess I'm just not -- had not thought about at all how those

7    arguments apply to Salesforce.

8          Now, maybe they don't apply at all, but, certainly,

9    the -- for example, in *Mazars*, the -- the courts considered,

10   for example, whether there was a legislative purpose or not in

11   resolving those claims.  So I just hadn't thought about it,

12   and -- and I haven't thought about it.

13         MR. COLUMBUS:  And the ways in which the -- I mean,

14   to the extent one has to kind of break through these procedural

15   hurdles to give relief against Salesforce, these

16   Congress-specific doctrines still apply.  Not Speech or Debate

17   specifically, necessarily, but the rulemaking clause as we've

18   discussed, and just the general notion of separation of powers

19   and -- and deference to Congress's findings, Congress's

20   purposes, and the notion that Congress acts with a presumption

21   of regularity.

22         THE COURT:  Okay.  Understood.

23         Mr. Letter, do you want to get a word in edgewise?

24         MR. LETTER:  If I may.  If Mr. Columbus is finished

25   only.

1          THE COURT:  Thank you, Mr. Columbus.  I appreciate

2     it.

3          MR. LETTER:  Your Honor, I just want to make two

4     brief points in addition to -- you know, what Mr. Columbus has

5     said is exactly right.

6          But two things.  To get, first, to the point you just

7     asked, I do want to emphasize, I think what Mr. Columbus said

8     at the end there is extremely important because, obviously,

9     Salesforce can't violate the First Amendment.  Salesforce

10    cannot violate the Fourth Amendment --

11         THE COURT:  Or the Fourth Amendment.

12         MR. LETTER:  -- et cetera.  So if -- we are obviously

13    right about Speech or Debate.  I heard no serious argument from

14    the other side.  I think Mr. Murray would concede that he's got

15    no serious argument.  So once that's -- once the House is

16    dismissed, then what claims are there validly against

17    Salesforce?

18         THE COURT:  Well, that's what I asked him, and he

19    said all of them, which is what he should do right now.  But

20    I --

21         MR. LETTER:  That is what he should do, but you and I

22    both know that Salesforce cannot violate the Fourth Amendment

23    or the First Amendment.

24         As we understand it, Salesforce has said that they wish

25    to comply with the subpoena, and they have been working with

1    the committee.  They wish to comply with the subpoena.

2    Salesforce is saying, we're in the middle here, though.  So if

3    Your Honor issues an injunction against the subpoena, well,

4    okay.

5         But what we're saying -- what we want to emphasize is it

6    would be very strange for Your Honor to issue an injunction

7    against a subpoena through Salesforce since Salesforce cannot

8    violate these constitutional provisions.

9         THE COURT:  That's the constitutional provisions,

10   yes.  Obviously there are other claims.

11        MR. LETTER:  And the Stored Communications Act, as

12   we've said, all the arguments that we made in our brief and

13   Mr. Columbus has pointed out, as far as the Stored

14   Communications Act, yes.

15        THE COURT:  You represented -- just to -- tying a bow

16   on this, you're not -- you are not seeking any materials that

17   would be covered by the Stored Communications Act?

18        MR. LETTER:  That's exact -- and, again, as

19   Mr. Columbus said.  So, yes, are you in a somewhat awkward

20   position?  Yes, you are.  But, in part, that's because of --

21   the -- the framers had a very good reason why they put the

22   Speech or Debate Clause in the Constitution.  And I understand

23   my friend Mr. Murray's consternation and discomfort, but his

24   discomfort and consternation is with the framers of the

25   Constitution, not with Your Honor, not with the D.C. Circuit,

1    not with the Supreme Court.

2            THE COURT:  No.  That's fair.  I mean, it may be,

3    quite candidly, that again -- and, you know, we -- we are where

4    we are here.

5            I'll have to go back -- I'll have to go back and take

6    a look from this prerogative.  You know, the First Amendment,

7    the Fourth Amendment, the other -- well, the Stored

8    Communications Act.  What we're left with is a valid

9    legislative purpose, whether the committee is authorized or

10   unauthorized, and the questions of the subpoena being overly

11   broad and burdensome.

12           MR. LETTER:  Right.

13           THE COURT:  And I guess your point is, look, those

14   are -- well, I don't know if the unauthorized part was a part

15   of it.  But, for example, just to take *Mazars*, that was a case

16   where at least the valid legislative purpose issue was

17   litigated, even though Speech or Debate was not -- was not

18   raised by the House as a shield.

19           MR. LETTER:  Right.  Your Honor, just so you know the

20   background there, the -- originally -- remember, *Mazars*

21   involves, you know, two cases:  *Deutsche Bank* that came from

22   the Second Circuit and -- and *Mazars*.

23           THE COURT:  It's Mazars?  I always pronounce it

24   differently.

25           MR. LETTER:  I --

1        THE COURT:  I don't know whether it was --

2        MR. LETTER:  You know, I was pronouncing it Mazars

3  for a very long time.  And I think it was Columbus who went on

4  the website, and the company actually tells you how to

5  pronounce the name; isn't that right?

6        Yes, the company tells us how to pronounce the name.  So

7  there you go.

8        THE COURT:  All right.

9        MR. LETTER:  The -- but there -- originally, the

10  House was sued, and we contacted President Trump's lawyers

11  and said, you know you can't do that; right?  And they said,

12  yeah, you're probably -- yeah, we know that.  We can read the

13  Constitution.  And so they agreed they would dismiss.  We

14  said we would intervene in order to defend the validity of

15  the subpoena.  And so in *Mazars*, they didn't sue us because

16  they knew they couldn't.  So with -- we exercised the option

17  that is open to the House of Representatives.  We came into the

18  case.

19        Here, as I said, the Speech or Debate -- there's no

20  argument that this is not covered by Speech or Debate.

