## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

REPUBLICAN NATIONAL COMMITTEE,

    *Plaintiff*,

  v.

                                           Civil Action No. 22-659 (TJK)

NANCY PELOSI *et al.*,

    *Defendants*.

## <u>MEMORANDUM OPINION</u>

On January 6, 2021, a mob attacked the U.S. Capitol as the House of Representatives and Senate were set to count and certify the Electoral College vote for the 2020 presidential election. Later that year, the House established the Select Committee to Investigate the January 6th Attack on the United States Capitol and tasked it with investigating, among other things, the causes of the attack. The Select Committee asserts that some in the mob that day were motivated by claims that the 2020 presidential election was fraudulent or stolen—claims advanced in emails sent by the Republican National Committee and former President Trump's campaign. For that reason, the Select Committee issued a subpoena for related documents and testimony to a third-party vendor for the RNC. The RNC, in turn, sued Speaker Nancy Pelosi, the Select Committee, its members, and the third-party vendor, to challenge the subpoena on several grounds.

This case presents an unusual thicket of procedural and substantive issues, in part because of the way the Select Committee decided to defend the case; in part because of the exceedingly rare spectacle of a congressional committee subpoenaing the records of one of our country's two major political parties; and in part because those records reside with the RNC's third-party vendor, rather than the RNC itself. After navigating the thicket, for the reasons explained below, the Court

will dismiss the claims against all defendants except the third-party vendor as barred by the Constitution's Speech or Debate Clause, dismiss as moot one of the claims against the third-party vendor, and enter judgment against the RNC on the rest of its claims against the third-party vendor.

## I.     Factual Background

### A.     The January 6, 2021 Attack on the U.S. Capitol

The 2020 presidential election was held on November 3, 2020.  On December 14, 2020, the Electoral College met, and a majority of the electors cast their votes for Joseph R. Biden and Kamala D. Harris.  *See* ECF No. 17 at 19.  On January 6, 2021, a mob attacked the U.S. Capitol, where the House and Senate were set to count and certify the Electoral College vote.  According to the RNC, "[m]any in the mob intended to interfere" with Congress's counting and certification.  ECF No. 8-1 at 9–10.  And some "attacked Capitol police officers, vandalized portions of the Capitol itself, and forced their way into the Senate chamber."  *Id*. at 10.  At the time, the RNC described the events of the day as "an attack on our country and its founding principles."  *Id.*

### B.     House Resolution 503 and the Select Committee

On June 30, 2021, the House of Representatives established the Select Committee to Investigate the January 6th Attack on the United States Capitol ("Select Committee").  *See* H.R. Res. 503, § 1, 167 Cong. Rec. H3322–24, H3335 (June 30, 2021).  The House instructed the Select Committee to "investigate and report upon the facts, circumstances, and causes relating to" the attack, including "the influencing factors that fomented" it.  *Id.* § 3(1).  To fulfill that task, the House empowered the Select Committee to investigate "how technology . . . may have factored into the motivation, organization, and execution" of the attack, *id.* § 4(a)(1)(B), including by examining the roles of any relevant "public and private" entities, *id.* § 4(a)(1)(C). The Select Committee must issue a "final report" to the House containing "such findings, conclusions, and

recommendations for corrective measures . . . as it may deem necessary." *Id.* § 4(a)(3).  These "corrective measures" include any "changes in law, policy, procedures, rules, or regulations that could be taken" to prevent "future acts of violence . . . including acts targeted at American democratic institutions." *Id.* § 4(c)(1).

The authorizing resolution states that the Speaker of the House "shall appoint 13 members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader." H.R. Res. 503, § 2(a).  And it empowers the Speaker to designate "one member to serve as chair of the Select Committee." *Id.* § 2(b).

 On July 1, 2021, Speaker of the House Nancy Pelosi appointed eight members to the Select Committee—Representative Bennie Thompson as Chair and Representatives Zoe Lofgren, Adam Schiff, Pete Aguilar, Liz Cheney, Stephanie Murphy, Jamie Raskin, and Elaine Luria as members. *See* 167 Cong. Rec. H3597 (July 1, 2021).  House Minority Leader Kevin McCarthy recommended five more members to Speaker Pelosi: Representative Jim Banks (to serve as Ranking Member) along with Representatives Rodney Davis, Jim Jordan, Kelly Armstrong, and Troy Nehls.  *See* ECF No. 6 ¶ 68; ECF No. 17 at 24.  Speaker Pelosi agreed to appoint Representatives Davis, Armstrong, and Nehls but declined to appoint Representatives Banks and Jordan, and she asked Minority Leader McCarthy to recommend two other members.  ECF No. 6 ¶ 69; ECF No. 17 at 24–25 & n.39.  That same day, Minority Leader McCarthy decided to withdraw all five of his recommended appointees in protest.  ECF No. 6 ¶ 70; ECF No. 17 at 25 & n.40.  A few days later, Speaker Pelosi appointed Representative Adam Kinzinger as the ninth member of the Select Committee.  *See* ECF No. 6 ¶ 70; 167 Cong. Rec. H3885 (July 26, 2021).  Since then, the Select Committee has operated as a nine-member body.  *See* ECF No. 6 ¶¶ 67, 70, 86, 118; ECF No. 17 at 25.

On September 2, 2021, Chairman Thompson named Representative Cheney "Vice Chair" of the Select Committee.  ECF No. 6 ¶ 71; ECF No. 17 at 25.

### C.      The Select Committee's Subpoena Procedures

The Select Committee's authorizing resolution establishes its procedures, including those procedures relating to the issuance of subpoenas.  *See* H.R. Res. 503, § 5.  Among other things, it makes Rule XI of the Rules of the House of Representatives applicable to the Select Committee. *See id.* § 5(c).  Rule XI, Clause 2(m)(3)(A)–(D) permits a House committee to issue investigative subpoenas for documents or testimony to "any person or entity."  *See Rules of the House of Representatives*, 117th Cong. (Feb. 2, 2021).  The authorizing resolution also provides that the Chair of the Select Committee, "upon consultation with the ranking minority member, may order the taking of a deposition, including pursuant to a subpoena, by a Member or counsel of the Select Committee."  *See id.* § 5(c)(6)(A).

### D.      The Salesforce Subpoena

On February 23, 2022, Chairman Thompson issued a subpoena to Salesforce.com, Inc. ("Salesforce").  *See* ECF No. 6 ¶ 2; ECF No. 8-3 at 2.  The subpoena ordered Salesforce to produce documents by March 9, 2022 and to testify at a Select Committee deposition on March 16, 2022. *See* ECF No. 8-3 at 2.

In a cover letter accompanying the subpoena, Chairman Thompson laid out the Select Committee's rationale for issuing it to Salesforce.  According to the letter, "[i]nformation provided to the Select Committee and public reporting indicate that during the 2020 election cycle, Salesforce provided its services to President Donald Trump's reelection campaign and to the [RNC]" and that between November 3, 2020 and January 6, 2021, "the Trump campaign and the RNC jointly sent out hundreds of emails to supporters using a Salesforce-owned tool."  ECF No.

6-1 at 4.  The letter cited public reports characterizing the tenor of the emails as "inflammatory, with nearly every email suggesting that the election was fraudulent, that Democrats had stolen the election, and that Congress needed to be pressured to overturn the results to keep Trump in power." *Id*.  The letter also stated that those same reports noted that nearly every email asked supporters to donate money.  *Id*. at 4–5.  The letter highlighted one email, allegedly sent on January 6, that read:

> We have the TRUTH . . . **TODAY will be a historic day in our Nation's history**. . . . Every single Patriot from across the Country must step up RIGHT NOW if we're going to successfully DEFEND the integrity of this Election.  President Trump is calling on YOU to bolster our **Official Defend America Fund**.

*Id*. at 5.  The letter asserted that the Select Committee had evidence that "numerous defendants" facing January 6-related charges were motivated by "false claims about the election."  *Id.* at 5.  And it noted that, according to public reports, Salesforce itself had acknowledged that, because "there remain[ed] a risk of politically incited violence across the country," it had taken "action to prevent [the RNC's] use of our services in any way that could lead to violence."  *Id*.

For these reasons, the Select Committee informed Salesforce that it was subpoenaing information "regarding whether and how the Trump campaign used Salesforce's platform to disseminate false statements about the 2020 election" in the lead-up to January 6.  ECF No. 6-1 at 5.  The schedule accompanying the subpoena specified five categories of records demanded.  *See id.* at 6.  Specifically, the subpoena demanded information "referring or relating to" these topics:

1.    [For the time period of November 3, 2020, to January 6, 2021, a]ll performance metrics and analytics related to email campaigns by or on behalf of Donald Trump for President, Inc. ("Trump Campaign"), the Republican National Committee ("RNC"), or the Trump Make America Great Again Committee ("TMAGAC"), including but not limited to delivery metrics (send rates and bounce rates), engagement metrics (opens, open rates, clicks, click rates, and click-to-open rates), time attributes, and message attributes.

2.    [For the time period of November 3, 2020, to January 6, 2021, a]ll records related to login sessions by individuals associated with the Trump

Campaign or the RNC into Salesforce's Marketing Cloud platform, includ-
ing all related metadata.

3.      For the time period of January 1, 2021, to January 31, 2021, all documents
        and communications concerning investigative reports or analyses con-
        ducted by Salesforce regarding the protests, marches, public assemblies,
        rallies, or speeches in Washington, D.C. on January 5, 2021, or January 6,
        2021 (collectively, the "Washington Rallies").

4.      For the time period of November 3, 2020, to January 31, 2021, all docu-
        ments and communications concerning investigative reports or analyses
        conducted by Salesforce regarding the use of Salesforce's platforms by the
        RNC or the Trump Campaign and related materials.

5.      For the time period of November 3, 2020, to January 31, 2021, all commu-
        nications between Salesforce representatives and representatives of the
        RNC or the Trump Campaign concerning the 2020 Presidential election, the
        continued use of Salesforce's platforms by the RNC or the Trump Cam-
        paign, the Washington Rallies, or any of the facts and circumstances of the
        topics that are the subject of any of the above requests.

*Id.* On February 24, Salesforce notified the RNC of the subpoena. *See* ECF No. 6 ¶ 41.

        **E.      The Materials at Issue**

        After issuing the subpoena, the Select Committee engaged with Salesforce to clarify what

information, exactly, the subpoena demanded. *See* ECF No. 17-3 at 2. In a March 21, 2022 letter

memorializing these conversations, the Select Committee "stress[ed]" to Salesforce that these top-

ics did not seek "any individual records or information on donors to the RNC or those whom the

RNC solicited" or "any disaggregated information about donors to the RNC, disaggregated infor-

mation about recipients of solicitations from the RNC, or email addresses acquired by the RNC

through voter registration drives, GOTV efforts, or coalition signups." *Id.* at 2–3. Further, in light

of objections Salesforce had raised about the subpoena demanding content protected by the Stored

Communications Act, 18 U.S.C. § 2701 *et seq.*, the Select Committee told Salesforce that it was

not "seeking communications content covered" by the Act and that it did not expect Salesforce to

produce the portion of any responsive record revealing such content.  *See* ECF No. 6 ¶ 137; ECF No. 17-3 at 3 & n.1.

The Select Committee and Salesforce have made additional representations to the Court about the materials the Select Committee is demanding from Salesforce in connection with the subpoena and what Salesforce is preparing to produce.  The Select Committee has emphasized that it is "not seeking any information that would individually identify" any of the RNC's donors, volunteers, or email recipients, such as names, home addresses, email addresses, giving history, or the like.  *See* ECF No. 24 at 73–74.  And Salesforce confirmed that it would not be producing any such information.  *Id.* at 117, 121.

For the first topic identified by the subpoena, the Select Committee explained that it seeks data by which it can learn how well the RNC's email campaigns performed in engaging their recipients from November 3, 2020 to January 6, 2021.  *See* ECF No. 24 at 75–76.  In response, Salesforce is preparing to produce reports that it creates and sends to the RNC containing the specified metrics for each email (*i.e.*, send rates, bounce rates, opens, open rates, clicks, click rates, and click-to-open rates), the date each email was sent (*i.e.*, time attributes), and the RNC's internal name for each email campaign (*i.e.*, message attributes).  *See id.* at 61–63, 67, 118.  The RNC's internal name often reflects general details about who among the RNC's email recipients the email campaign is targeting—for example, "Detroit Volunteers June 2020"—thus shedding some light on how the RNC targets its email campaigns.  *See, e.g.*, ECF No. 8-2 ¶ 17(j); ECF No. 21 at 16; ECF No. 24 at 61, 91–92.

