**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| REPUBLICAN NATIONAL COMMITTEE, | ) ) ) |
| *Plaintiff*, | ) ) |
| v. | ) ) |
| NANCY PELOSI, et al., | ) ) |
| *Defendants*. | ) ) ) |

Case No. 1:22-cv-00659-TJK

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**
**OF PLAINTIFF'S MOTION FOR INJUNCTION PENDING APPEAL**

Christopher O. Murray
STATECRAFT PLLC
1263 Washington Street
Denver, CO 80203
Tel:  602.362.0034
Email:  chris@statecraftlaw.com

*Attorney for Plaintiff Republican National Committee*

## INTRODUCTION

In response to the Court's May 1, 2022 Memorandum Opinion ("Order"), Plaintiff Republican National Committee ("RNC") seeks an injunction pending appeal while the D.C. Circuit considers the novel constitutional questions presented in this case regarding challenges to congressional subpoenas issued to a political party's third-party vendors.

As the Court recognized, its Order is by all accounts significant. First-impression issues are many, and the constitutional stakes are high. For the first time, a congressional committee dominated by the political party in power leveraged its subpoena authority to compel the disclosure of the minority party's confidential and protected internal party deliberative material. Not only did the congressional committee subpoena the information of a political foe, but it directed its subpoena to the minority party's digital-information custodian. As the Court's 54-page Order makes plain, in deciding the RNC's claims (particularly against Salesforce.com ("Salesforce")), there were no less than a half-dozen "close" calls on which the Court rightfully acknowledged that reasonable minds could disagree.

If a first-of-its-kind congressional subpoena were not enough, the Congressional Defendants' quizzical litigation posture compounded the complexity of the case and required these complex issues to be resolved on a necessarily expedited basis. Now, as the Congressional Defendants see it, this case will be over absent *some* type of injunctive relief prior to the RNC fully exhausting its appellate rights with the D.C. Circuit and the U.S. Supreme Court. Through this motion, the RNC simply asks the Court to maintain the status quo while higher courts examine the important issues presented in this case. Without an injunction, the RNC will have no opportunity to obtain relief on appeal, as Salesforce has indicated it intends to respond to the Subpoena and the Congressional Defendants claim the courts are without authority to award relief once Salesforce produces the RNC's confidential information to Congress.

**BACKGROUND**

This Court is well-versed in the facts of this case by now. Hence, the RNC only briefly recounts the proceedings leading to this point. On February 23, 2022, the U.S. House Select Committee to Investigate the January 6th Attack on the U.S. Capitol ("Select Committee") served Salesforce with a subpoena seeking a vast amount of RNC information concerning its digital communications and fundraising. (*See* Pl.'s Mem. in Supp. of Pl.'s Mot. for Prelim. Inj. ("Memo") at 3; Decl. of C. Schaeffer ("Schaeffer Decl.") at 3.) The Select Committee issued the Subpoena despite the RNC working cooperatively with the Committee during its investigation of the events surrounding January 6th.

On March 9, 2022, the RNC filed this lawsuit against the Select Committee and its Members to enjoin any production in response to the Subpoena. The RNC later amended its complaint on March 15, 2022, to add Salesforce as a defendant to prevent Salesforce from complying with the Subpoena's March 16, 2022 return date. (*See* Am. Compl. at 2.) On the same day, the RNC moved for a preliminary injunction to enjoin Salesforce from producing information, or sitting for a deposition, in response to the Subpoena. (Memo at 29.) The parties then conducted expedited briefing and participated in a hearing before the Court on April 1, 2022. (*See generally* Apr. 1, 2022 Hr'g Tr. ("Apr. 1 Tr.").)