21        THE COURT:  At least as to your client?

22        MR. LETTER:  Right.  The other points Your Honor

23  made, legislative -- valid legislative purpose, Mr. Murray

24  agreed.  That is also not here because the D.C. Circuit has

25  already decided that.  The --

1      THE COURT:  Well, they -- they -- the committee -- as

2   to the committee, I guess that's right.

3      MR. LETTER:  Yeah.

4      THE COURT:  And their argument is, Judge, you should

5   look to the subpoena to make sure that what is being requested

6   is part of that valid purpose --

7      MR. LETTER:  Right.

8      THE COURT:  -- right?

9      MR. LETTER:  And -- and that's entirely against

10   Supreme Court precedent.  The Supreme Court precedent is

11   absolutely clear that what you look at in Speech or Debate is

12   the nature of the act.  Is it a legislative act?  Because

13   otherwise -- think about it.  The Speech or Debate Clause means

14   nothing if you say, oh, you issued a subpoena or you issued a

15   speech, but I get to look at whether the speech was actually

16   part of the valid part of the legislative function.  And we

17   know the answer to that is, no, you can't.

18      THE COURT:  So your position is I don't look at the

19   content of the subpoena at all --

20      MR. LETTER:  No.

21      THE COURT:  -- to make that decision?

22      MR. LETTER:  No.  You look -- I'm sorry.  When I say

23   "no," I'm agreeing with Your Honor.

24      THE COURT:  Right.  Right.  No, no.  I understand.

25      MR. LETTER:  I'm agreeing exactly with Your Honor.

1    It's the nature -- is -- was the -- was -- what the action that

2    was taken, the nature -- and that's in the Supreme Court

3    decisions.  So the nature of this was a subpoena issued as part

4    of a valid legislative purpose.

5         The overbreadth, et cetera -- the problem with that is

6    this is not a subpoena to the RNC.  Let's be absolutely clear

7    on that.  This is a subpoena to Salesforce for Salesforce's

8    records.  Salesforce has not argued that the subpoena is

9    invalid and has not argued that it's overbroad.

10        THE COURT:  Yes, I'm just --

11        MR. LETTER:  Right.

12        THE COURT:  -- recognizing the import of that now.

13   No.  Right.

14        But that doesn't -- so your -- your point is -- they

15   certainly haven't argued it's invalid.  So your point is that

16   an overbreadth -- the -- the issue of -- let's just say the

17   issue of overbreadth is not something a third party can come in

18   and -- and -- is not a claim a third party can come in and

19   make?

20        MR. LETTER:  It's -- they could -- they could make,

21   maybe, an argument that, for example, if the House said we are

22   criminally prosecuting somebody -- so if it was obvious on its

23   face that it's beyond the power of the House, that would be one

24   thing.

25        THE COURT:  Right.  Well --

1      MR. LETTER:  But otherwise, no, absolutely not.

2   That's not -- we know that.  That -- that is part of Speech or

3   Debate.  And so you can't say, oh, well, I know you gave this

4   speech on the floor of the House, but you violated

5   constitutional rights when you did so.  We know that is totally

6   invalid.  For -- if I may, just for a moment.

7      THE COURT:  No, no, no.  It's okay.

8      MR. LETTER:  I'm sorry.

9      THE COURT:  Go ahead.

10      MR. LETTER:  I argued, you know, in District Court

11   and the D.C. Circuit the *McCarthy* case on Speech or Debate.

12   The argument was what the House is doing was unconstitutional

13   so, obviously, it wasn't valid.  And the D.C. Circuit said, no,

14   no.  It doesn't work that way.

15      We know it doesn't work that way.  So this -- this is

16   not a valid argument that -- that has any --

17      THE COURT:  Right.  But --

18      MR. LETTER:  -- purpose.

19      THE COURT:  -- my point is the issue of the third

20   party.

21      MR. LETTER:  Right.

22      THE COURT:  Does that matter?  In other words, your

23   point is you don't think -- I think the point you were just

24   making was that Salesforce couldn't come in and make those

25   arguments.

1          MR. LETTER:  I don't know how -- I suppose Salesforce

2    could come in and say, you know, this subpoena has -- you're

3    doing an investigation on X and the subpoena is about a

4    100 percent different subject, about which we have no records,

5    or something like that.

6          THE COURT:  Well --

7          MR. LETTER:  But we can come -- you and I can come up

8    with crazy hypotheticals, but that's not this.

9          THE COURT:  Right.

10         MR. LETTER:  So Salesforce has not said --

11         THE COURT:  No.  Right.  But -- and you don't think

12   a third party with -- whose records -- whose -- you know,

13   might have an interest in those records cannot come forward

14   in the same way that the -- that the entity who's subpoenaed

15   can?

16         MR. LETTER:  Exactly, Your Honor.  And, again

17   that's -- that's what Speech or Debate is about.  You can't

18   come in and start saying, gosh, Congress should have done this

19   differently.

20         Now, Your Honor, we know there's different cases

21   when Congress and the executive, for instance, together

22   criminally prosecute somebody.  You've got various cases from

23   the 19- -- primarily from the 1950s, and then there is judicial

24   review.

25         THE COURT:  Yeah.

```
1              MR. LETTER:  But that's not this.

2              THE COURT:  It's very different.

3              MR. LETTER:  Right.

4              THE COURT:  So how is it that -- I mean, I guess to

5     get right to the point, what is the committee's position about

6     how -- if you addressed this in your papers, I'm sorry, but I

7     don't recall it.  And I wouldn't necessarily expect it, but,

8     again, we're in a strange procedural posture here.

9              MR. LETTER:  Yeah.

10             THE COURT:  What is the -- does the committee have

11    a position on how I should resolve the claims against

12    Salesforce?

13             MR. LETTER:  The claims by the RNC?

14             THE COURT:  Correct.

15             MR. LETTER:  As I say, I don't think you're -- we

16    have briefed the merits.

17             THE COURT:  They're not -- they're not -- I can't

18    resolve them -- what I -- what I -- what I'm confused about

19    is based on what you just said a moment ago, it -- it

20    suggested to me that you think the speech and -- the Speech or

21    Debate Clause has some role in resolving claims against

22    Salesforce.

23             MR. LETTER:  I think it --

24             THE COURT:  And I thought your -- I thought what

25    you-all said a moment ago is you thought it didn't, but I want
```

1      to make sure I understand your position on this.