For the second topic, the Select Committee represented that it is seeking information to determine who at the RNC worked on these email campaigns, and when they did, to discover who might have more information about them.  *See* ECF No. 24 at 76–77.  In response, Salesforce is

preparing to produce its login-session logs that identify individuals who logged in to its platform and contain technical information about each login session such as login and logout times as well as user activity during the login session.  *See id.* at 118–19.

For the third and fourth topics, the Select Committee stated that it seeks any reports and analyses that Salesforce itself conducted about the rallies in Washington, D.C. on January 5th and 6th, the RNC's and Trump campaign's use of its platforms, and Salesforce's own internal communications related to any such reports and analyses.  *See* ECF No. 24 at 77–79.  Salesforce plans to assert its own privilege objections to a "large amount" of the materials responsive to this topic because much of the material that exists was prepared by Salesforce's counsel.  *See id.* at 119–20. But it is preparing to produce some ancillary records responsive to this topic, such as "abuse reports," which are reports about email recipients complaining about email solicitations, with all personally identifiable information redacted from those reports.  *Id.*

For the fifth topic, the Select Committee explained that it is seeking communications between Salesforce and the RNC or the Trump campaign about the 2020 presidential election, their continued use of Salesforce's platforms, the rallies in Washington, D.C. on January 5th and 6th, or any of the other topics in the subpoena.  *See* ECF No. 24 at 80.  In response, Salesforce is preparing to produce some emails between itself and @gop.com email addresses, which "may" contain "some data about the RNC's use of the platform" but have no donor information or personally identifiable information of the RNC's email recipients.  *See id.* at 120.  Neither Salesforce nor the RNC, which presumably has copies of these emails, has further described their contents.

In summary, none of the materials at issue contains personally identifiable information of RNC donors, volunteers, or email recipients.  But the subpoena does seek some of the RNC's confidential information about its email campaigns from November 3, 2020 to January 6, 2021.

**II.     Procedural History**

On March 9, 2022, the RNC—the national party committee of the Republican Party—sued Speaker Pelosi, the Select Committee, and each member of the Select Committee ("House Defendants"), to challenge the subpoena.  *See* ECF No. 1 ¶¶ 11–22.  On March 15, the RNC filed an amended complaint, adding Salesforce as a defendant while explaining that it did so merely "to ensure [the RNC] can obtain effective and complete emergency relief until this dispute is finally resolved on the merits," and not because it believed that "Salesforce has breached any contractual or other duty to the RNC."  *See* ECF No. 6 ¶¶ 23, 49–50.  In its amended complaint, the RNC also explained that the Select Committee had extended the subpoena return date (*i.e.*, the production deadline) to March 16.  *Id.* ¶ 47.

The RNC's amended complaint asserts six claims against all defendants: that (1) the subpoena violates the First Amendment; (2) the subpoena violates the Fourth Amendment; (3) the subpoena does not advance a valid legislative purpose; (4) the Select Committee lacks the necessary congressional authorization to issue the subpoena; (5) the subpoena is excessively broad and unduly burdensome; and (6) the subpoena violates the Stored Communications Act.  *See* ECF No. 6 ¶¶ 74–142; *see also* ECF No. 24 at 49; ECF No. 27 at 9 n.1.  For relief, the RNC seeks a multitude of different declarations and injunctions, some in the alternative.  *See* ECF No. 6 at 29–30.  The RNC seeks to enjoin both Salesforce's production of materials and its deposition testimony in response to the subpoena, but the RNC does not identify any pertinent distinctions between the two for purposes of its claims.  *See id.* ¶¶ 38, 74–142; *id.* at 29–30; ECF No. 24 at 120–21.

At the same time the RNC filed its amended complaint, it also filed a motion for prelimi-nary injunction.[1]  *See generally* ECF No. 8.  The next day, the Court held a status conference, during which House Defendants agreed to postpone the subpoena's return date to April 6.  *See* Minute Order of March 16, 2022; Minute Entry of March 16, 2022.  The Court also set a briefing schedule and ordered a hearing on the motion on April 1.  *See* Minute Order of March 16, 2022.

Salesforce responded to the motion, mainly to note that it is "essentially a third-party to this dispute."  *See* ECF No. 15 at 1–2.  House Defendants opposed the motion, arguing both that their legislative immunity under the Speech or Debate Clause, *see* U.S. Const. art. I, § 6, cl. 1, barred the RNC's lawsuit and that the RNC's claims failed on the merits.  *See* ECF No. 17 at 28–49.  House Defendants also asked the Court to "'advance the trial on the merits and consolidate it with the hearing.'"  *Id.* at 13 (quoting Fed. R. Civ. P. 65(a)(2)).  The RNC replied.  ECF No. 21.

On April 1, the Court held a hearing on the motion.  *See* ECF No. 24 at 1.  During that hearing, the RNC agreed to House Defendants' proposal to proceed immediately to the "trial on the merits."  *See id.* at 5.  For that reason, House Defendants then agreed not to enforce the sub-poena, and Salesforce agreed not to comply with it, until April 20, 2022, when the Court antici-pated resolving the merits.  *See id.* at 70–71, 118.

As the hearing progressed, previously unbriefed issues emerged affecting the Court's abil-ity to proceed immediately to a final judgment.  House Defendants retreated from what appeared to be their position in their briefing that the Speech or Debate Clause barred the entire lawsuit, arguing instead that the Clause barred only the claims against them.  *See* ECF No. 23 at 2; ECF No. 24 at 83–84, 94–97.  And the RNC contended that even if the Court dismissed House

---

[1] The National Republican Senatorial Committee ("NRSC") filed an amicus brief in support of the RNC's motion.  *See* ECF No. 18.

Defendants on that basis, it could still assert all the claims in the amended complaint against Salesforce as a standalone defendant.  *See* ECF No. 24 at 125–28.  Thus, the Court ordered the RNC and House Defendants—and "invited" Salesforce—to file supplemental briefs addressing questions potentially bearing on those issues.[2]  *See* ECF No. 23.  The parties have since filed those briefs.  *See* ECF Nos. 25–29.  House Defendants later agreed to postpone the return date of the subpoena to May 2 to allow the Court to fully consider those issues.

## III.   Legal Standards

The Court must dismiss an action—or any portion of it—if it lacks subject matter jurisdiction.  *See* Fed. R. Civ. P. 12(b)(1), (h)(3).  The plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.  *See Kokkonen v. Guardian Life Ins.*, 511 U.S. 375, 377 (1994); *Moran v. U.S. Capitol Police Bd.*, 820 F. Supp. 2d 48, 53 (D.D.C. 2011) (citing *Lujan v. Def. of Wildlife*, 504 U.S. 555, 561 (1992)).  When a defendant raises a jurisdictional immunity from suit as a bar to claims, the plaintiff must overcome that defense to avoid dismissal.  *See Jackson v. Bush*, 448 F. Supp. 2d 198, 200 (D.D.C. 2006).  Further, a plaintiff has the burden of establishing "'the irreducible constitutional minimum of standing,'" a jurisdictional

---

[2] The Court asked the parties to address whether (1) the RNC had standing to assert its claims against Salesforce; (2) whether Rule 19 of the Federal Rules of Civil Procedure required dismissal of the entire lawsuit if the Speech or Debate Clause required dismissal of House Defendants; and (3) assuming the entire case should not be dismissed for one reason or another, how the RNC could assert its claims (almost all of which depend on state action) against Salesforce, a private party that had no role in issuing the subpoena.  *See* ECF No. 23 at 2–3.  The RNC appears to fault the Court for raising these questions.  *See* ECF No. 27 at 11–12, 21.  But the Court had an independent duty to raise both standing and Rule 19.  *See, e.g.*, *Schindler Elevator Corp. v. WMATA*, 514 F. Supp. 3d 197, 202 (D.D.C. 2020); *Eco Tour Adventures, Inc. v. Zinke*, 249 F. Supp. 3d 360, 390 (D.D.C. 2017).  As for the question about proceeding on the merits against only Salesforce, the Court sought to ensure that Salesforce—which to that point the parties had treated as almost a neutral third-party—had a "full opportunity to present [its] respective case[]" before the Court entered a final judgment, potentially against it alone.  *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (internal quotation marks omitted).

requirement. *G.Y.J.P. ex rel. M.R.P.S. v. Wolf*, No. 20-cv-1511 (TNM), 2020 WL 7318009, at *2 (D.D.C. Dec. 11, 2020) (quoting *Lujan*, 504 U.S. at 560). When "deciding questions of jurisdiction under Rule 12(b)(1)," the Court "is not confined to the pleadings and may consider outside matters." *See Jackson*, 448 F. Supp. 2d at 200.

The Court must grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A dispute is "genuine" if the evidence is such that a reasonable factfinder could return a verdict for the non-moving party. *Scott v. Harris*, 550 U.S. 372, 380 (2007). A fact is "material" if it is capable of affecting the outcome of the litigation under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[3]

## IV.    Analysis

The Court now proceeds into the thicket. To begin with, the RNC's claims against House Defendants must be dismissed. As the Framers intended, House Defendants are immune from suit under the Speech or Debate Clause. Further, the Court lacks subject matter jurisdiction to pass on the merits of the claims against them in the alternative, as they urge. Turning next to the RNC's claims against Salesforce, the Court finds that the RNC has standing to pursue them. But on the merits, those claims come up short—except one, which is moot—given the highly deferential

---

[3] The Court finds that "the record is sufficient for a determination on the merits under the summary judgment standard, or, where reliance on the record is unnecessary, under the motion to dismiss standard." *See March for Life v. Burwell*, 128 F. Supp. 3d 116, 124 (D.D.C. 2015). Thus, with the consent of the parties, the Court consolidates the preliminary injunction motion with the trial on the merits on all claims under Federal Rule of Civil Procedure 65(a)(2). *See id.*; *cf. Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 511 n.17 (1975) (instructing district courts to give "the most expeditious treatment" to cases in which "one branch of Government is being asked to halt the functions of a coordinate branch").

review the Court must give Congress's investigative power and the nature of the materials at issue. Even so, the RNC identified important First Amendment interests implicated by the subpoena that would have presented a much different question for the Court had the materials at issue not been narrowed after discussions between the Select Committee and Salesforce.

A.   **The Court Lacks Subject Matter Jurisdiction over the RNC's Claims Against House Defendants Because They Are Immune from Suit Under the Speech or Debate Clause**

The Speech or Debate Clause provides that "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1. Its purpose is "to protect the individual legislator, not simply for his own sake, but to preserve the independence and thereby the integrity of the legislative process." *United States v. Brewster*, 408 U.S. 501, 524 (1972). The Clause "serves the additional function of reinforcing the separation of powers so deliberately established by the Founders." *Eastland*, 421 U.S. at 502 (quoting *United States v. Johnson*, 383 U.S. 169, 178 (1966)). When it applies, the Clause provides immunity from both criminal and civil suits. *See id.* at 502–03. And, in our Circuit, it is a jurisdictional bar. *See, e.g.*, *Howard v. Off. of Chief Admin. Officer of U.S. House of Reps.*, 720 F.3d 939, 941 (D.C. Cir. 2013). It may be invoked as a defense to suit where, as here, congresspersons or their adjuncts are sued—that is, "made a defendant in a judicial proceeding." *See United States v. Am. Tel. & Tel. Co.*, 567 F.2d 121, 130 (D.C. Cir. 1977); *see also Eastland*, 421 U.S. at 495, 512; *Judicial Watch, Inc. v. Schiff*, 998 F.3d 989, 990, 993 (D.C. Cir. 2021).

"The Supreme Court has consistently read the Speech or Debate Clause 'broadly' to achieve its purposes." *Rangel v. Boehner*, 785 F.3d 19, 23 (D.C. Cir. 2015) (quoting *Eastland*, 421 U.S. at 501). Thus, although the Clause speaks of "Speech or Debate," it protects all "legislative acts." *Doe v. McMillan*, 412 U.S. 306, 312 (1973). An act is "legislative" if it is "generally

done in a session of the House by one of its members in relation to the business before it." *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880). More specifically, the Clause covers matters that are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel v. United States*, 408 U.S. 606, 625 (1972). The "act 'of authorizing an investigation pursuant to which . . . materials [may be] gathered' is an integral part of the legislative process." *Eastland*, 421 U.S. at 505 (citing *McMillan*, 412 U.S. at 313). And the "[i]ssuance of subpoenas . . . has long been held to be a legitimate use by Congress of its power to investigate," which "plainly" meets the test laid out in *Gravel*. *Id.* at 504.

Applying these principles here, the Court has little trouble concluding that the Speech or Debate Clause immunizes House Defendants from this suit and that they must be dismissed for that reason. *Eastland*, in which the Supreme Court resolved a challenge to a subpoena issued by a Senate subcommittee, provides a useful analytical template.