Four days after the hearing, the Court requested supplemental briefing on four specific questions, all of which anticipated dismissal of the the Congressional Defendants under the Speech or Debate Clause. (April 5, 2022 Order at 2–3.) The parties submitted supplemental briefs addressing these questions three days later, on April 8, 2022, and responses to those supplemental briefs four days after that, on April 12, 2022. During briefing and at the April 1 hearing, the Congressional Defendants claimed to have "narrowed" the scope of the Subpoena in response to this lawsuit. The Court "credited th[e] negotiations," which it found "significantly reduced the [S]ubpoena's potential overbreadth." (Order at 17.) To the Court, this narrowing proved dispositive: "[T]he RNC identified important First Amendment interests … that would

have presented a much different question … had the materials at issue not been narrowed after discussions between the Select Committee and Salesforce." (*Id.* at 13; *see also id.* at 17.)

On May 1, 2022, the Court issued its Order dismissing the RNC's claims against the Congressional Defendants, dismissing as moot the RNC's claims under the Stored Communications Act, and entering judgment against the RNC on the remainder of its claims against Salesforce. (*See* Order at 52–53.) Recognizing that Salesforce's production in response to the Subpoena would likely moot the RNC's appeal, the Court entered an "'administrative injunction' to ensure the RNC has time to seek an injunction pending appeal." (Order at 52.) That administrative injunction is set to expire upon resolution of this motion.

The RNC timely filed a notice of appeal on May 4, 2022, and now moves for an injunction pending appeal, or, alternatively, an extension to the current administrative injunction, to prevent irreparable harm while the D.C. Circuit considers the merits of the RNC's appeal.

## ARGUMENT

The Court should temporarily enjoin Salesforce's compliance with the Subpoena to preserve the RNC's right to challenge the Court's Order on appeal. In considering whether to grant an injunction pending appeal, a court must balance four factors: (1) the applicant's likelihood of success on the merits; (2) whether the applicant will suffer irreparable injury; (3) the balance of hardships to other parties interested in the proceeding; and (4) the public interest. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020).

The injunction pending appeal standard is "more flexible than a rigid application of the traditional four-part standard applicable to granting a preliminary injunction." *MediNatura, Inc. v. Food & Drug Admin.*, No. CV 20-2066 (RDM), 2021 WL 1025835, at *6 (D.D.C. Mar. 16, 2021). The plain language of Rule 62(d) supports this: it permits courts to grant injunctions pending appeal "[w]hile an appeal is pending from an interlocutory order or final judgment that … refuses … an injunction." Thus, "an injunction pending appeal may be appropriate, even if the Court believed its analysis in denying … injunctive relief is correct." *MediNatura, Inc.*, 2021 WL 1025835, at *6 (quoting *Beverage Ass'n v. City & Cnty. of San Francisco*, No. 15-cv-3415,

2016 WL 9184999, at *1 (N.D. Cal. June 7, 2016)). Best understood, the Rule 62(d) standard allows an injunction pending appeal when "the threat of irreparable harm may be so grave and the balance of equities may favor a plaintiff so decisively that an injunction pending appeal of a difficult or novel legal question may be proper." *Id.*

Here, the irreparable injury that would befall the RNC absent an injunction pending appeal is undeniable. By the Congressional Defendants' own admission, Salesforce's disclosure of the RNC's constitutionally protected information would moot the RNC's entire case. Once the information is turned over to Congress, the court would lack authority to redress any constitutional violations. *See Hearst v. Black*, 87 F.2d 68, 71 (D.C. Cir. 1936). Even more, it is undeniable that this case centers on a first-of-its-kind congressional subpoena, which the Court characterized as "highly unusual," prompted by an "exceedingly rare spectacle," and issued by a committee dominated by members of the Democratic Party. The constitutional issues in the case are both weighty and novel and, as the Court repeatedly acknowledged in its Order, subject to reasonable disagreement. The RNC should have an opportunity to test the Order before higher courts, and, because of the unique nature of this case—where disclosure will simultaneously inflict the RNC's claimed injury and shield that injury from judicial review—an injunction pending appeal is the only way that is possible.