2               MR. LETTER:  Your Honor, I believe that it influences

3      here, just as -- as Mr. Columbus said, the -- the rules clause

4      of the Constitution tells you -- and, again, the -- the

5      precedent is 100 percent on our side -- you -- you are not to

6      be writing the rules of the House, so --

7               THE COURT:  But those are other constitutional --

8      separation of powers-related doctrines, which I get, but

9      they're not the Speech or Debate Clause.

10              MR. LETTER:  You're right, Your Honor, but they're --

11     they're the same.  Again, Salesforce has no -- it's -- the

12     separation of powers has nothing to do with Salesforce.  The

13     rules clause has nothing to do with Salesforce.

14          They do have to do with you.  You know the separation of

15     powers tells you as a judge what you can do and not do.  And

16     the separation of powers tells you your power to supervise

17     Congress is extremely limited.  So you -- you know that.  And

18     so it really -- if Salesforce were going to argue some -- some

19     of these -- make some of these arguments, maybe this would be a

20     different case, but they're not.

21          And so for the RNC to come in here and say to you, we

22     want you to override the clause, we want you to override

23     separation of powers --

24              THE COURT:  Sure.

25              MR. LETTER:  -- that's -- that puts you in an

1    extremely awkward and inappropriate position.

2              THE COURT:  But -- okay.  To summarize, though,

3    that's -- you know, I think my entire job is being put in

4    awkward and difficult positions.

5              The -- the -- the -- your point is, though -- tell me

6    what you think -- the Speech or Debate Clause, how that affects

7    my resolution of claims against Salesforce.  In other words,

8    are you saying I should rely only on those other doctrines that

9    you mentioned, separation of powers doctrines, that play a role

10   in my resolution of those claims, but not Speech or Debate,

11   or -- or does Speech or Debate play a role in how you would

12   suggest I resolve those claims?

13             MR. LETTER:  Your Honor, I -- I know judges hate it

14   when I say this, but I'll do that anyway.  That's a very good

15   question.  And you're supposed to say, well, I know it is,

16   Mr. Letter.  That's why I asked it.

17             The Speech or Debate Clause is also tied in with

18   separation of powers because, as we know, it's a limitation on

19   the courts and the executive on what they can do with Congress.

20   So it seems to me they do tie together.  Does it mean that you

21   dismiss the case against Salesforce on Speech or Debate?  No.

22   And so Mr. Columbus was exactly right on that.

23             But what it does mean is, I -- I believe it influences

24   you, then, in how you look at these claims.  And let me give

25   you one example.  The *Hearst v. Black*, the D.C. Circuit held --

1    long time ago, but it's still you know, precedent.  The

2    D.C. Circuit cites it all the time.

3            THE COURT:  The parties cited cases from 1808, so --

4    or -- yeah.

5            MR. LETTER:  I once was in court, I heard

6    Judge Silberman yell at -- Silberman yell at somebody who

7    was -- somebody -- the other side was citing, like, an 1830

8    case, you know.  The other side said, that's really old.  And

9    Judge Silberman said, I'm really old.  So what.

10           So the *Hearst v. Black*, the D.C. Circuit said they

11   couldn't order Congress not to look at material and not -- and

12   to return it.  And the D.C. Circuit analyzed that in terms of

13   separation of powers.  But the D.C. Circuit more recently has

14   talked about *Hearst v. Black* as tied in with Speech or Debate.

15   So I guess what I'm saying is I think these interlock, and they

16   do then -- they have to influence you and what -- how you are

17   going to look at these issues, but -- but I'll --

18           THE COURT:  So even though -- let me try to summarize

19   it.  So even though Speech or Debate -- the Speech or Debate

20   Clause does not, obviously -- does not immunize or provide a

21   basis -- sort of the way for me to dismiss claims against

22   Salesforce the way it does against your client, it's part of a

23   broader set of -- a broader set of separation of powers

24   doctrines that you think, you know, I have to take into

25   consideration to resolve those claims.

1          MR. LETTER:  I -- I think you just said it exactly

2     right.  They -- they have to very seriously influence you

3     unless you're going to, you know, say something like, you know,

4     I always did want to run Congress and so --

5          THE COURT:  Right.  And so are there any cases that

6     you know of in which the kind of analysis you're describing

7     right now a court undertook?

8          MR. LETTER:  I'm not aware, Your Honor, because I

9     think this is something that's only coming up quite recently,

10    frankly.  You know, things like the *Mazars* case, you know.

11    Obviously, there -- one of the things the Supreme Court pointed

12    out is this hasn't happened before, to which my answer was,

13    yeah, it hasn't happened before because no President before has

14    done before what then-President Trump did.

15         So -- so I'm not aware, Your Honor, of cases, but I do

16    think the D.C. Circuit's way of treating *Hearst v. Black* in

17    combo- -- as -- in combination with Speech or Debate is -- they

18    do lock -- heavily influence each other.