First, the *Eastland* Court considered whether a Senate subcommittee investigation was "related to and in furtherance of a legitimate task of Congress." *See* 421 U.S. at 505. The Court examined the Senate resolution authorizing the subcommittee and found that it was enough to show that the investigation "concerned a subject on which 'legislation could be had.'" *Id.* at 506 (quoting *McGrain v. Daugherty*, 273 U.S. 135, 177 (1927)). Thus, the Court held that the subcommittee's investigation fell "within the sphere of legitimate legislative activity." *Id.* (internal quotation marks omitted). Here, the D.C. Circuit has already held that the Select Committee's investigation has a "'valid legislative purpose' and its inquiry 'concern[s] a subject on which legislation could be had,'" as laid out in its authorizing resolution. *See Trump v. Thompson*, 20 F.4th

10, 41–42 (D.C. Cir. 2021) (quoting *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031–32 (2020)).  The parties agree that these determinations bind the Court.  *See* ECF No. 17 at 12, 33; ECF No. 21 at 9; ECF No. 24 at 40, 42.

Second, the *Eastland* Court then inquired into "the propriety of making [the subpoena target whose bank records were demanded] a subject of the investigation and subpoena."  *See* 421 U.S. at 506.  But the Court stressed that "the scope of [its] inquiry [was] narrow."  *Id.*  And it reaffirmed that, in conducting this inquiry, "courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province."  *Id.* (quoting *Tenney v. Brandhove*, 341 U.S. 367, 378 (1951)).

The House instructed the Select Committee to "investigate and report upon the facts, circumstances, and causes relating to" the January 6 attack, including "the influencing factors that fomented" it.  H.R. Res. 503, § 3(1).  The House also empowered the Select Committee to investigate "how technology . . . may have factored into the motivation" for the attack, *id.* § 4(a)(1)(B), including by examining the roles of any relevant "public and private" entities, *id.* § 4(a)(1)(C).  And it tasked the Select Committee with reporting to the House its "findings, conclusions, and recommendations" for legislative remedial measures.  *Id.* § 4(a)(3), (c).

Now, according to the unchallenged assertions of the Select Committee: (1) its investigation and public reporting suggest that the RNC and the Trump campaign used Salesforce's platform and tools to send emails between November 3, 2020 and January 6, 2021 asserting that the 2020 presidential election was fraudulent or stolen; (2) those claims, in turn, motivated some who participated in the January 6 attack on the Capitol; and (3) Salesforce itself acknowledged that, because "there remain[ed] a risk of politically incited violence across the country," it had taken "action to prevent [the RNC's] use of [its] services in any way that could lead to violence."  ECF

15

No. 6-1 at 4–5.  Through the subpoena, House Defendants seek, and Salesforce has agreed to provide, information—limited to a few months' time—about whether and how successfully the RNC used Salesforce's platform to spread these claims about the 2020 presidential election.  *See id.* at 5–6.  Given all the above, the Select Committee's decision to subpoena the RNC's Salesforce-held information may fairly be deemed within its province and thus falls within the scope of the Clause.  *See Eastland*, 421 U.S. at 506; *Rangel*, 785 F.3d at 24.

The RNC argues that the Speech or Debate Clause does not apply for several reasons, but none are persuasive.  First, it argues that the subpoena serves no legitimate legislative purpose, and thus falls outside the Clause's protection, because the information sought is irrelevant to the Select Committee's investigation.  Given the above and the narrow scope of the Court's review under the Clause, the Court cannot agree.  In these circumstances, the "wisdom of congressional approach or methodology is not open to judicial veto." *Eastland*, 421 U.S. at 509 (citing *McMillan*, 412 U.S. at 313).  Courts routinely reject similar arguments against subpoenas issued by members of Congress that are shielded by the Clause.  *See, e.g.*, *Judicial Watch*, 998 F.3d at 992.

The RNC refines this argument a bit by asserting that the subpoena is impermissibly over-broad and that this overbreadth places it outside the immunity conferred by the Clause.  The Court notes, as described above, that negotiations between House Defendants and Salesforce greatly nar-rowed the scope of the materials at issue.  For example, House Defendants are not seeking, and Salesforce is not producing, any disaggregated information about any of the RNC's donors, vol-unteers, or email recipients, including any person's personally identifiable information.  Moreover, even the RNC's own confidential information that is undeniably at issue is relatively narrow in scope.

The RNC responds by suggesting that the Court should not credit the results of these ne-
gotiations.  But courts regularly credit discussion that narrows disputes over congressional sub-
poenas.  *See, e.g.*, *Bean LLC v. John Doe Bank*, 291 F. Supp. 3d 34, 37 (D.D.C. 2018).  Even the
Supreme Court, at least once, has required recipients of legislative subpoenas who object to their
scope to work with Congress to narrow the dispute so that such issues can be "easily . . . remedied"
without judicial involvement.  *See McPhaul v. United States*, 364 U.S. 372, 382 (1960).  Thus, the
Court credits those negotiations, which significantly reduced the subpoena's potential overbreadth
and made clear that the personally identifiable information of "millions" of RNC supporters is no
longer at risk of disclosure.  *See* ECF No. 21 at 11.  Obviously, should House Defendants change
course and demand, or Salesforce suggest it was preparing to produce, any materials beyond what
they have represented are at issue, that would be a different story.

Still, the RNC argues that the subpoena is overbroad because the Select Committee undis-
putedly seeks information "wholly unrelated" to the January 6 attack, such as "holiday greeting"
campaigns that took place between November 3, 2020 and January 6, 2021.  However, the Speech
or Debate Clause prohibits the Court from parsing the Select Committee's demands so finely.  The
Court is unaware of any court that has ever done so when deciding whether the Clause applies.
Most obviously, the *Eastland* Court did not do so.  To the contrary, it held that a "cursory look at
the facts" revealed the "legitimacy" of that subpoena, which sought "any and all" financial records
of a political organization, without examining whether some subset of the financial records sought
exceeded the subpoena's legitimate scope.  *See Eastland*, 421 U.S. at 494, 506.

Moreover, in a similar situation, the Supreme Court in *McMillan* declined to wade into the
particulars of a dispute over information included in the record of a Senate subcommittee's hear-
ings and its committee report.  In that case, the plaintiffs argued that congressional defendants

could be held liable for their decisions to include that information in those places, claiming that the information was "unnecessary and irrelevant to any legislative purpose" served by the record and the report. *See McMillan*, 412 U.S. at 312. The Court seemed to agree that the information was not "even remotely useful" to "any legislative purpose," but *still* it held that the Clause "pre-termit[ted] the imposition of liability on any such theory" by preventing the judiciary from second-guessing such "legislative judgment[s]." *See id*. at 312–13. So too here. *See Eastland*, 421 U.S. at 509 (citing *McMillan*, 412 U.S. at 313). That is the nature of the "absolute" immunity granted by the Clause when it applies. *See Rangel*, 785 F.3d at 24.

Second, the RNC argues that the Speech or Debate Clause should not apply because the subpoena is merely an "open attempt by political foes to unearth a competing political party's internal deliberations and political and digital strategy," a point the NRSC forcefully echoes. Given the obvious political dynamics involved, this is an understandable point. And to be sure, although the subpoena has been narrowed through negotiation, the Court recognizes the highly unusual nature of the Select Committee's demand for what is mostly the RNC's information and documents, even though they are in Salesforce's possession. The problem for the RNC is that this Court may not examine House Defendants' motives when evaluating whether the Clause applies. Courts "are not the place for such controversies." *See Tenney*, 341 U.S. at 378. Instead, "[w]hether an act is legislative" for purposes of the Clause "turns on the nature of the act, rather than on the motive or intent of the official performing it." *See Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998). Thus, when acts are "legislative," as the subpoena is here, the Clause "protects against inquiry . . . into the motivation for those acts." *See Brewster*, 408 U.S. at 525.

Third, the RNC argues that the Court cannot decide whether the Clause applies until it addresses the merits of the RNC's "congressional authorization" claim. The RNC contends that

the Court must first decide whether the Select Committee is duly constituted and lawfully permitted to issue subpoenas despite having only nine members, no "ranking member," and no member recommended by Minority Leader McCarthy.  Like the RNC's prior argument, this has intuitive appeal, but again, precedent forecloses it.  An "act does not lose its legislative character" for Speech or Debate Clause purposes "simply because a plaintiff alleges that it violated the House Rules." *Rangel*, 785 F.3d at 24.  Instead, legislative immunity applies whether the disputed legislative action "was regular, according to the Rules of the House, or irregular and against their rules." *See Kilbourn*, 103 U.S. at 203 (quoting *Coffin v. Coffin*, 4 Mass. 1, 27 (1808)); *accord Tenney*, 341 U.S. at 373–74.  Thus, House Defendants are immune from suit even assuming the subpoena was issued irregularly and against the House's rules governing the committee.[4]  *See, e.g., Judicial Watch*, 998 F.3d at 992–93.

In sum, the subpoena falls "within the 'legitimate legislative sphere.'"  *See Eastland*, 421 U.S. at 503.  Thus, "the Speech or Debate Clause is an absolute bar" to the RNC's claims against House Defendants, and they must be dismissed because the Court lacks subject matter jurisdiction over the claims against them.  *See id.* at 503, 512; *Judicial Watch*, 998 F.3d at 993.

*             *             *

Because House Defendants must be dismissed based on the Court's lack of subject matter jurisdiction over the claims against them, the Court cannot reach the merits of those claims.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998); *Ex parte McCardle*, 74 U.S. (7

---

[4] In arguing otherwise, the RNC relies on a line of cases for the proposition that "rules of Congress and its committees are judicially cognizable."  *See Yellin v. United States*, 374 U.S. 109, 114 (1963).  And this is true, at times.  But in none of these cases was the immunity conferred by the Clause at issue.  *See, e.g., id.*; *Christoffel v. United States*, 338 U.S. 84 (1949); *Exxon Corp. v. FTC*, 589 F.2d 582 (D.C. Cir. 1978).

Wall.) 506, 514 (1868).  The only way the Court can consider the merits of this case is if the Court has subject matter jurisdiction over the RNC's claims against Salesforce.

House Defendants argue otherwise, asserting that *Lesesne ex rel. B.F. v. District of Columbia*, 447 F.3d 828 (D.C. Cir. 2006), permits the Court to "issue a merits-based alternative holding" even if it concludes that it lacks subject matter jurisdiction over the case.  *See* ECF No. 30 at 2–3. Unsurprisingly, *Lesesne* does not stand for this proposition.  There, the D.C. Circuit held merely that a district court did not erroneously reach the merits after finding the case moot because the district court was wrong to find the case moot and so "did, in fact, have jurisdiction" to reach the merits.  *See* 447 F.3d at 833.  It also recognized that, had the district court lacked subject matter jurisdiction on account of mootness, then it "would have been without jurisdiction to consider the merits."  *See id.* (quoting *Info. Handling Servs., Inc. v. Defense Automated Printing Servs.*, 338 F.3d 1024, 1031 (D.C. Cir. 2003)).

Thus, *Lesesne* stands only for the point that a court with subject matter jurisdiction does not err in exercising it, even if the court incorrectly concludes that it lacks jurisdiction.  But *Lesesne* is not a license for courts to find that they lack subject matter jurisdiction and then issue merits-based alternative holdings just in case they are wrong about the jurisdictional question.  House Defendants' reading of *Lesesne* runs headlong into *Steel Co.*'s well-known dictate that a court has "no authority" to reach the merits, even in the "alternative," if it concludes that it lacks subject matter jurisdiction.  *See Jackson v. Off. of Mayor of District of Columbia*, 911 F.3d 1167, 1171 (D.C. Cir. 2018); *see also Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 379 (1981).

### B.    The Court Has Subject Matter Jurisdiction over the RNC's Claims Against Salesforce

To repeat, the RNC asserts the same claims against both House Defendants and Salesforce. Whether the Court may exercise subject matter jurisdiction over the claims against Salesforce turns

on whether the RNC has standing to pursue them.[5]  *See Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 174 (D.C. Cir. 2012); *Whitlock v. U.S. Dep't of Homeland Sec.*, No. 21-cv-807 (DLF), 2022 WL 424983, at *4 (D.D.C. Feb. 11, 2022).  The parties have identified no case in which a court addressed whether a plaintiff had standing to pursue claims like these against a third-party recipient of a congressional subpoena as a standalone defendant after the congressional defendants were dismissed on Speech or Debate Clause grounds.  In a few cases in which the issue might have come up, the court had no need to address it because the congressional defendants had inter-vened—that is, they were not "made defendants" involuntarily—rendering the Clause inapplica-ble.  *See, e.g.*, *Am. Tel. & Tel. Co.*, 567 F.2d at 128–30 & n.28; *see also Mazars USA*, 140 S. Ct. at 2028; *Bean LLC*, 291 F. Supp. 3d at 39; *cf. Eastland*, 421 U.S. at 517–18 & n.4 (Marshall, J., concurring in the judgment) (observing that a court would "not necessarily" need to dismiss a case in which the Clause requires dismissing the congressional defendants if the third-party recipient of the subpoena had been sued as well and remained in the case).  For the reasons explained below, the Court finds that the RNC has standing to assert its claims against Salesforce.