I.      **The Irreparable Harm the RNC Will Suffer Absent an Injunction Pending Appeal is Obvious and Not Subject to Reasonable Dispute.**

The Congressional Defendants' legislative immunity argument solidifies the irreparable harm the RNC will face absent an injunction pending appeal. Without an injunction, Salesforce has said it will comply with the Subpoena. (*See* Apr. 1 Tr. at 117:5–23.) This is critical because, if Salesforce produces in response to the Subpoena, the Congressional Defendants have argued that no court would have the authority to order relief. (Cong. Defs.' Opp'n at 23 (citing Hr'g Tr. at 33:9–16, *Budowich v. Pelosi*, No. 21-3366-JEB (D.D.C. Jan 20, 2022).) Put directly, once the Select Committee is in possession of the RNC's confidential and protected information, per the Congressional Defendants, there is nothing the courts can do. *See Senate Permanent Subcomm.*

*on Investigations v. Ferrer*, 856 F.3d 1080, 1086 (D.C. Cir. 2017). The Congressional

Defendants advanced this argument in another congressional subpoena and cited much of the

same authority:

> **THE COURT:** Let's go back to the jurisdictional issue. So for Speech or Debate, … your argument … is that once Congress is in possession of documents, that it is not for the Court to tell them to disgorge such documents.
>
> But do you take the position that, even if a committee did not have a proper legislative purpose, or that a subpoena at issue was plainly invalid or overbroad or otherwise defective, that no one could challenge a committee's ability to use those documents?
>
> **[COUNSEL FOR CONGRESSIONAL DEFENDANTS]:** Yes, Your Honor. …

(*See* Cong. Defs.' Opp'n, Ex. A at 19:1–11.)

Congressional Defendants embrace of this position makes this precisely the type of case

that warrants an injunction pending appeal. As Judge Moss recently explained, injunctions

pending appeal are "especially appropriate where, in the absence of such an injunction, the

subject matter of the dispute will be destroyed or otherwise altered in a way that moots the

pending appeal." *MediNatura, Inc.*, 2021 WL 1025835, at *6. "Once a tree has been felled and

sent to the sawmill, another tree may be planted in its place, but the original 100-year-old pine is

gone forever." *Id.* "Likewise, in a compelled speech case, the disputed words, once uttered,

cannot be put back in the speaker's mouth." *Id.* The same logic applies here, perhaps with even

greater force: once the subpoenaed information is within the halls of Congress, its confidential

and protected status are gone forever and cannot be rehabilitated. And, more detrimentally, once

Congress has the RNC's information, the Speech or Debate Clause renders the RNC's case

nonjusticiable and moot.

Several cases illustrate the need for an injunction pending appeal when there is a strong

showing of irreparable harm. In *Native Ecosystems Council v. Kimbell*, environmental groups

challenged a Forest Service plan for logging. No. 05-cv-110-M, 2005 WL 8167434, at *1 (D.

Mont. Nov. 21, 2005). While the district court denied plaintiffs' request for preliminary

injunction, it granted an injunction pending appeal. Absent an injunction pending appeal "there

[was] a chance that a substantial portion of the Project [would] already have been completed by the time the Ninth Circuit consider[ed] the merits of [p]laintiffs' claims." *Id.* Even though the court had found against plaintiffs on the success-on-the-merits factor, "there [was] a possibility that the Ninth Circuit [would] disagree," and "[i]f logging ha[d] been completed or substantially completed by that time," the courts "[would] no longer [have been] able to grant appropriate relief." *Id.* An injunction pending appeal was thus "a prudent measure to preserve [p]laintiffs' right to challenge the Project's effects on the environment." *Id.* at 2. Similarly, in *American Beverage Association v. City & County of San Francisco*, the district court denied plaintiffs motion for preliminary injunction but granted an injunction pending appeal. No. 15-cv-3415, 2016 WL 9184999, at *2 (N.D. Cal. June 7, 2016). Because plaintiffs raised "a plausible argument [under the First Amendment] that there are serious questions on the merits," and because there was "a good chance that the injunction pending interlocutory appeal will be relatively brief because the appeal will likely be resolved on an expedited basis," an injunction pending appeal was warranted. *Id.*