19         And just one last point -- and thank you, Your Honor,

20    for your -- your strong patience.  You asked if you rule in

21    favor of the House here, you know, what next.  If you rule in

22    favor of the House, our strong position is then the documents

23    should be disclosed to us in -- by Salesforce, which is not

24    fighting our subpoena immediately.  If --

25         THE COURT:  But let me pause you there for a moment.

```
1    But I do have to resolve -- I mean, I can't -- it doesn't
2    seem to me that I get there unless I also resolve the claims
3    against Salesforce.  I mean, right?  I have to resolve all of
4    it?
5              MR. LETTER:  Yes, Your Honor.
6              THE COURT:  Okay.
7              MR. LETTER:  Yes, Your Honor.  If the -- as I think
8    Mr. Murray recognized -- although he called it a stay.  It's
9    not -- it wouldn't -- I think you corrected it.  It's not a
10   stay.  He would need to get an injunction pending appeal.
11   There's -- there's a lot that has to go into getting an
12   injunction.
13        That's what Judge Boasberg was saying to Mr. Budowich
14   the other day.  So they would have to convince you to issue an
15   injunction pending appeal or an administrative --
16             THE COURT:  Right.
17             MR. LETTER:  -- injunction, as you yourself are,
18   obviously, very familiar with.
19        So that is something, obviously, I think, you would have
20   jurisdiction to do that; to say, I'm going to give you, you
21   know, two days to go to the D.C. Circuit or something or like.
22        But, again, our position -- I just want to be absolutely
23   firm.  Our position is if you rule in our favor, we should get
24   the documents.  If they wish to immediately seek an injunction
25   pending appeal, we think you have authority to rule on that.
```

1    You could grant it.  We would urge you to deny it, but that's

2    something that we think would be within your power to consider

3    and to grant.

4        If you do grant it, we would hope that it would be a

5    very limited administrative injunction so that they could go to

6    the D.C. Circuit to try to get an injunction pending appeal.

7    And the only -- I can give you -- the best example of that

8    recently is the *Trump v. Thompson* when -- when -- trying to

9    keep the Archives from disclosing material.  And there, the --

10   the District Court ruled in our favor, the D.C. Circuit ruled

11   in our favor.  What that meant was -- the D.C. Circuit gave,

12   then, Mr. Trump a short amount of time to try to get an

13   injunction pending appeal -- pending cert from the

14   Supreme Court.  And the matter was then very, very, very, very,

15   rapidly -- I personally know how rapidly it was.  And the

16   Supreme Court denied that.  So that's --

17        THE COURT:  And it was an administrative stay then

18   probably; right?

19        MR. LETTER:  I'm fairly sure that's what the court

20   called it, which I think they used the word administration.

21        THE COURT:  I mean, it's just an odd posture because,

22   like I said, I can't -- there's nothing -- I wouldn't have --

23   there's -- there isn't an order of mine to stay.  So --

24        MR. LETTER:  Right.

25        THE COURT:  You know, anyway --

114

```
1           MR. LETTER:  That's why it's not a stay.  It's an
2    injunction pending appeal or an injunction pending cert.
3    That's right.  With -- with -- again, as Judge Boasberg noticed
4    and the Supreme Court, clearly, was aware of.
5           THE COURT:  Right.
6           MR. LETTER:  That's a very high standard.
7           THE COURT:  Right.  Right.  Which is why it's -- you
8    know -- okay.  I -- I understand -- I understand your position.
9           MR. LETTER:  Thank you very much.  I appreciate
10   your --
11          THE COURT:  No, no.  I mean, I feel like we -- I
12   haven't had a PI come in like this where I feel like I didn't
13   understand the full contours of this until -- until, you know,
14   late in the day here.
15          MR. LETTER:  And Mr. Columbus and I didn't mean to
16   tag team you.
17          THE COURT:  No, that's -- that's quite all right.
18          MR. LETTER:  Thank you, Your Honor.
19          THE COURT:  Let me hear from -- all right.
20          THE COURT REPORTER:  I need a break.
21          THE COURT:  You know what?  I apologize.  I normally
22   have -- our court reporter today is not my normal court
23   reporter.  My normal court reporter would have kicked me under
24   the bench really hard probably about an hour ago.
25          I recognize that it is 4:42 on a Friday right now.  I'm
```

1    going to give the court reporter a -- I have to give her -- how

2    long.

3                 THE COURT REPORTER:  Ten minutes.

4                 THE COURT:  All right.  I'm going to give her

5    ten minutes.  I'll come back.  I'll hear from Salesforce about

6    some matters.  I certainly will hear from you again,

7    Mr. Murray, briefly.

8         If we have to -- if we have to -- if we have to come

9    back and finish this up another day, we -- we will.  But let me

10   give her that ten minutes and be back in ten.

11                (Recess taken.)

12                MR. SOMMER:  Good evening, Your Honor.  It's been a

13   while.  I'm Jacob Sommer for Salesforce.

14                THE COURT:  Mr. Sommer, welcome.

15        And let me apologize.  I think -- I think I realized I

16   called Mr. Columbus your name a moment ago.  So I apologize for

17   that to you, sir.

18        In any event, why don't -- why don't I hear from you,

19   sir, on -- well, part -- what I had planned to ask you about

20   was the details of what you think you're producing -- what --

21   what -- whether you can corroborate, I suppose, what I heard

22   from House counsel about what you're preparing to produce.  I

23   think you had indicated that you were waiting to see what my

24   decision would be, but in the meantime, you were preparing to

25   comply with the subpoena and -- and to make sure that at least

1      we're on the same page about what is at issue.  So if you could

2      address that, number one.

3              And, then, number two, again, I -- I don't want to --

4      again, we're at 5 o'clock here, and I know I have court staff

5      that sometimes need to be places.  And there may not be enough

6      time to address all of this as we'd like to here today.  But I

7      think it would, I guess in a preliminary way, make sense for

8      you to address whether Salesforce has any position, I would

9      guess -- just put it that way -- about the claims against them.

10             Because, again, just for everyone's benefit, the way the

11     briefing on this came in to me made -- suggested to me that the

12     claims against the House and against your client would, sort

13     of, rise and fall together in some ways on the issue of the

14     Speech and Debate -- Speech or Debate Clause and its direct

15     effects.

16             I think now what I know is that that's -- I understand

17     the committee's position is that these are not meritorious

18     claims against your client, and maybe they aren't, but it's not

19     quite the -- exactly the same analysis that I have to go

20     through, I don't think.  And so, you know, we may have to

21     regroup early next week.  And I'll talk to the parties about

22     getting additional briefing on that point, if I think I need

23     it, because, again, it's just not something that I think the

24     parties really covered.