The "irreducible constitutional minimum of standing" requires the RNC to show that it will imminently suffer an injury-in-fact, that the injury is fairly traceable to Salesforce, and that the injury is likely to be redressed by a favorable decision.  *See Lujan*, 504 U.S. at 560–61.  When considering these elements, the Court "must assume *arguendo* the merits" of the claims at issue, including that the plaintiff has a cause of action against the defendant to assert the claims.  *See*

---

[5] As explained below, the Stored Communications Act claim is moot, meaning the Court lacks subject matter jurisdiction over it even if the RNC has standing to assert it against Salesforce.  *See, e.g.*, *Ruseva v. Rosenberg*, 490 F. Supp. 3d 320, 322 (D.D.C. 2020).  But for simplicity's sake, the Court will address this point when discussing the "merits" of each claim, and it omits that claim from this standing analysis.

*Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007); *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003) (per curiam).

First, the RNC has established as to each of its claims that it will imminently suffer an injury-in-fact stemming from Salesforce's compliance with the subpoena.  An injury-in-fact is, fundamentally, a "cognizable interest" that the challenged action will impair.  *See Lujan*, 504 U.S. at 562–63.  Each of the RNC's claims arises out of such a "cognizable interest."  *See, e.g.*, *AFL-CIO v. FEC*, 333 F.3d 168, 176–78 (D.C. Cir. 2003) (First Amendment); *Wikimedia Found. v. NSA*, 857 F.3d 193, 209–10 (4th Cir. 2017) (Fourth Amendment); *Eastland*, 421 U.S. at 501 n.14 (valid legislative purpose); *Yellin*, 374 U.S. at 114 (Rules of Congress and its Committees).  And the threatened injuries to these interests are imminent.  *See* ECF No. 6 ¶¶ 44–50; ECF No. 8-5 ¶¶ 10–12.

Second, the RNC has shown that its cognizable injuries are "fairly traceable" to Salesforce's imminent disclosure of the materials at issue to the Select Committee.  To "show that the alleged injury is fairly traceable to the challenged action," the RNC "must make a reasonable showing that but for" Salesforce's imminent action "the alleged injury will not occur."  *Am. Fed. of Gov't Emps., AFL-CIO v. United States*, 104 F. Supp. 2d 58, 63 (D.D.C. 2000) (cleaned up).  This element may be met even if a non-party is a "key player in the causal story."  *See Orangeburg v. FERC*, 862 F.3d 1071, 1080 (D.C. Cir. 2017).  Here, if Salesforce produces the materials at issue, the RNC's injuries will occur.  That is enough to make the RNC's injuries fairly traceable to Salesforce.

Granted, a plaintiff does not show fair traceability when another party's action will "independently cause[]" the alleged injuries.  *See Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1297 (D.C. Cir. 2015).  Not so here.  Salesforce possesses the materials the Select Committee demands, and

the materials will not be disclosed without Salesforce's compliance with the subpoena. Thus, Salesforce's compliance is a necessary link in the fair-traceability chain.

In addition, that Salesforce's disclosure of the materials at issue to the Select Committee flows from a legal duty to comply with a subpoena—rather than a voluntary choice—does not mean that the RNC's threatened injuries are not fairly traceable to its compliance. *See* ECF No. 6 ¶ 41; ECF No. 6-1 at 4–10; ECF No. 24 at 117. For example, in *Powell v. McCormack*, a congressman sued members as well as employees of the House of Representatives over a resolution calling for his "exclusion" and sought relief against both the members and the employees. *See* 395 U.S. 486, 492–94 (1969). The Supreme Court held that the congressman could maintain his action against the House employees even though they were simply "acting pursuant to express orders of the House." *See id.* at 501–06. Although the Court was not addressing standing in *Powell*, the D.C. Circuit has since considered its implications in the standing context and acknowledged that the "causal connection" between the employees' actions and the plaintiff's injuries was "obvious." *See Common Cause v. Biden*, 748 F.3d 1280, 1284 (D.C. Cir. 2014). Similarly, fair traceability is present here even though Salesforce's threatened disclosure of the RNC's materials flows from the Select Committee's "express orders" rather than Salesforce's own decision. *See ACLU of Minn. v. Tarek ibn Ziyad Acad.*, 643 F.3d 1088, 1091, 1093 (8th Cir. 2011); *Isabel v. Reagan*, 394 F. Supp. 3d 966, 972–73 (D. Ariz. 2019).

Third, the RNC has shown redressability. "The redressability element of standing 'is virtually always merely the reciprocal of causation.'" *LTMC/Dragonfly, Inc. v. Metro. Wash. Airports Auth.*, 699 F. Supp. 2d 281, 292 (D.D.C. 2010) (quoting *Viet. Veterans of Am. v. Shinseki*, 599 F.3d 654, 658 (D.C. Cir. 2010)); *see also Dynalantic Corp. v. Dep't of Def.*, 115 F.3d 1012, 1017 (D.C. Cir. 1997). A favorable ruling from the Court on the merits of any of the RNC's

challenges to the subpoena would bar Salesforce from complying with it, either in whole or in part. *See Powell*, 395 U.S. at 549 n.86.  Thus, just as causation is satisfied, so is redressability.

To be sure, redressability may be absent when "the court's power to redress an injury" is "independently impaired," even if a defendant's challenged action causes the injury.  *See Viet. Veterans*, 599 F.3d at 658 (citing *Renal Phys. Ass'n v. HHS*, 489 F.3d 1267, 1278 (D.C. Cir. 2007)). For instance, as with causation, redressability is absent when the "independent choice" of parties beyond the court's power would still cause the harm.  *See Renal Phys. Ass'n*, 489 F.3d at 1278; *see also LTMC/Dragonfly*, 699 F. Supp. 2d at 292.  This is not the case here.  Again, Salesforce's compliance with the subpoena is necessary to cause the RNC's injuries, and Salesforce is not beyond the Court's power.  Should the Court find for the RNC on the merits of its claims directed at the subpoena, remedies targeted at Salesforce would redress the RNC's injuries.[6]

### C.   Summary Judgment Is Warranted Against the RNC on Its Claims Against Salesforce

With House Defendants dismissed, and the RNC's standing to pursue its claims against Salesforce established, two other issues that could pose obstacles to the RNC pursuing its claims against Salesforce require mention before the Court turns to the merits of those claims.  First, Rule 19 of the Federal Rules of Civil Procedure would require dismissal of the entire action if House Defendants were indispensable parties such that the action could not proceed against only

---

[6] Additionally, a plaintiff cannot show redressability if the only redress the Court could grant would be unconstitutional.  *See, e.g.*, *Johnson v. Comm'n on Pres. Debates,* 869 F.3d 976, 981–82 (D.C. Cir. 2017).  For example, in *Johnson*, the D.C. Circuit concluded that the plaintiffs had not shown redressability because the redress available would likely violate the First Amendment.  *See id.*  No such constitutional impediment to redress is present here.  True, the Speech or Debate Clause bars an order directed at House Defendants, but they acknowledge that the Clause does not bar redress against Salesforce.  *See* ECF No. 24 at 83, 85–86; ECF No. 28 at 7; *cf. Rangel*, 785 F.3d at 25 n.3 ("[T]he Speech or Debate Clause is technically the privilege of the Member and congressmen can therefore waive the immunity of their aides." (cleaned up)).

Salesforce.  *See* Fed. R. Civ. P. 19(a)–(b).  Second, for the RNC to prevail on most of its claims

against Salesforce—each of which challenges the subpoena issued by the Select Committee—it

would need to establish that Salesforce qualifies as a "state actor" for purposes of those claims.

*See, e.g.*, *Daniels v. Union Pac. R.R. Co.*, 480 F. Supp. 2d 191, 196 (D.D.C. 2007).  But neither of

these issues is a jurisdictional hurdle to reaching the merits.  *See Lincoln Prop. Co. v. Roche*, 546

U.S. 81, 90 (2005) (Rule 19); Wright & Miller, 7 *Fed. Prac. & Proc. Civ.* § 1611, nn.18–26 &

accompanying text (3d ed. Apr. 2022 update) (Rule 19); *Johnson*, 869 F.3d at 983–84 (state-action

doctrine); *id.* at 987 (Pillard, J., concurring in part and concurring in the judgment) (state-action

doctrine).  Thus, to avoid having to decide those issues, and because the Court finds against the

RNC on all its claims on other grounds, the Court assumes without deciding that House Defendants

are not indispensable under Rule 19 and that Salesforce may be treated as a "state actor" in this

context.[7]

Before turning to those claims, the Court first lays out the principles governing Congress's

investigative power and the Court's limited role in reviewing Congress's exercise of that power.

Congress has no enumerated "investigations" power.  *See* U.S. Const. art. I, § 8.  But the

Supreme Court has long recognized that each house of Congress has the implied "power 'to secure

needed information' in order to legislate" and thus to issue subpoenas and employ other

---

[7] Even if a Rule 19 analysis were necessary, because the Court finds summary judgment warranted against the RNC, it is self-evident that House Defendants' "absence" will not "as a practical matter impair or impede [their] ability to protect the[ir] interest" and will not "prejudice" them.  Fed. R. Civ. P. 19(a)(1)(B)(i), (b)(1).  In addition, Salesforce has argued that, if it were considered a "state actor" here because of its compliance with the subpoena, it would be entitled derivatively to House Defendants' legislative immunity.  *See* ECF No. 25 at 7–8.  Even if that were so, especially given how the Supreme Court has characterized an analogous "derivative" immunity, the Court sees no reason why this defense would be a jurisdictional bar to considering the merits.  *Cf. Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166 (2016); *In re U.S. Off. of Personnel Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 68–69 (D.C. Cir. 2019) (per curiam).

compulsory process to obtain public and private information alike. *See Mazars USA*, 140 S. Ct. at 2031 (quoting *McGrain*, 273 U.S. at 161). This power "is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." *Barenblatt v. United States*, 360 U.S. 109, 111 (1959). Thus, it "encompasses inquiries into," among other things, "defects in our social, economic or political system for the purpose of enabling the Congress to remedy them." *Mazars USA*, 140 S. Ct. at 2031 (internal quotation marks omitted).

That said, because this power is justified "solely as an adjunct to the legislative process," there are inherent limits to it. *See Mazars USA*, 140 S. Ct. at 2031. First, the targets of "legislative subpoenas retain their constitutional rights throughout the course of an investigation." *See id.* at 2032, 2035. Thus, a legislative investigation may be forced to yield when it threatens a "dissipa-tion of precious constitutional freedoms."[8] *See Watkins v. United States*, 354 U.S. 178, 204 (1957). Second, there are several related limitations reflecting the principle that both a legislative investi-gation and a specific legislative-investigative act must have a "valid legislative purpose"—that is, each must be "related to, and in furtherance of, a legitimate task of the Congress," such as pursuing a "subject on which legislation could be had." *See Mazars USA*, 140 S. Ct. at 2031 (cleaned up); *see also Quinn v. United States*, 349 U.S. 155, 161 (1955) (observing that the "power to investi-gate" does not "extend to an area in which Congress is forbidden to legislate"). For instance, Congress cannot issue a subpoena "for the purpose of 'law enforcement.'" *See Mazars USA*, 140 S. Ct. at 2032. Also, "Congress has no general power to inquire into private affairs and compel disclosures" without a valid legislative purpose to do so. *See id.* (cleaned up); *Quinn*, 349 U.S. at 161. In other words, Congress cannot "expose for the sake of exposure." *Mazars USA*, 140 S. Ct.

---

[8] When the Speech or Debate Clause applies, however, it renders such rights nonjusticiable. *See, e.g.*, *Rangel*, 785 F.3d at 24; *Eastland*, 421 U.S. at 509–10 & n.16.

at 2032 (internal quotation marks omitted); *Watkins*, 354 U.S. at 187.  Thus, investigations conducted "solely" for any of these reasons are "indefensible."  *See Mazars*, 140 S. Ct. at 2032.