It is for these reasons Judge Moss concluded that,"[g]iven the language of Rule 62(d) and the interest in preserving the jurisdiction of the courts of appeals to consider at least certain cases on the verge of mootness, the Court is persuaded … there may be rare cases in which a court should issue an affirmative injunction pending appeal, even if the movant's likelihood of success on the merits is uncertain." *MediNatura, Inc.*, 2021 WL 1025835, at *7. Here, as explained, *infra*, while the RNC's claims may be characterized as "uncertain" because of the novelty of the Congressional Defendants' actions in issuing the Subpoena, they raise important and substantial issues. Indeed, the Order is replete with examples where the Court described the RNC's challenges as "reasonable" and hypothesizing that it might have decided the issues differently had the circumstances been different on the margins. Surely the Court appreciates that a higher court could see these "close" calls differently. All the RNC asks for is an opportunity to test its claims with a higher court. *Id.* ("The principal reason for a district court to grant an injunction pending appeal based on a showing of less than a likelihood of success is to avoid the risk that

the case will become moot before the court of appeals has a chance to disagree."). In the end, it was the Congressional Defendants who chose to invoke the Speech or Debate Clause; they should have to live with the consequences of its invocation, including the strong likelihood that this case would be moot without an injunction pending appeal. *See Prigg v. Com. of Pennsylvania*, 41 U.S. 539, 606 (1842) ("[H]e who lives by the sword today, may die by the sword tomorrow.")

The need for an injunction pending appeal is bolstered by the type of rights at issue. It is well-established that "'a prospective violation of a constitutional right constitutes irreparable injury for ... purposes' of 'seeking equitable relief.'" *Karem v. Trump*, 960 F.3d 656, 667 (D.C. Cir. 2020) (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)). When a plaintiff seeks only equitable relief for prospective violations of its constitutional rights, any resulting constitutional harm constitutes irreparable injury. *See, e.g.*, *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 385 (D.D.C. 2020) (existing and prospective violation of First Amendment rights "are sufficient to demonstrate irreparable harm"); *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 217–18 (D.D.C. 2020) ("Plaintiffs who have shown a likelihood of success on their Fifth Amendment claims … have also established irreparable harm."); *Brown v. FEC*, 386 F. Supp. 3d 16, 34 (D.D.C. 2019) (showing a likelihood of success on the merits of First Amendment claim "typically" results in irreparable injury). Because the RNC is likely to succeed on its constitutional claims, irreparable harm necessarily follows.

That the harm here is irreparable cannot be reasonably disputed. Absent an injunction during the pendency of this appeal, the RNC could win on the merits of its constitutional claims but nonetheless lose its protected information to the legislative-immunity abyss. This result is precisely what an injunction pending appeal works to avoid.

## II.    Neither the Congressional Defendants Nor Salesforce Will Be Harmed By an Injunction Pending Appeal.

The balance of hardships amongst the parties heavily favors the RNC. As discussed above, without an injunction, the RNC's constitutional rights will be lost. And, once these

valuable rights are lost, the RNC has no ability to redress this deprivation; the Congressional Defendants argue that no court has authority to address the RNC's claims once Salesforce produces under the Subpoena. (*See* page ___, *supra*.) Neither the Congressional Defendants nor Salesforce have articulated specific harm they will suffer from an injunction. To be clear, it is hard to imagine a greater imbalance of the equities, particularly when the Select Committee has articulated no more than generalized "frustrat[ion]" of their ongoing investigation. The balance of the equities weighs decidedly in the RNC's favor.

### III.    An Injunction Pending Appeal is in the Public Interest.

Protecting constitutional rights is in the public interest. The D.C. Circuit has made this point clear: "[t]he Constitution does not permit Congress to prioritize any policy goal over" constitutional rights, *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013), no matter the nation's interest in the congressional investigation. Indeed, "the Constitution is the ultimate expression of the public interest,' and consequently, government actions in contravention of the Constitution are 'always contrary to the public interest.'" *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 386 (D.D.C. 2020) (quoting *Gordon*, 721 F.3d at 653), *appeal dismissed*, 2021 WL 2201669 (D.C. Cir. May 17, 2021). Even more, [t]here is generally no public interest in the perpetuation of unlawful [government] action." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "[E]nforcement of an unconstitutional law" or subpoena "is ***always*** contrary to the public interest." *Gordon*, 721 F.3d at 653 (emphasis added).