25             So with all of that, let me stop talking and hand it

1    over to you.

2              MR. SOMMER:  Well, I'll resist the temptation to

3    start with Issue 2, the lawyers' -- the lawyers' issue, and go

4    to what we were planning to produce.

5              I will corroborate, we have had productive discussions

6    with the committee.  To be very clear, Salesforce is not

7    intending to produce any documents beyond that narrative scope.

8    We're not going to gratuitously give extra documents.  I want

9    to be very clear about that.  I also want to be clear that we

10   are --

11             THE COURT:  When you say the "scope," do you mean the

12   scope that they articulated at today's hearing and that's

13   reflected in the record before me?

14             MR. SOMMER:  Correct, Your Honor.  Their letter to

15   us, the filing, and what they've said today, we're taking all

16   of that into account that we are only going to comply within

17   that scope.

18             I also want to be clear, we do not wish to comply with

19   the subpoena.  It is a subpoena.  We are bound to comply by

20   it -- with it, and we will comply with it pending your order,

21   Your Honor.

22             For the first request, which is the -- all performance

23   metrics and analytics --

24             THE COURT:  Before we get to that, one more quick

25   detail that I realized.

1          MR. SOMMER:  Sure.

2          THE COURT:  So as of right now, I have -- the House

3    agreed to, sort of, give me until the 20th.  So you won't --

4    can you just represent for the record that you're not going to

5    comply with the subpoena at least until that additional time

6    they've given me to try to sort all this out?

7          MR. SOMMER:  We will not comply until after your

8    order.

9          THE COURT:  All right.  Very well.  Continue.

10          MR. SOMMER:  For Request 1, which is the performance

11    metrics and analytics request, we are preparing for production,

12    reports that we have that we sent to the RNC that have

13    information about send rates, bounced rates, opens, open rates,

14    clicks, click rates, and click-to-open rates.  They also have

15    the date the emails were sent.

16          And for message attributes, they would have -- they have

17    a name for the campaigns.  It does not quite match what

18    Mr. Murray said, but there is a name for the campaigns.  That's

19    what we're preparing for the performance metrics and analytics.

20          For the second request, all records related to login

21    sessions, we have logs.  We have logs of login sessions.  They

22    have -- they do identify who logged in by email address, and

23    they have other technical information that I won't go through

24    about the login.

25          THE COURT:  Log in, log out, that kind of thing?

 1          MR. SOMMER:  That kind of thing.

 2          THE COURT:  What about user activity, like what the

 3     person was doing on the system?

 4          MR. SOMMER:  Yes.  The logs are not just log in/log

 5     out.  The level of detail, I can't represent to you.  They're

 6     not small logs.

 7          For the time period for the third and fourth request,

 8     which I think are very related to each other, the analyses, as

 9     we've said to the committee throughout, most of those were

10     conducted by Salesforce's counsel.  And so we will be asserting

11     privilege objections over a large amount of that data.  There

12     is some that does not fall under privilege, mostly related to

13     abuse reports and things.

14          THE COURT:  I'm sorry.  What -- abuse reports?

15          MR. SOMMER:  Yes.  When someone writes in to complain

16     about the email.  When you send a lot of emails, you perhaps

17     have complained about getting emails you didn't want, things

18     like that.

19          THE COURT:  And, again, on that, you're saying a

20     recipient of the email may complain?

21          MR. SOMMER:  Correct.  But we would redact the

22     personal information.  The email address is essentially the

23     personal information.  We would redact that from the

24     production, and my understanding is the committee does not

25     object to that.

1          THE COURT:  All right.  So that's -- how would

2     that -- I see.  You think that falls within 3 and 4 --

3          MR. SOMMER:  It was --

4          THE COURT:  -- in theory?

5          MR. SOMMER:  In theory, yes, Your Honor.

6          Most of the rest is privileged, however, the actual

7     analyses we did, because what action the RNC took -- or

8     Salesforce took with regard to the RNC would, of course,

9     implicate the contract between us and RNC and would need legal

10    counsel.

11         For the fifth request, communications between Salesforce

12    representatives and representatives of the RNC or Trump

13    campaign, I think that's very predictable.  Those are emails

14    between Salesforce and @gop.com email addresses.  There may be

15    some data about the RNC's use of the platform, but those would

16    not come -- contain donor lists, PII about email list

17    recipients.  So that's what we're preparing for production.

18         Obviously, we haven't produced it to the committee.

19    They haven't looked at it in any discovery.  There's going to

20    be a little back and forth after they look at our records and

21    questions about them, but that's what we're planning on

22    producing.

23         And our testimony, we presume, would be related to the

24    documents we've produced, but we have not discussed what

25    witness would show up for testimony because the committee,

1    understandably, needs to look at the document before they tell

2    us what they need more information about.

3          I'm happy to answer any other questions about the

4    documents, unless --

5          THE COURT:  All right.  No.  I mean, I'll just say,

6    just as a summary, so then nothing you're preparing would

7    contain a recipient of fundraising emails, email address, phone

8    number, name, date of birth, giving history, or social security

9    number, or any other kind of PII for that individual?

10         MR. SOMMER:  That is correct, Your Honor.  These are

11   all at an aggregate level.  The report I described is at an

12   aggregate level.

13         THE COURT:  Okay.  All right.  So let's pivot -- I

14   don't have any more questions about that.

15         Let's pivot, I guess, to Question 2.  How -- you know,

16   let me put it this way.  I've been asked to consolidate the --

17   you know, the merits of this case, and I have -- obviously, I

18   have the document you-all have filed.  If -- I don't want to --

19   let me put it this way.  I think the thing I learned today, in

20   summary, is that I do need to -- you know, that the arguments

21   that the House has made about how -- for -- well, to resolve

22   the case in their favor, they have application to -- some

23   application to your client, but they're not -- you're not,

24   obviously, situated precisely the same insofar as they claim

25   that Speech and Debate -- Speech or Debate is a bar to the

1    claims against them, but it doesn't operate in precisely the

2    same way as a bar to the claims against your client.