Congressional committees may wield this investigatory power when the relevant body delegates it to them.  *See, e.g.*, *McGrain*, 273 U.S. at 168.  But to "issue a valid subpoena," a "committee . . . must conform strictly to the resolution establishing its investigatory powers."  *Exxon Corp.*, 589 F.2d at 592; *see also Bean LLC*, 291 F. Supp. 3d at 42.  Ordinarily, a committee's conformity to its authorizing resolution or governing rules is nonjusticiable.  *See, e.g.*, *Metzenbaum v. Fed. Energy Reg. Comm'n*, 675 F.2d 1282, 1287 (D.C. Cir. 1982) (per curiam).  But a court may pass on this sort of challenge to a committee's actions when "rights of persons other than members of Congress are jeopardized by Congressional failure to follow its own procedures."[9]  *See id.*

Although these limitations constrain Congress's investigative power, the Court's role in policing whether Congress has transgressed them is itself limited, owing in large part to the separation-of-powers concerns implicated when the judiciary is asked to decide the validity of a legislative-investigative act.  *See Sanders v. McClellan*, 463 F.2d 894, 902 (D.C. Cir. 1972).  The Court's role is circumscribed in several ways.

First, the Court's review is "deferential" when assessing whether an investigative act has a valid legislative purpose, bearing in mind that the "legitimate legislative purpose bar is a low one" and that the legitimate "purpose need not be clearly articulated."  *See Comm. on Ways & Means, U.S. House of Reps. v. U.S. Dep't of Treasury*, No. 19-cv-1974 (TNM), 2021 WL 5906031, at *5, *12 (D.D.C. Dec. 14, 2021) (citing *McGrain*, 273 U.S. at 177–80).  Indeed, the Court is "bound to presume that the action" has a "legitimate object" so long as "it is capable of being so construed."

---

[9] Subject, once again, to the caveat that the Speech or Debate Clause renders nonjusticiable such a challenge when the Clause applies.  *See, e.g.*, *Rangel*, 785 F.3d at 24; *Kilbourn*, 103 U.S. at 203.

*See McGrain*, 273 U.S. at 178–79 (internal quotation marks omitted).  In other words, the legislative investigators need not "declare in advance what [they] meditate[] doing when the investigation [is] concluded."  *See In re Chapman*, 166 U.S. 661, 670 (1897).

Second, in assessing whether the legislative purpose is a valid one, the Court must account for Congress's "wide boundaries" in investigating.  *See Barsky v. United States*, 167 F.2d 241, 245 (D.C. Cir. 1948).  After all, the "very nature of the investigative function . . . is that it takes the searchers up some 'blind alleys' and into nonproductive enterprises."  *Eastland*, 421 U.S. at 509.  Thus, "Congress is not limited to securing information precisely and directly bearing on some proposed measure" but also may seek information having "an indirect bearing on the subject."  *United States v. Bryan*, 72 F. Supp. 58, 61 (D.D.C. 1947), *aff'd sub. nom. Barsky*, 167 F.2d 241.  And when considering the valid legislative purpose in the scope of a subpoena, the Court's review is limited to determining "whether the documents sought . . . are 'not plainly incompetent or irrelevant to any lawful purpose'" of the committee "'in the discharge of [its] duties.'"  *Senate Select Comm. on Ethics v. Packwood*, 845 F. Supp. 17, 20–21 (D.D.C. 1994) (quoting *McPhaul*, 364 U.S. at 381); *cf. Hutcheson v. United States*, 369 U.S. 599, 618–19 (1962) (plurality opinion) ("[I]t does not lie with this Court to say when a congressional committee should be deemed to have acquired sufficient information for its legislative purposes.").

Third, for the Court to find a subpoena invalid based on an improper purpose, the subpoena must be "solely" for a prohibited purpose, such as exposing for exposure's sake.  *See Mazars USA*, 140 S. Ct. at 2032.  Mixed purposes do not defeat an investigative act, provided one of those purposes is a valid legislative one.  *See, e.g.*, *McGrain*, 273 U.S. at 180; *Sinclair v. United States*, 279 U.S. 263, 295 (1929), *overruled on other grounds by United States v. Gaudin*, 515 U.S. 506 (1995).  And an otherwise valid legislative purpose is not nullified by an improper motive.  *See,*

*e.g.*, *Barenblatt*, 360 U.S. at 132–33.  Thus, when attempting to "impeach" the purpose of a legislative inquiry as invalid, the challenger faces a "formidable bar."  *See Comm. on Ways & Means*, 2021 WL 5906031, at *5.  Even "'an impressive array of evidence'" suggesting an illegitimate purpose may not suffice.  *See id.* at *6 (quoting *Watkins*, 354 U.S. at 199–200 & n.32).

Fourth, when a litigant whose rights have been "jeopardized" by a committee's failure to follow its own rules challenges that failure, the Court's determination of what the rules require is constrained.  *See Metzenbaum*, 675 F.2d at 1287.  The Court may intervene if doing so "requires no resolution of ambiguities."  *See United States v. Durenberger*, 48 F.3d 1239, 1244 (D.C. Cir. 1995).  But a "sufficiently ambiguous House Rule is non-justiciable."  *See United States v. Rostenkowski*, 59 F.3d 1291, 1306 (D.C. Cir. 1995).  In that case, judicial interpretation "runs the risk" of the Court telling the House what its own rules require, thereby "intruding into the sphere of influence reserved" to it under the Rulemaking Clause of Article I of the Constitution.  *See id.* Further complicating such a challenge, "the Court must give great weight to the [House's] present construction of its own rules," particularly when that construction was arrived at before the "events in controversy."  *See United States v. Smith*, 286 U.S. 6, 33 (1932); *cf. Barker v. Conroy*, 921 F.3d 1118, 1130 (D.C. Cir. 2019) (giving the House's interpretation of its own rules controlling effect even though the interpretation was adopted after the plaintiff sued about the rule).

With these principles in mind, the Court considers the RNC's challenges to the subpoena. The RNC asserts six claims: (1) the Select Committee lacks necessary congressional authorization to issue the subpoena; (2) the subpoena does not advance a valid legislative purpose; (3) the subpoena violates the First Amendment; (4) the subpoena violates the Fourth Amendment; (5) the subpoena is overbroad and unduly burdensome; and (6) the subpoena violates the Stored Communications Act.  *See* ECF No. 6 ¶¶ 74–142; ECF No. 8-1 at 17–31.

### 1.  The Select Committee Is Properly Authorized

The RNC's broadest challenge is to the legitimacy of the Select Committee itself, which it attacks as an indirect way to attack the validity of the subpoena.  *See* ECF No. 6 ¶¶ 116–24; ECF No. 8-1 at 28–30.  The RNC argues that the Select Committee lacks the proper authorization to wield investigative power on behalf of the House on three grounds: the Select Committee lacks the required number of members; it contains none of the five Republican members recommended by Minority Leader McCarthy; and it lacks a "ranking minority member" with whom Chairman Thompson had to consult before issuing the subpoena.

First, the RNC argues that the Select Committee lacks authorization because it has only nine members, when its authorizing resolution states that Speaker Pelosi "shall" appoint thirteen members.  *See* H.R. Res. 503, § 2(a).  To the RNC, "shall" is mandatory, meaning the Select Committee is improperly constituted with only nine members.  It's not an unreasonable position.  But for a few reasons, especially given the House's own reading of the authorizing resolution, the Court cannot agree.

Starting with the resolution's text, as this Court observed in upholding former President Trump's right to name his own acting Director of the Consumer Financial Protection Bureau, "although 'shall' is usually understood as mandatory," the word is "a semantic mess" and is sometimes used "to mean 'should,' 'will,' or even 'may.'"  *English v. Trump*, 279 F. Supp. 3d 307, 323 (D.D.C. 2018) (cleaned up).  Thus, that the resolution states that Speaker Pelosi "shall" appoint thirteen members to the Select Committee is not conclusive as to whether thirteen members are required for it to lawfully operate.  Especially given this mess, the Court must give "great weight" to the House's own reading of § 2(a) before this lawsuit was filed.  *See Smith*, 286 U.S. at 33l; *Barker*, 921 F.3d at 1130.  And the House views the Select Committee to be duly constituted and

30

empowered to act under its authorizing resolution, even though the Select Committee has only nine members. This understanding is reflected by the House's adoption of the Select Committee's recommendations to find witnesses in contempt of Congress for their refusals to comply with Select Committee subpoenas.[10] *See* 167 Cong. Rec. H5748, H5768–69 (Oct. 21, 2021) (Steve Bannon); 167 Cong. Rec. H7667, H7794, H7814–15 (Dec. 14, 2021) (Mark Meadows). If the Court reads § 2(a)'s "shall" as mandatory, it would be "interpret[ing] the Rule differently than . . . the [House] itself" and "would effectively be making the Rules—a power that the Rulemaking Clause reserves to each House alone." *See Rostenkowski*, 59 F.3d at 1306–07.

Second, the RNC contends that the Select Committee lacks authorization to issue the subpoena because it does not include the Republican members Minority Leader McCarthy recommended to Speaker Pelosi to serve on the Select Committee. This argument also is based on § 2(a) of the authorizing resolution, which states that Speaker Pelosi "shall appoint" five Select Committee members "after consultation with the minority leader." Again, the Court cannot agree.

To the extent this argument rehashes the parties' dispute over the word "shall," for the reasons already explained, the Court cannot find that the Select Committee is improperly constituted on this basis. And if it is a dispute over the authorizing resolution's use of the word "consultation," for similar reasons, the Court cannot side with the RNC. To "consult" with Minority Leader McCarthy, all Speaker Pelosi had to do was ask for his "advice or opinion." *See Consultation*, Black's Law Dictionary (11th ed. 2019). There is no dispute that she did. That she did not

---

[10] In addition, Speaker Pelosi—the person responsible for implementing § 2(a) and thus whose "contemporaneous exposition" is entitled to "[g]reat weight" as a general matter, *see Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 418 (1821); *Edwards' Lessee v. Darby*, 25 U.S. (12 Wheat.) 206, 210 (1827)—decided to appoint only one more member to the Select Committee after Minority Leader McCarthy withdrew his recommended appointees.

accept all his recommendations, and that Minority Leader McCarthy then withdrew all his recommendations, does not mean that Speaker Pelosi failed to consult with him. And again, the House's implicit determination that the Select Committee is duly authorized without the Republican members Minority Leader McCarthy recommended all but precludes the Court from holding otherwise. *See Rostenkowski*, 59 F.3d at 1306–07.

Third, the RNC says that the Select Committee could not have lawfully issued the subpoena because, under § 5(c)(6)(A) of the authorizing resolution, Chairman Thompson had to consult with the "ranking minority member" before issuing it—and the RNC contends that the Select Committee does not have a "ranking minority member." Section 5(c)(6)(A) of the resolution states that, after "consultation with the ranking minority member," Chairman Thompson "may order the taking of depositions, including pursuant to subpoena, by a Member or counsel of the Select Committee." House Defendants acknowledge that this rule governs the subpoena, but they argue that Representative Cheney qualifies as the Select Committee's "ranking minority member" for consultation purposes. *See* ECF No. 17 at 25; ECF No. 24 at 93–94. The RNC does not dispute that Chairman Thompson consulted with Representative Cheney before issuing the subpoena. *See* ECF No. 17 at 25.

A "ranking member" is "[t]he most senior (though not necessarily the longest-serving) member of the minority party on a committee." *See* "Ranking Member," *Glossary of Legislative Terms*, congress.gov (last accessed Apr. 11, 2022). Representative Cheney is a Republican member of the House. *See, e.g.*, ECF No. 6 ¶¶ 14, 72. She was appointed to the Select Committee before Representative Kinzinger, and she meets the requirements to be considered the "most senior . . . member" of the Republican Party on the Select Committee. True, for whatever reason the Select Committee did not give her—or anyone else—the formal title "ranking member." But to

the extent there is any uncertainty about whether she fits the bill, on this record the Court must defer to the Select Committee's decision to treat Representative Cheney as the ranking minority member for consultation purposes.  *See Rostenkowski*, 59 F.3d at 1306.

### 2.    The Subpoena Has a Valid Legislative Purpose

Next, the RNC contends that the subpoena is unenforceable because it does not advance a valid legislative purpose.  *See* ECF No. 6 ¶¶ 103–15; ECF No. 8-1 at 26–28.  This argument, like the previous one, has several distinct aspects.  The RNC argues that House Defendants have failed to adequately identify the valid legislative purpose supporting the subpoena; that their "purported legislative purpose" is a pretext for engaging in "ad-hoc law enforcement," "harass[ing]" a "political adversary," and "expos[ing] for the sake of exposure"; and that the subpoena is overbroad and thus exceeds the bounds of any possible legitimate legislative purpose.  These arguments echo those that the Court rejected when applying the Speech or Debate Clause to dismiss House Defendants.  For similar reasons, even with the Clause removed from the equation, the Court must do so again.