Without question, protecting the RNC's constitutional rights serves the public interest. And, enforcing an unlawful government subpoena violating the RNC's rights is unquestionably not in the public interest. Thus, the public interest favors the RNC, especially here where an injunction would maintain the status quo and preserve the RNC's right to protect its constitutional interests through appeal, an interest of the highest public order.

### IV.    The RNC is Likely to Prevail on the Merits on Appeal.

The RNC recognizes that the Court has just analyzed the RNC's claims on the merits and decided those claims against it. By its argument here, the RNC does not seek to convince the

Court in this abbreviated filing that its decision was incorrect, only that there is a substantial likelihood that a higher court may disagree. *See Confederated Tribes of Chehalis Rsrv. v. Mnuchin*, No. 20-CV-01002 (APM), 2020 WL 3791874, at \*1 n.2 (D.D.C. July 7, 2020) (granting injunction pending appeal while noting "[w]ading into th[e] thorny [merits] issues once more is neither desirable nor necessary" because "the questions [p]laintiffs have raised are sufficiently 'substantial' to warrant an injunction pending appeal"). And there is. The Court's Order upholds an unprecedented congressional subpoena to the national political party committee of the minority party by a congressional committee dominated by the majority party. Not only is the Subpoena unprecedented, but the Court, by its own admission, resolved a trove of first-impression issues defining the enforceability of congressional subpoenas issued to third-party vendors or custodians. Because a higher court may well disagree with this Court's resolution of some (or all) of these issues, the RNC is likely to prevail on the merits of its appeal and entitled to an injunction to ensure that appeal can proceed.

A.      **The First Amendment protects the RNC's protected information compelled by the Subpoena.**

The First Amendment protects "a political party's discretion in how to organize itself, conduct its affairs, and select its leaders." *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 230 (1989); *see also Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 224 (1986) ("The Party's determination of the boundaries of its own association, and of the structure which best allows it to pursue its political goals, is protected by the Constitution."). Pertinent here, the D.C. Circuit has expressly recognized that political parties' First Amendment right to association includes security in their internal materials and documents. In *American Federation of Labor & Congress of Industrial Organizations v. FEC*, the D.C. Circuit held that the FEC's regulation compelling public disclosure of Democratic National Committee and AFL-CIO internal planning materials obtained in an investigation violated the First Amendment rights of the political party and the labor union. 333 F.3d at 179. The court expressly accepted that, while compelled disclosure requirements are less direct restrictions on a party's rights than the regulation of

political group leadership or structure, compelled disclosure similarly frustrates a group's decisions as to "how to organize themselves, conduct their affairs, and select their leaders," as well as their selection of a "message and the best means to promote that message." *Id.* (quoting *Eu*, 489 U.S. at 230–31 & n.21) (internal brackets omitted).

In *Bonta*, the Supreme Court confirmed that where a compelled disclosure requirement implicates First Amendment associational interests, the disclosure requirement must meet exacting scrutiny. 141 S. Ct. at 2383. This review requires that the proposed disclosure bears a substantial relationship to a sufficiently important governmental interest. *Id.* (citing *Doe v. Reed*, 561 U.S. 186, 196 (2010)). *Bonta* clarified that exacting scrutiny requires that the disclosure requirement "be narrowly tailored to the government's asserted interest." *Id.* Hence, for the Subpoena to survive this challenge, it must have been issued in support of a sufficiently important governmental interest, and must be tailored to that interest. In its Order, the Court correctly held that exacting scrutiny applies to the First Amendment claims. (Order at 43.)