3         Do you-all plan -- is this -- is this the only

4    substantive response to the motion and to -- and to the claims

5    in the suit that I should expect from you-all?

6         MR. SOMMER:  Yes, Your Honor.  I'm happy to address

7    briefly the claims orally today, but that's all we're planning

8    to file.

9         THE COURT:  All right.  That's -- I mean, if you want

10   to address them, very well.  I'll hear from you.

11        MR. SOMMER:  Very briefly.

12        THE COURT:  Please.

13        MR. SOMMER:  We're somewhat surprised that the

14   claims are against Salesforce.  As a reminder, Salesforce

15   did not issue the subpoena, Salesforce did not constitute

16   a congressional committee, and Salesforce is not turning

17   over SCA-protected material.  In fact, in our objection

18   letter, you'll see we actually objected on the SCA, met

19   and conferred with the committee, and had a productive

20   discussion.

21        And we don't believe any of the material we will

22   be producing -- or would produce, if Your Honor allowed

23   the subpoena to be enforced, would contain SCA-protected

24   material.

25        THE COURT:  You're not producing it, and they, per

1    their representation, are not requesting it?

2              MR. SOMMER:  Correct.  Correct.

3         And Your Honor is correct.  We're a private party.  We

4    can't violate the First or Fourth Amendments.  That's Claims 1

5    and 2.  Claim 3 is no legislative purpose.  Again, we didn't

6    constitute the committee.  Four, no congressional

7    authorization, we -- we are not Congress.

8         Five, too broad, burdensome; I suspect Mr. Murray is

9    going to clarify that argument some when he comes up here.  But

10   we have reached agreement with the committee on, I think, the

11   scope of the production, and we don't have a burdensome

12   argument post our meet and confer.

13        Six, we already talked about the SCA violations.

14        So the RNC may have arguments -- and to be clear, we

15   take no position on whether the RNC's arguments are correct

16   about whether the committee has a legislative purpose or has

17   congressional authorization, but we're -- we're not advancing

18   those same arguments.

19             THE COURT:  Because you don't think you need to?

20             MR. SOMMER:  We don't think we need to.

21             THE COURT:  All right.  Understood.

22        Thank you for being here.  I don't have any further

23   questions.

24             MR. SOMMER:  Thank you, Your Honor.

25             THE COURT:  All right.

1          Mr. Murray, at the -- I'll certainly hear from you

2     briefly.  As I said, I -- you know, again, I haven't had one of

3     these come in where my view of my task changed as much to some

4     degree as I have in this one.  So I'll hear from you.

5          I may -- I think I need to do some more -- go back and

6     look at the briefs through the, sort of, width, particularly

7     Mr. Letter's clarification of how they -- how they think -- at

8     least they believe I should -- and, frankly, Salesforce's views

9     about how I should resolve the case, the claims against

10    Salesforce.

11         But I -- I may give you an opportunity to -- to file

12    something, and maybe them the opportunity to file something

13    additional, just on this.  I hate to -- I hate to do it, but --

14    but it may be that I feel I need it.

15         But do you want to just very briefly kind of sketch out

16    how you think you -- if I were to -- if I were to -- agree that

17    Speech or Debate Clause bars claims against the committee,

18    how -- how you would have a valid -- any of the claims you've

19    advanced, how any of those claims could be valid against

20    Salesforce.

21         MR. MURRAY:  Yes.  Thank you, Your Honor.

22         And I'll just say one more time, I appreciate -- I think

23    probably all of us really appreciate the time that Your Honor

24    has allowed us and, frankly, the patience of court staff

25    relying on us to be here after 5 o'clock on Friday.

1          THE COURT:  I join your sentiment about the court

2     staff.  Thank you, all, for being here.

3          MR. MURRAY:  And I'll say, you know, I am a lawyer

4     and so I hold cocktail hour on a Friday sacred too.  So I

5     really do appreciate it.

6          Your Honor, let's just cut right to the chase.  The idea

7     that Salesforce can't violate the Constitution in this context

8     is just wrong.  *Mazars* -- and thank you.  I did not know

9     that -- that it was not Mazars.  So -- and I didn't bother to

10    Google it.  So I'm sorry.

11         But to my mind, *Mazars* settles this, and I want -- and,

12    again, there the constitutional conflict was between two

13    branches; right?  But, remember what the Supreme Court said --

14    I'm going to go a little further into the quote I gave you -- I

15    don't know -- two days ago, it feels like.

16         It's -- so simply because the subpoenas were issued --

17    sorry -- the separation of powers -- so I'm going to substitute

18    constitutional concerns -- right? -- are no less palpable here

19    simply because the subpoenas were issued to third parties.

20    Congressional demands -- and, again, here it's not the

21    President's information -- for First Amendment-protected

22    information of a major political party present a constitutional

23    conflict no matter where the information is held.  It is, after

24    all -- and the Court says the President's information, I would

25    say, constitutionally protected; right?  Were it otherwise --

1          And this is the important part.  Were it otherwise,

2     Congress could sidestep constitutional requirements -- and here

3     in *Mazars* it says any time a President's information is

4     requested.  Remember, it was a President's private information,

5     not his public information; right?  So Congress could sidestep

6     constitutional requirements -- right? -- any time information

7     is trusted to a third party, which occurs with rapidly

8     increasing frequency.  And it cites to the *Carpenter* case,

9     which cuts back on third-party doctrine; right?

10          Then it continues.  Congress could --

11          THE COURT:  Very limited cutback.

12          MR. MURRAY:  Fair enough.  But I'd say -- so *Jones*

13     was the first crack in the dam.  *Carpenter* is the next one.

14          THE COURT:  No, I -- I'm very familiar with that line

15     of cases.