First, the RNC contends that House Defendants have not adequately identified a valid legislative purpose in the records being subpoenaed, faulting them for not recommending any "draft legislation related to the topics provided" or explaining how these topics would "further any valid legislative end."  ECF No. 6 ¶¶ 108–09; *see also* ECF No. 8-1 at 27.

Again, the Court's review here must be "deferential."  *Comm. on Ways & Means*, 2021 WL 5906031, at *12.  To be sure, in any context, the "more detailed and substantial the evidence of Congress's legislative purpose" for issuing an investigative subpoena, "the better."  *Cf. Mazars USA*, 140 S. Ct. at 2035–36 (identifying "special considerations" when Congress subpoenas the President's personal information).  Even so, the Select Committee did not have to "declare in

advance" what legislation it may recommend based on the materials at issue to show that the subpoena has a "legitimate object."  *See In re Chapman*, 166 U.S. at 670; *see also Eastland*, 421 U.S. at 509; *McGrain*, 273 U.S. at 172; *Trump v. Thompson*, No. 21-cv-2769 (TSC), 2021 WL 5218398, at *12 (D.D.C. Nov. 9, 2021).  After all, the Select Committee may investigate "what *if any* legislation [is] necessary or desirable" to avert a future January 6-style attack.  *See Sinclair*, 279 U.S. at 294–95 (emphasis added).  And "Congress's decision whether, and if so how, to legislate in a particular area will necessarily depend on what information it discovers in the course of an investigation" as "members educate themselves on the relevant facts and circumstances."  *Trump v. Mazars USA, LLP*, 940 F.3d 710, 731 (D.C. Cir. 2019), *vacated on other grounds by Mazars USA*, 140 S. Ct. 2019.

The subpoena's valid legislative purpose is apparent enough to sustain it against this challenge.  *See In re Chapman*, 166 U.S. at 670.  The House instructed the Select Committee to "investigate and report upon the facts, circumstances, and causes relating to" the January 6 attack, including "the influencing factors that fomented" it.  H.R. Res. 503, § 3(1).  And it empowered the Select Committee to investigate "how technology . . . may have factored into the motivation" for the attack, *id.* § 4(a)(1)(B), including by examining the roles of any relevant "public and private" entities, *id.* § 4(a)(1)(C).  The Select Committee is tasked with reporting to the House its "findings, conclusions, and recommendations" for legislative remedial measures.  *See* H.R. Res. 503, § 4(a)(3), (c).  Thus, it is "hardly disputable" that the Select Committee may investigate the causes of the January 6 attack, and its "broad knowledge of the causes" of that day will make it "better able to fulfill its responsibility" to make well-informed recommendations to the House.  *See Sanders*, 463 F.2d at 900.

According to the Select Committee, its investigation and public reporting suggest that

claims that the 2020 presidential election was fraudulent or stolen motivated some who partici-

pated in the attack, and emails sent by the RNC and the Trump campaign using Salesforce's plat-

form spread those claims.  *See* ECF No. 6-1 at 4–5.  Salesforce itself acknowledged that, because

"there remain[ed] a risk of politically incited violence across the country," it had taken "action to

prevent [the RNC's] use of our services in any way that could lead to violence."  *See id.* at 5.

Through the subpoena, House Defendants seek, and Salesforce has agreed to provide, information

about whether and how successfully the RNC used Salesforce's platform to spread these claims

about the 2020 presidential election.  *See id.* at 5–6.  Given all the above, the Court finds that the

subpoena for the materials at issue has a valid legislative purpose.[11]

     Second, the RNC argues that the Select Committee's alleged legislative purpose is a pretext

for impermissible law-enforcement, political-harassment, and exposing-for-exposure's-sake pur-

poses.  To support this claim, the RNC points out that the Select Committee's investigation is

being led by two former federal prosecutors and that the Select Committee has "more than a dozen

former federal prosecutors on staff."  *See* ECF No. 6 ¶ 54.  It also identifies three tweets from

Select Committee members: one from Chairman Thompson on the first anniversary of the January

6 attack reflecting that "[w]e have been working diligently to bring justice" to "the tragedy of Jan.

6"; one from Representative Schiff in November 2021 saying that "[w]e will expose those

---

[11] Even if the Select Committee had to provide examples of specific legislation for which the RNC's subpoenaed information would be relevant—and again, it does not—examples are not hard to find.  *See, e.g.*, *Trump*, 2021 WL 5218398, at *12.  One example of legislation that could be had for which this information would be relevant would be a bill amending the Electoral Count Act, 3 U.S.C. § 15, to move the date of Congress's electoral-college certification closer to election day. *See* 167 Cong. Rec. H5759 (Oct. 21, 2021); *see also* U.S. Const. amend. XII; *Trump*, 20 F.4th at 42.  The subpoenaed information would be relevant to that valid legislative end because, as House Defendants argued, it might suggest that the RNC's email campaigns had a "cumulative effect" between election day and January 6 that led to the attack.  *See* ECF No. 24 at 88–89.

responsible for Jan 6" and "[n]o one is above the law"; and one from Representative Raskin in December 2021 observing that "[e]xec. privilege doesn't cover criminal misconduct, like insur-rections or coups." *Id.* ¶¶ 57–59, 114.  The RNC also references three public statements from Select Committee members: one from Representative Kinzinger about how "[w]e'll be able to have out on the public record anything [the] Justice Department needs maybe in . . . pursuit of [a crime]"; one from Chairman Thompson about how "we are pursuing evidence" leading to "former President Trump or anyone else"; and one from Representative Raskin about how neither attorney-client nor executive privilege "operate[s] to shield participants in a crime from an investigation into a crime." *Id.* ¶¶ 56–57, 59.  The RNC further points out "public reporting" that has "widely confirmed" that "the Select Committee's investigation aims to produce criminal referrals."  *Id.* ¶ 62.

This evidence falls short of the RNC's goal in several ways.  To begin with, these staffing decisions and statements are not nearly enough to overcome the "formidable bar" the RNC faces to "impeach" the Select Committee's otherwise valid legislative purpose.  *See Comm. on Ways & Means*, 2021 WL 5906031, at *5.  For example, in *Watkins*, the Supreme Court described an "im-pressive array of evidence" from several formal sources suggesting that the "sole purpose" of the inquiry at issue was to expose for exposure's sake.  354 U.S. at 199 & n.32.  Even so, the Court found that the "solution" to the "problem" before it was "not to be found in testing the motives of committee members."  *Id.* at 200.  The RNC's evidence of an illegitimate purpose here is substan-tially less "impressive" than the evidence in *Watkins*.  Thus, it does not come close to showing that the Select Committee's proffered legislative purpose is merely a pretext.

In addition, even assuming this evidence shows that the subpoena is serving an additional, illegitimate, quasi-law-enforcement purpose—perhaps a reasonable conclusion to draw—

precedent dictates that this purpose "takes nothing from the lawful object" the Select Committee is also pursuing. *See McGrain*, 273 U.S. at 180. Similarly, even if this evidence reflects an untoward motive of certain Select Committee members, that too is irrelevant given the Select Committee's valid legislative purpose. So long as "Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Barenblatt*, 360 U.S. at 132; *see also Watkins*, 354 U.S. at 200.

Third, the RNC argues that the subpoena is overbroad because it seeks information "unrelated to any potential legislation." *See* ECF No. 6 ¶ 126; *see also id.* ¶¶ 106, 110–11; ECF No. 8-1 at 28. This argument focuses on two general categories of information. The first category is any personally identifiable information of RNC donors, volunteers, and email recipients. *See* ECF No. 6 ¶¶ 1, 5, 7–8, 39, 81–84, 94, 110. But as discussed above, the Select Committee is not demanding, and Salesforce is not preparing to produce, any such information. The second category is what the RNC describes as confidential information about its "operations and activity wholly unrelated" to the January 6 attack that reflects its email-outreach strategy. ECF No. 21 at 12; *see also* ECF No. 6 ¶¶ 5, 7, 9, 32, 88, 110, 129. For example, the parties agree that the materials at issue include data about emails sent in connection with elections besides the 2020 presidential election and emails sent for the RNC to extend holiday greetings to its supporters. *See* ECF No. 24 at 44, 75.

In assessing whether these records exceed the Select Committee's valid legislative purpose, the Court's role is limited to asking whether they "are 'not plainly incompetent or irrelevant to any lawful purpose'" of the Select Committee "'in the discharge of its duties.'" *Packwood*, 845 F. Supp. at 20–21 (brackets omitted) (quoting *McPhaul*, 364 U.S. at 381); *see also Eastland*, 421 U.S. at 509 (recognizing that the "nature of the investigative function . . . is that it takes the

searchers up some 'blind alleys'").  The Court cannot say that the Select Committee has exceeded the "wide boundaries" it must be afforded here.  *See Barsky*, 167 F.2d at 245.

For starters, the Select Committee is hardly on an unconstrained "fishing expedition[]" into the RNC's records.  *See Sinclair*, 279 U.S. at 294.  It has requested information only relating to emails sent from November 3, 2020 to January 6, 2021.  That two-month window is plainly relevant to its investigation into the causes of the January 6 attack.  Granted, some of those emails will be "unrelated to the presidential election, post-election recount, or litigation efforts."  ECF No. 21 at 12.  But some of *those* emails may have included claims that the presidential election was fraudulent or stolen.  And though some may not, the Select Committee's "collection of facts may cover a wide field" and can include "matters that may have an indirect bearing on the subject" being investigated.  *See Bryan*, 72 F. Supp. at 61.  As House Defendants explain, this information will give the Select Committee the context to understand how much attention and interest was generated by emails that asserted the election was fraudulent or stolen.  ECF No. 24 at 75.  By providing this "context," this information will "'materially aid'" the Select Committee's valid legislative purpose.  *See Comm. on Ways & Means*, 2021 WL 5906031, at *11 (brackets omitted) (quoting *McGrain*, 273 U.S. at 177).

### 3.    The Subpoena Does Not Violate the First Amendment

The RNC next argues that the subpoena violates its First Amendment associational rights by compelling the disclosure of the RNC's confidential, strategic information.[12]  *See* ECF No. 6 ¶¶ 74–90; ECF No. 8 at 1; ECF No. 8-1 at 9, 17–18.  This argument has some force, especially

---

[12] The RNC also asserted that the subpoena violates the First Amendment because it compels disclosure of the personally identifiable information of its donors, volunteers, and email recipients.  *See, e.g.*, ECF No. 6 ¶¶ 83–84; ECF No. 21 at 14.  But again, the Select Committee is not demanding, and Salesforce is not preparing to produce, any such information.

given that the Select Committee is dominated by members of the Democratic Party, whose candidates compete with RNC-backed candidates in almost every federal election.  But, as explained below, the Court ultimately concludes that the subpoena does not violate the First Amendment, in part because of the limited materials at issue.

The RNC has the right to "organize itself" and "conduct its affairs" free from government interference as integral to the freedom of association guaranteed to it by the First Amendment.  *See Eu v. S.F. Cnty. Dem. Cent. Comm.*, 489 U.S. 214, 230 (1989).  By extension, the RNC also has a First Amendment interest in keeping confidential its internal, strategic materials pertaining to how it organizes itself and conducts its affairs.  *See AFL-CIO*, 333 F.3d at 176–78.  And compelled disclosure of such materials can violate those First Amendment rights in some cases.  *See id.*  For example, in *AFL-CIO*, the D.C. Circuit held that a Federal Election Commission regulation that compelled "public disclosure" of political organizations' "confidential internal materials" of a strategic nature "intrude[d]" on the organizations' First Amendment associational rights because that disclosure would "directly frustrate the organizations' ability to pursue their political goals effectively by revealing to their opponents 'activities, strategies and tactics'" that the organizations had pursued and would "likely follow in the future."  *See id.* at 177.

The RNC relies on *AFL-CIO* as the basis for its First Amendment claim arising out of the threatened disclosure of its confidential, strategic information about digital outreach to its donors, volunteers, and email recipients.  *See, e.g.*, ECF No. 6 ¶¶ 75–78; ECF No. 8-1 at 13, 18–19; ECF No. 21 at 13–14; ECF No. 24 at 57, 91, 130.  But *AFL-CIO* is not on all fours with this case because that decision focused on the "extensive interference with political groups' internal operations and with their effectiveness" flowing from compelled "public disclosure" of such information.  *See* 333 F.3d at 176–78.  And ordinarily, "release of information to the Congress does not constitute

'public disclosure.'" *See Exxon Corp.*, 589 F.2d at 589.  The RNC suggests this is of no moment because, in *Americans for Prosperity Foundation v. Bonta*, the Supreme Court emphasized that "disclosure requirements" can infringe associational rights "even if there is no disclosure to the general public." 141 S. Ct. 2373, 2388 (2021) (cleaned up).  Fair enough.  But *Bonta* is not entirely on point, either, because the Court there considered a challenge to a California regulation requiring tax-exempt organizations to disclose to the state the names and addresses of certain donors—information, unlike that here, that could directly chill individual associational rights.  *See id.* at 2380, 2387–88.