In the end, the Court disagreed with the RNC that the disclosure of the material demanded by the Select Committee—at least as recast by the Select Committee in the course of this litigation—"mainly because disclosure of the material at issue is not nearly as burdensome for the RNC as disclosure of the 'detailed descriptions of training programs, member mobilization campaigns, polling data, and state-by-state strategies' was for the AFL-CIO and Democratic National Committee in *AFL-CIO*." (*Id.* at 46.) The Court recognized that "[p]ublic disclosure of that kind of information would obviously 'seriously interfere[]' with a political organization's 'effectiveness.'" (*Id.* at 47.) The Court further recognized that the RNC represented that the information demanded by the Subpoena "'could' be used to create a 'mosaic' of its email outreach strategy that its political rivals could then use to better compete with the RNC in the digital arena." (*Id.*) And the Court acknowledged that, even crediting the Committee's post-litigation narrowing of the Subpoena's demands, "some of the internal names of the RNC's email campaigns could reveal some of its strategic decisions, such as the general audiences to which the RNC targets certain communications. And obviously, information that

shows which email campaigns attracted more attention, and which attracted less, has some strategic value." (*Id.*) On balance, the Court found that any associational harm from the release of this data was too "logically attenuated" and "speculative" to defeat the interest of the Select Committee. (*Id.*)

The RNC respectfully disagrees that the harm of disclosure is speculative or attenuated here. The Supplemental Declaration of Christian Schaeffer, filed in light of the Congressional Defendants' attempts to walk-back some of the Subpoena's broad demands, detailed that there are, at most, "three employees at the RNC with global access to the Salesforce platforms that would allow them to access all the information demanded by the Salesforce Subpoena." (Pl's Reply in Support of Memo, Decl. of C. Schaeffer ("Schaeffer Suppl. Decl."), Ex. A, at 4.) This raises a question: if the harm from the disclosure of this information is speculative, why does the RNC go to such lengths to protect it? In the end, the RNC deserves the opportunity to test the Court's decision regarding the importance of the information unquestionably demanded—and its weight versus the interests of the Select Committee—on appeal. This is only possible if the Court enters an injunction pending appeal.

### B.     Other issues are primed for appellate review and warrant reversal.

***Crediting the Congressional Defendants' post hoc narrowing was improper.*** The Court recognized this case would have presented "a much different question" if the Congressional Defendants had not "narrowed" the Subpoena during litigation. (Order at 13; *see also id.* at 17.) The Congressional Defendants' litigation tailoring was an obvious attempt to avoid fatal constitutional problems with the Subpoena. But the remedy for an overbroad congressional subpoena is to strike the subpoena—as opposed to letting Congress test the waters and only then walking back overbroad requests upon scrutiny. "[I]f a committee could subpoena information irrelevant to its legislative purpose, then the Constitution would in practice impose no real limit on congressional investigations." *Trump v. Mazars USA, LLP*, 940 F.3d 710, 740–41 (D.C. Cir. 2019), *vacated and remanded*, 140 S. Ct. 2019 (2020). The Supreme Court has described this as "a jurisdictional concept of pertinency." *Id.* (quoting *Watkins v. United States*, 354 U.S. 178, 206

(1957)). And, when a congressional committee exceeds its jurisdiction—like the Select

Committee did here—it no "longer acts as a competent tribunal," *United States v. Cross*, 170 F.

Supp. 303, 306 (D.D.C 1959), and any extra-jurisdictional act is void.

   ***The Select Committee composition violates H.R. Res. 503 ("H. Res. 503").*** H. Res. 503

unambiguously instructs:

> (a) APPOINTMENT OF MEMBERS.—The Speaker ***shall*** appoint 13 Members to the
> Select Committee, 5 of whom ***shall*** be appointed after consultation with the
> minority leader.

§ 2(a) (emphasis added). To be sure, the Court did not answer what *shall* means in subsection

2(a). Instead, the Court leaned on what it described as the "semantic mess" around the term *shall*

and deferred to Congress's one-off treatment of the subsection. (Order at 30; *see also* Antonin

Scalia & Bryan Garner, Reading Law 113 (2012) ("*Shall*, in short, is a semantic mess.")