16          MR. MURRAY:  I can only imagine, Your Honor.

17          So -- which are applicable only in the Fourth Amendment

18     context anyway.

19          THE COURT:  Right.

20          MR. MURRAY:  So, indeed, Congress could declare

21     open season on the President's information -- again, I

22     would say here, constitutionally protected information --

23     held by schools, archives, internet service providers, email

24     plans, and financial institutions.  The Constitution does not

25     tolerate such ready evasion.  It deals with substance, not

1    shadows.

2        Your Honor, if you were to, say, dismiss the

3    congressional defendants -- right? -- which you agree speech --

4    I want to be clear about this.  We don't think Speech and

5    Debate immunity applies because we think there's no legitimate

6    legislative purpose.

7        THE COURT:  Right.

8        MR. MURRAY:  I think Mr. Letter and I have made

9    clear -- and Mr. Columbus.  We've made clear where our swords

10    cross on that; right?

11        THE COURT:  Yeah.  And I -- totally.  And I

12    don't -- you know, I haven't prejudged that, but I feel, like,

13    I have all the information I need to make that decision.

14        MR. MURRAY:  And I'm going to try -- and I'm going to

15    not talk about it again; right?

16        So if you dismiss the Congress on that basis of -- a

17    congressional committee on that basis and you leave Salesforce

18    here but then throw your hands up and say, ah, but they're a

19    private party, they can't violate the Constitution, you're

20    shadow boxing, Your Honor, if you do that.

21        And I would tell you, *Mazars*, I think, settles it, along

22    with *AT&T* II.  And, in fact, I would also say along with

23    *Eastland* because there was open hand-wringing on the court

24    about would -- were -- the bank here; right?  Would -- this

25    would have come up with the bank here; right?  I'll also say --

1   and -- and I really don't -- I don't want to suggest that this

2   is a route to go down because I think it is in this context not

3   applicable; right?

4        But I think also, if you were to say -- because you

5   might be thinking, oh, well, what about state actor doctrine;

6   right?  Look, I think the minute that Salesforce said, well,

7   we're going to comply -- right? -- the -- the nexus between the

8   government action and Congress and what they're doing -- they

9   just told you, we're only going to comply if -- if the Congress

10  requires us to and you don't enjoin us.  They're state actors

11  for that purpose.

12       But, again, I don't think that's the right analysis

13  here, and I don't want to suggest it.  But I just have to say

14  it.  Like, if the Court is thinking along those lines, I think

15  they satisfy state actor test.  So I'll -- so that will be --

16  that's why they can violate -- because the bottom line is if

17  they produce and we're right about our constitutional

18  arguments -- right?  And you may -- you may go through and say,

19  actually, Mr. Murray, I think you're wrong on all of them, no

20  matter who does it.  You're just wrong and it's *Holcombe* and

21  you lose.

22       We disagree with you, but if we're right about our

23  constitutional arguments and they produce those documents, we

24  will have lost constitutional rights forever.  We will be

25  constitutionally injured.  Okay?

1          THE COURT:  Fair enough.

2          MR. MURRAY:  So I -- I will -- so I'll just finish

3    real quickly.  I'm not going to beat a bunch of dead horses,

4    but I just -- I do have to say, I've got to stand up for my

5    client a little bit.  And I understand what Mr. Columbus has to

6    do up here too and argue for his client.  But, look, the -- the

7    congressional defendants relied on a lot of different news

8    articles for a lot of, you know, points about what the

9    committee is doing -- right? -- and why it's okay to be trying

10   to do what they are doing with the Republican National

11   Committee's data and why it's okay to go fishing around for

12   that.

13          And I think Mr. Columbus said, hey, look, like, they're

14   entitled to a presumption, you know, of regularity; right?

15   I've just got to be -- if they can use news articles, I can;

16   right?

17          The committee leaks like a sieve.  And the idea that

18   this data -- right? -- is going to be held in confidence by the

19   members of this committee, I'm sorry, Your Honor.  I was -- you

20   know, I may have been born yesterday, but I didn't fall off the

21   turnip truck.  I know what's going to happen.

22          And I'll just give one example.  It's a recent *New York

23   Times* article.  The headline is Inside January 6th Committee's

24   Investigation of Trump Financial Ties, I think.  And, in short,

25   there's a committee -- somebody who's been briefed on the

1   committee's efforts -- right? -- talking about what the

2   committee is looking into and intending to investigate.  And

3   that happens with congressional committees.  It's just kind of

4   the way Washington works.  But I would say to the extent that

5   there's a presumption of regularity around the confidentiality

6   of these documents, it is rebutted if the Court wants to rely

7   on news articles.

8        The very, very last thing I'll say -- oh, Mr. Columbus

9   made an argument that the information in *AFL-CIO* -- right? --

10  was very different information than the information sought

11  here.  I just say, Your Honor -- and I guess it was.  It was

12  about 27 years ago; right?  The sort of data that was important

13  in the digital operations, they may have just barely existed.

14  And I'll say, if they did exist, the Democratic Party was

15  probably way better at them back at the mid-'90s.  But, look,

16  this is how political -- digital interaction, it's how so much

17  of our society interacts with each other now.

18        Of course, it is going to be critical to a political

19  party's activities.  And, yes, is it -- have they asked for

20  memorandum detailing our digital strategy?  No, they have not

21  asked for that -- right? -- but what they're going to get --

22  and this is the uncontroverted testimony of Mr. Schaeffer in

23  his declarations -- they could write that memorandum if they

24  get this information.

25             THE COURT:  Well, I guess I have to match that up

1    against -- that's -- that's what he has declared.  I also have,

2    now, representations from Salesforce about what they're going

3    to produce.  It's not quite -- I'm not saying -- I think it's

4    not fair to say that what they plan to produce is nothing at

5    all, but it's not quite the memorandum that you -- you know,

6    so -- I -- I don't know.  I'm not suggesting that it's not

7    important and proprietary data to the RNC.  I have no doubt it

8    is.