All that said, the Court is persuaded that the RNC has a cognizable First Amendment claim here.  The materials at issue include "confidential internal materials" relating to how the RNC used Salesforce's platform to engage its donors, volunteers, and email recipients, as well as certain communications between the RNC and Salesforce, in which the RNC has a First Amendment interest.  *See AFL-CIO*, 333 F.3d at 176–77.  And disclosure of these materials by Salesforce to the Select Committee should be considered more like disclosure to the public than merely disclosure to the government.  *See id.*  The Court reaches this conclusion for two reasons.

First, House Defendants have not represented that they will keep this information confidential.  *Cf. Bean LLC*, 291 F. Supp. 3d at 47 (finding that the likelihood of public disclosure was "quite low" where the committee's rules "require[d] subpoenaed materials . . . to be kept confidential" and there was insufficient "evidence to suggest" that the committee would not "follow its own rules").  To be sure, the Court "must presume" that the Select Committee "will exercise [its] powers responsibly and with due regard for the [RNC's] rights" in handling the information, *see Exxon Corp.*, 589 F.2d at 589—a point about which House Defendants repeatedly remind the Court, *see* ECF No. 24 at 90, 98, 134.  But House Defendants' failure to reassure the Court on that

point looms large.  And as the RNC points out, according to at least one newspaper article, the Select Committee—or at least persons associated with it—have shared with the media "information regarding private communications" the Select Committee obtained.  *See* ECF No. 8-1 at 35.  Second, perhaps more importantly, given the unusual circumstances here, the RNC's information need not be leaked to the media to impact its First Amendment interests.  By providing the information to the Select Committee, dominated by members of the Democratic Party, Salesforce would be directly handing the RNC's information to those in a position to use it to "frustrate the [RNC's] ability to pursue [its] political goals."  *AFL-CIO*, 333 F.3d at 177.  This Court "would have to be that 'blind' Court" not to recognize these political realities.  *See United States v. Rumely*, 345 U.S. 41, 44 (1953).

The next question is what test applies to determine whether the subpoena survives the RNC's First Amendment challenge.  The RNC argues that the Court should review this claim under "exacting scrutiny" as refined in *Bonta*, according to which "there must be a substantial relation between the disclosure requirement and a sufficiently important governmental interest," with the required disclosure being "narrowly tailored to the government's asserted interest."  *See* 141 S. Ct. at 2383 (cleaned up).  House Defendants assert that the governing standard is a more general "balancing" of "the competing private and public interests at stake in the particular circumstances shown" without a narrow-tailoring requirement.  *See Barenblatt*, 360 U.S. at 126.

As a practical matter, the Court does not see much if any difference between the approaches the parties suggest.  Setting aside the narrow-tailoring issue, the *Barenblatt* Court recognized that *NAACP v. Alabama*, 357 U.S. 449 (1959), applied the "the same principles" it applied in "balancing" the interests at stake.  *See* 360 U.S. at 127.  And the *Bonta* plurality recognized that the "exacting scrutiny" standard, referred to as such in *Buckley v. Valeo*, 424 U.S. 1, 64 (1976) (per

41

curiam), had its origins in *NAACP v. Alabama* as well. *See Bonta*, 141 S. Ct. at 2382–83. These tests, then, appear to be different ways of saying much the same thing. *See, e.g.*, *AFL-CIO*, 333 F.3d at 176 ("When facing a constitutional challenge to a disclosure requirement, courts . . . balance the burdens imposed on individuals and associations against the significance of the government interest in disclosure . . . ." (citing *Buckley*, 424 U.S. at 64–68)).

Less clear is whether the narrow-tailoring requirement applies when a legislative subpoena is being challenged on First Amendment grounds, and the parties have identified no case in which a court addressed this question. *See* ECF No. 17 at 37; ECF No. 21 at 15. The Court assumes that the narrow-tailoring requirement applies here, "[w]here exacting scrutiny applies." *See Bonta*, 141 S. Ct. at 2384. Even so, applying that requirement is not straightforward because the "contours of the narrow-tailoring inquiry . . . must be calibrated to fit the distinct issues raised" in the context of each case. *See Grutter v. Bollinger*, 539 U.S. 306, 333–34 (2003). And the context here is not a law or regulation of general applicability, but a legislative investigation in which Congress generally "has broad discretion in determining . . . the scope and extent of the inquiry," *see Bryan*, 72 F. Supp. at 61; *see also Eastland*, 421 U.S. at 509, and a subpoena for which the responsive documents have been narrowed by negotiation.

As it turns out, the standards governing legislative investigations fairly track the components of narrow tailoring as they might apply to such investigations, providing the contours for what a "fit that is . . . reasonable" looks like in this unusual context. *See Bonta*, 141 S. Ct. at 2384 (quoting *McCutcheon v. FEC*, 572 U.S. 185, 218 (2014) (plurality opinion)). To start, the records demanded must be "reasonably relevant" to the investigation. *See McPhaul*, 364 U.S. at 381–82 (cleaned up); *cf. Bonta*, 141 S. Ct. at 2386 (finding a lack of tailoring where the information at issue was basically irrelevant to the purpose for disclosure). Related to that, the investigative

demand should not be "substantially" overbroad, meaning that a "substantial portion" of the information sought "does not serve to advance" the investigative "goals." *See Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989) (footnote omitted); *see also Bonta*, 141 S. Ct. at 2386 (finding a "dramatic mismatch" that rendered the regulation insufficiently tailored). Also, the subpoena must not cause an "unnecessary and unreasonable dissipation of precious constitutional freedoms." *See Watkins*, 354 U.S. at 204. An "unnecessary" burden is imposed when, for instance, there are "multiple alternative mechanisms" for obtaining the information without imposing the burden. *See Bonta*, 141 S. Ct. at 2385, 2387. Finally, while assessing the adequacy of the tailoring, the Court must be "loath to second-guess the Government's judgment" about the relevance of the information demanded and the necessity of the burdens imposed. *See Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 478 (1989). That is, even in the face of a First Amendment challenge, the Court may not "lightly interfer[e]" with an investigative act, *see Sanders*, 463 F.2d at 902–03, and "every reasonable indulgence of legality must be accorded" it, *see Watkins*, 354 U.S. at 204.

To sum up, then, the Court applies exacting scrutiny to the RNC's First Amendment challenge to the subpoena, and it considers as part of that analysis whether the scope of the Select Committee's demand is narrowly tailored to its interest. *See Bonta*, 141 S. Ct. at 2383. For the subpoena to withstand exacting scrutiny, the "strength" of the Select Committee's interest "must reflect the seriousness of the actual burden" imposed by the subpoena on the RNC's First Amendment rights. *See id.* at 2383, 2387. And for the subpoena to pass the narrow-tailoring requirement, the materials demanded must be "reasonably relevant" to the Select Committee's inquiry and not substantially overbroad, the burdens imposed must not be "unnecessary," and the Court must remain reticent to "second-guess" the Select Committee's judgment about these points. As

explained below, the Court finds that the subpoena, as narrowed by negotiations that clarified the materials at issue, does not violate the First Amendment.

First, the Select Committee has a strong—that is, a "sufficiently important"—interest in the records demanded. *See Bonta*, 141 S. Ct. at 2383. The D.C. Circuit has already recognized Congress's "uniquely weighty" and "vital interest in studying the January 6th attack," which is being undertaken by the Select Committee to help propose "remedial legislation" that will safeguard Congress's "constitutional and legislative operations." *See Trump*, 20 F.4th at 17, 19, 35. Indeed, it is hard to imagine a more important interest for Congress than to preserve its own ability to carry out specific duties assigned to it under the Constitution. *See id.* at 35; *Barsky*, 167 F.2d at 246. Part of the study the Select Committee is tasked with doing includes investigating the "causes" and "influencing factors" of the attack. H.R. Res. 503, § 4(a)(1).

The subpoena is part of this "uniquely weighty" and "vital" study. To repeat: according to the Select Committee, its investigation and public reporting suggest that claims that the 2020 presidential election was fraudulent or stolen motivated some who participated in the attack, and emails sent by the RNC and the Trump campaign using Salesforce's platform spread those claims. *See* ECF No. 8-3 at 4–5. Through the subpoena, the Select Committee seeks information that will help it understand whether and how much those email campaigns attracted attention and thus were a factor in the January 6 attack. *See, e.g.*, ECF No. 24 at 75. And the Select Committee's knowledge of the causes of the attack will make it "better able to fulfill its responsibility" of providing well-informed recommendations to the House for remedial measures to avert a future attack. *See Sanders*, 463 F.2d at 900. In sum, the materials demanded have particular "value" to the Select Committee "in the exercise of legislative duty," and its interest in this information is strong. *See Barenblatt v. United States*, 240 F.2d 875, 884 (D.C. Cir. 1957), *vacated and remanded*, 354 U.S. 930

(1957) (per curiam), *adhered to by* 252 F.2d 129 (D.C. Cir. 1958) (en banc), *aff'd*, 360 U.S. 109 (1959).

Second, the strength of the Select Committee's interest here reflects the seriousness of the "actual burden" the subpoena imposes on the RNC's First Amendment rights. *See Bonta*, 141 S. Ct. at 2383. The Court considers "in the concrete" both the materials at issue and the RNC's alleged burden from their disclosure. *See Barenblatt*, 360 U.S. at 112. As the RNC has put it, the confidential internal materials at issue will shed light on what goes into making its email campaigns successful—such as how the RNC targets its email campaigns; the "cadence" or timing strategy of its email transmissions; and information showing the efficacy of those strategies, consisting mostly of performance-related data (for example, how many recipients opened a given email), and potentially including communications with Salesforce in which such information is referenced or discussed. *See, e.g.*, ECF No. 6 ¶¶ 7, 32, 88, 110; ECF No. 8-1 at 14; ECF No. 21 at 12–13, 16; ECF No. 24 at 61–67. The RNC fears that disclosure of this information will "frustrate" its "ability to pursue political goals such as winning elections and advocating for its policies." ECF No. 6 ¶ 88; *see also* ECF No. 8-1 at 13. Like many of its others, these are not unreasonable arguments.

But upon closer inspection, less is at stake than the RNC represents. For example, at least some of the email "cadence" information is already publicly available or readily deducible from publicly available sources. As House Defendants point out, several online databases have collected the emails sent by the RNC during the relevant time, and these databases include the date and time the emails were sent. *See* ECF No. 17 at 17 n.12. So the subpoena's demand for this information does not seek the disclosure of "confidential" internal materials and does not add to

the RNC's burden.[13]  *See AFL-CIO*, 333 F.3d at 177.  And while the RNC raises the specter that its employees' communications with Salesforce could, in theory, include discussions about data related to the performance of its email campaigns, *see* ECF No. 8-1 at 22, the RNC has provided no basis for the Court to find that such communications exist despite presumably having its own copies of them from @gop.com email addresses.  *See generally* ECF No. 8-2; ECF No. 21-1.

For the information the parties acknowledge exists but is currently confidential—such as the performance data of the RNC's email campaigns during this period—the strength of the Select Committee's interest in this information outweighs any actual burdens imposed by its disclosure to the Select Committee.  *See Bonta*, 141 S. Ct. at 2383, 2386–87.  The RNC's alleged burden is the subpoena's interference with the RNC's "ability to pursue political goals such as winning elections and advocating for its policies."  *See* ECF No. 6 ¶ 88; *see also AFL-CIO*, 333 F.3d at 177 (recognizing that compelled public disclosure of strategic information can violate the First Amendment when the disclosure causes "extensive interference" with political organizations' "effectiveness").  But because this alleged burden does not outweigh the Select Committee's interest, the "balance . . . must be struck in favor of the latter."  *See Barenblatt*, 360 U.S. at 134.

The Court strikes this balance mainly because disclosure of the material at issue is not nearly as burdensome for the RNC as disclosure of the "detailed descriptions of training programs, member mobilization campaigns, polling data, and state-by-state strategies" was for the AFL-CIO and Democratic National Committee in *AFL-CIO*.  *See* 333 F.3d at 176–77.  Public disclosure of that kind of information would obviously "seriously interfere[]" with a political organization's

---

[13] Similarly, the RNC has suggested a First Amendment harm from disclosure because someone could use the information to create a "mosaic" of RNC supporters' "political activities and beliefs." *See, e.g.*, ECF No. 21 at 14.  But again, the personally identifiable information that would provide almost the entire basis for this revealing "mosaic" is not at risk of disclosure.