   That said, simply because *shall* may be semantically challenged in ***some*** uses does not

mean it is by definition problematic in subsection 2(a). Of course, it is not the rule that the use of

*shall* always lead to ambiguity. Nevertheless, what matters here is that reasonable minds could

disagree with the Court on the use of *shall* in subsection2(a)—namely, that it requires appoint of

13 members. (*See id.* (describing the RNC's reading as "not an unreasonable position").) In fact,

*Reading Law*—presumably the source of the Court's semantic-mess reference—clarifies that

"when the word *shall* can reasonably be read as mandatory, it ought to be so read." Reading

Law, *supra*, at 114. And *Reading Law* describes the sentence structure utilized by subsection

2(a) as a "correct" use of the ***mandatory*** term. *Compare id.* at 113 (Exemplar: "Each party *shall*

bear its own expenses. []The grammatical subject is charged with the duty imparted by the very

phrase *shall bear* … . The usage is [therefore] correct."[]), *with* H. Res. 503, § 2(a) (The

grammatical subject (Speaker) is charged with the duty imparted by the phrase *shall appoint*).

   ***The Subpoena violates the Fourth Amendment.*** The Court found that the Subpoena's

breadth and lack of safeguards (like a taint team) to protect the RNC's sensitive information did

not violate the Fourth Amendment. (Order at 49 –50.) The Court's analysis that the lack of any

safeguards need not affect its analysis of the Subpoena's Fourth Amendment reasonableness largely turned on its conclusion that, unlike in *Senate Select Committee on Ethics v. Packwood*, 845 F. Supp. 17, 20–21 (D.D.C. 1994), "no such similarly sensitive personal—and potentially irrelevant—information is at issue here." (Order at 50 n.15.) Respectfully, this analysis appears influenced by the Court's determination of the nature of the potential harm to the RNC under the First Amendment. If the Court is incorrect in that analysis, the information at issue is certainly "personal" to the RNC. Moreover, it is undisputed that this information will include data relating to irrelevant material like the RNC's "holiday greeting" communications. (*Id.* at 17, 37.)

   ***The Subpoena was not issued in service of a valid legislative purpose.*** "[A] congressional subpoena is valid ***only if*** it is 'related to, and in furtherance of, a legitimate task of the Congress.'" *Mazars*, 140 S. Ct. at 2031 (quoting *Watkins*, 354 U.S. at 187) (emphasis added). True, this Court in *Trump v. Thompson* concluded the Select Committee generally has a valid legislative purpose, 20 4th 10, 19 (D.C. Cir. 2022), but the Subpoena must still be in service of that purpose. The record, media accounts, and social media statements by some of the Congressional Defendants leave little doubt that the Select Committee's purpose was not legislative. This Court concluded that the extraordinary statements of Select Committee members claiming a non-legislative purpose for their investigation could not impeach the Committee's legislative purpose. (Order at 36.) But even here, the Court acknowledged that it is "perhaps a reasonable conclusion to draw" that the "subpoena is serving an additional illegitimate, quasi-law-enforcement purpose." (*Id.*) While there is a "high bar" to challenging the regularity of a Select Committee's legislative purpose, given the peculiar nature of this case and the partisan aims—acknowledged by the Court—which may taint the Committee's particular request here, the RNC should have the opportunity to test the Court's analysis before a higher court.

**CONCLUSION**

Based on the foregoing, the RNC respectfully requests that the Court grant the RNC's motion for injunction pending appeal. In the alternative, the RNC asks the Court to extend the current administrative injunction until 48 hours after resolution of this motion to allow the RNC to seek relief from the D.C. Circuit. Like the current administrative injunction, the RNC requests that the extended administrative injunction remain in place until the D.C. Circuit resolves the RNC's motion for injunction pending appeal

Respectfully submitted this 4th day of May, 2022.

STATECRAFT PLLC

By:    *s/ Christopher O. Murray*
       Christopher O. Murray
       1263 Washington Street
       Denver, CO 80203
       Tel:  602.362.0034
       Email:  chris@statecraftlaw.com

*Attorney for Plaintiff Republican National Committee*

**CERTIFICATE OF SERVICE**

I certify that on May 4, 2022, I filed **Memorandum of Points and Authorities in Support of Plaintiff's Motion for Injunction Pending Appeal** via the CM/ECF system for the U.S. District Court for the District of Columbia, which will cause a copy to be served on all registered parties.

_s/ Christopher O. Murray_
Christopher O. Murray