9              MR. MURRAY:  And I heard what Salesforce --

10             THE COURT:  Or at least, you know, I think the record

11   suggests that.

12             MR. MURRAY:  I apologize, Your Honor.  I should have

13   been patient.

14        I heard what Salesforce represented, but I still have

15   yet to hear any concept of the idea -- right? -- that the

16   Republican National Committee could take a look at this

17   production before it goes out and raise objections in context.

18   It could be -- right? -- that when we look at this stuff, if we

19   get the chance to do that, we say, you know, all right, on

20   balance, so be it; right?  But I doubt it.  But -- but if

21   that's the case, we certainly wouldn't darken your door --

22   right? -- arguing over nothing.

23        But once it goes out, it's gone, whatever is in there.

24   We lost it.  It's gone.  And then Speech or Debate immunity

25   does protect it inside of Congress, and we're -- anyway, you --

1    you get the point, Your Honor.

2             THE COURT:  I do.

3             MR. MURRAY:  And the -- just the -- you know, the

4    final piece I'll say -- I just have to.  Mr. Columbus mentioned

5    why -- why would the RNC send people to go interview --

6    right? -- or allow people to go interview voluntarily with an

7    irregularly composed committee.  Your Honor, that's just

8    practical; right?

9             I mean, the RNC deplores what happened on January 6th;

10   right?  They may think that the committee is irregularly

11   organized, but it exists and it's undertaking this effort.  And

12   it's one thing to voluntarily cooperate with the committee that

13   you think is irregular.  But this committee is now trying to

14   use its powers that it alleges it has under the Constitution to

15   put the screws to the constitutional right of the RNC.  The RNC

16   has a right to stand up, especially when it wasn't talked to

17   before, and say no.

18            Thank you very much for your time.

19            THE COURT:  All right.  Very well.

20            Mr. Letter, do you want to respond to any of that?  Very

21   briefly.  And I guess the thing -- the question that came to my

22   mind was simply -- I don't mean to suggest you'd be obligated

23   to do this.  But I just ask, for my information, whether the

24   committee has any plans to engage with the RNC in any way to

25   preview the kind of information you anticipate you will receive

1    in connection with this subpoena?

2            MR. LETTER:  May I have one moment to consult?  I'll

3    be right back.

4            THE COURT:  Yes.

5            MR. LETTER:  Sorry, Your Honor.  I'll answer your

6    question, and then if I may just make -- I'll be super brief.

7            THE COURT:  Uh-huh.

8            MR. LETTER:  Right.  No -- remember, we are not

9    seeking the data of the RNC.  We're seeking records from

10   Salesforce.  And -- no.  So we have no -- we have no plans to.

11       That ties in one of the points I wanted to make.  The

12   *Mazars* case -- oh, no.  Mazars.  You have no idea how many

13   times I said Mazars.

14           THE COURT:  I'm so sorry that I got you off track.

15           MR. LETTER:  The *Mazars* case, remember what the

16   Supreme Court ordered there.  The Supreme Court said, we have a

17   new test and so remand to -- to try to meet that new test.  And

18   we -- we said, okay.  And we thought we met that test.  We

19   argued in front of Judge Mehta, and we convinced Judge Mehta

20   that, indeed, we did meet that test for some of the material.

21   We've now argued that in the D.C. Circuit.  At no point did the

22   Supreme Court say, and you should -- before you disclose it,

23   because it's personal information about Mr. Trump, you should

24   let Mr. Trump look at it.

25           THE COURT:  No.  Right.  No, no, no.  I understand.

```
1              MR. LETTER:  So that's just a bogus argument, I

2    think.

3              THE COURT:  Well, it's -- I'm trying to be practical

4    too, but I get your point.

5              MR. LETTER:  Okay.  And last is, I can tell my friend

6    doesn't like D.C. Circuit precedent.  The -- as Mr. Columbus

7    said, the Exxon case is binding on you.  It said you must

8    presume -- you don't presume regularity for the DNC or the RNC.

9    You must presume it for Congress; and said -- and, therefore,

10   you presume that Congress will behave properly.  It might not,

11   but it's a presumption.  And, again, I know he doesn't like the

12   D.C. Circuit precedent, but there it is.

13             THE COURT:  Okay.

14             MR. LETTER:  Thank you, Your Honor.

15             THE COURT:  All right.  Very well.

16        So, you know, as I mentioned, I think I'm going to take

17   all of what you have said under advisement.  And it may be

18   that -- it may be on this issue that I just think, really, the

19   parties' briefing did not -- I'm going to go back and look.  I

20   don't want to prejudge it.

21        But it may be that I will want you-all to address this

22   question that we didn't get to until late in the day -- that I

23   think my colloquy with Mr. Letter put kind of a fine point

24   on -- the question of how, if at all, this Speech or Debate

25   Clause and other -- and other separation of powers principles
```

1    should play a role in how I resolve claims against Salesforce.

2    I just don't -- I don't recall that really being fleshed out at

3    all in the papers.  And it may be that I -- I just need the

4    parties to put something down on paper to educate me more about

5    that; but I don't want to say it now because I know that --

6    that will take time, and I know time is of -- is of the

7    essence, I'm sure, to at least -- well, to the defendants, if

8    to no one else.  So -- I'm sure the RNC has plenty of time.

9         But -- but -- so let me look at that, and I'll be in

10   touch with the parties if I think we need to huddle up early

11   next week, if I need -- if I need more on that.

12        Until then, everyone have a good weekend.  And we'll be

13   in touch.

14              (Proceedings were concluded at 5:24 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4     Certified Realtime Reporter, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true, and complete transcript

7     of the proceedings to the best of my ability.

8

9                    Dated this 5th day of April, 2022.

10

11                    /s/ Nancy J. Meyer
                      Nancy J. Meyer
12                    Official Court Reporter
                      Registered Diplomate Reporter
13                    Certified Realtime Reporter
                      333 Constitution Avenue Northwest
14                    Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25