"effectiveness." *See id.* at 178.  The Court cannot reach the same conclusion about the information here, at least on the record before it.  Nothing suggests that the Select Committee is demanding, or that Salesforce is preparing to produce, internal RNC memoranda laying out its digital strategy. The RNC's representations on this front appear to assume that if all the material it feared was at stake were disclosed—including, for example, granular personal information about its donors, such as their giving history—the information "could" be used to create a "mosaic" of its email-outreach strategy that its political rivals could then use to better compete with the RNC in the digital arena.  *See* ECF No. 8-1 at 21; ECF No. 6 ¶ 88; ECF No. 8-2 ¶¶ 18, 24–25.  No doubt. But—again, to return to one example—the RNC's donors' personal information and giving histories are not being demanded or produced.  True, some of the internal names of the RNC's email campaigns could reveal some of its strategic decisions, such as the general audiences to which the RNC targets certain communications.  And obviously, information that shows which email campaigns attracted more attention, and which attracted less, has some strategic value.  But on the record here, whatever competitive harm may come to the RNC from disclosure of the actual material at issue is too "logically attenuated" and "speculative" to defeat the Select Committee's weighty interest.  *See United States v. Salvation Army S. Territory*, No. 13-mc-341 (ABJ/JMF), 2013 WL 2632639, at *3 (D.D.C. June 12, 2013); *see also Buckley*, 424 U.S. at 71–72 & n.88; *cf. AFL-CIO*, 333 F.3d at 177 (rejecting a per se rule that any "action that places a political association at a disadvantage relative to its opponents violates the First Amendment").

Third, the Select Committee's demand is narrowly tailored to its interest.  As the Court has already explained, the Select Committee seeks reasonably relevant information from a narrow window during which the RNC sent emails promoting claims that the presidential election was fraudulent or stolen.  *See* ECF No. 8-3 at 4–6.  And the material being demanded is not overbroad

because even information about those email campaigns the RNC argues are irrelevant will provide

helpful "context" that will "'materially aid'" the Select Committee. *See Comm. on Ways & Means*,

2021 WL 5906031, at *11 (brackets omitted) (quoting *McGrain*, 273 U.S. at 177); *see also* ECF

No. 24 at 43–44, 75; ECF No. 8-1 at 14, 21–22.  As for the necessity of the burden, the RNC has

not argued that the subpoena is insufficiently tailored because of viable "alternative mechanisms"

for the Select Committee to get the information it seeks.  *See Bonta*, 141 S. Ct. at 2385, 2387; *see*

*also* ECF No. 8-1 at 17, 19–22; ECF No. 21 at 13, 16.  Thus, the Court will not "second-guess"

the Select Committee's "judgment" as to its chosen means.  *See Fox*, 492 U.S. at 478.  For these

reasons, the Select Committee's demand is "in proportion to the interest served"—that is, it is

narrowly tailored.  *See Bonta*, 141 S. Ct. at 2384 (quoting *McCutcheon*, 572 U.S. at 218).[14]

### 4.     The Subpoena Does Not Violate the Fourth Amendment

The RNC also argues that the subpoena violates the Fourth Amendment's prohibition on

unreasonable searches and seizures because its breadth "exceeds any lawfully authorized purpose"

of the Select Committee.  *See* ECF No. 6 ¶¶ 91–102; ECF No. 8-1 at 22–26.  The parties dispute

---

[14] The RNC also argues that it should have a right to review documents Salesforce is preparing to produce to the Select Committee as responsive to the third, fourth, and fifth categories outlined in the subpoena before they are produced to the Select Committee because the RNC cannot be sure that its First Amendment-protected material is not included in these documents.  *See* ECF No. 8-1 at 22.  As to categories three and four, the RNC has provided no specific basis for the Court to find that such First Amendment-protected material may exist in responsive documents, nor has it explained why the Court should strike the balance any differently than it already has here as to any such material.  *See id.*; ECF No. 21-1 ¶¶ 13–16; ECF No. 24 at 19.  Moreover, Salesforce's representations about the documents it is withholding as privileged and those it is preparing to produce underscore the lack of any reasonable basis to conclude that such protected material is at issue. *See* ECF No. 24 at 119–20.  As for the fifth category, the RNC also has provided no specific basis for the Court to find that such First Amendment-protected communications may exist despite presumably having its own copies of them from @gop.com email addresses.  *See generally* ECF No. 8-2; ECF No. 21-1.  And again, the Court has no reason to suspect it would strike the balance any differently as to any such First Amendment-protected material present.

whether the RNC has a Fourth Amendment interest in the Salesforce-held information that the subpoena demands.  *Compare* ECF No. 17 at 39, *with* ECF No. 21 at 18–22.  Even assuming the RNC retains such an interest, the subpoena does not violate the RNC's Fourth Amendment rights.

The leading Supreme Court case on Fourth Amendment challenges to legislative subpoenas (and one of the "few federal cases" on point) is *McPhaul*, 364 U.S. 372.  *See* 1 *Bus. & Com. Litig. in Fed. Cts.* § 6:15 (Robert L. Haig, Ed., 5th ed. 2021 update).  In *McPhaul*, a House committee issued to the executive secretary of the Civil Rights Congress a subpoena that demanded production of "all records, correspondence[,] and memoranda pertaining to the organization of, the affiliation with other organizations[,] and all monies received or expended by the Civil Rights Congress."  *See* 364 U.S. at 374.  The subpoena's recipient argued that it was "so broad as to constitute an unreasonable search and seizure in violation of the Fourth Amendment."  *Id.* at 382. The Supreme Court recognized that the subpoena was "broad," but it reasoned that the committee's inquiry was a "relatively broad one" and thus the "permissible scope of materials that could reasonably be sought was necessarily equally broad."  *See id.*  And it ultimately held that the subpoena was not so broad "such as to violate the Fourth Amendment."  *Id.* at 383.

So too here.  As discussed above, the subpoena demands documents within the permissible scope of materials that the Select Committee may seek in its investigation.  Also as discussed above, the information at issue that could shed some light on the RNC's political strategy is no more sensitive than the *McPhaul* subpoena's demands for information about the Civil Rights Congress's "organization" and affiliates.  Moreover, in this case, unlike in *McPhaul,* the subpoena is time-limited to a few months of records.  Thus, because the subpoena is "not more sweeping" than

the one "sustained against challenge[]" in *McPhaul*, the Court "cannot say that the breadth of the subpoena [is] such as to violate the Fourth Amendment."[15]  *See McPhaul*, 364 U.S. at 383.

### 5.    The Subpoena Is Not Overbroad and Unduly Burdensome

In its complaint, the RNC asserted a standalone claim that the subpoena is "excessively broad and unduly burdensome."  *See* ECF No. 6 ¶¶ 125–33.  This claim raises the same issues that the Court has already addressed.  *See id.*  Confirming its redundancy, the RNC did not advance this claim in its preliminary injunction motion despite devoting sections of that motion to each of its five other claims.  *See* ECF No. 8 at 1–3; No. 8-1 at 17–31.  Thus, this claim fails for all the reasons already explained above.

### 6.    The RNC's Stored Communications Act Claim Is Moot

Finally, the RNC brings a claim under the Stored Communications Act, 18 U.S.C. § 2701 *et seq.*, because the subpoena "appears to seek the actual content of communications" covered by the Act.  *See* ECF No. 6 ¶¶ 134–42.  But a "federal court does not have subject matter jurisdiction over claims that are moot."  *Amin v. Nyack Sch. of Adult & Distance Educ.*, 710 F. Supp. 2d 80,

---

[15] The RNC also argues that the Select Committee's failure to put in place "safeguards" such as a "taint team or analogous filter" for its protected information renders the subpoena unreasonable under the Fourth Amendment.  *See* ECF No. 8-1 at 24–26.  For this, it relies on *Packwood*, in which Senator Robert Packwood raised a Fourth Amendment challenge to the Senate Ethics Committee's subpoena for his "personal diaries."  *See* 845 F. Supp. at 21–22.  The court, aware of the "peculiarly sensitive nature of personal diaries," factored into its Fourth Amendment reasonableness analysis the "protocol" the committee planned to follow in examining these diaries, consisting of "a focused, temporally limited review of a fraction of the diaries of most recent origin with many passages masked" that would take place "in the presence of Senator Packwood's counsel," after which the diaries would be "returned immediately to Senator Packwood." *Id.* at 22.  No such similarly sensitive personal—and potentially irrelevant—information is at issue here.  Thus, the court's determination that the presence of such protocols in *Packwood* helped support the reasonableness of the search there does not mean they are required here.  Of course, "whether a search and seizure is unreasonable within the meaning of the Fourth Amendment depends upon the facts and circumstances of each case."  *See Cooper v. California*, 386 U.S. 58, 59 (1967).

82 (D.D.C. 2010).  And a "claim for relief that has already been realized is moot."  *Id.*  That is the case here.

As the RNC noted in its complaint, Salesforce objected to the subpoena "to the extent it [sought] the disclosure of the contents of electronic communications maintained on behalf of the RNC in violation of the Stored Communications Act."  *See* ECF No. 6 ¶¶ 44, 137.  But after "conversations" with Salesforce, the Select Committee confirmed that it was not seeking communications content covered by the Act.  *See* ECF No. 15-1 at 3 & n.1; *see also* ECF No. 17 at 49.  House Defendants reaffirmed to the Court that they were "not seeking any materials that would be covered" by the Act.  *See* ECF No. 24 at 100.  And Salesforce has since informed the Court that it is not preparing to produce any material covered by the Act.  *See* ECF No. 25 at 2, 4.  In other words, the RNC has already realized its claim for relief to prevent Salesforce from producing matter covered by the Stored Communications Act to the Select Committee.  Thus, this claim is moot.

## V.   Administrative Injunction

Before concluding, the Court recognizes that the subpoena's return date is currently Monday, May 2, 2022.  Thus, the RNC has little time to move for an injunction pending appeal.  *See* Fed. R. Civ. P. 62(d), (g); Fed. R. App. P. 8(a)(2).  And all the RNC's claims could become moot before it can do so.  That is so because, once Salesforce discloses the materials at issue to the Select Committee, "the separation of powers, including the Speech or Debate Clause, bars this [C]ourt from ordering" the Select Committee to return or destroy the subpoenaed documents.  *See Senate Permanent Subcomm. on Investigations v. Ferrer*, 856 F.3d 1080, 1086 (D.C. Cir. 2017).

Under the All Writs Act, the Court "may issue all writs necessary or appropriate in aid" of its jurisdiction and "agreeable to the usages and principles of law."  *See* 28 U.S.C. § 1651(a).  The All Wits Act is a "residual source of authority" by which the Court may "issue writs . . . not

otherwise covered by statute" when "the need arises." *Pa. Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S. 34, 43 (1985); *see also Adams v. United States ex rel. McCann*, 317 U.S. 269, 272 (1942). The authority conferred by the Act includes issuing injunctive relief.  *See, e.g.*, *Trump v. Comm. on Ways & Means*, 415 F. Supp. 3d 38, 44, 50 (D.D.C. 2019); *ITT Cmty. Dev. Corp. v. Barton*, 569 F.2d 1351, 1359 n.19 (5th Cir. 1978).  One circumstance when the "need arises" to issue such relief is when it is necessary to "preserve the availability of meaningful judicial review."  *See Astrazeneca Pharms. LP v. Burwell*, 197 F. Supp. 3d 53, 56 (D.D.C. 2016); *see also TRAC v. FCC*, 750 F.2d 70, 76 (D.C. Cir. 1984).  Thus, injunctive relief under the All Writs Act "may be appropriate when a claim is not yet ripe for judicial review but may both ripen and become moot almost instantaneously, thereby depriving the court of jurisdiction to decide the claim." *Comm. on Ways & Means*, 415 F. Supp. 3d at 44.

Here, the RNC's ability to seek an injunction pending appeal could ripen and then very quickly become moot.  Thus, to preserve the availability of meaningful judicial review, the Court will enter an "administrative injunction" to ensure the RNC has time to seek an injunction pending appeal.  *See Trump v. Thompson*, No. 21-5254, 2021 WL 5239098, at *1 (D.C. Cir. Nov. 11, 2021) (per curiam).  The administrative injunction will dissolve automatically on May 5, 2022 if the RNC has not moved for an injunction pending appeal by then.  If the RNC does so move by then, the administrative injunction will dissolve automatically upon the resolution of that motion.

## VI.   Conclusion

For all these reasons, the Court will dismiss all the claims against House Defendants, dismiss as moot the Stored Communications Act claim against Salesforce, enter judgment against the

RNC on the rest of its claims against Salesforce, and enter an administrative injunction to give the

RNC time to seek an injunction pending appeal.  A separate order will issue.


/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: May 1, 2022